## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

BETCO CORPORATION,

                              Plaintiff,

      v.

MALCOLM D. PEACOCK, MARILYN
PEACOCK, B. HOLDINGS, INC. and
E. HOLDINGS, LLC,

                      Defendants.

OPINION & ORDER

14-cv-193-wmc

---

In 2010, plaintiff Betco Corporation purchased the assets of defendants B. Holdings, Inc. and E. Holdings, LLC. Some months after the purchase, Betco allegedly discovered for the first time that the sole shareholders/members of the two corporate defendants, individual defendants Malcolm and Marilyn Peacock, had misrepresented the quality and capabilities of those assets. In April of 2012, Betco brought this lawsuit in the Northern District of Ohio alleging claims for fraud and breach of contract. That case came within months of trial before it was suddenly transferred to this court in March of 2014. Shortly afterward, defendants filed a motion to alter the schedule in light of Betco's numerous discovery violations in the Ohio action. Ultimately, the court declined to impose the sanctions that defendants requested but did order the parties to finish briefing defendants' long-dormant summary judgment motion (dkt. #63), which defendants had timely filed in Ohio but which the Ohio court then stayed. For reasons explained more fully below, the court will now grant in part and deny in part defendants' motion for summary judgment.

PRELIMINARY OBJECTIONS

In opposition to defendants' motion, Betco submitted its own proposed findings of fact. Defendants responded with myriad objections to those proposed findings, only some of which are well taken. Although difficult to address in the abstract, the court will *briefly* review defendants' most common objections before setting forth the undisputed facts in hope of setting some parameters and providing guidance to others who may be providing less than helpful objections.

*First*, defendants frequently purport to object that the testimony Betco offers is inadmissible as "self-serving." On the contrary, a self-serving affidavit "is an acceptable method for a non-moving party to present evidence of disputed material facts," provided that "the evidence meets the usual requirements for evidence presented on summary judgment -- including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Perhaps these latter, specific requirements are what defendants claim is missing from Betco's proposed findings of fact, but providing only a generic objection is too vague.

*Second*, defendants object that many of Betco's proposed findings of fact are "bald assertions" that carry no weight on summary judgment. To the extent this assertion accurately describes a proposed finding, defendants' objection is well taken. *See Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (quoting *Hadley v. Cnty. of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983)) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter

asserted.")  Contrary to defendants' own "bald assertion," however, some of the proposed findings to which defendants object constitute specific, concrete facts.  (*See, e.g.*, Defs.' Resp. PPFOF (dkt. #124) ¶ 15.)  So long as these proposed findings of fact are supported by admissible evidence -- *e.g.*, by affidavit based on personal knowledge -- the court overrules defendants' objection.

*Third*, defendants object that some of the facts Betco proposes are based on Betco's own answers to interrogatories.  This seems a reasonable objection as a general matter, since out-of-court statements are inadmissible hearsay when offered by the party who made them, but the Seventh Circuit recognizes an exception to that rule for well-crafted discovery responses.  For example, in *Johnson v. Holder*, 700 F.3d 979 (7th Cir. 2012), the Seventh Circuit held that "a district court 'may consider answers to interrogatories when reviewing a motion for summary judgment so long as the content of those interrogatories would be admissible at trial.'"  *Id.* at 982 (quoting *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008)).  In both *Johnson* and *Hardrick*, however, the interrogatories were answered by an *individual* party, who was, therefore, answering personally "under oath."  Fed. R. Civ. P. 33(b)(1)(A), (3).  In contrast, the responses Betco wishes to offer, while also made under oath consistent with Rule 33(b)(3), were made on behalf of Betco as a company, as Rule 33(b)(1)(B) contemplates and as their carefully crafted, paragraph-long subscription notice emphasizes.

Although it is unclear how well the rationale of *Johnson* and *Hardrick* applies to cases where the answering party is a company, for the present, the court will give Betco the benefit of the doubt and look to the potential admissibility of the interrogatory responses' contents. Here, the interrogatories upon which Betco relies were apparently answered by

3

Tony Lyons, Betco's Chief Financial Officer and Senior Vice President, and Denise Lennard, Betco's Senior Vice President of Operations and Human Resources. (*See* Br. Ex. 2 (dkt. #48-2) ECF 18.)   To the extent that Betco's support for its proposed facts is an interrogatory response containing information to which Lyons or Lennard would likely be capable of testifying at trial, the court has considered those facts in resolving the motion for summary judgment. *See Johnson*, 700 F.3d at 982.   However, to the extent that Lyons and Lennard could *not* obviously offer admissible testimony, the facts will be disregarded.[1]

*Fourth*, defendants object that some of Betco's facts rely solely on affidavits submitted in 2014, long after the discovery cutoff.   In its previous opinion, the court instructed Betco to rely only on timely-produced liability evidence or, in the alternative, to explain why the untimeliness was substantially justified. (Oct. 20, 2014 Opinion & Order (dkt. #99) 14.)   Still, defendants' generic objection is problematic, because the mere fact that support is contained in a post-discovery affidavit does *not* mean the information contained in it was necessarily:   (1) subject to past discovery and (2) not previously disclosed.   Since neither party offers additional guidance on these points, the court will exclude evidence to which defendants offered this objection if it appears not to have been timely-produced and Betco has provided no justification, consistent with the court's previous opinion.

---

[1] As a matter of practice, however, this court would strongly encourage parties *not* to rely on statements made in their interrogatory responses as factual support on summary judgment, especially where, as here, multiple individuals are attesting to answers generally for which none or only some may have personal knowledge.   Not only would such "group" testimony be inadmissible at trial, the court is under no obligation to hunt among the possible speakers for someone who *may* have the necessary knowledge.

UNDISPUTED FACTS[2]

## I.  The Parties

Plaintiff Betco, a corporation with its principal place of business in Toledo, Ohio, primarily manufactures cleaning chemicals and cleaning equipment.  It has been owned by the Betz family for 63 years and employs approximately 300 people.  As of about 1987, Betco had between $11 million and $13 million in sales.  By 2012, Betco's sales had grown to over $100 million.

Paul Betz has been Betco's president and CEO since 1985.   Denise Lennard is Betco's Senior Vice President of Operations and Human Resources.   Betco's controller, Senior Vice President and Chief Financial Officer, Anthony Lyons, was hired in 1987 and has served as the CFO for about 21 years.  Kurt Bischoff is Betco's vice president of research and development.  He started with Betco in 1997 as a senior chemist but began work in his current capacity about nine years ago.  Keith Kennedy, who began working for Bio-Ohio[3] in October of 2012, is the *de facto* general manager of Bio-Ohio; Derek Loverich is the plant manager at the Beloit plant; and Neil Seeger is the technical manager at the Beloit plant.

Defendants Malcolm and Marilyn Peacock reside in Beloit, Wisconsin, and are the only two members of defendant E. Holdings, LLC, an Illinois limited liability company formerly known as Enviro-Zyme International, LLC ("EZI"), and defendant B. Holdings, Inc., an Illinois corporation formerly known as Bio-Systems Corporation with its principal place of business in Beloit, Wisconsin ("BSC").

---

[2] Consistent with its rulings above, the court finds the following facts, taken from the parties' submissions, to be material and undisputed unless otherwise noted.

[3] "Bio-Ohio" is the name of Betco's wholly-owned subsidiary, which now owns most of the assets purchased from E. Holdings, LLC and B. Holdings, Inc.

At the time relevant to this lawsuit, EZI and BSC (collectively, "Bio-Systems") were in the business of producing waste-degradation and odor-control products. The Peacocks were the owners, operators and managers of EZI and BSC, and Malcolm was in charge of their affairs at least until the assets of those companies were sold in September of 2010.

## II. Purchase of Bio-Systems' Assets

### A. Background

During Betz's tenure as CEO, Betco has purchased four other businesses. In the transaction relevant to this case, Betco purchased certain assets of BSC and EZI. The assets consisted principally of production equipment and related items located in commercial buildings in Beloit, Wisconsin. The Beloit plant produces various solid, liquid and powder products that use bacteria as the primary active ingredient, including bacteria like *Pseudomonas* and the spore-forming *Bacillus*.[4] The strength of the Beloit products is measured in terms of bacteria "count" of "Colony Forming Units" or "CFUs."

Successfully growing various forms of bacteria has an inherent complexity, requiring control over numerous variables. For example, bacteria from the *Bacillus* genus can transform into the hardy and inert "spore" form, a process known as "sporulation," which is a defensive measure usually triggered by an unfavorable condition. When not in spore form, *Bacillus* bacteria are in the "vegetative" state. If bacteria are not in spore form when placed in a product, the number of bacteria decreases over time. Contamination can also be harmful to the process of growing bacteria, because contaminants can outcompete the bacteria by using the same required nutrients or by producing a toxin.

---

[4] While defendants object to these facts and others that follow, they are undisputed for purposes of the record before the court on summary judgment. (*See* Defs.' Resp. PPFOF (dkt. #124) ¶¶ 13-14.)

Steven Royko owns and operates a consulting firm called Royko Enterprises, which primarily represents companies looking to sell their businesses.  Apparently, Royko also manages Cornerstone Business Services, Inc. ("Cornerstone"), a mergers-and-acquisitions advisory firm.  At some point, defendants, who were looking either to sell Bio-Systems and its assets or to locate an investor, engaged Royko to represent them.

### B. Offer of Sale

On or around May of 2010, Royko cold-called Betco and eventually connected with a company executive.  On his clients' behalf, Royko inquired whether Betco was interested in purchasing Bio-Systems.  Royko subsequently e-mailed an overview of Bio-Systems, as well as a Confidentiality Agreement, to Lennard, which she in turn forwarded to Lyons and Betz.  Lyons signed the Confidentiality Agreement, which governed information regarding the purchase of Bio-Systems.  While Betco contends that this agreement restricted its ability to investigate representations made by Bio-Systems and its agents, it points to no admissible evidence to support that contention and cites no particular provision(s) of the Confidentiality Agreement itself.  (*See* Pl.'s Resp. DPFOF (dkt. #124) ¶ 37.)

Either defendants or their agents then provided Betco with information regarding BSC and EZI, including but not limited to a "Confidential Business Review," or "CBR." (Albert J. Bianchi Decl. Ex. V (dkt. #63-25) [hereinafter CBR].)  Malcolm Peacock also supplied Royko with the information contained in the CBR.  Further, Royko discussed all the representations in the CBR with Peacock.

The CBR contained numerous express representations as to the operations, profitability and other aspects of BSC and EZI, including that:

- They were "operating at approximately 50% capacity on one shift." (*Id.* at Betco-00538.)

- Bio-Systems could "increase output for its products from four to eight times by adding a second shift." (*Id.* at Betco-00539.)

- The company had "world-class production and service processes." (*Id.*)

- The company "follows detailed production processes to ensure quality, accuracy and product safety." (*Id.* at Betco-00527.)

- Bio-Systems "estimate[d] that the current facilities [could] support a significant increase in production, revenues and profits." (*Id.* at Betco-00528.)

- Bio-Systems estimated that the facilities could produce "Powder products at the rate of 90,000 lbs of 5 billion count every ten days." (*Id.*)

- Bio-Systems estimated that its facilities could support "Liquid production at 500 gals of 2 billion count every two days." (*Id.*)[5]

On the other hand, the CBR also included a cautionary note with respect to the plant's potential capacity. It read in part that the nature of the business and the method of growing the bacteria "add[] a significant amount of variability to the potential capacity. As a result, the reader should be aware that the projections for additional capacity are high-level estimates. In practice, the actual outputs will vary both above and below the projected amounts." It further stated that the graphs representing the capacity were meant "simply to

---

[5] Betco offered only general citations to the CBR in its entirety in its proposed findings of fact, rather than citing to individual pages on which the particular representations were made. Rather than declining to consider any of the specific representations Betco alleges, however, the court has endeavored to identify the points in the CBR that make representations comparable to those listed in the proposed findings of fact.

offer a way of visualizing BIO-SYSTEMS' estimate of potential increase in manufacturing capacity that exists at the current facilities."

### C. Due Diligence

Betco personnel principally involved in the purchase process included Lennard, Lyons, Betz and Bischoff.  According to Betco, defendants refused to divulge the identities of their customers, although defendants object to this as a conclusory assertion and point out that Betz testified Betco *did* know who some of defendants' customers were.  (Betz Dep. (dkt. #63-6) 77:22-23.)

On July 26, 2010, before the purchase took place, Betz e-mailed his management team with observations and questions regarding the potential deal.  In that e-mail, he raised concerns about Bio-Systems' technology, because it was "not core to Betco."  On August 2, Bischoff e-mailed Betz and Lyons.  Among other things, Bischoff noted that he would like to obtain "[t]he name of a qualified 3rd party that can validate the technology at Biosystems," as well as "[w]hat Biosystems currently does to insure that only the desired cultures are present and verify that no pathogenic bacteria are present in finished goods." (*See* Third Decl. of Albert Bianchi, Jr. Ex. G (dkt. #63-10).)

Following a telephone conversation with Malcolm Peacock and others on August 3, Lyons e-mailed Betco's management team with answers to some of the questions Betco had about Bio-Systems.  Lyons noted in the e-mail that according to Malcolm, bacteria had not grown at the Beloit plant every July for the past fifteen to twenty years, which caused inventory problems for Bio-Systems.  Betco was also informed that in growing bacteria at the Beloit plant, "[y]ields are never consistent."

9

Betco's formal due diligence included site visits, conversations with BSC and EZI personnel, examination of financial information and requests for information.[6]   While Bischoff was put in charge of Betco's due diligence review of all the technical and scientific aspects of Bio-Systems, Betco employed Dr. Barry King as an expert consultant regarding Bio-Systems' bio-remediation processes, because Bischoff did not fully understand some of Bio-Systems' technology and processes.  For example, Bischoff did not fully understand Bio-Systems' "wet batch process involving the use of liquid onto dry grains in order to increase population and increase yields."  Bischoff also wanted Dr. King to help confirm whether Bio-Systems' technology was current.

Initially, Bischoff visited and inspected the Beloit plant and then e-mailed Dr. King questions.  Dr. King confirmed Bischoff's belief that the valuable technical property Betco was purchasing consisted of a "unique combination of various microorganisms to produce a desired effect."  Eventually, Betz agreed to place Dr. King on retainer to inspect the Beloit plant, concluding that the $2,000 fee was a "small price to pay for some peace of mind."

Accordingly, on August 24, 2010, Betco and Dr. King entered into a consulting agreement.  Bischoff then created a list of questions for Dr. King regarding the Beloit plant and Bio-Systems' processes, introducing the list as follows:

> We need to do our due diligence to insure that the technology is correct and will remain current[,] which is where an expert such [as] you can assist.

Although Betco intended to ensure that Bio-Systems' technology was current as part of its pre-purchase due diligence, Dr. King was never actually directed to inspect the Beloit plant

---

[6] Betco's proposed finding of fact also states that its due diligence was "commercially reasonable." The court agrees with defendants that this is a legal question, not a factual one.  However, defendants do not object to Betco's description of the specific due diligence activities in which it engaged, and so those facts are undisputed for summary judgment purposes.

or Bio-Systems' technology.  Later, Bischoff could not explain why this was so,[7] although Betz testified that Malcolm Peacock would not permit Betco to bring in a consultant.  (*See* Betz Dep. (dkt. #63-6) 56:22-57:3.)

During the due diligence process, Malcolm Peacock apparently represented to Betco that defendants' products were as advertised on his literature and specification sheets.  He also told Betco that the wet-batch process, about which he was generally secretive, gave the business an advantage, and confirmed when asked that the plant had significant excess capacity.  After Betco located Dr. King, it further consulted with Malcolm Peacock, who alleviated Betco's concerns.

In general, Betco believed it had received true and accurate information from defendants and placed its trust in Malcolm Peacock.  It also interpreted the fact that BSC and EZI had happy customers as a sign there was nothing wrong with the Beloit plant and its products.[8]  Moreover, nothing in the financial statements or underlying documents defendants produced suggested that Bio-Systems' products did not meet specification.

Finally, the parties agree that in 2010, depending on the product being manufactured, the Beloit plant *could*, in fact, support a significant increase of production, revenues and profits with respect to individual products.  More specifically, it was possible for the Beloit plant to produce 90,000 pounds of powder product at five billion bacteria count strength every ten days, and liquid product at a rate of 500 gallons at two billion count every two days, as contemplated in the CBR.  It was also true that defendants

---

[7] Two years later, in April of 2012, Bischoff reached out to Dr. King about evaluating the Beloit plant, admitting Betco had made a mistake by not having him evaluate the plant pre-purchase.

[8] For example, Terry Maier, a current customer of Bio-Systems, was also a customer when the Peacocks owned Bio-Systems.  He made several visits to the Beloit plant during that time and found the facility "impressive."

maintained an ISO manual that contained procedures for its employees to follow, including procedures for employees working in production.

### D. The Asset Purchase Agreement

Ultimately, Betco did decide to purchase Bio-Systems, largely because of its profitability. On September 29, 2010, Betz, along with Malcolm and Marilyn Peacock, signed an Asset Purchase Agreement on behalf of Betco and Bio-Systems, respectively. The closing took place the same day.

Under the terms of the Asset Purchase Agreement, Betco agreed to pay $5.5 million, with $5 million to be paid on the closing date and $500,000 held in escrow in the form of a promissory note.[9]   In return, Betco received the production equipment and assets located in the Beloit plant.

The money in escrow was to be used as necessary for Betco's indemnification in accordance with the terms of the Asset Purchase Agreement. If not paid out sooner for those purposes, the note was to be paid out in full by September 29, 2012. Betco requested the holdback provision as a means of ensuring it had time to identify and be indemnified from the escrow account for any problems with its purchase if not satisfactorily addressed. The parties agree that Betco paid out the escrow money to Malcolm Peacock by September of 2011, completing the terms of the Asset Purchase Agreement.[10]

---

[9] Betco calculated the purchase price by using a "multiple" of 4.8 times the enterprise's "Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization."

[10] Although the parties dispute the extent of Malcolm Peacock's involvement, he remained employed by Bio-Ohio in some capacity after the closing. Betco contends that he was employed as President, while Malcolm Peacock testified that his role was "confusing" and that he was told to focus on sales and marketing. Betco proposes a number of facts regarding Malcolm Peacock's allegedly secretive and overbearing management style, but relies only on its own answers to interrogatories as support.

12

### III. Post-Closing Alleged Problems with the Beloit Plant

Betco acknowledges that Bio-Systems makes many products, all of which work, and that it is a solid company with a good future. Betco further acknowledges that Bio-Systems has value as a company, due to the variety of good products it produces. In fact, Bio-Systems' net worth has been continually increasing since Betco's purchase of its assets, because Bio-Systems has made money every years since the purchase.

In March of 2011, however, Betco first became aware of alleged issues with products produced at the Beloit plant, although Kurt Bischoff testified the full "scope of the problem" was not known at that time. Specifically, Betco learned that some products had bacteria counts that were lower than the products' specifications.[11]

To learn more about the problem, Betco employees Joe Provolish, John Henson, Brett Hanus and Bischoff visited the Beloit plant in mid-March and spoke with various employees there, including Derek Loverich and Neil Seeger. Loverich and Seeger told Betco personnel that: (1) the Beloit plant's boiler capacity was insufficient; and (2) product bacteria counts were "consistently too low due to inadequate fermentation equipment capability." Seeger raised additional concerns with Bischoff as well, including: (3) a question as to whether the Beloit plant's smaller fermenters were real fermenters; (4) issues

---

There is also no suggestion that the signators averring to those answers, Lyons and Lennard, had personal knowledge of those facts (indeed, it does not appear either actually worked at the Beloit plant), so those answers will not be considered for summary judgment.

[11] Betco also maintains that Malcolm Peacock "concealed" other problems at the plant, including underpowered boilers, insufficient production and chronic contamination in the six small fermenters, incorrect piping and contamination in the large fermenter, chronic contamination in the wet-batch process, and a chronic inability to produce product to specification. (Defs.' Resp. PPFOF (dkt. #124) ¶ 96.) To support this proposed fact, however, plaintiff cites only to the deposition testimony of Beloit plant employee Mindy Walters and, again, Betco's own answers to interrogatories. The cited portion of Walters' deposition refers *only* to unknown products that were shipped below specification and there is no indication that Lyons or Lennard had personal knowledge that Malcolm Peacock concealed any of these other listed problems.

with sending out contaminated products; and (5) issues with sending out products with low bacteria counts.  Seeger also advised that there were at least a few times when product was "under spec" but Malcolm Peacock instructed him to ship it anyway, although Seeger did not identify any specific products and could remember neither what the count was supposed to be nor who any of the customers were.  (*See* Neil Seeger Dep. (dkt. #115) 54:9-55:4.)[12]

After the Beloit visit, Betco established seven follow-up actions to take.  These included a plan to have a "lab evaluate [the] issue of out of spec finished products – colony counts are consistently too low but product is shipped anyway."  At the time, however, no one from Betco raised the issue of low bacteria count with Malcolm Peacock.  Indeed, when Malcolm Peacock met with Betco personnel in Toledo in April of 2011, Betco did not raise the issue of low bacteria count, even though the parties agree that various unidentified "concerns" were raised.  Lyons later testified that *all* the issues from the visit notes, including low bacteria count, should have been raised with Malcolm Peacock.  More generally, Lyons conceded that Betco should have brought any breach of warranty or misrepresentation claims to Malcolm Peacock's attention within one year of purchase.

Malcolm Peacock began to transition his job responsibilities to others in November of 2011.  Lennard monitored and assisted Bio-Ohio on Betco's behalf during the transition period, including by overseeing human resources and operations.  The transition was complete in the spring of 2012, when Malcolm Peacock's responsibilities were divided and

---

[12] Loverich also confirmed that before the purchase took place in the fall of 2010, he was sometimes instructed to produce product even though it would not meet specifications.  He did not know, however, whether Malcolm Peacock had obtained permission to ship the product at lower specifications.

14

transferred to various other individuals, and Bio-Ohio's management underwent various reorganizations.

Betco contends that it was only at the beginning of this transition period, well after Malcolm Peacock had received the $500,000 from escrow in September of 2011, that defendants' "misrepresentations began to emerge," but Betco offers only a series of conclusory statements as support for its allegations that defendants had engaged in patterns of deception that tainted the sale. (*See* Defs.' Resp. PPFOF (dkt. #124) ¶¶ 84-88.)

Still, in March of 2012, Seeger did provide Betco with a detailed explanation of what he believed to be various issues with Bio-Systems' products and operations. Specifically, he raised a concern about meeting specifications for powder products, because customers were checking product label claims for actual microbial counts. He also did not believe Bio-Systems could meet the powder product specifications using the methods employed at the Beloit plant at the time, and proposed as a solution that they change Bio-Systems' product specifications. Seeger also testified that the "wet batch" process used at the Beloit plant did not actually work and that the six small fermenters in the Beloit plant are "not true fermenters," although defendants object to that testimony as expert testimony from a lay witness. (*See* Defs.' Resp. PPFOF (dkt. #124) ¶¶ 110-112, 118.) According to Keith Kennedy, the Beloit plant can only produce between 10 and 20% of the bacteria needed, although defendants object that his methods of calculating what the plant *can* produce are undisclosed and thus unreliable. (*Id.* at ¶ 121.)

By July 27, Betco had received at least seven written evaluations of Bio-Systems' products and operations from LexaMed, a technical company that offers laboratory support and consulting services to the medical device and pharmaceutical industries. According to

Robert Reich, president and consultant for LexaMed, there are numerous faults in the production processes at the Beloit plant that result in contamination and inconsistent yields, which would in turn make it "difficult, utilizing the existing facility, equipment and procedures, for the site to significantly increase production capacity."  (*See* Defs.' Resp. PPFOF (dkt. #124) ¶ 114.)  Defendants again object, stating that nothing in the cited testimony establishes that Reich tested the same processes used at the Beloit plant, but the record makes clear that Reich himself was the LexaMed assessor of the Beloit plant and examined the facility personally.  (*See, e.g.*, Reich Dep. (dkt. #74) 19:8-13 (identifying report Reich authored after visiting Beloit plant); Reich Dep. Ex. A (dkt. #120-1) (report).)

## IV. Litigation

Betco filed this lawsuit in Ohio on April 27, 2012, alleging that defendants made the following intentional misrepresentations in the course of selling Bio-Systems:

- The Beloit plant had significant excess capacity, on the order of 50% or more.

- The Beloit plant's capacity could be easily increased four to eight times by the addition of a second shift.

- The Beloit plant was a state-of-the-art facility, producing world-class levels.

- The Beloit plant's operations incorporated detailed production processes to ensure quality, accuracy and product safety.

- A quality-control technician tested all products to ensure they met specifications.

- All product was manufactured to specifications.

- The Beloit plant could support a significant increase in production, revenues and profits.

- The Beloit plant could produce powder products at the rate of 90,000 pounds of product at a strength of 5 billion colony-forming unit count every ten days.

- No Bio-Systems product had had quality problems in the preceding five years.

Betco also alleged that defendants failed to disclose the following material facts before the sale of Bio-Systems:

- The small fermenters were not true fermenters but were instead jury-rigged apparatuses that could not properly control environmental conditions.

- The Beloit plant had certain quality problems.

- The Beloit plant lacked extra capacity.

- Defendants were willfully blind to problems in the production process.

- Defendants intentionally shipped product to customers, knowing that it did not meet specification.

- Defendants misrepresented the strength of certain shipments of product.

- Defendants engaged in other deceptive practices, including mislabeling products for international shipment and falsifying international shipping documents.

As of Lyons' deposition on August 8, 2013, Betco had yet to calculate damages it claimed to have suffered as a result of these alleged acts of deception.


OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Celotex*, 477 U.S. at 323.

The parties agree that Wisconsin law governs the parties' claims.  (*See* Defs.' Br. Supp. Summ. J. (dkt. #63-1) 3-4; Pl.'s Br. Opp'n (dkt. #102) 10.)  Defendants contend that each of Betco's claims fails, either as a matter of law or based on the undisputed facts. The court addresses each claim in turn.

## I.  Rescission

In Wisconsin, when a party to a contract discovers an alleged fraud, he may either affirm the contract and sue for damages, or he may disaffirm and seek restitution.  *Eklund v. Koenig & Assocs., Inc.*, 153 Wis. 2d 374, 380, 451 N.W.2d 150 (Ct. App. 1989).  However,

"a party may not affirm a contract and later on disaffirm it and ask for rescission." *Beers v. Atlas Assurance Co.*, 231 Wis. 361, 285 N.W. 794, 797 (1939).  Defendants argue that by asserting claims for fraud and breach of contract in its first complaint, Betco cannot now seek to *disaffirm* that same contract.

In support, defendants point to a line of Wisconsin cases applying this rule, beginning with *Beers*.  In that case, the plaintiff initially asserted claims against numerous insurance companies and individuals -- first, to recover for fraud, and later, for breach of contract.  *Id.* at 794.  Later, the plaintiff filed an amended complaint that for the first time sought judgment for rescission of the contract.  *Id.* at 795.  The Wisconsin Supreme Court held that the plaintiff could not bring an action for equitable rescission after having previously sought to recover contract damages:

> It appears from our prior decisions in this same action that in the first and second amended complaints the plaintiff unquestionably attempted to state a cause of action for fraud and deceit, thereby *clearly affirming the contract.*  Now the plaintiff, after having failed to state a cause of action for fraud and deceit, has abandoned that kind of action and attempts to state a cause of action based on a contract asserted to be void for fraud which he has rescinded and which he asks the court to rescind in equity by finding that under all of the circumstances, he is entitled to equitable rescission.  Such procedure not only involved an election of inconsistent remedies but also an election of substantive rights.  Under the circumstances, we think it clear that *the plaintiff is precluded from bringing the present action* which is either one based upon legal rescission or one in equity praying for rescission by the court.

*Id.* at 798 (emphasis added).

In *Schlotthauer v. Krenzelok*, 274 Wis. 1, 79 N.W.2d 76 (1956), the Wisconsin Supreme Court returned to the doctrine articulated in *Beers*:

19

> The reason why a suit at law to recover damages for fraud bars a subsequent suit for rescission is not because there has been an election of inconsistent remedies, but rather that the act of instituting an action at law for damages recognizes the existence of the contract and affirms it.  Once having been so affirmed, the right to rescind is forever lost.

274 Wis. at 5.  In contrast, the court explained that "[t]he commencement of a suit for rescission for fraud involves merely a choice of procedural remedy and effects no change of substantive rights which should preclude the injured party from thereafter abandoning such remedy and affirming the contract by seeking damages for the fraud[.]"  *Id.*

In *Stadler v. Rohm*, 40 Wis. 2d 328, 161 N.W.2d 906 (1968), the Wisconsin Supreme Court reaffirmed the holdings of *Beers* and *Schlotthauer*,[13] but also established a narrow exception.  The plaintiffs in *Stadler* sued after purchasing a hotel.  Among other things, plaintiffs sought "damages for unspecified defects in the motel."  40 Wis. 2d at 331.  Five months later, they amended their complaint to seek rescission based on misrepresentation.  *Id.*  The trial court permitted rescission, but the supreme court reversed under *Beers* and *Schlotthauer*, holding that plaintiffs affirmed the contract by commencing their suit for damages.  *See id.* at 340-41.  The court then remanded "for further proceedings pursuant to [plaintiffs'] original theory of breach of contract."  *Id.* at 341.

Even so, the supreme court noted in *Stadler* that a party "is never bound by the election of a remedy, made in ignorance of substantial facts, which, if known, might proffer an additional suit."  40 Wis. 2d at 336-37 (quoting *Bank of Lodi v. Washburn Elec. Light & Power Co.*, 98 Wis. 547, 550, 74 N.W. 363 (1898)).  In analyzing this exception, the court

---

[13] *See Stadler*, 40 Wis. 2d at 335 ("This court has restricted the application of the doctrine of election of remedies in cases where an action in equity precedes an action at law.  However, where an action at law precedes an action in equity the principle that commencement of the first suit may affirm the contract and preclude the equitable remedy has not been affected.") (footnote omitted).

emphasized the importance of considering "whether 'such ignorance is the result of a failure to resort to reasonable means of knowledge within [the party's] reach.'" *Id.* at 337 (quoting *Thoen v. Harnstrom*, 98 Wis. 231, 233, 73 N.W. 1011 (1898)); *see also, e.g., Gaugert v. Duve*, 217 Wis. 2d 164, 172-75, 579 N.W.2d 746 (Ct. App. 1998) (discussing rule of *Stadler*).

Under the current state of Wisconsin law, Betco's claim for rescission would appear barred.  Indeed, Betco may have tacitly conceded the point by amending its complaint to remove the rescission claim.  (*See* 3d Am. Compl. (dkt. #96).)  Yet, despite that amendment, Betco purports to reserve its right to elect rescission as a remedy in the event it prevails on a claim of misrepresentation.  While this remedy may well be unavailable under Wisconsin law, as described above, the equitable remedy of rescission also does not appear appropriate on the record before this court for a number of reasons.  Given the significant passage of time between the purchase and Betco's attempt to rescind that purchase, to say nothing of the additional passage of time until this court could order actual rescission, restoring both parties to the position they would have occupied had the sale never occurred seems wholly unrealistic.  *See Schnuth v. Harrison*, 44 Wis. 2d 326, 339, 171 N.W.2d 370 (1969) ("The effect of a rescission of a contract is to restore the parties to the position they would have occupied had no contract ever been made.").  Ultimately, however, the court need not (and will not) decide this equitable question until it has a more complete record at the close of evidence on liability.

## II. One-Year Time Bar

Defendants also contend that the text of the Asset Purchase Agreement bars any claims Betco has for negligent misrepresentation, breach of contract and the breach of the duty of good faith and fair dealing.  That agreement states in relevant part:

> 10.05 <u>Limitations on Indemnification.</u>
>
> (a) Notwithstanding any investigation made by or on behalf of any of the parties hereto or the results of any such investigation and notwithstanding the participation of such party in the Closing, other than fraud or intentional misrepresentation, (i) the representations and warranties contained in this Agreement, except for the representations and warranties contained in Sections 4.01, 4.03, 4.04, 4.05, 4.10, 4.11, 5.01 and 5.02, shall survive the Closing for one year from the Closing Date, and (ii) the representations and warranties contained in Sections 4.01, 4.03, 4.04, 4.05, 4.11, 5.01 and 5.02 shall survive indefinitely; <u>provided</u>, <u>however</u>, that notwithstanding any provision in this Agreement or the Seller Related Documents to the contrary, with respect to any specific representation or warranty under which any Buyer Indemnified Party shall have made a claim for indemnification hereunder prior to the expiration date of the applicable survival term specified above and as to which such claim has not been completely and finally resolved prior to such expiration date, such representation or warranty shall survive for the period of time beyond such expiration date sufficient to resolve, completely and finally, the claim relating to such representation or warranty.

(Mot. for Summ. J. Ex. D (dkt. #63-7) Betco-00031-32 [hereinafter "APA"].)

In subsection (e) of the same article, the APA states in relevant part:

> (e) After the Closing, the rights set forth in this Article X shall be each party's sole and exclusive remedies against the other parties hereto for misrepresentations or breaches of covenants contained in this Agreement and the Related Documents. Notwithstanding the foregoing, nothing herein shall prevent any of Indemnified Party (*sic*) from bringing an action based upon allegations of fraud or other intentional breach of an obligation of or with respect to any party in connection with this Agreement and the Related Documents.

22

(*Id.* at Betco-00032.)

The parties appear to agree that this language serves to bar any claims Betco has for breach of the provisions of the APA itself.   (*See* Pl.'s Br. Opp'n (dkt. #102) 15 ("This language may effectively bar claims, other than fraud or intentional misrepresentation, brought against the Peacocks for breach of one of the specific representations or warranties contained in the terms of the APA.").)   Betco nevertheless contends that its claims survive because they are "premised on the covenant of good faith and fair dealing," rather than on the specific provisions of the APA.   (*Id.*)   According to Betco, the implied covenant of good faith and fair dealing is also broad enough to encompass a duty to refrain from making material misrepresentations, meaning the claim for negligent misrepresentation likewise survives the APA's limiting language.

As a preliminary matter, Betco has offered no argument as to how its breach of contract claim, Count Three in the third amended complaint, survives Section 10.05 of the APA.   The claim specifically alleges that defendants breached: (1) the warranty of legal compliance, contained at Section 4.09 (3d Am. Compl. (dkt. #96) ¶ 59); (2) the warranty that all items processed or delivered by defendants conformed to all applicable contractual commitments and express and implied warranties, contained at Section 4.19 (*id.* at ¶ 60); and (3) the warranty that all representations and warranties in Article IV of the APA (including those listed above) were true (*id.* at ¶ 61).   Each of these alleged breaches falls within the scope of the limiting language of the APA as "representations and warranties contained in this agreement," and they do not survive as one of the exceptions enumerated in Section 10.05(a)(ii).   Instead, those warranties survived only one year after the closing date – that is, until September 29, 2011.   Since Betco did not bring this lawsuit until April

23

27, 2012, defendants are entitled to summary judgment on Betco's breach of contract claim.

Betco's other claims are not expressly barred by the language of Section 10.05 of the APA, which limits remedies "for misrepresentations or breaches of covenants *contained in this Agreement and the Related Documents*,"[14] as well as "representations and warranties" that are "*contained in this Agreement*."  (APA at Betco-00031-00032 (emphasis added).)  Based on the plain language of Section 10.05, the one-year time limit applies only to claims arising directly from a breach of, or a misrepresentation within, the APA.  *See Rosplock v. Rosplock*, 217 Wis. 2d 22, 31, 577 N.W.2d 32 (Ct. App. 1998) (court may not rewrite a clear and unambiguous contract).

Betco's remaining claims do not seem to fall within the ambit of this language.  The claim for negligent misrepresentation is premised on the same alleged misrepresentations as the claim for fraud.  (*See* 3d Am. Compl. (dkt. #96) ¶ 52.)  The claim for breach of the covenant of good faith and fair dealing likewise arises from that same general pattern of misrepresentation.  (*Id.* at ¶ 68; *see also* Pl.'s Br. Opp'n (dkt. #102) 16.)  Most importantly, for the most part, those alleged misrepresentations do *not* appear in the APA, but instead were allegedly made (1) in the CBR or (2) directly by Malcolm Peacock.[15]

---

[14] "Related Documents" is defined as including both "Buyer Related Documents" and "Seller Related Documents."  (APA at Betco-00030.)  "Seller Related Documents" is further defined as including "this Agreement, the Disclosure Schedule, the Closing Agreements or any schedules, certificates or other documents delivered or to be delivered by or on behalf of Seller or the Shareholders pursuant to the terms of this Agreement or otherwise referenced or incorporated in this Agreement."  (*Id.* at Betco-00029.)  "Buyer Related Documents" is defined in the same manner, except that it includes any documents delivered by or on behalf of the *buyer*, not the seller.  (*Id.* at Betco-00030.)

[15] A possible exception is Section 4.19, "Product Warranty," which warrants that "Each item processed or delivered by Seller has been in conformity with all applicable contractual commitments and all express and implied warranties, and Seller has no Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand

24

Defendants also point to *no* provision in the APA warranting, for example, that: the Beloit plant had a certain amount of unused capacity; it incorporated careful, detailed production processes during which products were assessed by a quality control technician; the facility was state of the art; the plant could support a four-to-eight-times increase in production; and so on. Nor do the defendants demonstrate that the CBR is a "Related Document," at least as the term is defined in the APA. In particular, defendants point to nothing in the record suggesting that either party delivered the CBR "pursuant to the terms of" the APA, or that the CBR is "otherwise referenced or incorporated" into the APA. Accordingly, the court will not apply the one-year time bar to Betco's claims for negligent misrepresentation or breach of the covenant of good faith and fair dealing at this time.

There is, of course, another response to plaintiff's circumvention of Section 10.05 with respect to alleged misrepresentations not contained in the APA. Specifically, the APA also contains an integration clause in Section 13.08 that purports to "supersede any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way." (APA at Betco-00036.) Curiously, defendants do not argue that this provision precludes plaintiff's remaining misrepresentation claims under Wisconsin law, and this court declines to hold as much without giving plaintiff an opportunity to respond.[16]

---

against any of them giving rise to any Liability) for replacement or repair thereof or other damages in connection therewith[.]" (Mot. for Summ. J. Ex. D (dkt. #63-7) Betco-00017.) Since no party has argued on summary judgment that this covers Malcolm Peacock's alleged representation that all product was manufactured to particular specifications, however, this issue is not currently ripe for consideration.

[16] Of course, even if effective, the integration clause would not necessarily preclude plaintiff's remaining claims for misrepresentation. *Compare Grube v. Daun*, 173 Wis. 2d 30, 59-60, 496 N.W.2d 106 (Ct. App. 1992) ("tort disclaimers in contracts will not be honored unless the

### III. Breach of Duty of Good Faith and Fair Dealing

Defendants also argue that the claim for breach of the duty of good faith and fair dealing fails as a matter of law, because Betco has produced no evidence that defendants violated that duty in the *performance* of the APA.   Rather, they argue Betco's claim is premised entirely on defendants' pre-sale conduct in allegedly misrepresenting the quality of BSC and EZI.   (*See* 3d Am. Compl. (dkt. #96) ¶ 68 (premising claim on "tortious and wrongful conduct set forth above").)

This court has previously recognized that the covenant of good faith and fair dealing "extends only to the performance or enforcement of a contract and not to precontractual negotiations."   *Terranova v. Terranova*, 883 F. Supp. 1273, 1277 n.2 (W.D. Wis. 1995) (dismissing breach of duty of good faith claim based on pre-contract negotiations *sua sponte*); *see also Market St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) ("Before the contract is signed, the parties confront each other with a natural wariness.   Neither expects the other to be particularly forthcoming, and therefore there is no deception when one is not.").   *But see Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 986 (7th Cir. 2003) ("a duty not to defraud other contracting parties arises as part of the duty to bargain in good faith and fair dealing"); *Budgetel Inns, Inc. v. Micros Sys., Inc.*, 8 F. Supp. 2d

---

disclaimer is specific as to the tort it wishes to disclaim"; as-is clause did not bar claims of negligence and misrepresentation), *with Peterson v. Cornerstone Prop. Dev., LLC*, 2006 WI App 132, ¶ 37, 294 Wis. 2d 800, 720 N.W.2d 716 (integration clauses expressly stated that contract was "entire agreement," seller had made "no representations" other than those in contract, and buyer had not relied on any other representation served to disclaim right to rely on any alleged fraudulent misrepresentations); *see also C & M Hardware, LLC v. True Value Co.*, 2013 WI App 84, ¶ 20, 348 Wis. 2d 761, 833 N.W.2d 872 (distinguishing *Peterson* because integration clause did not disclaim liability for misrepresentation); *Gebhardt v. Boshen*, 2010 WI App 100, ¶¶ 51-54, 327 Wis. 2d 799, 788 N.W.2d 384 (discussing *Peterson*).   Nor, obviously, would it bar a claim for breach of the duty of good faith and fair dealing in carrying out the terms of the APA.

1137, 1147 (E.D. Wis. 1998) (noting that a "duty of good faith and fair dealing exists both with respect to the creation and performance of a contract").

The Wisconsin Court of Appeals, too, has indicated that "the general requirement of good faith under [Wis. Stat. § 401.203] applies only to the performance or enforcement of a contract," meaning that "it does not impose a duty of good faith in the negotiation and formation of contracts."[17]  *Hauer v. Union State Bank of Wautoma*, 192 Wis. 2d 576, 596, 532 N.W.2d 456 (Ct. App. 1995); *see also Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 22 n.9, 291 Wis. 2d 393, 717 N.W.2d 58 ("[G]ood faith has nothing to do with contract formation.  It is about the parties' performance in a contract setting.").

Overall, Wisconsin case law does not support an independent claim for breach of the covenant of good faith and fair dealing based on pre-contract activity.  Certainly, this is consistent with cases like *Terranova*, *Market Street Associates*, *Hauer* and *Metropolitan Ventures*. It is also consistent with the fact that Wisconsin, like many other states, does not recognize a separate, non-contractual claim for a breach of the duty of good faith and fair dealing even post-formation.  To the extent *Harley-Davidson* and *Budgetel Inns* recognize a duty of good faith and fair dealing pre-formation, it appears to be no more than the duty that gives rise to claims for intentional and negligent misrepresentation.  Indeed, in both *Harley-Davidson* and *Budgetel Inns*, the courts' recognition of a pre-formation duty of good faith arose specifically in the context of fraud.  *Harley-Davidson*, 319 F.3d at 986 (discussing "duty not to *defraud* other contracting parties" during bargaining); *Budgetel Inns*, 8 F. Supp. 2d at 1147 (discussing fraud in the inducement).   Post-formation, however, "the role of implied

---

[17] That statutory section has since been renumbered, and the covenant of good faith and fair dealing now appears at Wis. Stat. § 401.304.

conditions – and with it the scope and bite of the good-faith doctrine – grows." *Market Street Assocs.*, 941 F.2d at 596.  Thus, following contract formation, a party may bring a specific claim for breach of the duty of good faith and fair dealing that does not depend on intentional or negligent misrepresentation.

Here, the only discernible post-formation misconduct that Betco alleges is a pattern of concealing the alleged deficiencies of the Beloit plant.  (*See* 3d Am. Compl. (dkt. #96) ¶¶ 29-34.)  Given that Betco had just one year to determine and raise problems with that plant and two years to withhold some or all of the $500,000 in escrow to address those problems, a trier of fact might reasonably find that a deliberate practice of concealment would frustrate the substance of the APA, if not its explicit terms.  *See Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 796, 541 N.W.2d 203 (Ct. App. 1995) (noting that "a party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled").

The problem then is not with Betco's theory, but with its failure to present admissible evidence that Malcolm Peacock engaged in this kind of concealment.  Certainly, Betco *proposes* a number of facts related to Malcolm Peacock's secretive management style, but it then relies almost entirely on its own interrogatory responses to support those facts.  As defendants point out, there is no evidence in the record that Lyons and Lennard (the only two people aside from counsel involved in answering the interrogatories) have any personal knowledge about Malcolm Peacock's alleged concealment, other than their general assertions that he was not forthcoming.  (*See* Defs.' Resp. PPFOF (dkt. #124) ¶¶ 84-102, 106.)  Plus, most of the proposed facts also fail due to their conclusory nature.  (*See id.* at ¶¶ 84-88.)  Such bare assertions without supporting evidence cannot create a dispute of fact

at summary judgment.  *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 371 (7th Cir. 2009).

The one exception is Proposed Fact 95, which offers the deposition testimony of various employees *at the Beloit plant* to support the proposition that Malcolm Peacock on one occasion informed them not to speak to Lennard or let her into the building.  This is a slender reed indeed from which to infer that Malcolm Peacock had adopted a deliberate pattern of behavior to conceal the Beloit plant's flaws from the new owners.  *See E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) ("merely a scintilla of evidence" is not enough to meet a party's burden of proof).    Still, Betco has provided other circumstantial evidence, albeit all disputed, that Malcolm Peacock stayed on as President on site at the Beloit plant until the escrowed sum was paid out.  This opportunity and motive for concealment; Malcolm Peacock's alleged general demeanor; and the one specific instance of concealment of which Betco has produced evidence *might* be enough for the trier of fact to reasonably find that Malcolm Peacock breached his duty of good faith and fair dealing.[18] The court thus concludes that while this evidence is insufficient to allow a reasonable trier of fact to find for Betco on its good faith and fair dealing claims against Marilyn Peacock, BSC or EZI, the claim against Malcolm Peacock survives for the present.  Accordingly, defendants are entitled to summary judgment on Betco's claims for breach of the covenant of good faith and fair dealing, except as pled against Malcolm Peacock, on which the court will reserve.

---

[18] Of course, this assumes the duty of good faith extends to Malcolm Peacock individually, which is yet another legal issue not briefed by the parties.

## IV. Evidence of Fraudulent and Negligent Misrepresentation

To succeed on its fraudulent misrepresentation claim, Betco must prove the following five elements:

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205 (quoting *Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA*, 223 Wis. 2d 704, 718-19, 590 N.W.2d 1 (Ct. App. 1998)).   The claim for negligent misrepresentation likewise requires a factual representation that is untrue and upon which the plaintiff relied to his detriment, but requires only that the defendant be *negligent* in making the representation. *Malzewski v. Rapkin*, 2006 WI App 183, ¶ 20, 296 Wis. 2d 98, 723 N.W.2d 156.

A claim for fraudulent misrepresentation can also arise from a *failure* to disclose a material fact. *Kaloti,* 2005 WI 111, ¶ 13.   Before a party can be held liable for a failure to disclose, however, he must be under a duty to disclose.   *Id*.   Ordinarily, "there is no duty to disclose in an arm's-length transaction."   *Id.* at ¶ 15.   The exception to that general rule arises when:

> (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Id.* at ¶ 20.  When those requirements are met, the law treats the failure to disclose a fact "as equivalent to a representation of the nonexistence of the fact."  *Id.* at ¶ 13 (quoting *Hennig v. Ahearn*, 230 Wis. 2d 149, 165, 601 N.W.2d 14 (Ct. App. 1999)).

The principal dispute in the present motion for summary judgment is whether Betco has advanced admissible evidence that defendants actually made any *untrue* representations, whether negligently or intentionally, in inducing Betco to enter into the APA.  Some of the identified "misrepresentations" that Betco pled are apparently true: for instance, the parties agree that the Beloit plant *was* in fact capable of producing 90,000 pounds of powder product at five billion bacteria count strength every ten days and liquid product at a rate of 500 gallons at two billion count every two days.  (*See* Pl.'s Resp. DPFOF (dkt. #124) ¶¶ 69-70.)  Defendants also undisputedly maintained detailed production processes at the Beloit plant.  (*Id.* at ¶ 76.)  And the court can find *no* evidence in the record to suggest that it was untrue that defendants maintained a quality-control technician to inspect products.  Accordingly, defendants are entitled to summary judgment with respect to those alleged misrepresentations.

On the other hand, plaintiff has produced at least *some* evidence that other representations defendants made were misleading.  For instance, the notion that the plant could support a significant increase in production at the time of sale could be false given the opinion of plaintiff's expert Reich, who inspected the plant and assessed its processes in 2012.[19]  Likewise, a reasonable trier of fact could infer that Malcolm Peacock's representations that Bio-Systems' products were "as advertised" on the specification sheets

---

[19] The court disagrees that this is a fact related to "future events," because the challenged representation is that the Beloit plant *as it existed at the time* could support such increases.

and had never had quality-control issues were false in light of the testimony of Loverich and Seeger, who were aware of below-spec products and were instructed to ship them to customers anyway.  Although Betco has by no means produced overwhelming evidence, the court concludes that summary judgment on the misrepresentation claims related to the Beloit plant's production capacity and the quality of its products[20] would be improper on this record.

Defendants also argue that no reasonable trier of fact could find Betco's reliance on Peacock's general representations was justifiable, based on the fact that it failed to follow through with its due diligence by having Dr. King inspect the plant.  However, this, too, presents a fact question, given that Betco *did* perform site visits, conduct conversations with BSC and EZI personnel, examine financial information and submit requests for information. A reasonable trier of fact could find that Betco was justified in relying on the information it obtained from defendants despite its incomplete due diligence, particularly given that BSC and EZI appeared to operate profitably and produce satisfied customers.

Defendants further argue that no reasonable trier of fact could find for Betco on the theory that they fraudulently failed to disclose material facts, because any such omissions took place as part of an arms-length transaction (in which they had no duty to disclose). *Kaloti*, 2005 WI 111, ¶ 15.  Betco does not attempt to respond to this argument, and "[f]ailure to respond to an argument . . . results in waiver."  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).  Accordingly, defendants are entitled to summary judgment on any claims for fraudulent *omissions*.

---

[20] This means that claims remain under ¶¶ 41(a), (b), (c), (f) and (g) of the amended complaint.

32

Finally, defendants contend that no reasonable trier of fact could find Betco suffered monetary damages to a reasonable certainty.   Defendants' original motion based this argument entirely on Betco's tardiness in submitting its required damages disclosures, but the court previously rejected the draconian measure of dismissing nearly all Betco's claims as a discovery sanction.   In their reply, defendants seize on the new damages information provided by Betco and argue that it is still too vague and conclusory for a factfinder to conclude that Betco had suffered damages "to a reasonable certainty."

"It is well-settled that new arguments cannot be made for the first time in reply." *Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989).   "This goes for new facts too." *Id.*   On the other hand, at the time defendants filed their opening brief, they did not yet *have* the damages information that they now contend is too speculative and conclusory to support a verdict.   Still, the court is hesitant to grant summary judgment on these grounds without the benefit of a response from Betco, which has not yet had the opportunity to come forward with all of its damages evidence in response to defendants' contentions. Accordingly, the court will give Betco 21 days to file a response addressing *only* defendants' new argument that Betco's damages evidence is too speculative to permit a trier of fact to find in its favor.   No reply will be allowed unless invited by the court.

Finally, the court previously granted defendants relief from the dispositive motion deadline pending resolution of this summary judgment motion.   Should defendants wish to file an additional motion for summary judgment on the remaining claims in this lawsuit, they may have until March 20, 2015, to do so.   In addition to any other issues they may wish to raise, the court is particularly interested in the parties addressing:

- Whether the integration clause contained in Section 13.08 of the APA precludes consideration of Betco's claims of misrepresentation that remain for trial;

- Whether any of the remaining misrepresentations are not actionable because they are forward-looking, constitute "puffery" or are unreasonably vague; and

- Whether the duty of good faith and fair dealing that arises out of the dealings between Betco, EZI and BSC extends to Malcolm Peacock, individually.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #63) is GRANTED IN PART and DENIED IN PART, consistent with the opinion above.

2. Plaintiff Betco Corporation has until March 20, 2015, to file a response only addressing defendants' newly-raised damages argument.

3. Defendants may file an additional motion for summary judgment on or before March 20, 2015.  Plaintiff may have 14 days to respond; no reply will be allowed unless invited by the court.

Entered this 27th day of February, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge