IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BETCO CORPORATION,

                Plaintiff,                    OPINION & ORDER

    v.

                                             14-cv-193-wmc

MALCOLM D. PEACOCK, MARILYN
PEACOCK, B. HOLDINGS, INC. and
E. HOLDINGS, LLC,

                Defendants.

---

Plaintiff Betco Corporation ("Betco") purchased various assets for the manufacture of so-called bio-degradation products from the defendants B. Holdings, Inc., E. Holdings, LLC and Malcolm and Marilyn Peacock. Some years later, it brought suit in Ohio alleging that defendants had misrepresented the plant's capabilities and the quality of its products. The District Court for the Northern District of Ohio transferred the lawsuit here on February 28, 2014. (Dkts. #71, 72.) This court previously granted summary judgment to defendants on certain of Betco's claims, while allowing Betco to go forward with various claims against all the defendants for tortious misrepresentation and a single claim against Malcolm Peacock for an alleged breach of the covenant of good faith and fair dealing. (Dkt. #128.) Because defendants had originally moved for summary judgment when this case was still in Ohio, and as part of sanctions against plaintiff for its discovery violations (*see* dkt. #99), the court also granted defendants leave to file a second motion for summary judgment. That motion is now fully briefed and before the court for decision. (Dkt. #136.)

For reasons explained below, the court finds that Betco's remaining misrepresentation claims are interwoven with the subject matter of the Asset Purchase

Agreement and, therefore, barred from proceeding by Wisconsin's robust economic loss doctrine.   The court also finds, however, that a trial is still required to determine whether Malcolm Peacock is liable for breach of the covenant of good faith and fair dealing arising out of that same agreement.   Accordingly, the court will deny Betco's motion for summary judgment with respect to that claim only and grant it in all other respects.

## UNDISPUTED FACTS[1]

### I.  Background

Plaintiff Betco is an Ohio limited liability company, whose sole member is also incorporated in that state, and maintains its principal place of business in Toledo, Ohio. Betco's primary business is the manufacture of cleaning chemicals and equipment.   As of 1987, it had between $11 million and $13 million in sales; by 2012, its sales had grown to over $100 million. Paul Betz is Betco's president and CEO and has served in that role since 1985.   Anthony Lyons was originally hired as Betco's controller and has been its Chief Financial Officer for about 22 years.

Defendants Malcolm and Marilyn Peacock reside in Beloit, Wisconsin.   Defendant B. Holdings, Inc., formerly known as Bio-Systems Corporation, is an Illinois corporation with its principal place of business in Beloit.   Defendant E. Holdings, LLC, formerly known as Enviro-Zyme International, LLC, is an Illinois limited liability company; its only two members are Malcolm and Marilyn Peacock.[2]   Bio-Systems Corporation and Enviro-Zyme

---

[1] Unless otherwise noted, the following facts are undisputed.   The court views the parties' summary judgment submissions in the light most favorable to Betco as the non-moving party.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).

[2] The court refers to the Peacocks by their respective first names for the sake of clarity.

International, LLC, are known collectively as "Bio-Systems."[3]  Together, they produced a variety of "bio-degradation" products in liquid and powder forms, all of which contained bacteria designed to degrade various forms of waste.[4]

Before the purchase at issue in this case, Betco had purchased three other businesses, some larger than Bio-Systems.  In fact, Betco viewed its purchase of Bio-Systems as a relatively small acquisition, since the purchase price of $5 million to $6 million would have a relatively minor impact on the consolidated company's financial statement.

## II. The Confidential Business Review

In May or June of 2010, Betco received a Confidential Business Review ("CBR") from a mergers-and-acquisitions advisory firm, Cornerstone, regarding Betco's possible purchase of Bio-Systems.  The first page of the CBR contains a disclaimer stating in part:

> Information contained herein has been obtained from management of [Bio-Systems] and other sources which are deemed reliable, but no representations or warranties are made by the Company or Cornerstone Business Services, Inc. as to the accuracy of such information.   Only those particular representations and warranties, which may be made in a definitive agreement when, and as it is executed, are subject to such limitations and restriction as may be specified in the definitive agreement, shall have any legal effect.

> The Company and Cornerstone Business Services, Inc., expressly disclaim any and all liability for inaccuracy or incompleteness of any information contained herein, or in any other written or oral communication transmitted or made available to interested parties.

An additional disclaimer on the third page of the CBR further states in part:

---

[3] The court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  (*See* Oct. 20, 2014 Opinion & Order (dkt. #99) 2 n.1; 3d Am. Compl. (dkt. #96) ¶¶ 1-5.)
[4] "Biodegradation" products are apparently those that *induce* the breakdown of waste (as distinguished from "biodegradable" products, which are those that are capable of being decomposed).

Information contained hereinbefore has been obtained from sources we believe to be reliable, but we make no representations or warranties, express or implied, as to the accuracy of the information. References to age, square footage and/or financial information may be approximate. Buyer must verify the information and bears all risk of inaccuracies.

The CBR also contains numerous figures. Most relevant for purposes of defendants' summary judgment motion is Figure 10, which is reproduced below.



Figure 10: Powder Production – Bulk Products

By their terms, the "Notes relating to Figures 9-11" also apply to Figure 10 and state in relevant part:

1. The nature of BIO-SYSTEMS' business and how the bacteria is grown adds a significant amount of variability to the potential capacity. As a result, the reader should be aware that the projections for additional capacity are high-level estimates. In practice, the actual outputs will vary both above and below the projected amounts.

2. No units are assigned to the graphs. The purpose is simply to offer a way of visualizing BIO-SYSTEMS' estimate of potential increase in manufacturing capacity that exists at the current facilities. Consequently, Current Output is assigned a "1" and the rest of the scenarios are multiples of Current Output.

The CBR also notes that Bio-Systems offered more than 1700 distinct SKUs.

4

### III. Betco's Due Diligence

On July 26, 2010, Betco's president, Betz, e-mailed observations and questions about Betco's potential purchase of Bio-Systems to his management team, including that Bio-Systems' technology "scares [him] the most as it is not core to Betco." On August 2, Kurt Bischoff, Betco's vice president of research and development and the employee in charge of Betco's due diligence review of the technical aspects of Bio-Systems, e-mailed Betz and Betco's CFO, Lyons, regarding the upcoming visit to the Beloit plant. Among other things, Bischoff noted that he wished to obtain the name of a qualified third party who could validate Bio-Systems' technology, as well as determine what Bio-Systems did to ensure that only desired bacterial cultures were present in finished goods. Lyons spoke with Malcolm Peacock and others on August 3, after which he sent an e-mail that answered some of Betco's questions to Betco's management team. Lyons noted in that e-mail that Malcolm had indicated bacteria was not grown at the Beloit plant for a few weeks each July for the past fifteen to twenty years, which caused inventory problems for Bio-Systems. Betco was also informed that yields were "never consistent" in growing bacteria at the Beloit plant.

As part of Betco's due diligence, Bischoff also contacted Dr. Barry King to act as consulting expert for Betco regarding Bio-Systems' bio-remediation purchases. He wanted to use Dr. King as a resource because he did not fully understand some of Bio-Systems' technology and processes; he also wanted Dr. King to help confirm whether Bio-Systems' technology was current. Betz agreed with Bischoff that Dr. King should be placed on retainer so he would visit and inspect the Beloit plant. Accordingly, on August 24, Betco and Dr. King entered into a consulting agreement. After visiting and inspecting the plant, Bischoff e-mailed Dr. King some specific questions. In the course of exchanging e-mails

with Bischoff, Dr. King confirmed Bischoff's belief that the valuable technical property Betco was acquiring in purchasing Bio-System was "the unique combination of various microorganisms to produce a desired effect."  Even though one of the contemplated steps in Betco's due diligence efforts was to ensure that Bio-Systems' technology was current, however, Betco never had Dr. King inspect the Beloit plant or Bio-Systems' technology.

## IV. The Asset Purchase Agreement

On September 29, 2010, the parties signed an Asset Purchase Agreement ("APA") principally for production equipment and related assets located in Bio-Systems' commercial buildings in Beloit.[5]  Malcolm signed the APA as the President of Bio-Systems Corporation and the Manager of Enviro-Zyme International, LLC.  He also signed the APA twice more, in his capacity as a shareholder of Bio-Systems Corporation and a member of Enviro-Zyme International, LLC.

Betco's decision to purchase these assets was primarily based on Bio-Systems' profitability.  Betco had various attorneys involved in the completion of the APA, who were responsible for, among other things, reviewing the APA's terms and upon whom Betco relief for assistance and advice in proceeding with the purchase.

According to Lyons, Betco relied on Bio-Systems' reporting of Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") to analyze its profitability and value.  (Pl.'s Add'l PFOF (dkt. #141) ¶ 39.)  In particular, Betco relied on information provided by Malcolm and Bio-Systems in arriving at Bio-Systems' EBITDA and certain

---

[5] The APA was formally titled "Asset Purchase Agreement by and between Bio-Systems Corporation an Illinois Corporation, Enviro-Zyme International, LLC an Illinois Limited Liability Company and Betco Corporation, Ltd. an Ohio Limited Liability Company Dated as of September 29, 2010."

assumptions about its future cost structure and capacity for expanded production.  (*Id.* at ¶ 38.)

The APA sets the purchase price at $5.5 million, with $5 million to be paid on the closing date and $500,000 held in escrow in the form of a promissory note.  The escrowed amount was to be used as necessary for the indemnification of Betco in accordance with the terms of the APA.  Unless paid out sooner, the note was to be paid out by September 29, 2012.  Betco requested this holdback provision to give it enough time to identify problems with its purchase and, if necessary, turn to the funds in escrow to address those problems. The escrow money was paid out to Malcolm in September 2011, one year early, completing the terms of the APA.[6]

Article I, Section 1.01 of the APA states in part that Betco was purchasing:

> (a)  All of the equipment, machinery, computers, trucks, other vehicles (except as set forth on Schedule 1.02), fixtures, furnishings and leasehold improvements, owned by Seller, wherever located;
>
> (b)  All personal property leases to which Seller is a party that are used in connection with the business;
>
> (c)  All of Seller's inventories and Seller's interest in and benefits under all orders or contracts for the purchase of inventory entered into in the Ordinary Course of Business, (inventory is to include usable and saleable product and specifically excludes all obsolete, outdated, and slow moving inventory);
>
> . . .

---

[6] In the original motion for summary judgment, it was unclear why Betco agreed to release the funds early.  Plaintiff maintains it released the funds at Malcolm's request and insinuates that it was prompted by Malcolm's concern that he would be unable to conceal the plant's deficiencies much longer.  (*See* Pl.'s Br. Opp'n (dkt. #102) 8.)  Defendants offered little in the way of factual opposition, instead relying primarily on evidentiary problems with plaintiff's suggestion.  (*See* Defs.' Resp. PPFOF (dkt. #124) ¶¶ 69-70.)

(f) All documents and other tangible materials embodying technology or Intellectual Property rights owned by, licensed to or otherwise controlled by Seller, wherever located;

. . .

(h) All Seller's books, records and other documents and information relating to the Assets or the Business including, without limitation, all customer and prospect lists, sales literature, purchase orders and invoices, sales orders and sales order log books, customer information, recipes, formulas, procedural processes, commission records, correspondence, employee payroll and personnel records, product data, material safety data sheets, price lists, product demonstrations, quotes and bids and all catalogs and brochures whether written or any other media;

. . .

(n) All other assets used in connection with the Business whether owned or leased by Seller or otherwise as to which Seller possesses rights to their usage (except for the Excluded Assets).

The APA also contains limitations on the sellers' indemnification obligations in Section 10.05, providing in subsection (a) that:

(a) Notwithstanding any investigation made by or on behalf of any of the parties hereto or the results of any such investigation and notwithstanding the participation of such party in the Closing, other than fraud or intentional misrepresentation, (i) the representations and warranties contained in this Agreement, except for the representations and warranties contained in Sections 4.01, 4.03, 4.04, 4.05, 4.10, 4.11, 5.01 and 5.02, shall survive the Closing for one year from the Closing Date, and (ii) the representations and warranties contained in Sections 4.01, 4.03, 4.04, 4.05, 4.11, 5.01 and 5.02 shall survive indefinitely; provided, however, that notwithstanding any provision in this Agreement or the Seller Related Documents to the contrary, with respect to any specific representation or warranty under which any Buyer Indemnified Party shall have made a claim for indemnification hereunder prior to the expiration date of the applicable survival term specified above and as to which such claim has not been completely and finally resolved prior to such expiration date, such representation or warranty shall survive for

8

the period of time beyond such expiration date sufficient to resolve, completely and finally, the claim relating to such representation or warranty.

Subsection (e) of Section 10.05 further provides that:

> (e) After the Closing, the rights set forth in this Article X shall be each party's sole and exclusive remedies against the other parties hereto for misrepresentations or breaches of covenants contained in this Agreement and the Related Documents. Notwithstanding the foregoing, nothing herein shall prevent any of Indemnified Party (*sic*) from bringing an action based upon allegations of fraud or other intentional breach of an obligation of or with respect to any party in connection with this Agreement and the Related Documents.

Finally, Section 10.06 of the APA, entitled "Remedies of Buyer," states in relevant part that: "The parties hereto understand that Buyer shall first seek recourse against an offset of the Promissory Note and shall only pursue its other remedies against Seller and the Shareholders in the event that the Promissory Note is depleted."

The APA defines "Related Documents" as including both "Buyer Related Documents" and "Seller Related Documents." The "Seller Related Documents" include "this Agreement, the Disclosure Schedule, the Closing Agreements or any schedules, certificates or other documents delivered or to be delivered by or on behalf of Seller or the Shareholders pursuant to the terms of this Agreement or otherwise referenced or incorporated in this Agreement." "Buyer Related Documents" are defined in the same manner, except that they include documents delivered "by or on behalf of" the *Buyer*. The parties apparently dispute whether the CBR qualifies as a "related document" in light of these definitions, although neither party points to any facts suggesting that the CBR fits this definition.

9

The APA also contains a "Product Warranty" that states: "No item processed or delivered by Seller is subject to any guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of sale.  Section 4.19 of the Disclosure Schedule includes copies of the standard terms and conditions of sale for Seller (containing applicable guaranty, warranty, and indemnity provision)."  The APA does not actually contain any Section 4.19 of the Disclosure Schedule, however.

## V. Alleged Misrepresentations

### A. "Wet-Batch" Process

According to Betco, when Malcolm and Marilyn Peacock owned Bio-Systems, Malcolm represented himself to Bio-Systems employees as extremely knowledgeable concerning all aspects of the process involved in the formulation and manufacture of Bio-Systems' products.  (Pl.'s Add'l PFOF (dkt. #141) ¶ 3.)  Allegedly, Malcolm claimed to have developed a secret "wet-batch" process that allowed him to produce products cost-effectively at higher volume and quality than his competitors.  (*Id.* at ¶ 4.)

At the time of acquisition, Betco understood this wet-batch process was used for the manufacture of most of Bio-Systems' powder products.  For some time after acquisition, Bio-Ohio continued to use this process as Betco's wholly-owned subsidiary, which holds the assets purchased from Bio-Systems.  (*Id.* at ¶ 5.)  Betco contends, however, that it has since discovered the wet-batch process is not a viable method for manufacture of the products that BSC has historically produced, at least not at the level required for those products.  (*Id.* at ¶ 33.)

Upon discovery of the deficiencies of the process, Bio-Ohio began using purchased bacteria to supplement those products.  (*Id.* at ¶ 34.)  That solution did not work well, as

10

the purchased bacteria tended to die when added to wet-batch product during the drying process. (*Id.* at ¶ 35.) By the end of April of 2015, Betco allegedly planned to convert its production so as to discontinue use of the wet-batch process and purchase *all* of its bacteria needs. (*Id.* at ¶ 36.)

## B. Bacteria Counts and Labeling

According to Betco, some of Bio-Systems' products featured labels stating the bacteria strains and levels contained in those products. (*Id.* at ¶ 7.) The bacteria were the active ingredient in those bio-degradation products. (*Id.* at ¶ 8.) Those labels included specific representations regarding bacterial strains and the quantity (or "count") of bacteria contained in the product. (*Id.* at ¶ 9.) Some Bio-Systems products were also sold with Certificates of Analysis ("COAs"), which certified that the products had been tested and contained certain bacteria strains and counts. (*Id.* at ¶ 11.)

Betco alleges that Malcolm directed Bio-Systems' testing of products, including by directing the lab manager to use a spiral plater and a ProtoCOL counter for bacteria counting, in lieu of manual counting of bacteria. (*Id.* at ¶¶ 12-14.) "Colony forming units" or "CFUs" are of different sizes for different bacterial strains, and the ProtoCOL counter was not calibrated for any particular strain of bacteria. (*Id.* at ¶ 15.) Betco contends that in discussions with employees, Malcolm would reference "spreader colonies" as a reason not to trust the high count generated by the ProtoCOL counter, suggesting he knew that it inflated bacterial counts. (*Id.* at ¶¶ 16, 26.)

Betco also alleges that Malcolm directed the lab manager to determine "theoretical" counts for some products, which involved testing intermediate product instead of finished

11

product.  (*Id.* at ¶ 17.)  Bacteria counts can change significantly from the intermediate stage to the finished stage.  (*Id.* at ¶ 18.)  According to Betco, some Bio-Systems products were also routinely shipped *before* testing, including those that bore specific bacterial counts on their labels or COAs.  (*Id.*  at ¶ 19.)

Betco further contends that Malcolm directed customer service and sales personnel to prepare the COAs for products requiring them.  (*Id.* at ¶¶ 21-22.)  Sales personnel were not informed, however, whether lab testing was performed for those products or what results were obtained.  Instead, they were instructed to obtain a copy of the most recent COA for a customer, then change the date and slightly alter the count number.  (*Id.* at ¶¶ 23-24.)  Allegedly, under Malcolm's supervision, this process remained in place at Bio-Ohio even after the acquisition.  (*Id.* at ¶ 27.)

Finally, Malcolm allegedly informed Bio-Systems' employees that they should not speak to Betco personnel even after the acquisition.  (*Id.* at ¶ 28.)  Mr. Derek Loverich, the manager of the Beloit plant, believed that if he spoke to Betco personnel about his concerns with the operation of Bio-Systems, he could be fired.  (*Id.* at ¶ 29.)  As an example, in September or October of 2011, a Betco vice president was allegedly meeting with Loverich and a newly-hired microbiologist, Neil Seeger, when Malcolm interrupted their discussions, "demand[ed]" to know why the vice president was speaking to Loverich and Seeger, and ended the meeting.  (*Id.* at ¶¶ 30-31.)

## C. Boilers and Plant Capacity

As noted above, the CBR suggested that the Beloit plant contained significant excess production capacity.  Betco's expert, Mr. Robert Reich, however, opines that "it would be

difficult, utilizing the existing facility, equipment and procedures, for the site to significantly increase production capacity." While Loverich testified during his deposition that production of *some* products could be increased in the Beloit plant, he also provided an affidavit stating that this is an "oversimplification" and that the boilers at the Beloit plant were inadequate to support the production of any products requiring fermentation. (Derek Loverich Aff. (dkt. #143) ¶ 33.) According to Betco, Malcolm actively misled Betco personnel by instructing his employees to tell Betco that new boilers were required to support increased production of a product requested by Betco, rather than simply to support the fermentation process for existing products. (Pl.'s Add'l PFOF (dkt. #141) ¶ 32.) Even after a boiler upgrade was completed in 2012, according to Loverich, the Beloit plant could not produce sufficient bacteria to produce powder products up to specification. (Derek Loverich Aff. (dkt. #143) ¶ 33.)

## VI. Damages

After discovering that Bio-Systems was not able to meet its production requirements, Betco began purchasing outside bacteria at a "modified average monthly cost" of $61,681. (*Id.* at ¶¶ 42-43.) According to Betco, adding this operating expense into its original profitability analysis results in a reduction in value of $3,529,955, meaning that it would have valued Bio-Systems' assets at just $1,970,045, rather than the $5.5 million that it paid. (*Id.* at ¶ 44.) Betco also alleges that after learning the boilers at the Beloit plant were underpowered, it invested $453,740.77 in new equipment, with the majority of that expense going to replacing the boilers. (*Id.* at ¶ 46.)

Despite these claims of overpayment and unexpected costs, Betco recognizes that Bio-Systems makes "a lot of different good products that all work" and that it is "a solid company with a good future." (Pl.'s Resp. DPFOF (dkt. #140) ¶ 50.) Betco has further recognized that although some improvements to the business are needed, Bio-System has many good products and the business has value. (*Id.* at ¶ 51.) Revenues for Bio-Systems of Ohio LLC continue to grow. (*Id.* at ¶ 52.) In fact, Bio-Systems has made money every year, and its net worth has increased since Betco's purchase. (*Id.* at ¶ 53.)[7]

PROCEDURAL HISTORY

Following substantial litigation in the District Court for the Northern District of Ohio, this case was transferred to the Western District of Wisconsin in March of 2014. A detailed history of the Ohio suit appears in this court's opinion of October 20, 2014, and will not be repeated here. (*See* Oct. 20, 2014 Opinion & Order (dkt. #99) 2-7.) Post-transfer, in response to a motion to modify the scheduling order and for sanctions filed by defendants, the court ordered the parties to finish briefing defendants' summary judgment motion originally filed in Ohio, restricting Betco to liability evidence that was timely produced under the Ohio court's schedule. (*Id.* at 14.) It also granted defendants relief from the dispositive motion deadline pending resolution of that summary judgment motion. (*Id.* at 14 n.10.)

After briefing was complete, the court granted in part and denied in part defendants' motion for summary judgment. (Feb. 27, 2015 Opinion & Order (dkt. #128).) Specifically, it granted defendants summary judgment on all of Betco's contract claims,

---

[7] As Betco's wholly owned subsidiary, all expenses and income related to Bio-Ohio are consolidated with Betco's financials. (*Id.* at ¶ 47.) Taxes are calculated and paid accordingly. (*Id.*)

except its claim for the breach of the covenant of good faith and fair dealing against defendant Malcolm Peacock.  (*Id.* at 22-29.)  The court also granted summary judgment on Betco's claims for misrepresentation premised on alleged fraudulent omissions, and held that Betco had produced no evidence that certain alleged affirmative misrepresentations pled in its complaint were *actually* false, including alleged misrepresentations about the plant's ability to produce a certain quantity of powder product and liquid product; the maintenance of detailed production processes; and the maintenance of a quality-control technician.  (*Id.* at 31-32.)

The court further determined, however, that Betco had produced at least some evidence relating to other alleged misrepresentations, including those related to the Beloit plant's production capacity and the quality of its products.  (*Id.* at 31-32.)  In a footnote, it noted that this conclusion meant misrepresentation "claims remain under ¶¶ 41(a), (b), (c), (f) and (g) of the amended complaint."[8]  (*Id.* at 32 n.20.)  The court also reserved on the question of whether Betco could elect to rescind the APA if it successfully proved misrepresentation.[9]

Having pared down Betco's claims, the court established a schedule for the remainder of the case leading up to trial already set on June 15, 2015.  This included granting defendants leave to file an additional motion for summary judgment by March 20, with Betco to respond within fourteen days.  The court also granted leave to Betco to respond to

---

[8]  Betco interprets this court's previous opinion and order as having permitted *all* the misrepresentation claims to survive.  (Pl.'s Br. Opp'n (dkt. #139) 2.)  To the extent that the opinion was unclear, the court now confirms that Betco's claims for intentional and negligent misrepresentation, except for those listed in the text above, did *not* survive summary judgment because Betco failed to present evidence that any of those alleged "misrepresentations" were actually false.

[9]  At the same time, the court noted this relief would appear to be inappropriate on this record, and that Wisconsin law may well foreclose that remedy anyway.  (*Id.* at 18-21.)

one of defendants' arguments on summary judgment -- that the evidence of damages Betco had produced was too speculative and conclusory to support an award of damages -- because that argument was first raised in Betco's brief in reply.  Those additional summary judgment materials are now pending before the court and ripe for decision.

OPINION

## I.  Second Motion for Summary Judgment

In their second motion for summary judgment, defendants principally contend that Wisconsin's economic loss doctrine bars Betco's remaining misrepresentation claims.  The economic loss doctrine is a judicially-created rule that precludes contracting parties from pursuing recovery in tort for "purely economic or commercial losses associated with the contract relationship."  *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 27, 283 Wis. 2d 555, 699 N.W.2d 205 (quoting *Van Lare v. Vogt, Inc.*, 2004 WI 110, ¶ 19, 274 Wis. 2d 631, 683 N.W.2d 46).  "Recovery for 'economic loss' refers to recovery as a result of a product failing in its intended use, . . . or failing to live up to a contracting party's expectations."  *Id.* at ¶ 29 (citing *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 405-06, 573 N.W.2d 842 (1998); *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 24, 270 Wis. 2d 146, 677 N.W.2d 233).  In determining whether the economic loss doctrine applies, "a court must examine the nature of the damages complained of, the risk that caused them to arise and how that risk impacts on the policies underlying the doctrine."  *Prent Corp. v. Martek Holdings, Inc.*, 238 Wis. 2d 777, 789-90, 618 N.W.2d 201 (Ct. App. 2000).

The Wisconsin Supreme Court has described those policies as follows:

> Application of the economic loss doctrine to tort actions between commercial parties is generally based on three policies, none of which is affected by the presence or absence of privity between the parties: (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Daanen & Janssen,* 216 Wis. 2d at 403; *see also Prent,* 238 Wis. 2d at 789.

Betco essentially concedes that the economic loss doctrine bars its claims against the corporate defendants. (*See* Defs.' 2d Mot. Summ. J. (dkt. #136) 2-7; Pl.'s Br. Opp'n (dkt. #139) 8 ("We also recognize that the Court has dismissed the claims against the corporate Defendants that were based on lack of good faith and fair dealing, and that, without that part of the claim against those corporate Defendants, the economic loss doctrine may effectively dispose of the tort claims against them.").) The court agrees. The alleged losses at issue in this suit are purely economic -- that is, they arose because the Beloit plant has failed to live up to Betco's expectations in terms of the quantity and quality of bacteria it can produce. *See Kaloti,* 2005 WI 111, ¶ 29. It is also appropriate to apply the economic loss doctrine in light of the policies articulated in *Daanen & Janssen*: the parties were free to bargain to allocate the risks associated with the Beloit plant's performance, and Betco, as the buyer, was "best situated" to allocate against the risk that the Beloit plant would not perform as desired. *Daanen & Janssen,* 216 Wis. 2d at 403. Indeed, the parties' APA did just that by requiring the sellers to place in escrow a portion of the purchase price and allowing Betco a grace period after purchase to claim it.

Moreover, while Wisconsin has adopted a "narrow fraud in the inducement exception" to the economic loss doctrine, *Kaloti,* 2005 WI 111, ¶ 42, it does not save

Betco's claims against the corporate defendants.  "[A] fraud in the inducement claim is not barred by the economic loss doctrine 'where the fraud is extraneous to, rather than interwoven with, the contract.'"  *Id.* (quoting *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 47, 262 Wis. 2d 32, 662 N.W.2d 652).  "[S]tated another way, the fraud [must] concern[] matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract."  *Id.*  "To further explain, misrepresentations that concern 'the quality or character of the goods sold' . . . are either: (1) expressly dealt with in the contract's terms, or (2) if they are not dealt with explicitly in the contract's terms, they go to reasonable expectations of the parties to the risk of loss in the event the goods purchased did not meet the purchaser's expectations."  *Id.* at ¶ 43 (internal citations omitted).

Here, the misrepresentations of which Betco complains *do* relate to the quality and characteristics of the goods sold -- the ability of the purchased Beloit plant and its assets to produce a certain quantity and quality of bacteria.  "[W]hether a product meets a certain level of performance or a purchaser's expectations is not a matter of societal interest."[10] *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis.2d 305, 321, 592 N.W.2d 201 (1999).  Rather, it is the subject of the parties' contract.  *Id.*  Thus, at least under Wisconsin law, the alleged fraud is "interwoven with" the APA, and the economic loss doctrine's

---

[10] The definition of a product has been expanded under Wisconsin's economic loss doctrine from a "good" covered by the U.C.C. to any contract dispute involving a product or even real property.  *See 1325 N. VanBuren, LLC v. T-3 Grp.*, 2006 WI 94, ¶ 67, 293 Wis.2d 410, 716 N.W.2d 822; *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶25, 283 Wis.2d 606, 699 N.W.2d 189 (new home); *Kaloti*, 2005 WI 111, ¶ 27 (contract between cereal manufacturer and distributer); *Van Lare*, 2004 WI 110, ¶¶ 19-20 (fifty-five acre gravel pit); *Stoughton Trailers, Inc. v. Henkel Corp.*, 965 F. Supp. 1227, 1233 (W.D. Wis. 1997) (painting system).

18

exception for fraud in the inducement does not apply.  The corporate defendants are, therefore, entitled to summary judgment on the remaining misrepresentation claims.

If Malcolm and Marilyn Peacock, too, are parties to the APA, then there is no reason the economic loss doctrine would not apply with equal force to the misrepresentation claims against them.  If they are *not* parties to the APA, however, the question becomes more complicated.  At bottom, the economic loss doctrine applies to preclude "*contracting parties from pursuing tort recovery for purely economic or commercial losses[.]*"  *Kaloti*, 2005 WI 111, ¶ 27 (emphasis added) (quoting *Van Lare*, 2004 WI 110, ¶ 19); *see also Shister v. Patel*, 2009 WI App 163, ¶ 14, 322 Wis. 2d 222, 776 N.W.2d 632 (declining to apply economic loss doctrine to bar tort claims against a real estate broker in part because "there [was] no contractual relationship" between the plaintiff and the broker).  *But see Latino Food Marketers, LLC v. Ole Mexican Foods, Inc.*, No. 03-C-0190-C, 2004 WL 632869, at *11-12 (W.D. Wis. Mar. 29, 2004) (the question is "not whether the plaintiff *did* contract with the defendant, but whether the plaintiff *could have* (and should have) contracted to cover a particular loss . . . There is sense to a rule that does not make the existence of a contract a requirement for applying the economic loss doctrine") (emphasis in original).

The court need not address the question of the doctrine's possible applicability to a closely-related non-party further, however, because it agrees with Betco that the undisputed facts prove Malcolm *is* a party to the APA.  The first paragraph of the APA reads:

> This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 29, 2010, is made and entered into by and among BETCO CORPORATION, LTD., an Ohio limited liability company ("Buyer"), BIO-SYSTEMS CORPORATION, an Illinois corporation, and ENVIRO-ZYME INTERNATIONAL, LLC, an Illinois limited liability company, (collectively "Seller"), and the shareholders and members

19

identified on Exhibit A to this Agreement, each of whom is an individual resident of the State of Wisconsin (the "Shareholders" and each individually, a "Shareholder"). Each of Buyer, Seller and each Shareholder is sometimes referred to herein as a "party" and all are sometimes referred to herein collectively as the "parties."

(Mot. for Summary J. Ex. D (dkt. #63-7) Betco-00004 [hereinafter "APA"] (emphasis in original).)  The referenced Exhibit A lists exactly two shareholders: Malcolm and Marilyn Peacock.  (*Id.* at Betco-00045.)  And while Malcolm did sign the APA in his capacity as President of Bio-Systems Corporation and Manager of Enviro-Zyme International, LLC, which would not necessarily make him a party to the APA, he *also* signed it twice individually, as a Shareholder and as a Member.  (*Id.* at Betco-00043.)

Because Malcolm and Marilyn Peacock were parties to the APA, the surviving misrepresentation claims against them are barred by the economic loss doctrine.  This also means, however, that Betco's remaining breach of good faith and fair dealing claim against Malcolm Peacock survives defendants' second motion for summary judgment, since defendants' *only* asserted ground for dismissing that claim is Malcolm Peacock's purported non-party status.  (*See* Defs.' 2d Mot. Summ. J. (dkt. #136) 11-13.)  Accordingly, the court will grant defendants' motion for summary judgment on all remaining misrepresentation claims, but deny the motion with respect to the claim against Malcolm for his alleged breach of the covenant of good faith and fair dealing.[11]

---

[11] Defendants raise a number of other justifications for summary judgment on the misrepresentation claims, including that:  (1) some of the alleged misrepresentations were non-actionable "puffery," *Loula v. Snap-On Tools Corp.*, 175 Wis. 2d 50, 54, 498 N.W.2d 866 (Ct. App. 1993); (2) they constituted "unfulfilled future promises"; and (3) the multiple disclaimers in the CBR fatally undermine Betco's claims of reasonable reliance.  Some of these alternative bases for summary judgment appear to have merit (for instance, the purported misrepresentation that the Beloit plant was a "state-of-the-art" facility producing "world-class" levels of bacteria appears to be a classic

## II. Damages

This then leaves defendants' contention that even if a claim survives summary judgment, Betco has no come forward with evidence of actual damages. "Damages must be proved with reasonable certainty." *Caygill v. Ipsen*, 27 Wis. 2d 578, 589, 135 N.W.2d 284 (1965). The "mere difficulty of proof" does not "exonerate a plaintiff from this burden." *Id.* at 589-90. "Neither a court nor a jury as the trier of the facts can determine damages by speculation or guesswork. The trier of the fact may make a reasonable estimate of the damage based on relevant data and evidence." *Pleasure Time, Inc. v. Kuss*, 78 Wis. 2d 373, 387, 254 N.W.2d 463 (quoting *De Sombre v. Bickel*, 18 Wis. 2d 390, 398, 118 N.W.2d 868 (1963)).

Defendants initially argued that Betco's damages evidence was too speculative to permit a trier of fact to find in its favor. In support, they pointed out that Betco's "evidence" as to the amount of damages was entirely conclusory, consisting of bare assertions like: "Betco overpaid by at least $3,607,888" and "The costs to date for the purchase of needed third-party-bacteria total: $1,485,091.08." (*See* 2d Tony Lyons Aff. (dkt. #106) ¶¶ 26-27.)

In response, Betco now points to two specific categories of damages: (1) capital expenditures required to increase the facility's capacity, including the cost of new boilers; and (2) overpayment predicated on the incorrect belief that the Beloit plant could produce all the bacteria it needed to make products to specification. Betco also submits the affidavit

---

example of non-actionable puffery, and CFO Lyons conceded in his deposition that "as well as [he] understood it, the allegations of fraud [were] based on future production capacity." (Aug. 8, 2013, Anthony Lyons Dep. (dkt. #118) 21:1-4.)). The court need not address them further at this time, however, because as discussed above, all of the misrepresentation claims are barred by Wisconsin's economic loss doctrine.

of Tony Lyons, along with two exhibits purporting to detail its "EBITDA analysis" (dkt. #135-1); and list the capital expenditures that Betco allegedly made in order to bring the Beloit plant up to the represented production capacity at the time of purchase (dkt. #135-2).  As the trier of fact, the court may still not ultimately adopt Lyons's analysis, which lacks much in terms of proving causation (something Betco will need to prove at trial), but for purposes of summary judgment, the court concludes that a reasonable factfinder *could* find some of this evidence satisfies the reasonable certainty requirement without resorting to speculation.

In their second-filed motion for summary judgment, defendants also argue that Betco cannot establish it suffered damages *at all*.  "Actual damage is an essential element in the cause of action based on negligence or on fraud."  *Widemshek v. Fale*, 17 Wis. 2d 337, 340, 117 N.W.2d 275 (1962).  Specifically, defendants contend that Betco cannot rely on pecuniary losses suffered by its subsidiary Bio-Ohio; rather, Betco must show that the alleged losses negatively affected *Betco's* bottom line.  (Defs.' 2d Mot. Summ. J. (dkt. #136) 14.)

In response, Betco points out that Wisconsin follows "the benefit of the bargain rule in intentional misrepresentation cases."  *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 52, 288 N.W.2d 95 (1980).  A claim for breach of the contractual covenant of good faith and fair dealing likewise requires the plaintiff to show "that the party accused of bad faith has actually denied the *benefit of the bargain* originally intended by the parties," suggesting that this same measure of damages is appropriate for measuring damages in the context of a duty of good faith claim.  *Zenith Ins. Co. v. Employers Ins. of Wausau,* 141 F.3d 300, 308 (7th Cir.

1998) (emphasis added) (interpreting Wisconsin law); *see also N. Crossarm Co. v. Chem. Specialties, Inc.*, 318 F. Supp. 2d 752, 763 (W.D. Wis. 2004).[12]

Since Betco, not Bio-Ohio, entered into the APA, paid for the assets of Bio-Systems, and now carries the value of those assets on its consolidated financial statements, albeit as a wholly owned subsidiary, Betco would certainly seem the appropriate party to seek the benefit of the bargain.  (*See, e.g.*, APA (dkt. #63-7) (Betco Corporation, Ltd. listed as "Buyer").)  Since this fits the rubric of the benefit of the bargain rule, defendants' argument to the contrary is unpersuasive.

Finally, defendants also rely heavily on the fact that Betco *has* benefited from its purchase of Bio-Systems, pointing out that Bio-Systems is undisputedly a good company and that its net worth has been increasing since Betco purchased it.  As Betco points out, however, that fact does not mean that Betco *cannot* prove damages under the benefit of the bargain rule.  Should Betco prevail on the question of liability, the remaining defendant, Malcolm Peacock, is free to argue that Bio-Systems' profitability mitigates any damages suffered as a result of his failure to act with good faith under the contract, but Betco is also free to argue, as it does on summary judgment, that post-purchase profitability or appreciation on value "is related to the *amount* of damages, and not whether Betco can prove damages in any amount."  (Pl.'s Br. Opp'n (dkt. #139) 14 (emphasis added).)  Accordingly,

---

[12] "Under the benefit of the bargain rule, the measure of the purchaser's damages is the difference between the value of the property as represented, and its actual value as purchased."  *Id.* at 52-53 (footnote omitted).  Here, the damages flow, if at all, from Malcolm's claimed failure to honor his duty of good faith and fair dealing by suppressing information that might have led Betco to exercise timely its rights under the APA.  For example, Betco appears to claim that Malcolm's post-acquisition actions kept it from bringing claims against defendants within a hear of executing the APA.

23

the court declines to enter summary judgment based on the theory that Betco cannot prove it has suffered damages.

ORDER

IT IS ORDERED that defendants' motion for summary judgment (dkt. #136) is GRANTED IN PART and DENIED IN PART consistent with the opinion above.  Trial will proceed as scheduled on Betco's only remaining claim for breach of the contractual duty of good faith and fair dealing against defendant Malcolm Peacock.

Entered this 8th day of June, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge