UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

BETCO CORPORATION,

      Plaintiff,

-vs-                             Case No. 14-CV-193-WMC

MALCOLM PEACOCK and MARILYN    Madison, Wisconsin
PEACOCK, B. HOLDINGS, INC.     June 15, 2015
and E. HOLDINGS, INC.,       8:30 a.m.

      Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY,

APPEARANCES:

For the Plaintiff:
                 Connelly Jackson & Collier
                 BY:  REGINALD JACKSON
                     TIMOTHY NACKOWICZ
                 405 Madison Avenue, Ste. 4300
                 Toledo, Ohio  43604

                 Nowlan & Mouat
                 BY:  DAVID MOORE
                     SARA GEHRIG-WOODMAN
                 100 South Main Street
                 Janesville, Wisconsin  53547

Also present:     Kaylynn Vernon - legal assistant

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

1 │ APPEARANCES CONTINUED:

2 │ For the Defendants:
3 │                      Michael Best & Friedrich
   │                      BY:  ALBERT BIANCHI
   │                      MARY TURKE
4 │                      1 South Pinckney Street, Ste. 700
   │                      Madison, Wisconsin  53703
5 │
6 │
7 │                          * * * * *
8 │                          **I-N-D-E-X**

9 │ Opening statement by Mr. Jackson               4-8
   │ Opening statement by Mr. Bianchi               9-20
10 │
11 │ PLAINTIFF'S WITNESSES          EXAMINATION      PAGES

12 │ ROBERT REICH          Direct by Mr. Nackowicz   21-58
   │                       Cross by Mr. Bianchi       59-83
13 │                       Redirect by Mr. Nackowicz  84-85
   │ PAUL BETZ             Direct by Mr. Jackson      88-98
14 │                       Cross by Mr. Bianchi       98-110
   │                       Redirect by Mr. Jackson    110-111
15 │ KURT BISCHOFF         Direct by Mr. Jackson      112-119
   │                       Cross by Mr. Bianchi       119-137
16 │                       Redirect by Mr. Jackson    137-140
   │                       Recross by Mr. Bianchi     140-141
17 │ DEREK LOVERICH        Direct by Ms. Gehrig       141-184
   │                       Cross by Mr. Bianchi       184-204
18 │                       Redirect by Ms. Gehrig     204-208
   │ MINDY WALTERS         Direct by Ms. Gehrig       209-247
19 │                       Cross by Mr. Bianchi       247-268
   │                       Redirect by Ms. Gehrig     268-269
20 │ DEBORAH DARE          Direct by Ms. Gehrig       272-281
   │                       Cross by Ms. Turke         282-287
21 │ GERSON ARTRECHE       Direct by Ms. Gehrig       287-300
   │                       Cross by Ms. Turke         300-303
22 │ DANA JUUL             Direct by Ms. Gehrig       304-314
   │                       Cross by Ms. Turke         314-325
23 │                       Redirect by Ms. Gehrig     325-329
   │ KEITH KENNEDY         Direct by Ms. Gehrig       330-376
24 │
25 │

**E–X–H–I–B–I–T–S**

| PLAINTIFF'S EXHIBITS | | | IDENTIFIED/RECEIVED | |
|---|---|---|---|---|
| Ex. | 1 | Business memorandum | 90 | 111 |
| | 8 | 5-16-12 email | 175 | 194 |
| | 9 | 6-15-11 email | 309 | 314 |
| | 10 | Invoices | 293 | 314 |
| | 12A | Wet-batch data | 354 | --- |
| | 12B | Graph | 358 | --- |
| | 13A | Findings | | 348 |
| | 13B | Data | 343 | --- |
| | 14 | Email | 170 | 175 |
| | 15 | Customer summary | 371 | --- |
| | 16 | Video | 226 | 238 |
| | 18 | ProtoCOL orientation | 365 | --- |
| | 19 | Certificates of analysis | 280 | --- |
| | 20 | Reich CV | 23 | --- |
| | 23 | Document | 341 | --- |
| | 27 | Mix sheets | 213 | --- |

| DEFENDANTS' EXHIBITS | | | | |
|---|---|---|---|---|
| Ex. | 504 | Business review | 111 | 111 |
| | 506 | Due diligence document | 104 | 104 |
| | 515 | Email | 105 | 105 |
| | 519 | Email | 128 | 129 |
| | 521 | 9-10 email | 120 | 121 |
| | 522 | 9-10 email chain | 108 | 108 |
| | 524 | 10-10 email | 136 | 137 |
| | 526 | Memo | 99 | 104 |
| | 537 | Formula | 126 | 126 |
| | 538 | Procedure | 127 | 128 |
| | 544 | Email | 130 | 131 |
| | 546 | Email | 131 | 132 |
| | 566 | 3-11 email | 135 | 136 |
| | 696 | Plate count | 266 | 268 |
| | 710 | Email | 197 | 198 |
| | 727 | 5-2-12 email | 202 | 203 |
| | 760 | Instructions | 260 | 262 |
| | 763 | Instructions | 316 | 323 |
| | 771 | APA | 90 | 111 |
| | 778 | ISO Manual | 256 | 258 |
| | 790 | ProtoCOL Manual | 252 | 255 |
| | 842 | Production report | 191 | 191 |
| | 843 | Production report | 191 | 192 |
| | 844 | Production report | 192 | 193 |
| | 846 | Production report | 192 | 193 |
| | 847 | Summary | 193 | 193 |
| | 854 | Marketing piece | 323 | 324 |

1    (Proceedings called to order.)

2        THE CLERK:  Case Number 14-CV-193-WMC.  *Betco*

3    *Corporation, Limited v. Peacock, et al.* called for the

4    first day of court trial.  May we have the appearances,

5    please.

6        MR. JACKSON:  Your Honor, may it please the

7    Court.  Reginald Jackson of Connelly, Jackson, Collier

8    of Toledo, Ohio, on behalf of the plaintiff.  With me is

9    Tim Nackowicz with the Toledo firm of Allotta and

10   Farley, he was formerly with our firm; Dave Moore with

11   Nowlan and Mouat of Janesville, and Sara Gehrig, the

12   same firm for the plaintiff.  Thank you.

13       THE COURT:  Very good.  For the defendant.

14       MR. BIANCHI:  For defendants, Albert Bianchi

15   and Mary Turke of Michael, Best & Friedrich.  And also

16   seated with us here is my client Malcolm Peacock.

17       THE COURT:  Very good.  I indicated at the

18   outset that I would appreciate a short statement,

19   although I have now had the benefit of the briefs from

20   both sides and I will leave to each side what statement

21   they wish to make to begin.

22       MR. JACKSON:  Thank you, Your Honor.  First, on

23   behalf of the plaintiff we would thank the Court for

24   allowing this matter to proceed to trial, and hopefully

25   for Mr. Betz and for Mr. Peacock to proceed to a

1  conclusion of this matter that has gone on for some

2  three years.

3      We understand the Court has taken considerable time

4  and effort to understand this dispute and we thank the

5  Court for narrowing the issues.  We expect to move

6  through the evidence appropriately and efficiently.  We

7  understand the Court's instruction to be completed

8  within five days and we believe that we can meet that

9  expectation.

10      As background, and I hope I'm not being redundant,

11  but we're talking about a company located in Beloit,

12  Wisconsin, which produces bioaugmentation products.

13  They come in forms of liquid, extruded products, gel,

14  and powdered products, and their application is for the

15  treatment of water and wastewater, and many of the

16  end-use producers -- I'm sorry, customers are wastewater

17  treatment facilities which are regulated by the federal

18  and state EPA.

19      I would like to give the Court a brief outline of

20  what we expect the evidence will be.  We understand the

21  Court's instruction that we are focused on the period

22  between the time of the purchase of the operation and

23  the time that Mr. Peacock left.  That is a period

24  between September 2010 and November 2011 when Mr. Betz,

25  on behalf of Betco, told Mr. Peacock that he would

1  remain in the role as a consultant; that he was free to

2  go home, they would continue to pay him, and they did

3  until April of 2012 when certain matters came to light

4  which we will present which caused Betco to terminate

5  the services of Mr. Peacock.

6      The evidence will show that as part of his role,

7  Mr. Peacock wished to remain -- I'm sorry, as part of

8  the Asset Purchase Agreement, Mr. Peacock desired to

9  remain an employee for an additional two years, and in

10  fact, stayed on.  Pursuant to an employment contract,

11  Mr. Peacock was president.  There will be testimony, you

12  will hear, as to Mr. Peacock's role.  He was expected to

13  continue the operation of the Beloit facility as he had

14  done for some 20 years.  By all appearances to Betco,

15  Mr. Peacock was running an efficient, profitable

16  operation.  Certain matters came to light after

17  Mr. Peacock left and it is that -- those matters which

18  are the subject of the Court's review.

19      The evidence will further show that during this

20  relevant time period, employees in Beloit were concerned

21  that the people in Toledo, Betco, were not aware that

22  product was being shipped without being tested; that

23  some product was not tested at all; that some product

24  was tested after it was shipped as opposed to before it

25  being shipped, and that certificates of analysis, which

1   you'll hear more about, were being made up or falsified

2   and deceiving the customers.

3       The evidence will further show that Mr. Peacock

4   suppressed the Beloit employees from conveying this

5   information to the people in Toledo; that he asked

6   Mr. Betz to keep the Toledo people out of the Beloit

7   operation, do not meddle in his operation, and that

8   Mr. Betz complied with that.

9       The evidence will show that Mr. Betz -- I'm sorry,

10  Mr. Peacock instructed the employees in Beloit not to

11  speak to the people in Toledo.  The evidence will show

12  that for the 15 months while Mr. Peacock was in charge,

13  that by his words and actions he concealed what -- from

14  Betco what he knew to be true; that he instructed his

15  employees not to test liquid product; extruded products

16  were not tested; powder products were shipped, sometimes

17  tested, sometimes not.  Sometimes if the label or the

18  specification count was not appropriate, nothing was

19  done about the product.  And significantly, customers

20  who requested certificates of analysis were told that an

21  analysis or a test occurred; they were told that -- the

22  results of the analysis, and no one who produced or

23  generated the certificate of analysis was aware of any

24  test or of any result.

25      In sum, we believe this violates and is a breach of

1  the duty of good faith and fair dealing.  We believe

2  that Mr. Peacock breached a promise made in the Asset

3  Purchase Agreement.  And I quote from Section 4.19 that

4  he warranted to Betco that "each item processed or

5  delivered by seller has been in conformity with all

6  applicable contractual commitments and all express and

7  implied warranties."  And we believe the evidence will

8  show that it was not, that he knew it, and that once

9  Mr. Peacock left on we believe good terms as a

10  consultant, that employees in Beloit who were no longer

11  in fear of their jobs for retaliation came forward.

12      2012, Betco began to or the Beloit operation began

13  to identify what the problem was.  In 2013 it continued,

14  and 2014 and 2015 were spent fixing the problem.  The

15  problem was fixed by the abandonment of a failed process

16  and the increased and unexpected expense of purchasing

17  bacteria to process and deliver items in conformity with

18  contractual commitments and express and implied

19  warranties.

20      In sum, Betco did not get what Betco paid for.  The

21  business had a value and we recognize that it had a

22  value, but it did not have the value as represented by

23  the financials, by the financial statements which failed

24  to state the true level of expenses necessary to produce

25  a product without deception to customers.  Thank you.

1          THE COURT:  Thank you, Mr. Jackson.  And I'll

2  now hear from defendant.    (8:40 a.m.)

3          MR. BIANCHI:  Good morning.  And may it please

4  the Court.  Buyer's remorse is often described as an

5  emotional response on the part of a buyer in a sales

6  transaction which may involve feelings of regret, fear,

7  depression or anxiety.  These feelings we all have

8  experienced at some time or another.  The best way to

9  avoid or at least cope with buyer's remorse is to be

10  well informed.  However, once informed, it is up to the

11  buyer to take that information and to use it.

12      Ignore that information and those fears and

13  regret-filled emotions begin to swell.  Here, within a

14  year of the purchase, Betco was well informed about

15  Bio-Systems and all of its processes.  Mr. Peacock

16  concealed nothing, giving Betco access to all

17  procedures.  But Betco ignored the information it

18  received.

19      Now disgruntled with its failure to both appreciate

20  Mr. Peacock's pre-sale disclosures and its failure to

21  seek expertise on production issues prior to the

22  expiration of contractual warranties, Betco now blames

23  Mr. Peacock for Betco's decision under the guise that

24  Mr. Peacock concealed material information post-sale.

25  But the evidence will show that Betco was aware of all

1  the alleged issues of which it now complains.

2       Betco's position is a classic example of buyer's

3  remorse.  Indeed from the beginning of this three-year

4  litigation, the Peacocks have maintained that this is

5  simply a case of buyer's remorse and thus they can't be

6  held liable under the law.  Although the scope of the

7  case has been significantly reduced to only a claim for

8  breach of good faith and fair dealing against

9  Mr. Peacock, it remains at its core a case of buyer's

10 remorse.

11      The duty of good faith and fair dealing is founded

12 on honesty and reasonableness.  The evidence here will

13 show that Mr. Peacock was both honest and reasonable in

14 not only presenting Bio-Systems' processes to Betco in

15 his responses to their questions or inquiries, but

16 specifically responding to those actual questions that

17 they posed about the company's processes.

18      The problem and what the evidence will also show is

19 that Betco was not honest or reasonable with

20 Mr. Peacock.  Betco never presented to Mr. Peacock the

21 issues that it has allegedly found with Bio-Systems'

22 processes.  Betco hid these concerns from Mr. Peacock,

23 even though it was aware of the concerns six months

24 after the purchase of the company and six months before

25 it paid Mr. Peacock the reserve amount that was in

1    escrow in accordance with the EPA.  Indeed if Betco had

2    raised these issues with Mr. Peacock as it should have

3    under the warranty provision in the APA, it could have

4    discussed with them any concerns and even been able to

5    explain the reasoning behind his various processes which

6    were the same processes that had brought -- bought

7    Bio-Systems its success for the last 20 years.

8        The law in Wisconsin is clear that it is not a

9    breach of the duty of good faith if a course of action

10   available to Betco could have avoided the harm, and this

11   course was not followed.  The evidence will show that

12   within one -- within the one-year period in which Betco

13   could bring warranty claims under the Asset Purchase

14   Agreement, Betco was aware of all the issues it alleges

15   to have with Bio-Systems.

16       For example, Betco points to having to replace

17   boilers as an item that demonstrates this breach of duty

18   of good faith and fair dealing.  However, the evidence

19   will show that not only did Mr. Peacock honestly discuss

20   the boiler issue with Betco, but Betco started the

21   process of replacing the boilers before it paid

22   Mr. Peacock the reserve fund out of escrow.  Thus, if

23   Betco believed replacement of the boilers to be

24   something that they should have sought reimbursement for

25   from Mr. Peacock as a breach of warranty under the APA,

1   they could have taken the cost of the project out of the

2   escrow fund.  But Betco didn't do this and yet now it

3   wants to come back and argue that Mr. Peacock is liable

4   for those costs.

5       Another example of Betco's failure to take the

6   course of action to avoid the harm is evidenced in

7   Betco's CFO, Tony Lyons, who testified at his deposition

8   that he was also the person in charge of pursuing legal

9   issues for Betco.  And he stated that although he

10  personally was not aware of the allegation that

11  Bio-Systems was consistently producing product under

12  specification and shipping it to customers, that Betco

13  as an organization was, in fact, aware of that issue in

14  March of 2011.  Indeed you will see a memo that

15  memorializes this March 15, 2011, visit to Bio-Systems

16  by Betco personnel and it contains in detail every issue

17  of which Betco now complains.  Such issues should have

18  and could have been addressed with Mr. Peacock within

19  the APA's one-year warranty period.  But Betco failed to

20  follow that course of action.

21      An email that was sent to Mr. Peacock regarding

22  this March 2011 visit did not contain all the issues in

23  the Betco memo.  Instead of talking to Mr. Peacock,

24  Betco simply fired him and then personnel continued to

25  alter the processes that had served Bio-Systems for more

1  than two decades.  Betco cannot now, upon feeling

2  regret, try to hold Mr. Peacock liable for issues it

3  could have avoided, and in some instances, it created.

4       The evidence will also show that Mr. Peacock was

5  completely transparent about the procedures at

6  Bio-Systems.  One of the procedures Mr. Peacock honestly

7  shared with Betco about was the method that he used to

8  plate and count bacteria.  There will likely be much

9  talk about what method of plating and counting bacteria

10  is best, but such talk completely misses the point.

11  Instead the point and what the evidence will show is

12  that Mr. Peacock freely told anyone, not just Betco, but

13  all Bio-Systems' customers that Bio-Systems used a

14  spiral plater and a ProtoCOL counter to plate and count

15  bacteria.  In fact, Bio-Systems encouraged customers to

16  come into the Beloit plant to see how Bio-Systems plated

17  and counted its bacteria.

18       The evidence will show that Mr. Peacock correctly

19  believed that Bio-Systems' plating and counting methods

20  were not only sound and valid, but he found them to be

21  an improvement over past methods, including doing what

22  is referred to as a pour plate and manual count of

23  bacteria.

24       While Betco may be feeling anxious about the

25  methods that Bio-Systems used to plate and count

14

1    bacteria, such feelings do not create a breach of good

2    faith by Mr. Peacock because the methods which are

3    accepted and used by other companies were available for

4    everyone, including Betco, to examine at any time.

5         Betco has also challenged some of the fermentation

6    methods that Bio-Systems used when Mr. Peacock owned the

7    company.  Again, Betco will likely come forward with

8    statements about how the process does not allegedly work

9    as Betco had initially thought them to.  But the

10   evidence will show that the processes that allegedly do

11   not work are not the same as those that were

12   successfully used for 20-plus years by Mr. Peacock when

13   he owned Bio-Systems.  And regardless of the parties'

14   disagreement over the validity of the processes, the

15   evidence will also show that upon purchasing

16   Bio-Systems, Betco was given the ISO Manual which

17   contained the exact processes of which Betco now

18   complains.  In other words, within weeks after

19   purchasing the company, Betco knew the processes being

20   used to ferment bacteria at the Beloit plant.  Thus

21   nothing was stopping Betco from examining those

22   processes right from the beginning.

23        Even though Mr. Peacock provided Betco with this

24   information on Bio-Systems' processes right away, Betco

25   waited almost two years to examine those processes and

1  after that even began to change them.  Mr. Peacock's

2  actions were not a breach of the duty of good faith and

3  fair dealing.  Instead Betco is now simply looking to

4  pass the buck because it wants what it has decided are

5  better processes such as sprays or free-drying bacteria.

6  However, Betco purchased a company that used solid state

7  fermentation and that is what it's entitled to.

8      The evidence will show that Mr. Peacock was also

9  honest about Bio-Systems' products and processes with

10  Bio-Systems' customers.  Before the sale of Betco in

11  2010, Mr. Peacock had been running the business

12  successfully for over 20 years using the processes Betco

13  now challenges.  The success of Bio-Systems was built on

14  repeat customers.  Thus, if Mr. Peacock was not honest

15  about his products to his customers, then he would have

16  lost those customers and the business would never have

17  grown as it did.

18      The Court has already reviewed the testimony of

19  Bio-Systems' customers in the form of deposition

20  designations.  Those statements establish that the

21  customers were satisfied with not only Mr. Peacock and

22  his technical assistance, but with Bio-Systems' products

23  and their effectiveness.  Indeed the Court will see that

24  what is entirely absent from the evidence that's going

25  to be presented are customers having major quality

1   issues with Bio-Systems' products when Mr. Peacock owned

2   the company.  Also absent are any claims or even a

3   threat of a claim by a customer against Bio-Systems for

4   producing products and selling them not in conformity

5   with the provided specifications.  Not a single claim.

6       What the evidence will show is that even customers'

7   minor product issues were quickly resolved by

8   Mr. Peacock to the customers' satisfaction.  Thus, while

9   Betco complains about the quality of the products

10  produced at the Beloit plant, there is simply no

11  evidence of comparable unresolved customer complaints.

12      Indeed one customer was Mr. Peacock's other company

13  which was initially -- he was attempting to sell with

14  Bio-Systems United States and that's Bio-Systems in the

15  United Kingdom.  It regularly purchased and resold

16  products that were manufactured at the Beloit plant.  So

17  the question arises if the products were not up to

18  specification, then one would have expected Mr. Peacock

19  to have Bio UK buy its bacteria from a different

20  company.  But Bio UK continually and regularly bought

21  products from Bio-Systems' Beloit plant.

22      Mr. Peacock also dealt with customer issues they

23  might have with that same honesty and integrity that he

24  spoke to with Betco.  For example, if we return to the

25  bacteria count momentarily, whenever a customer asked

1   Mr. Peacock about the bacteria count on the products, he

2   freely shared the methods Bio-Systems used to plate and

3   count the bacteria and he would invite the customer or

4   the distributor to come and examine the processes, and

5   then he was ready to further explain why he believed the

6   Bio-Systems' methods were better than those used by its

7   competitors.

8       So Betco purchased a small bacteria-producing

9   business that had become fairly successful over the last

10  20 years using procedures and processes that Mr. Peacock

11  helped institute.  What Betco did not purchase was a

12  large bacteria company that had spent additional

13  capital, millions of dollars to use freeze or

14  spray-drying processes.  Simply put, Betco got exactly

15  what it was offered and what it decided to buy.  Betco's

16  post-sale remorse for not being a bacteria business that

17  uses more expensive bacteria-producing processes does

18  not transform any of Mr. Peacock's actions into a breach

19  of his duty of good faith and fair dealing.

20      So the evidence will show that shortly after the

21  purchase, Mr. Peacock suggested that Kurt Bischoff,

22  Betco's senior manager member tasked with understanding

23  the processes and procedures used at Bio-Systems, he

24  suggested that Kurt spend at least a week at the Beloit

25  plant to better understand the processes and procedures

1   and to even discuss any changes that he thought were

2   warranted.  But according to Mr. Bischoff, Bio-Systems

3   was only one of many projects he was working on for

4   Betco.  And so being very busy in 2011, he was unable to

5   devote the time needed to properly understand

6   Bio-Systems' processes until some time in 2012.  Indeed,

7   Mr. Bischoff only visited the plant a day here or a day

8   there, never the full week that Mr. Peacock suggested.

9        Betco even had an expert consultant, Mr. Barry

10  King, on retainer to be able to examine and investigate

11  the procedures used at Bio-Systems immediately upon

12  purchase.  But Mr. King never inspected the Beloit

13  plant.  Indeed Mr. Bischoff admitted that not having

14  Mr. King inspect the plant was a mistake.  No matter how

15  much Betco would like it to be true, its mistakes and

16  failures are not breaches of a duty of good faith by

17  Mr. Peacock.

18       Additionally, the evidence will show that in the

19  year he was employed with Betco, Mr. Peacock did not

20  take any action to try to conceal from Betco information

21  about Bio-Systems' processes.  Betco employees regularly

22  communicated with Bio-Systems' employees, both via email

23  and when Betco employees visited the Beloit plant.  This

24  makes logical sense as Betco is the new owner and

25  Mr. Peacock had simply become another employee of Betco.

1    So he had no power to prohibit interactions between

2    Betco personnel and Bio-Systems' employees.

3        Also while Mr. Peacock generally was overseeing

4    employees at the Beloit plant, he was not inspecting all

5    their work daily but instead relying on his area

6    managers, sales, production, and the lab; in other

7    words, he believed that if an employee had a problem

8    with equipment or a process, they would attempt to

9    resolve it themselves or bring it up the chain to their

10   supervisor and that the employees would follow the

11   procedures listed in Bio-Systems' ISO Manual and other

12   company directives.  Thus, Mr. Peacock reasonably

13   expected and believed that the Beloit plant was running

14   according to Bio-Systems' documented procedures that had

15   brought it great success over the past 20 years.  All

16   that information on Bio-Systems' procedures had been

17   provided to Betco again shortly after the purchase.

18       So in the end, the evidence will show that well

19   within the year of purchase, Mr. Peacock and other

20   employees of Bio-Systems freely shared with Betco the

21   various processes and procedures used at Bio-Systems.

22   The employees even shared some of their concerns.

23       The evidence will also show that Mr. Peacock

24   believed Bio-Systems' processes and procedures were

25   being properly followed and that they were valid and

1  successful as they had been for the past 20 years.

2  Despite all this, Betco still wants to hold Mr. Peacock

3  liable for its failure to take that information that it

4  was provided and make sure it knew what it had

5  purchased.  This Betco cannot be allowed to do.

6       Mr. Peacock is not responsible, let alone liable

7  for Betco's now feelings of buyer's remorse.  Betco was

8  simply not denied the benefit of what it bargained for.

9  In fact, it received exactly what Mr. Peacock offered.

10  While Betco may now regret that purchase of the business

11  that it little understood, the regret does not translate

12  into liability, and accordingly, at the end we will ask

13  that upon the hearing of all the evidence presented, the

14  Court find that Mr. Peacock did not breach his duty of

15  good faith and fair dealing in performing the Asset

16  Purchase Agreement.

17       THE COURT:  Thank you, Mr. Bianchi.  And now I

18  will hear the first witness for the plaintiff.

19       MR. JACKSON:  Your Honor, we'd call Robert

20  Reich.  Mr. Nackowicz will be handling this.  Mr. Reich

21  is called somewhat out of order.  I discussed this with

22  Mr. Bianchi.

23       THE COURT:  That's fine.

24       MR. JACKSON:  He has to travel.

25       THE COURT:  If you would, Mr. Reich, come

1  straight forward and just stand before the court

2  reporter to be sworn.

3        **ROBERT REICH, PLAINTIFF'S WITNESS, SWORN,**

4        MR. NACKOWICZ:  Can everyone see it's the first

5  page of Mr. Reich's CV?

6        THE COURT:  If you look, Counsel -- and

7  everyone is going to have to become familiar with this.

8  You can see down on your right the light is on for

9  everyone except a jury.  It is not disclosed to the

10 audience because I don't know what confidentiality

11 applies, but to the extent that you wish that, you'll

12 need to hit that last light.

13       MR. NACKOWICZ:  Thank you, Your Honor.

14       THE COURT:  That's fine.  You can proceed now.

15 Thank you.

16                 DIRECT EXAMINATION

17 BY MR. NACKOWICZ:

18 Q    Mr. Reich, please state your name and address.

19 A    Robert Reich.  561 Jennifer Lane.  Grayslake,

20 Illinois.

21 Q    What is your profession?

22 A    I am a microbiologist.

23 Q    So you're a scientist.

24 A    Yes.

25 Q    Are you employed?
                    ROBERT REICH - DIRECT

1   A    Yes.

2   Q    Where are you employed?

3   A    I work for a company called LexaMed in Toledo,

4   Ohio.

5   Q    What is your title?

6   A    President.

7   Q    Do the LexaMed employees answer to you then?

8   A    Yes.

9   Q    And do they perform tasks at your direction?

10  A    Yes.  Or people that report to me's direction.

11  Q    And what is LexaMed?

12  A    LexaMed is a laboratory and consulting company

13  primarily to the pharmaceutical and medical device

14  industries.

15  Q    And what is your educational background?

16  A    I am a microbiologist, undergraduate and graduate

17  degrees.

18  Q    Could you give me a brief thumbnail of your

19  professional experience.

20  A    Out of school I worked for an American canning

21  company where I was doing research into food-borne

22  diseases and processes to aseptically -- or not

23  aseptically, but to sterilize food products.  From there

24  I moved to the pharmaceutical and medical device

25  industries where I worked on basically microbial control

ROBERT REICH - DIRECT

1    issues, all aspects of that from disinfectant efficacy

2    to sterilization to identification, environmental

3    monitoring, control of microbes in the environment.

4    Q    What sort of projects are you involved in today?

5    A    Today personally there's three or four I'm involved

6    in.  One is a drug-eluting contact lens where we're

7    working on developing the process from -- basically from

8    a microbial-control standpoint and then developing

9    sterilization processes for that particular lens.

10        There's another project where we're looking at the

11   disinfectant -- commercial -- the disinfectant efficacy

12   of commercial disinfectants against environmental islets

13   in a large manufacturing plant.  And we're also

14   developing a Bacillus subtilis biological indicator for

15   a low temperature moist heat process.

16   Q    Calling your attention to Exhibit 20, which is on

17   the screen in front of you, and specifically the portion

18   here which has a Bates label in the lower right-hand

19   corner LexaMed-00123, do you recognize this document?

20   A    Yes.

21   Q    What is it?

22   A    That's -- it's my CV.

23   Q    Does it detail the sum and substance of your

24   training, education, and experience?

25   A    Yes.

                    ROBERT REICH - DIRECT

1          MR. NACKOWICZ:  Your Honor, I know we have --

2    the parties have stipulated that the resumes and CVs of

3    the experts may be admitted into evidence.  Would you

4    like us to propose admission at this time or will you

5    wait until the end?

6          THE COURT:  Either one is fine.  I will admit

7    Exhibit 20, assuming that's the agreement of the

8    parties.  I wouldn't typically admit CVs, but that's

9    fine.  Exhibit 20 is admitted.

10       And you may proceed.

11         MR. NACKOWICZ:  Your Honor, just to be clear

12   the -- this is only a portion of Exhibit --

13         THE COURT:  It's clear.  I've admitted.

14         MR. NACKOWICZ:  I just want Your Honor to know

15   that Exhibit 20 is a voluminous document of various

16   things that --

17         THE COURT:  I understand that and I would not

18   normally admit it at all because it's just hearsay, but

19   I've admitted it.

20       And you should proceed, Counsel.

21         MR. BIANCHI:  I think the problem is it's the

22   whole expert report and we objected to the entire expert

23   report.

24         THE COURT:  Well, then that makes it simple.

25   Exhibit 20 is out.  You don't have agreement and I'm not

                    ROBERT REICH - DIRECT

1  admitting it.

2       MR. NACKOWICZ:  Okay.  I was just proposing to

3  admit the portion which is his CV, and we can provide

4  a --

5       THE COURT:  It makes it simpler.  I'm just not

6  admitting these.  They're all hearsay.  You've

7  established his credentials on the stand.

8    And you should proceed.

9       MR. NACKOWICZ:  Very good.  Thank you, Your

10 Honor.

11 BY MR. NACKOWICZ:

12 Q   Were you hired or retained to perform services in

13 connection with this matter?

14 A   Yes.

15 Q   And what were you asked to do?

16 A   I was asked to go through the facility in Beloit to

17 view firsthand the operation and to assess from my

18 experience if the processes there would be effective in

19 growing certain bacteria, specifically spore formers and

20 Pseudomonas for commercial product.  And if I thought

21 that those -- the science behind those processes were

22 valid.

23 Q   So what did you do to do that examination?

24       THE COURT:  Can I get a time frame?

25 Q   When did you perform these tasks?
                    ROBERT REICH - DIRECT

1  A    In April 2012.

2  Q    And what did you do in that regard?

3  A    I went up to the site.  We walked through the site.

4  We looked at some of their procedures.  We talked to

5  some of their personnel.  There was some Betco people

6  there as well that, you know -- so they were giving me a

7  tour and understanding of the processes that were being

8  used at the time.

9  Q    And then in the time after you visited the plant,

10 what tasks did your employees perform?

11 A    Well, based on some of my observations and some

12 hypothesis, we did some lab work to substantiate some of

13 those initial hypotheses that I drew by walking through

14 the plant.

15 Q    And was that all performed at your direction?

16 A    Yes.

17 Q    Did you reach any conclusions or opinions in

18 connection with this matter?

19 A    Yeah.  There was quite a few.

20 Q    Were these opinions reached to a reasonable degree

21 of scientific certainty?

22 A    Yeah.  Based on my -- yes, based on my experience

23 and some of the data that we generated in the lab, yes,

24 I believe that there's -- my opinions were

25 scientifically valid.
                    ROBERT REICH - DIRECT

1   Q    Before turning exactly to your opinions, you just

2   made a lot of -- you just said a lot of technical terms,

3   so I'd like to back up and do a little groundwork for

4   bacteria.

5        So what is a bacteria or bacteria?

6           THE COURT:   The Court will take judicial notice

7   what a bacteria is.  You may ask your next question.

8   Q    The parties have agreed that Bacillus bacteria,

9   when they are not in their vegetative state, they are in

10  spore form.  Could you explain what spore form is and

11  what vegetative form is?

12  A    Vegetative form is the normal form that any of the

13  Bacillus organisms, when they're growing with proper

14  nutrients and environmental conditions, will be in a

15  vegetative form.  The spore forming is only a survival

16  mechanism.  It's -- some species of bacteria, Bacillus

17  being one of them, can be stimulated by adverse

18  conditions to form spores, which are resistant bodies

19  that are resistant to environmental -- it's a survival

20  mechanism -- resistant to environmental stresses.

21  Q    And what are Pseudomonas?

22  A    Pseudomonas are not spore-forming bacteria.

23  There's two basic types of bacteria:  Gram-positive and

24  gram-negative based on their cell wall chemistry.

25  Bacillus are gram-positives.  Pseudomonas are

                    ROBERT REICH - DIRECT

1  gram-negative nonspore-forming organisms.

2  Q    And do these Bacillus and Pseudomonas have any use

3  for mankind?

4  A    Sure.  I mean exactly what they're doing here.

5  They can be in bioremediation.  Some of the Bacillus are

6  used to ferment other products besides these that are

7  used therapeutically.

8  Q    And have you worked with spores before?

9  A    Yeah.  Pretty much my whole career has been spores.

10  My graduate degree was on spore formers, and currently

11  at LexaMed we have some commercial product that involves

12  spore formers and we make specialty products that

13  involve a high concentration of spore products.

14  Q    How hardy are bacteria when they are in the spore

15  form?

16  A    They are very resistant.  Again, it's a survival

17  mechanism.  To survive we use -- they'll survive

18  temperature extremes, Rh extremes, radiation extremes.

19  Q    And then when bacteria are in the vegetation state,

20  how hardy are they?

21  A    Well, they're significantly less resistant of those

22  types of environmental stresses.

23  Q    Is there any benefit to using bacteria in the spore

24  form in a product for industry as opposed to using

25  vegetative-form bacteria?
             ROBERT REICH - DIRECT

1   A    Again, because of the resistance, it makes it more

2   commercially viable and they usually give them a lot

3   longer shelf life in the spore form than you will in the

4   vegetative form.

5   Q    Do you grow bacteria at LexaMed?

6   A    Yes.

7   Q    How often?

8   A    Every day.

9   Q    How do you do it?

10  A    Well, it depends on -- each organism is a little

11  bit different.  But basically we grow them on an agar

12  medium specific for that nutrient of that particular

13  organism.

14  Q    I heard the term *solid state fermentation* a little

15  bit ago.  Is this process analogous to solid state

16  fermentation?

17  A    It is in that the organisms are grown on a solid

18  surface.

19  Q    What is fermentation?  How would you define that?

20  A    Classically fermentation is anaerobic respiration

21  of carbohydrates to yield carbon dioxide and alcohol and

22  energy.  But no more.  Traditionally it's used to -- any

23  sort of large scale microbial process, either

24  aerobically or anaerobically.  So when you're using a

25  particular organism on a particular substrate to yield a

                    ROBERT REICH - DIRECT

30

1  product of interest, a specific product.  So it's large

2  scale microbial manufacturing, if you will.

3  Q    Okay.  Do you create spores at LexaMed?

4  A    Yes.

5  Q    And what percentage of bacteria that you grow

6  actually sporulates and becomes spores?

7  A    We won't harvest unless it's around 90 percent.

8  Q    And is that the amount you routinely get through

9  your process?

10 A    Yes.

11 Q    Does LexaMed have a lab?

12 A    Yes.

13 Q    Is it certified or registered in any way?

14 A    It's ISO certified to 13485, which is analogous to

15 the ISO 9000 quality standards and it's FDA registered.

16 Q    Now, does LexaMed test the bacteria products that

17 it makes?

18 A    Yes.

19 Q    Does it test bacteria products for customers?

20 A    Yes.

21 Q    How often is testing performed at LexaMed?

22 A    Daily.

23 Q    Who are the people who do the testing?

24 A    We have a series of technicians, all of which have

25 a science degree, either a microbiology or biology

ROBERT REICH - DIRECT

1  degree.  We also have some chemistry, so we do some

2  chemistry too.

3  Q     Do these people have any additional training?

4  A     Well, they all have training, in-house training.

5  Again, part of ISO, when you look at the quality

6  systems, part of that whole regimen is training.  So we

7  have a pretty comprehensive training program for anyone

8  coming in on our general quality systems approaches, as

9  well as specific testing and that they're tasked to do

10  in the laboratory.

11  Q     And do you do testing for Bacillus?

12  A     Yes.

13  Q     And Pseudomonas?

14  A     Yes.

15  Q     And do you test high-bacteria-count materials?

16  A     Yes.

17  Q     When you're testing a material for bacteria, what

18  is the metric that's used to describe how many bacteria

19  is there?

20  A     Colony-forming units.

21  Q     Will a dead bacterium perform or create a colony?

22  A     No.

23  Q     Does that mean you're only counting live bacteria?

24  A     Yes.  The counts, viable counts, yes.

25  Q     So why does LexaMed test its products for bacteria?

                    ROBERT REICH – DIRECT

1   A    There's a myriad of reasons.  I mean we get -- you

2   know, we're a contract lab, so we do a lot of testing of

3   bacteria.  Some is if it's going to be a sterile

4   product, for example, you want to know what the baseline

5   population of a product is that you're trying to

6   sterilize so you have an idea of what sort of

7   sterilization assurance you're going to get.  Other

8   products you want to find out what the bio burden is,

9   which is what the indigenous flora is in or on that

10  product at the time.  We make a -- we sell, as I said, a

11  commercial product, about 12 different organisms, for

12  growth-promotion testing, so we have to know what the

13  population of those are because that's what we're

14  selling.

15       We also manufacture high-count biological

16  indicators to monitor various sterilization processes

17  and they're all Bacillus organisms and generally range

18  in count from 10 to the 5 to 10 to the 6 or 7.

19  Q    I heard the term *certificate of analysis* used

20  earlier as well.  Are you familiar with that?

21  A    Yes.

22  Q    What is that?

23  A    Just basically what it says.  It's a certificate --

24  it's testing that goes to a particular lot to certify

25  its -- that it meets its performance characteristics or

ROBERT REICH - DIRECT

33

1  its product specifications.

2  Q    And does LexaMed issue certificates of analysis?

3  A    Yes.

4  Q    What do you certify when LexaMed issues such

5  certificates?

6  A    Depending on the product we sell, if it's a product

7  for growth promotion, we certify count.  If it's a

8  product that's going to be used to monitor a particular

9  process, a sterilization process, we certify count as

10  well as resistance.

11  Q    Are these certificates, when they're issued, always

12  based upon test results?

13  A    Yes.

14  Q    Should they be issued without testing?

15  A    No.

16  Q    At LexaMed how do the employees perform these

17  bacteria testing?  What method?

18  A    Oh, how we're counting them?

19  Q    Yes, sir.

20  A    We use the plate -- a pour plate and manual count

21  for the most part.  We do some surface counting as well.

22  Q    So how does that work generally, the process from

23  start to finish?

24  A    If it is a high -- a high-count product,

25  anticipated high count, there will be some dilutions

                    ROBERT REICH - DIRECT

1  made and you plate those dilutions.  A certain aliquot

2  will be put into a plate.  It will be added to agar or

3  put on the surface of the agar.  If it's -- if the agar

4  is poured on the plates, they're allowed to set up, then

5  they're incubated.  After a certain period of incubation

6  appropriate for that particular organism, the time and

7  temperature appropriate for the particular organism

8  we're dealing with, then the actual colonies are

9  counted, manually counted.

10 Q    So a person actually counts how many colonies are

11 there.

12 A    Correct.

13 Q    And why is it you use that method?

14 A    For our purposes it's most convenient.  A lot of

15 the automatic methods, they maybe are higher volume

16 product or we found that we validated those methods so

17 we know that they're appropriate for our particular use.

18 So that's the method that we use.  And it lends itself

19 to the wide variety of bacteria that we're dealing with

20 on a daily basis.  And not just bacteria, but we do some

21 fungi work as well.

22 Q    So there are other ways to count, but you just use

23 the hand-counting method.

24 A    Correct.

25 Q    Is measuring turbidity a way to count bacteria?

                    ROBERT REICH - DIRECT

1   A    Yes.  You can correlate optical density to count,

2   yes.

3   Q    And can you explain turbidity?  How you would count

4   by turbidity?

5   A    Well, it's -- you correlate the turbidity or the

6   optical density of a particular solution to a count.  So

7   you get a curve that goes count versus turbidity.  So

8   then rather than having to count the plate and wait for

9   incubation, you can just look at the turbidity using a

10  spectrophotometer and you can correlate that particular

11  optical density to a particular bacterial count.

12  Q    Now, does that process count both live and dead

13  bacteria?

14  A    Yes.  The turbidity doesn't differentiate

15  viability.

16  Q    And I think you mentioned earlier that there are

17  machines that can be used to count as well; is that

18  correct?

19  A    Yes.

20  Q    Are there any drawbacks to using a machine?

21  A    Well, there's some.  It depends on which -- you

22  know, there's a number of different machines.  We heard

23  about spiral counting.  There's also all kinds of

24  automatic readers.  The automatic readers -- in our

25  experience we've had difficulty validating some of the

                    ROBERT REICH - DIRECT

1  automatic readers.  It doesn't count some of the

2  bacteria that are by the edge of the plate.

3      Depending on how the optics work and what organisms

4  you're using, you have to reset the optics of those,

5  especially if you're dealing in, like, mixed cultures.

6  A lot of bacteria have -- they're different.  Some are

7  pigmented, some are not.  Some are more translucent than

8  others.  Some are spreaders.  So the optics doesn't

9  always work.  One setting doesn't always fit all

10 occasions.

11     So we -- you have to change that.  So from our

12 standpoint, the manual method works best for the

13 procedures that we do in our laboratory.

14 Q   And you mentioned validation.  What is that?

15 A   That's making sure that you do the same thing all

16 over and over again and get the same result.  You

17 validate that particular process by doing a series of

18 tests to make sure that that process is correct, it

19 yields the right outcome that you're looking for and is

20 repeatable.

21 Q   Have you ever heard of the theoretical count method

22 of counting?

23 A   I don't know what that is.

24 Q   How comparable are plate count testing results from

25 one lab to another?

                 ROBERT REICH - DIRECT

1   A    Well, there's certainly, there's a lot of

2   variability in all the steps that we mentioned.  If it's

3   a flusion process, there's variability there.  There's

4   variability in plating.  I think the counting is pretty

5   much the same.  It's probably a good plus or minus 50

6   percent.

7        We did a round-robin study not too long ago through

8   an organization called the *Association of Advancement of*

9   *Medical Instrumentation* or AAMI.  They write standards

10  both for domestic as well as internationally, and we did

11  a round-robin study and that 50 percent was about right

12  using biological indicators, which are high-count spore

13  products.

14  Q    Turning specifically to what you did --

15       THE COURT:  I'm sorry, I just didn't follow

16  that part.  The variability is between any two labs even

17  if they're doing hand counts?  Or the variability is

18  experienced between labs using these automatic methods?

19       THE WITNESS:  No, any method.

20       THE COURT:  This is --

21       THE WITNESS:  We were using any system because

22  of the inherent variability of multiple steps, when it's

23  additive from, you know, the differences in agar,

24  different incubation time, difference in dilutions, all

25  those things.  It gets about a --
                    ROBERT REICH - DIRECT

1          THE COURT:  I get it.  I get it.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  So my question is is there a

4     variability in systems?  So in other words, did you

5     ever -- have you tested between labs' variability

6     between hand counting versus between automatic system

7     counting?

8          THE WITNESS:  I don't believe there's any

9     automatic system counting in that round-robin study.  We

10    have done some work when we have validated manual

11    methods and we found them to be fairly well competent

12    when they're well controlled using the same organisms.

13         THE COURT:  So what I'm hearing you say is if

14    you develop a good automatic method, it can be just

15    about as accurate or inaccurate as hand counting between

16    labs.

17         THE WITNESS:  Yeah.  And as we said, there's

18    multiple automatic methods.  All the methods have their

19    own weaknesses and -- strengths and weaknesses.  But

20    yes, we've had comparable success in comparing counts

21    from manual and certain automatic methods.

22         THE COURT:  Thank you very much.  You may

23    proceed, Counsel.

24         MR. NACKOWICZ:  Thank you, Your Honor.

25    BY MR. NACKOWICZ:
                    ROBERT REICH - DIRECT

1    Q    You said you examined the plant in Beloit.  What

2    sort of processes did you see there?

3    A    Well, we walked through the plant and we looked

4    at -- there was a process for growing spores and just

5    getting a spore yield.  There was the wet process in

6    which they grew up different levels of bacteria, both

7    Pseudomonas and Bacilli.  Then inoculated those onto a

8    solid matrix and then went through certain processes to

9    get those to sporulate to yield the final product.  So

10   as we looked at the wet spore-making process and the --

11   or the spore-growing process and the wet process of

12   making their solid state product.

13   Q    And then you said that after your visit, you had

14   LexaMed employees perform testing.  Why did you do the

15   testing?

16   A    Because all we did is walk through.  We looked at

17   some data.  We talked to the people in the lab and some

18   of their procedures, but we came to certain conclusions

19   and based on those conclusions -- I won't say

20   conclusions.  We had basically hypotheses and we wanted

21   to prove or disprove those hypotheses through generation

22   of data in our laboratory.

23   Q    Was this all done at your direction?

24   A    Yes.

25   Q    And this testing for plate count, was it done

                    ROBERT REICH - DIRECT

1  pursuant to the methods that we had talked about a

2  little bit ago?

3  A    I'm sorry, repeat.  What testing?  Our testing was

4  done using the manual plate counting method, if that's

5  what the question is.

6  Q    Correct.  Thank you.  Do you have written

7  procedures that were followed during this testing

8  process?

9  A    Yes.  We have specific procedures for performing

10 plate counts and we had specific work instructions for

11 doing the work that we did in association with the Betco

12 project.

13 Q    And were written test results created?

14 A    Yes.

15 Q    And are those the results that are attached to your

16 reports?

17 A    Yes.

18 Q    How reliable is the testing that you performed in

19 this case?

20 A    How reliable?

21        THE COURT:  Plus or minus 50 percent.  Why

22 don't you continue, Counsel.

23        MR. NACKOWICZ:  Yes, sir.

24 BY MR. NACKOWICZ:

25 Q    Is manual plate counting supported by peer
                  ROBERT REICH - DIRECT

1  literature and scientific literature in the industry --

2  A    Yes.

3  Q    You had said plus or minus 50 percent is an

4  acceptable tolerance.  Would factors of 10 be within the

5  acceptable tolerance?

6  A    No.  You're talking log differences?

7  Q    Is a log a factor of 10?

8         THE COURT:  I'll take judicial notice of that

9  too, Counsel.  Could you please proceed.

10        MR. NACKOWICZ:  Sure.

11  BY MR. NACKOWICZ:

12  Q    I want to turn directly to your reports now, and

13  they won't be admitted for evidence as the Judge said a

14  little bit ago, but I wanted to use them to refresh your

15  recollection and help the Judge understand what you did

16  and the conclusions you drew.  So turning your

17  attention --

18        MR. BIANCHI:  Real quick, I don't have a copy

19  of them.

20        MR. NACKOWICZ:  This is Exhibit 20.  Sorry.

21        MR. BIANCHI:  Our Exhibit 20 is four pages

22  long.

23        MS. GEHRIG:  Well, there's a disk.

24        MR. BIANCHI:  Sorry.  I don't have a disk

25  drive.
              ROBERT REICH - DIRECT

1            THE COURT:  All right.  We're going to proceed.

2    Ask your questions of this witness and you can make

3    arrangements at the break.  Please proceed.

4            MR. NACKOWICZ:  Thank you, Your Honor.

5    BY MR. NACKOWICZ:

6    Q    Turning to the page labeled Bates 0001, do you

7    recognize this document?

8    A    Yes.

9    Q    And who is the author?

10   A    I am.

11   Q    Calling your attention to page LexaMed-00011, I see

12   there are four bullet points at the top of this page.

13   My understanding is these are your conclusions.  I'd

14   like to quickly review them.

15        Can you sum up the sum and substance of the first

16   bullet point?

17   A    The first bullet point talks about the wet process

18   where we -- they grow up a particular number of

19   vegetative cells they added on to the solid matrix.

20   There is, based on my understanding, there's some growth

21   involved with that, and then those organisms will turn

22   to spore form to give you your count.

23        My evaluation of that, it would be very difficult

24   for that process to work, to get synchronous sporulation

25   like that.  The conditions were not controlled enough.
                    ROBERT REICH - DIRECT

1  We were getting some high-count product.  There was

2  anticipated some growth.  They put some nutrient on

3  there.  But the substrate themselves had a high level of

4  bacteria associated with them and they'd have varying

5  degrees of nutrients because it wasn't a controlled

6  substrate.  So that I found it very difficult to see how

7  you would get synchronous sporulation from those

8  organisms based on either a depletion of the nutrient or

9  on the differential drawing that they were doing.

10          THE COURT:  When you say controlled substrate,

11  are you talking about the medium?

12          THE WITNESS:  Yes, the medium.  The solid that

13  they put it on.

14          THE COURT:  It's just you used two different

15  terms.  I wanted to make sure.

16          THE WITNESS:  Oh, I'm sorry.

17          THE COURT:  Essentially you meant the same.

18          THE WITNESS:  I did.  I did.

19          THE COURT:  You may proceed, Counsel.

20          MR. NACKOWICZ:  Thank you.

21  BY MR. NACKOWICZ:

22  Q    So do you believe that the wet-batch process is

23  based on sound scientific principles?

24  A    In this case, no, I do not believe that we would

25  get a conversion of spores, a high-spore population.
                    ROBERT REICH - DIRECT

1   Q     What about the Pseudomonas bacteria?

2   A     The Pseudomonas, as we mentioned before, are not

3   spore formers.  So when you start to go through that

4   drying process, I think you would lose viability and

5   you'd have a hard time maintaining your Pseudomonas

6   counts.

7   Q     So do you think this process is viable on a

8   commercial scale?

9   A     Not that -- I don't believe it's viable to meet the

10  specifications that we were given at the 5 times 10 to

11  the 9 and to maintain that -- to achieve that routinely

12  and to maintain that over any sort of shelf life.

13  Q     Is 5 times 10 to the 9, does that mean 5 billion?

14  A     Yes.

15  Q     The second bullet point talks about the equipment

16  that you examined.  Do you have an opinion as to the

17  equipment?

18  A     Yeah.  There was one fermentor there that was

19  equipped with feedback loops and you can fix it so you

20  can control the temperature and pH.  There were other

21  tanks that were really holding tanks that were being

22  used as fermentalists that didn't have that same

23  feedback loop or control features.

24  Q     And then the next bullet point, the third one, it

25  references contamination.  Did you have opinions as to

ROBERT REICH - DIRECT

1   contamination at your initial --

2   A    Yeah, there was a lot of opportunity for

3   contamination, both of the product.  The substrate was

4   -- brought in a lot of bacteria with it.  That would not

5   be what the product was specified to have.  So I think

6   there was a lot of opportunity for contamination, and

7   we'll go through some of the studies where we supported

8   that hypothesis.

9   Q    And then your final bullet in this section here,

10  you discuss the ability to optimize the process.  What's

11  your opinion regarding that?

12  A    Well again, I thought -- since I didn't believe --

13  I didn't feel the process was scientifically valid, I'm

14  not sure how you could use that existing facility to

15  increase the yields very well if we weren't making good

16  product to start with.

17  Q    Turning your attention to the next document, this

18  is LexaMed-00013.  Do you recognize this document?

19  A    Yes.

20  Q    And who authored this?

21  A    I authored this -- I authored this document.

22  Q    Turning to the next page, LexaMed-00014, at the

23  bottom of the page underneath that table there's a

24  paragraph that starts out *Comments*.  Could you explain

25  your opinions that are in that paragraph?

                    ROBERT REICH - DIRECT

1   A    We were looking at -- we got product from --

2   samples of product were supplied by the site, by Betco,

3   of different products and we were confirming the count

4   and we were looking at the count during production.  We

5   found counts that were approximately 1-log lower than

6   what the specification was.

7   Q    Anything else?

8   A    They were off by 90 degrees -- I mean 90 percent.

9   I'm sorry.

10  Q    And so does this data support your initial

11  conclusions that --

12  A    It's supporting our initial conclusions that we

13  thought would be a hard time of getting and maintaining

14  those initial spore counts.

15  Q    And then if you'd refer to the next page,

16  LexaMed-00015, again right below the table you have a

17  paragraph that starts out *Comments*.  If you could

18  elaborate on your comments there.

19  A    Again, we were looking at the total microbial count

20  of different batches that they had given us.  Let me

21  look at this.  This is what -- this was on looking at

22  stability and we were looking at two different lots that

23  were at two years old and comparing them to the original

24  counts that were given by the site at 24 and 48 hours

25  and we found that they were off -- at the two-year mark

                    ROBERT REICH - DIRECT

1  they were off at least 3 logs.

2  Q    So at the end of two years --

3  A    Sometimes 4 logs at the end of --

4  Q    So at the end of two years, 99 percent of the

5  bacteria was no longer there?

6  A    Not if it's 4 logs, it would be 99.99 percent.

7  Q    Does that support or refute your --

8  A    Again, it supports some of our initial hypotheses.

9  Q    And then turning to the next page, LexaMed-00016.

10 Again, there's a table below it.  There's a paragraph

11 that starts out *Comments*.  Could you elaborate on your

12 opinions found there.

13 A    Yeah.  We were looking at the substrate material,

14 and that's what we had talked about before.  We were

15 looking at what the count was on that substrate

16 material, looking at the corn and the rice and the kelp

17 product.  And the total counts were pretty high into the

18 3- to 4-logs and most of those were spores.  We did a

19 total spore count.

20      You can differentiate the spores from the

21 vegetative cells by doing a process called *heat*

22 *shocking*.  So we said the vegetative cells and the

23 gram-negatives are not heat resistant.  So if you heat

24 shock that product, you kill off those, leaving the

25 spores.  So it's a method of differentiating the spore

                    ROBERT REICH - DIRECT

1  formers in the total microbial population.

2      So as you can see the heat shock here, we were

3  getting either up to the 10 to the 3 or 10 to the 4 per

4  gram spore formers in the substrate that was being used

5  for the product.

6  Q    So what you're saying is when the substrate came

7  in, it already had a lot of bacterial already in it.

8  A    Yeah.  We did that.  There was some discussion when

9  we were in there that some of that product may have been

10 eradiated to knock down those counts, but we couldn't

11 find or no one could find any sort of certificate of

12 processing.  So we just -- we were looking at seeing

13 what was -- what the microbial population was associated

14 with those substrates.

15 Q    So this goes to the contamination issue?

16 A    Yes.

17 Q    And why does contamination matter here?

18 A    Well, it can have, all these other bugs, they can

19 overwhelm the indicator organism that you're looking

20 for.  You can get -- it can overwhelm that process.  I

21 don't know what the contamination, what this particular

22 contamination will do for the functioning of this

23 product.  I'm not aware of that.

24      THE COURT:  What was the substrate that you

25 tested?
                    ROBERT REICH - DIRECT

1          THE WITNESS:  We tested -- there's a corn and a

2     rice and a kelp that they used to put the ferment they

3     make and they put it on that.  We tested those, the raw

4     substrate before it was inoculated with the fermentate.

5          THE COURT:  But you took that substrate and

6     medium back to your lab, as you understood it was used

7     regularly by Bio-Systems, and then you tested it for

8     contaminants which produced even spores --

9          THE WITNESS:  Yes, we tested -- correct.  We

10    didn't -- when we took it, we didn't actually sample the

11    product.  The product was sampled by representatives of

12    the site and they sent the samples to us.  We didn't

13    have individuals on site actually doing the sampling.

14         THE COURT:  All right.  So someone from

15    Bio-Systems --

16         THE WITNESS:  Yeah, we requested what we wanted

17    and they sent us labeled portions of the particular

18    substrates and we tested that.

19         THE COURT:  Thank you.

20    BY MR. NACKOWICZ:

21    Q    And you said the -- you mentioned indicator

22    organisms.  You're referring to the bacteria the plant

23    is intending to grow?

24    A    Yeah.  What the product is labeled.  You know, if

25    it's, whatever it is, megaterium or subtilis or whatever

                    ROBERT REICH - DIRECT

1  Bacillus they're using.

2  Q    Is there a contamination in the products that

3  LexaMed produces?

4  A    No.

5  Q    Turning your attention to the next report.

6  LexaMed --

7  A    I like that font a lot better though.

8  Q    LexaMed-00035.  Do you recognize this document?

9  A    Yes.

10 Q    And who is the author of this?

11 A    You'll have to go down it.  It's one of our -- one

12 of my associates, Mike Sugg.

13 Q    Was the report created at your direction?

14 A    Yes.  I was aware of what the studies were that

15 were being done, but it was under his -- he was

16 physically at the lab overseeing the project.

17 Q    And turning to LexaMed-00037, there is a paragraph

18 at the top of the page under *Comments*.  Could you review

19 that and explain your opinion there?

20 A    Could you go back to the previous page, please?

21 There was a table -- yeah, there you go.  I'm just

22 trying to remember what this particular one was.  We

23 were looking at the particular -- we got some samples of

24 the product from all the different organisms, two

25 Pseudomonas, Fluorescens and Putida, and the four or

ROBERT REICH - DIRECT

1  five different bacteria spore former.  So we were

2  looking to see what the microbial count per gram was

3  there.

4       So we got a total count on the product and then we

5  were seeing what portion of that particular count was

6  actually spore formers.

7  Q    And what percentage of the count was what --

8  A    It was very low.  This says less than 1 percent,

9  but if you look, it's -- if it was labeled 2.1 times 10

10 to the 9, it went to 10 to the 4, so that's .001 percent

11 or .01 percent.

12 Q    So the takeaway is 1 percent or less of the

13 bacteria was the target organism?

14 A    Correct.

15 Q    So in other words, it was almost entirely in

16 contaminant?

17 A    It was -- right.  There was organisms other than

18 what -- the target organism or the indicator organism.

19 Q    Turning your attention to the next report,

20 LexaMed-00046.  And is this document familiar?

21 A    Yes.

22 Q    And who authored this one?

23 A    It was again authored by Mike Sugg.

24 Q    And again at your direction?

25 A    Yes.  He's a laboratory supervisor with us.
                    ROBERT REICH - DIRECT

1    Q    Turning your attention to the next -- to page

2    LexaMed-49 under the *Comments* section.  If you could

3    elaborate as to your conclusions here.

4    A    This was a -- this study followed the last one.

5    The last study said here is the product.  We don't find

6    the indicator organism -- you know, we don't find the

7    majority of the organisms associated with that product

8    to be what -- the indicator organism.  So then we went

9    to the next study, looked at the same products, and we

10   tried to identify what organisms were associated with

11   that product.  So we got sent -- and if you go to the

12   beginning, I believe the site sent us particular plates

13   that they had sent us from this particular product.  We

14   identified what organisms were associated with those

15   plates.  And if you look here, the results indicate that

16   we had a lot of gram-positive cocci.  We had a lot of

17   organisms; in fact, we had a lot of organisms that were

18   not the indicator organisms associated with the product.

19            THE COURT:  Were these in spore or

20   vegetative --

21            THE WITNESS:  Some of them were supposed to be

22   spores.  We found the majority to be vegetative

23   organisms.

24            THE COURT:  Which means under stress most of

25   those will go away.
                  ROBERT REICH - DIRECT

1          THE WITNESS:  Under stress -- that's correct.

2    And if you look at when we did that heat shock and

3    nonheat shock count, you can see the heat shock count

4    was 10 to the 9.  The nonheat shock count -- I'm sorry,

5    the other way around.  The total count was 10 to the 9.

6    The heat shock count was like 10 to the 5.  So that's

7    .00 -- you know, 99.99 percent the organisms were not

8    spore formers.

9          THE COURT:  Does the indicator organism

10   increase in the percentage once you put it through

11   stress because they're in spore form?  Or did you test

12   for that?

13         THE WITNESS:  Well, we tested just spore forms.

14   I didn't test -- we didn't do that exact study that

15   you're running.  But if you look at some of this data

16   here, we weren't even finding too many spore formers in

17   some of these products.  So on these plates here it was

18   a little different, but I didn't do that study that you

19   just --

20         THE COURT:  All right.  Next question, Counsel.

21   BY MR. NACKOWICZ:

22   Q    So again, the takeaway is that of the materials

23   that were sampled in this study, it was mostly

24   contaminants and not the target organism?

25   A    Correct.

                    ROBERT REICH - DIRECT

1          MR. BIANCHI:  Objection.  Leading.

2          THE COURT:  Well, it's a little late for that.

3   In any event, he answered.

4   BY MR. NACKOWICZ:

5   Q    Does this set of testing and then the previous one

6   we just discussed, does that support or refute your

7   initial hypothesis as to the viability of the wet-batch

8   process?

9   A    It supports not just the viability, it's the whole

10  combination of that and the contamination.

11  Q    Turning your attention to the next report, LexaMed

12  000-61.  Again, ask you to look at it and tell me if you

13  recognize it.

14  A    Yes.

15  Q    And who's the author here?

16  A    Jim Whitcomb.

17  Q    And he was a LexaMed employee?

18  A    Yes.

19  Q    And was this test also done at your direction?

20  A    Yes.  I was aware of all the testing that was being

21  done.

22  Q    I will turn to your *Conclusions* section here, which

23  is LexaMed-00070.  There's three conclusions under your

24  *Conclusions* section.  If you can just quickly unpack

25  those.
                    ROBERT REICH - DIRECT

1    A    What we did here is we tried to simulate the

2    process that was being done, the wet process.  We tried

3    to simulate that.  We got -- all the materials were

4    obtained from the site.  They sent us the organism.

5    They sent us the substrates.  And we tried to duplicate

6    exactly that to see if we could replicate that process

7    and see how it worked in our hands.  And when we tried

8    the wet process with Pseudomonas, we were not able to

9    maintain the population of Pseudomonas going through the

10   process.  We had a loss on -- we couldn't get the

11   organisms to survive and grow in that operation, and

12   going through the drying process we lost viability.

13   Q    How tolerant are Pseudomonas to dessication?

14   A    Tolerant?

15   Q    Yeah.

16   A    They're not very tolerant.  We have -- well, I'll

17   just stop.  We use Pseudomonas daily.

18   Q    And the second conclusion, 3.2, that's regarding

19   the viability of the Bacillus production?

20   A    Yeah.  It showed that we did get stable spores, but

21   they continued -- they -- it wasn't a synchronous

22   process.  We continued to have increased spore counts;

23   stabilize after approximately one week; reached

24   approximately 20 percent or less; populations from the

25   simulated process did not reach the specification of 5.7

                    ROBERT REICH - DIRECT

1  times 10 to the 9 per gram.

2  Q    So you were unable to hit the targets.

3  A    Correct.

4  Q    And then the third conclusion.  3.3 regards

5  contamination?

6  A    Again, there was a lot of contamination.  As I

7  said, it comes in with that substrate and it was

8  obscuring a lot of our counts.  It was hard to -- a lot

9  of Bacillus are very similar morphologically so it's

10  hard to differentiate them.

11  Q    So do these studies support or refute your initial

12  hypothesis about the viability of the wet-batch process?

13  A    It supports it.

14  Q    And then the final report here, LexaMed-85.  Again,

15  if you could look at the page here and tell me if you

16  recognize it.

17  A    Yes.

18  Q    And it is also authored by Jim Whitcomb?

19  A    Yes.

20  Q    And again at your direction?

21  A    Yes.

22  Q    Turning to the *Conclusion* section in this one,

23  LexaMed-00089.  Here too you have three conclusions, if

24  you could just briefly elaborate.

25  A    Yeah.  Can we go back to the tables in there?  What

ROBERT REICH – DIRECT

1    we were trying to do here, we got -- they are stock
2    cultures of organisms.  They kept samples, frozen
3    samples of the fermentate, and they also had life-like
4    samples from a recognized culture collection.  So what
5    we wanted to do --
6              THE COURT:  When you say *they*, you mean
7    Bio-Systems?
8              THE WITNESS:  I'm sorry.  Yeah, the site.
9    Bio-Systems.
10              THE COURT:  Thank you.  Next question -- I'm
11    sorry, you were going to explain that --
12              THE WITNESS:  Yeah, I was just going to say
13    what we were doing here, we were looking at -- could you
14    go back up a little bit?  I'm sorry.  I just don't
15    remember the exact -- so we have the stock cultures that
16    we got from them.  We tried to identify those.  We have,
17    in-house, we have an automatic microbial identification
18    system known as the Biolog System.  It works on
19    basically -- it's based on bacteria growth.  And we were
20    able to identify -- they listed their -- they sent us
21    samples of their organisms, and as you can see, we were
22    able to confirm the stock culture for fluorescens,
23    putida, and subtilis.  We had some differences in
24    results with the Bacillus on a couple of the species.
25    They all came out to be Bacilli, but we had some
                    ROBERT REICH - DIRECT

1    differences in species.

2    BY MR. NACKOWICZ:

3    Q    So you're saying some of the starter cultures are

4    contaminated?

5    A    Yes.  And then to confirm that, we sent it out for

6    DNA sequencing to another contract laboratory to make

7    sure that there wasn't an artifact from our method.  And

8    they were also -- the DNA sequencing showed one of the

9    organisms was not what it was purported to be.

10   Q    And then the third conclusion, 3.3, it says

11   "Bacillus licheniformis and Bacillus megaterium

12   fermentate lots are both contaminated."  What's a

13   fermentate lot?

14   A    That's when they were -- they took us, when they

15   first grow it up from their stock culture, they make --

16   they enhance the number of organisms.  And when we were

17   looking at those they were labeled as Bacillus

18   licheniformis and Bacillus megaterium, the organisms in

19   that lot were actually identified as Bacillus cereus,

20   both by our method as well as by the genetic sequencing.

21   Q    So you found contamination here too.

22   A    Correct.

23   Q    And does this study support or refute your initial

24   hypothesis?

25   A    I don't know if that -- it's contamination in that

                    ROBERT REICH - DIRECT

1  it wasn't the organism.  They were starting with -- the

2  organism they were starting with was the wrong organism.

3  From that standpoint, it was a contaminant based on the

4  labeling that was given to that product.

5  Q    And do these studies support or refute your initial

6  hypotheses about the viability of the wet-batch process?

7  A    They support that as well as the contamination

8  issue.

9          MR. NACKOWICZ:  Thank you.  (9:44 a.m.)

10         THE COURT:  Cross-examination.

11                   CROSS-EXAMINATION

12  BY MR. BIANCHI:

13  Q    Mr. Reich?

14  A    Yes.

15  Q    Do you know what the value of your lab is?  Do you

16  have like a monetary value?

17  A    Of our lab?

18  Q    Yeah.

19  A    Five million.  Four to five million.

20  Four-and-a-half.

21  Q    But that's just the lab portion of it?

22  A    No, that would be the whole company.  That would

23  include the consulting component as well.

24  Q    And when you wrote these opinions or I should say

25  when you had directed someone to do that, how long

                   ROBERT REICH - CROSS

1  between when you examined the plant and then tested the

2  products to when you reached your opinions?

3  A    If you look at the dates, I think that we -- I

4  examined the plant in April, and a lot of the testing

5  started in May, June, and July.  So pretty quickly

6  thereafter.

7  Q    So a couple months.

8  A    Yes.

9  Q    And I know you mentioned being ISO certified;

10  correct?

11  A    Yes.

12  Q    And this ISO certification is specific to the

13  medical device industry; is that right?

14  A    No, not really.  It's 13485 is a subsection of ISO

15  9001, which I think is what you guys -- I'm sorry, what

16  the plant is certified to as well; shows an overall

17  quality system, which all processing, in terms of

18  manufacturing, in terms of personnel training and

19  procedures, all that stuff.  But you're right, 13485 is

20  a subset that focuses on the medical device industry.

21  Q    And being ISO certified demonstrates that your

22  company has a level of control and systems around its

23  processes; is that right?

24  A    Correct.

25  Q    And just to be clear, for the past 40 years you've

ROBERT REICH - CROSS

1  been working in the medical and pharmaceutical

2  industries; correct?

3  A     That is correct.

4  Q     And the medical device and pharmaceutical

5  industries are regulated by the FDA; is that right?

6  A     That is correct.

7  Q     And you are not an expert on marketing and

8  advertising, are you?

9  A     Although I do it at my company, I would not

10 consider myself an expert.

11 Q     And before serving as an expert for Betco in this

12 case, you had never worked specifically for a wastewater

13 treatment or septic system company; is that correct?

14 A     That is correct.

15 Q     As far as you're aware, Bio-Systems produces

16 products for an industry that is not regulated by the

17 FDA; that is, it's not an FDA-regulated concern; is that

18 correct?

19 A     That's my understanding, yes.

20 Q     And indeed there are no government agencies that

21 you're aware of that regulate Bio-Systems or its

22 industry.

23 A     Yeah, I don't know that.  So yes, that would be

24 true.

25 Q     And in all the tests that you did, LexaMed never

ROBERT REICH - CROSS

1  tested any of Bio-Systems' products to determine if they

2  actually worked as presented; is that right?

3  A    No.  We tested based on what the label copy or the

4  specs were.  We did not test them -- in a sewage

5  treatment application you mean?  No, we did not do that.

6  Q    And so you wouldn't know if the product actually

7  worked if it was dropped into a sewage treatment

8  facility.

9  A    I couldn't swear to that.  I know that we know that

10 some of the bugs weren't what they purported to do and

11 some of those bugs are chosen because they have

12 particular enzyme systems or whatever to chew up, you

13 know, whether it's a lipase or amylase or whatever

14 you're looking for.  But no, I can't swear that they

15 would not work.

16 Q    And you kind of referenced that a lot of the tests

17 found less than 1 percent of -- I think the words you

18 used was the indicative?

19 A    Indicator organism or whatever.

20 Q    Sorry.  Indicator organism.

21 A    Yeah, whatever the product was labeled to have.

22 Q    Sure.  So would that make you believe that likely

23 the product wouldn't work?

24 A    I would guess that it may not work as well as you

25 would expect.  If you were purporting to have 10 to the

                    ROBERT REICH - CROSS

1  9 and we had -- and we couldn't identify it, if there

2  was just a lower number of organisms, I would think it

3  wouldn't work as effectively.

4  Q    And again, I know you examined the plant in April

5  of 2012, and you also -- the products that you were

6  testing were ones that were created around that same

7  time, April 2012; is that right?

8  A    Yeah.  A lot of the in-process -- when they took

9  samples of their in-process stuff, we did test some that

10  had some age on it where we looked at what the count was

11  after two years.  But the majority of the product we

12  tested was formed around that time, yes, after April of

13  2012.

14  Q    And you yourself or even the people that were

15  working for you never saw any actual labels that were

16  used with the products that were being tested; is that

17  correct?

18  A    I've seen some labeled -- well, since then I've

19  seen labels that talk about counts of, you know, some of

20  them say 200 billion, some say 5 billion.  But yeah, in

21  that range.  But at the time we were told that the

22  specification was 5.7 times 10 to the 9.

23  Q    And when you did the actual test that resulted in

24  your report, you never saw any of the labels that were

25  used with the products.

ROBERT REICH - CROSS

1    A    At that time when I did the test, I had not seen

2    the labels.  I was told the specification.

3    Q    Okay.  Thank you.  And if there was nothing on a

4    label that said there was a specific amount of a

5    specific bacteria in a product, then any bacteria in the

6    product would satisfy that label claim; isn't that

7    right?

8    A    I'm sorry, say that again.

9    Q    Sure.

10   A    I'll repeat.  If the label did not specify the

11   microbial count and not a specific organism --

12   Q    Correct.  If it just said --

13   A    -- then the total count would be what you would be

14   looking at, yes.

15   Q    And you don't know, based on any of your tests,

16   whether additional bacteria in a product that's used in

17   a septic or wastewater treatment plant would help the

18   performance of the product; is that right?

19   A    I do not know if it would help it or hinder it.  A

20   lot of times you could see that one of the --

21            THE COURT:  You've answered the question.

22            THE WITNESS:  Okay.

23            THE COURT:  Next question.

24   BY MR. BIANCHI:

25   Q    And in testing the products and the procedures at

                     ROBERT REICH - CROSS

1   the Beloit plant, your main contact at Bio-Systems was

2   Neil Seeger; is that right?

3   A    Correct.

4   Q    And as your main contact, it was Neil who provided

5   you the procedures that he suggested Bio-Systems was

6   using; is that right?

7   A    Yes.

8   Q    So if Neil provided the wrong procedure, say he

9   misstated the temperature or a moisture level, then that

10  means you would have relied on that incorrect

11  information in reaching your opinions; isn't that right?

12  A    That's correct.  We tried to simulate the

13  procedures as we were given them.

14  Q    And you believe that the procedures that you were

15  provided contained very important details; isn't that

16  right?

17  A    Yes, yes.

18  Q    To the point where getting one or two of those

19  details such as temperature, for example, wrong could

20  greatly affect the result of your tests; is that right?

21  A    If we used a different incubation temperature, yes,

22  it could affect the results.

23  Q    And just to be clear, when you -- when I say you, I

24  mean LexaMed.  When LexaMed did its test of procedures

25  and products, it never spoke with my client Malcolm

                    ROBERT REICH - CROSS

1  Peacock; is that right?

2  A    No, never spoke with Malcolm.  Never met the

3  gentleman.

4  Q    And you said in April you did a quick walk-through

5  of the plant; is that right?

6  A    That's correct.

7  Q    And when you did that walk-through, the issues you

8  raised in your report about lack of temperature control

9  or lack of cleanliness, no moisture control, those were

10  all obvious issues to you; is that right?

11  A    Yes.

12  Q    You simply walked through the plant.  You could see

13  that.

14  A    Doors were open to the outside.  There was no

15  control, so yes.

16  Q    The cleanliness of the Beloit plan, including

17  having some product that might be spilling into others,

18  was a result of employees at that plant and not any of

19  the processes that you were testing; isn't that right?

20  A    I would guess it was a procedural issue with the

21  plant.  I mean certainly the processes didn't define

22  contamination or cross contamination of issues, yes.

23  Q    And I've mentioned temperature a couple times, but

24  to be clear, the temperature at which one grows bacteria

25  affects its growth; isn't that right?
                    ROBERT REICH - CROSS

1   A    It can affect the growth rate for sure.  I mean

2   there's optimum temperatures for each of those bacteria.

3   If it's slightly different, they'll just grow a little

4   slower.  But yes, the incubation temperature is a

5   significant factor.

6   Q    And if the temperature is too high or too low, then

7   the bacteria may not grow at all; correct?

8   A    Yes.  If it's outside their growth range.

9   Q    And also moisture levels are critical in growing

10  bacteria; isn't that right?

11  A    Yes.

12  Q    And in fact, bacteria need a certain moisture level

13  to be able to grow and to reproduce.

14  A    Correct.

15  Q    And I know your report often mentions the wet-batch

16  process, but another name for that is *solid state*

17  *fermentation*; correct?

18  A    Correct.

19  Q    And you understood that the goal of this wet-batch

20  process or solid state fermentation at Bio-Systems was

21  to form bacteria spores; correct?

22  A    Yes.  The eventual end-product, yes, was bacteria

23  spores.

24  Q    And --

25  A    Well, unless it was Pseudomona.  But for the
                    ROBERT REICH - CROSS

1  Bacillus, yes.

2  Q    And you had noted that to get them to turn into a

3  spore, you stressed the bacteria, the Bacillus; right?

4  A    Correct.  That's one method whether -- yeah, it

5  could be temperature stressing or nutrient stressing.

6  Q    And you just named temperature and nutrients.

7  Those are sometimes referred to as triggers to trigger

8  sporulation; correct?

9  A    Yes, you could say that.

10  Q    And you could potentially remove certain nutrients

11  and that could cause sporulation; right?

12  A    Yes.

13  Q    Did you test to see if the removal of ammonia would

14  cause the bacteria to sporulate using Bio-Systems' solid

15  state fermentation process?

16  A    We used the same media, and I forget the

17  designations.  Whether it be you had a sporulation media

18  that was -- wasn't as nutritious as the other media that

19  you grew up to get vegetative cells when you were

20  forming -- when you were growing your fermentate to

21  inoculate the substrate.  So there was two different

22  media.  We looked at both of those media and we were

23  able to get sporulation in the sporulation media, and we

24  had primary vegetative cells in your enriched media.

25  And I'm sorry, I don't remember the designations.

                    ROBERT REICH - CROSS

1  Q    But you didn't specifically check if the removal of

2  ammonia would cause the bacteria to sporulate; is that

3  right?

4  A    Not taking it out of the media.  We use the media

5  that was formulated with lower concentrations of

6  ammonia.

7  Q    And just to make sure that we're clear here, using

8  the wet-batch process can generate and grow bacteria

9  spores; correct?

10  A    Yes.

11  Q    And in fact, your problem, what you noted as a

12  problem with the wet-batch process was the way in which

13  it was being applied at Bio-Systems; isn't that correct?

14  A    I guess that's a fair statement.

15  Q    So your opinion is that the wet-batch process as it

16  was told to you can grow spores, but just not at

17  consistent high levels; isn't that right?

18  A    Yes.  It will grow some spores, but not at

19  consistent levels to meet the -- yes.

20  Q    And consistent to you means getting the same final

21  outcome of spores over and over again; correct?

22  A    Yes.

23  Q    So to break down your opinion further then, it's

24  that the wet-batch process, the yields or the results

25  were not consistent; correct?

                    ROBERT REICH - CROSS

1   A    Yes.  They were variable.

2   Q    And that variable means that at times you could get

3   really high counts and then at other times you could get

4   really low counts; correct?

5   A    Yes.

6   Q    And it could be possible during the times when you

7   were getting high count to produce more product at that

8   time and store it; isn't that right?

9   A    I don't know.  It would be variable if it were

10  between batches.  It's going to depend on the substrate.

11  It's going to depend on the fermentate, on the

12  conditions.  So I don't know, if you'd had a good batch

13  on Monday, I don't know if it necessarily assumes

14  there's a good batch on Tuesday or Wednesday.  But

15  that's a definition of variable, I guess.

16  Q    And if somebody wanted to grow bacteria using the

17  wet-batch process as you were informed about it, they

18  could use that process in a bucket at their house and

19  grow bacteria; isn't that right?

20  A    Could you grow bacteria in a bucket at your house?

21  Yes.  Given the -- you know, if you had the proper --

22         THE COURT:  The Court will also take judicial

23  notice of that.  You may proceed.

24  BY MR. BIANCHI:

25  Q    And so with this -- the different -- we talked
                    ROBERT REICH - CROSS

1  about temperature and moisture and substrate.  Even

2  minor adjustments in those areas would have an effect on

3  the overall wet-batch process used in producing

4  bacteria; isn't that right?

5  A    Adjustments in temperature, moisture, and nutrients

6  could affect the outcome?  Yes.

7  Q    Or any one of those.  Not even all together.

8  A    That's correct.  Any one individual could change

9  it.

10  Q    And the fermenting process used at Bio-Systems, I

11  think you'd agree, is not pharmaceutical grade; correct?

12  A    Correct.

13  Q    And before you inspected the Beloit plant and its

14  processes, you had never inspected or even seen another

15  facility that was growing microorganisms for use in

16  products like those produced at Bio-Systems; isn't that

17  correct?

18  A    That's correct.

19  Q    And LexaMed, in reaching its conclusions, made the

20  assumption that the trigger for sporulation with the

21  wet-batch process was dessication and drying out;

22  correct?

23  A    And depletion of nutrients because there are some

24  nutrients ended there, too, because you wanted to

25  increase that count a little bit to get to your final

ROBERT REICH - CROSS

1   spore count.  So it would be a combination of nutrient

2   depletion and the drying process.

3          THE COURT:  Because we've got these two terms,

4   was your last question related to spoliation or

5   sporulation?

6          MR. BIANCHI:  Sporulation.  I got too many

7   "L's" in there.

8          THE COURT:  We're going back and forth on this

9   and I want to make sure.  What we've been talking about

10  is sporulation, which I understand to mean a growth or

11  the development or growth of the spores; is that

12  correct?

13         THE WITNESS:  Sporulation, yes.

14         THE COURT:  Thank you.

15         MR. BIANCHI:  And I've only intended to say

16  sporulation as well.

17         THE COURT:  Understood.  Why don't you spell it

18  for the record.

19         THE WITNESS:  S-p-o-r-u-l-a-t-i-o-n.

20         THE COURT:  Thank you.

21  BY MR. BIANCHI:

22  Q    And did LexaMed decide what the trigger was for

23  sporulation in the wet-batch process or was it told what

24  the trigger should be?

25  A    I don't recall.  I mean I believe that that's what

                    ROBERT REICH – CROSS

1    the trigger was, but I probably was -- I probably was

2    told that by Neil as well, but I can't swear to that.

3    Q    Can we pull up the first report that he had.  I'm

4    looking at 00007.  If you look at that top paragraph, so

5    I'm on LexaMed four zeros and a 7.  This is in Exhibit

6    20.

7         And if you go about two-thirds of the way down,

8    there's a sentence that starts "The first drying step

9    involves..."

10   A    Yes.  "The first drying step involves 24 hours in a

11   dry room operated at 30 to 35."

12   Q    Degrees Celsius.  And you recall you were provided

13   with that temperature; isn't that right?

14   A    Correct.

15   Q    And I believe it's LexaMed 64, Table 5.  So if you

16   look at this page, 00064, it says at the top of the

17   table, each of the tables -- let's pick Table 7.  It

18   says "IP batch populations after 24 hours at 37 degrees

19   Celsius."  Do you see that there?

20   A    Yes.

21   Q    So at one time, LexaMed was told that after

22   fermentation bacteria was stored at 30 to 35 degrees

23   Celsius, and then later it was sold 37 degrees Celsius;

24   isn't that right?

25   A    I guess I think if you -- as an attachment to this

                    ROBERT REICH - CROSS

1  report is that Neil sent us a synopsis of that so we

2  can --

3  Q    And my question is simpler than that.

4  A    Oh.

5  Q    The temperature in Exhibit A that we first looked

6  at, page 7, is different than the one that was used in

7  -- page 64 to do that portion of the report; correct?

8  A    Yes.

9  Q    Okay.

10 A    If that -- Yes.  That's what I was told, 30 to 35.

11 And this was done at 37.

12 Q    Correct.  And they were both testing the wet-batch

13 process though; right?

14 A    Correct.

15 Q    And if you change even one condition in the process

16 like the temperature, it can create a domino effect that

17 changes other portions of the process; isn't that right?

18 A    It could.  This was a drying process.  This

19 might -- if it's a two degrees difference, it may dry a

20 little faster.  But --

21 Q    And when LexaMed tested the wet-batch procedure in

22 its laboratory in July 2012, it only ran through the

23 process once; right?

24 A    Correct.

25 Q    In mixing different bacteria strains, that can

                    ROBERT REICH - CROSS

1  affect the plate count of the products; correct?

2  A    I'm not sure what you mean.  If you have a mixed

3  culture and you're doing a plate count?

4  Q    Yes.  If you're trying to plate -- do a plate count

5  with a product that is a mixture of various bacteria,

6  that can make it difficult to do the plate count --

7  A    No --

8  Q    -- correct?

9  A    -- it wouldn't make it difficult to do the count.

10  You do the proper dilutions, you're going to count the

11  colonies.  I don't --

12  Q    So having different bacteria strain will not affect

13  the plate count of the product?

14  A    It shouldn't if you're incubating properly, and

15  they all grow within that, you know, on the medium on

16  the incubation temperatures.  Very seldom in real life

17  are you dealing with pure cultures especially.  A lot of

18  times you're dealing with mixed cultures when you're

19  plating.

20         THE COURT:  You would expect the plate count to

21  be the same for Bacillus and Pseudomonas --

22         THE WITNESS:  You could tell --

23         THE COURT:  If you were able to provide a pure

24  sample, you would expect their development to be the

25  same under the same conditions?
         ROBERT REICH - CROSS

1          THE WITNESS:  If you had a mixed culture of
2     Bacillus and Pseudomonas --
3          THE COURT:  Not a mixed culture.  One of each.
4          THE WITNESS:  Okay.  You have one of each.
5          THE COURT:  Two separate substrate or two
6     separate medium.
7          THE WITNESS:  Okay.
8          THE COURT:  And you treated them totally the
9     same:  Heat, temperature, time.  You would expect them
10    to develop at the same rate?  I thought every bacteria
11    developed at different rates.
12         THE WITNESS:  They do, but when you're looking
13    at colonies, you might have some different.  Some of the
14    Bacilli might grow faster.  Pseudomonas is a very fast
15    grower under ideal conditions.  So you would think that
16    they'd grow more or less the same if you did them --
17         THE COURT:  More or less --
18         THE WITNESS:  They would look different --
19         THE COURT:  I'm sorry.  The question was would
20    they develop the same; at the same rate.
21         THE WITNESS:  They would develop at comparable
22    rates.  I can't say they would be exactly --
23         THE COURT:  That's fine.  Next question,
24    Counsel.
25         THE WITNESS:  -- the same.
                    ROBERT REICH - CROSS

1              MR. BIANCHI:  Your Honor, can I give him his

2    deposition?

3              THE COURT:  Yes.

4              THE WITNESS:  I hope I don't have to read all

5    that right now.

6              MR. BIANCHI:  No.

7              THE COURT:  Do you have a specific page

8    reference?

9              MR. BIANCHI:  Yes.

10   BY MR. BIANCHI:

11   Q    I'm going to have to you turn to page 137.  And

12   it's -- let me know when you're there and I'll give you

13   the line.

14   A    I'm there.

15   Q    Okay.  And just be clear, you recall you were

16   deposed back in -- it's been awhile -- back in July,

17   July 25 of 2013; correct?

18   A    Correct.

19   Q    And when you were deposed, you were under oath; is

20   that right?

21   A    Correct.

22             THE COURT:  The Court will take judicial notice

23   of that.  You don't need to go through the litany, and

24   I'd ask you to ask your impeaching question.

25   BY MR. BIANCHI:
                    ROBERT REICH - CROSS

1  Q     On line 17.  I'm going to read it.  You were asked:

2            "Question:   And the mixing, that would affect

3          the plate count and the total count; correct?"

4       And your answer was:  "It could, sure.  It could,

5  because you're blending it with something else that has

6  a number of organisms too."

7       Did I read that correctly?

8  A    Yes.  Let me read the content sentence in.

9            THE COURT:  You've answered the question.  Your

10 counsel can elaborate.  You should ask your next

11 question, Counsel.

12           THE WITNESS:  Oh, okay.

13 BY MR. BIANCHI:

14 Q    Before LexaMed tested Bio-Systems' products, it had

15 never before even tested a septic or waste treatment

16 plant product for stable stability profile; isn't that

17 right?

18 A    That's correct.

19 Q    And I believe you already said this, but just to

20 confirm, the product systems LexaMed examined were

21 received from Bio-Systems; correct?

22 A    That is correct.

23 Q    LexaMed sometimes does send people to test on

24 location; isn't that right?

25 A    We do.

                    ROBERT REICH - CROSS

1  Q    But in this instance you did not do that?

2  A    We did not.

3  Q    And in fact, LexaMed doesn't know where the samples

4  were taken from exactly; isn't that right?

5  A    No.  We went with what the samples were labeled and

6  sent to us with, telling us what they were.  But we

7  weren't there when the samples were taken.

8  Q    And you don't know how the samples were taken;

9  isn't that right?

10  A    Correct.

11  Q    And so all of LexaMed's results and data are based

12  on assumptions that the Beloit plant had properly taken

13  and handled the samples; isn't that right?

14  A    Correct.

15  Q    And you, being LexaMed, did not know if Bio-Systems

16  sent bacteria that was still in the vegetative state as

17  opposed to bacteria that had already reached the spore

18  form; correct?

19  A    No.  We only knew what they told us.  We don't

20  know.

21  Q    So no, you didn't know whether it was vegetative

22  or --

23  A    No.

24  Q    And if they had sent vegetative bacteria, there's a

25  greater chance that the bacteria would have died during

ROBERT REICH - CROSS

1  shipment; isn't that right?

2  A      There would be -- yes, there's a greater chance the

3  veggies would die then in the spore form, that's

4  correct.

5  Q    LexaMed did not test to see if the products it

6  received from Bio-Systems still functioned after a

7  two-year time; isn't that right?

8  A      Correct.  Like we said before, we did not test

9  functionality in terms of remediation of any sort of

10  problems.

11  Q    And because LexaMed tested products that were

12  shipped from Bio-Systems, it could have obtained a

13  different count than if it had went on site and plated

14  samples right there at the Beloit plant; isn't that

15  right?

16  A      If there was a loss of vegetative cells, yes, we

17  would not have been able to detect that.  The spore

18  formers would have been stable.

19  Q    And the spore count that LexaMed did was based on

20  mature spores that would have shown heat resistance;

21  isn't that right?

22  A      Correct.

23  Q    And therefore LexaMed was looking for the spore

24  count on products, not the total count.

25  A      We did both, if you look at our reports.
                    ROBERT REICH - CROSS

1   Q     And so total count isn't total spore count?

2   A     No.  There's a total count and a total spore count.

3   The spore count is a subset of the total count.

4   Q     And there could have been immature spores that were

5   destroyed in the testing process; isn't that right?

6   A     Correct.

7   Q     And immature spores could have matured into a

8   mature spore if they had not been exposed to high heat;

9   isn't that right?

10  A     That's a possibility, yes.

11  Q     Isn't it true that the more samples taken, the

12  better chance one has of getting a true representation

13  of the overall picture of a product?

14  A     Yes.

15  Q     And the same is true for running a procedure;

16  correct?

17  A     You mean how many replicates you would run in a

18  procedure?

19  Q     Yes, sir.

20  A     Yes.

21  Q     And with a smaller number of samples, there's a

22  chance that the results may not be representative of the

23  original sample; correct?

24  A     That's a possibility depending on the sampling.

25  Q     And you understood that Bio-Systems was using a

                    ROBERT REICH - CROSS

1  spread plate method, specifically using a spiral plater

2  and an automatic counter to plate and count its

3  bacteria; correct?

4  A    Correct.

5  Q    And you yourself had never used a spiral plater or

6  an automatic counter before; right?

7  A    We used automatic counters all the time, but we

8  don't at LexaMed.  But I've use automatic counters and

9  we have validated automatic counters.  I have not used a

10  spiral plater myself.

11  Q    It is an acceptable and valid method to plate and

12  count bacteria using a spiral plater and automatic

13  counter; correct?

14  A    Yes.

15  Q    And I believe you noted earlier that it can be

16  difficult to differentiate species of the genus

17  Bacillus; isn't that right?

18  A    Correct.

19  Q    So if several Bacillus species are in a product, it

20  would be difficult to tell one from the other even on a

21  microscope; correct?

22  A    Yes.  Microscopically you couldn't tell.  Well,

23  some Bacillus are bigger than others, but generally

24  microscopically you couldn't differentiate.

25  Q    And you knew Neil Seeger outside of this

                        ROBERT REICH — CROSS

1  relationship with Bio-Systems; correct?

2  A    Yes.  I -- Neil Seeger, it's funny, was the son --

3       THE COURT:  At this point there's just a yes

4  and you've answered it.  Any more questions for this

5  witness?

6       MR. BIANCHI:  Last question.

7  BY MR. BIANCHI:

8  Q    You specifically gave him his first job out of

9  college --

10  A    I did --

11  Q    -- as a favor; correct?

12  A    -- yes.

13       MR. BIANCHI:  No further questions.

14       THE COURT:  I'll allow redirect.  Let me ask

15  one thing.  Let me just ask one thing.  You started out

16  early on by defining Bacillus and Pseudomonas, which I

17  understand to be two bacteria strains.  Was there some

18  other reason why that's significant, those two strains

19  are significant?

20       THE WITNESS:  Yeah, because that's what they

21  were purported to have in their products.

22       THE COURT:  So the targeted bacteria, those

23  were the two and you were just defining it for that

24  purpose.  It wasn't that one is more capable of

25  producing spore forms or more capable of vegetative

                    ROBERT REICH - CROSS

1  form.  That wasn't your reason for defining them.

2          THE WITNESS:  No, I was defining because those

3  were the organisms in question with this product.

4          THE COURT:  Thank you.  Thank you.  Redirect.

5          MR. NACKOWICZ:  Thank you, Your Honor.  (10:16)

6                   REDIRECT EXAMINATION

7  BY MR. NACKOWICZ:

8  Q    Notwithstanding the fact that you've worked in the

9  medical and pharma industries heretofore, you still

10 dealt with the Bacillus and Pseudomonas that we've been

11 talking about; correct?

12 A    Yes, routinely.

13 Q    Mr. Bianchi talked a little bit about process

14 earlier.  Will every change to a bacteria-growing

15 process materially change the outcome?

16 A    Would you repeat that again, please?

17 Q    If you have a bacteria-growing process, will every

18 single change materially affect --

19          THE COURT:  Will minor changes --

20 Q    -- the outcome?

21          THE COURT:  -- change, materially change --

22          THE WITNESS:  Not necessarily.

23          THE COURT:  -- results?

24          THE WITNESS:  Not necessarily.

25          THE COURT:  Next question.
                   ROBERT REICH - REDIRECT

1  BY MR. NACKOWICZ:

2  Q     There was a variance that was called to your

3  attention earlier, 35 degrees versus 37 degrees.  Do you

4  think that that's a material difference?

5             MR. BIANCHI:  Objection.  It was 30 --

6             THE COURT:  I'm sorry, the objection is --

7             MR. BIANCHI:  Misstates what I asked.

8             THE COURT:  -- misstates the testimony?  Well,

9  he's not doing that, so you can ask the question.

10 BY MR. NACKOWICZ:

11 Q     Is there any indication that this temperature

12 variance that was called to your attention had a

13 material effect on the outcome?

14 A     No.

15 Q     At this point, has your conclusion that the

16 wet-batch process is not scientifically valid and

17 appropriate on an industrial scale changed at all?

18 A     No.

19            MR. NACKOWICZ:  That's all I have.  Thank you,

20 Your Honor.

21            THE COURT:  Let me clarify that.  I thought you

22 had indicated the wet-batch process, if done properly,

23 might be an effective method.  But as done here by

24 Bio-Systems, it was not.  Did I misunderstand that?

25            THE WITNESS:  That's true.  I mean you can --
                    ROBERT REICH - REDIRECT

1    their solid state fermentation certainly is a utilized

2    process.  The way it was -- certainly the way it was

3    described to me and what I observed here, in my opinion

4    it was not scientifically valid and it wouldn't

5    reproducibly --

6              THE COURT:  Understood.  You may step down

7    then.  Thank you.

8              THE WITNESS:  Do I leave this here?

9              THE COURT:  You may.  Yes.

10        (Witness excused at 10:19 a.m.)

11             THE COURT:  At the break it will be retrieved.

12   Before we call our next witness, let me just clarify a

13   couple -- please be seated.  For purposes of making your

14   record, Exhibit 20 is not coming in, as I've indicated.

15   If there are specific tables that have been referenced

16   by a witness and you can reach agreement with the other

17   side, going forward I would ask you to just designate

18   those tables and those tables are legitimately brought

19   in if they represent summaries of data that an expert

20   relied upon.  But I'm not going to let in the entire

21   exhibit.

22        What was the understanding on CVs?  That both sides

23   would simply submit CVs and they be made exhibits?  I

24   didn't follow that.

25             MR. BIANCHI:  My understanding was that we

87

1   basically agreed that the experts, the people who were

2   actually experts listed on the document, that we agreed

3   that they were qualified to testify what was in the

4   report and so you didn't need to lay a foundation about

5   qualifications.

6          THE COURT:  I understand.  And that makes

7   sense.  With that said, if the parties can reach

8   agreement with respect to Mr. Reich's testimony on

9   specific tables, you can make those part of the record.

10  You just need to properly label them and I would suggest

11  you do it as Exhibit 20A, Exhibit 20B, Exhibit C, and

12  then make a record of what it was that was put into

13  evidence by virtue of reference.

14      The other thing is is neither side going to use the

15  document imager?

16         MR. BIANCHI:  We were going to.  The ELMO?

17         THE COURT:  Yes.  Unfortunately the document

18  image is directly behind, is it Ms. Gehrig?

19         MS. VERNON:  Kaylynn Vernon.  I'm just the

20  legal assistant.

21         THE COURT:  You're not just the legal

22  assistant.  Oftentimes you're the most important person

23  in the room, but that's not my point.  My point is

24  you're going to have to rearrange so we can get access

25  to the document imager.
                    ROBERT REICH - REDIRECT

1      Okay.  I think that's all the Court had.  I'm going

2  to take our morning break now and we'll reconvene at 25

3  to unless counsel have more issues, and then we'll

4  reconvene a little later.

5      Anything more for the plaintiffs at this time?

6          MR. NACKOWICZ:  No, Your Honor.  Thank you.

7          THE COURT:  Anything for the defendants?

8          MR. BIANCHI:  No.

9          THE COURT:  All right.  Then let's -- we'll

10  take a 15-minute -- let's make it simple.  At 20 to 11

11  we will reconvene.  So 10:40.  We're in recess and feel

12  free to move about as you wish.

13      (Recess      10:22-10:40 a.m.)

14          THE COURT:  Please be seated.  And you may call

15  your next witness.

16          MR. JACKSON:  Thank you, Your Honor.  Paul

17  Betz.

18          THE COURT:  You can actually come here and the

19  clerk can swear you in if you'd just raise your right

20  hand.

21          **PAUL BETZ, PLAINTIFF'S WITNESS, SWORN,**

22          THE COURT:  You may proceed, Counsel.

23                  DIRECT EXAMINATION

24  BY MR. JACKSON:

25  Q    Sir, would you state your name and address.
                  PAUL BETZ - DIRECT

1  A    Paul Betz.  16004 Trebbio Way.  Naples, Florida.

2  Q    And you are the CEO of Betco?

3  A    Correct.

4  Q    Could you briefly tell us what Betco is and what it

5  does?

6  A    It's a 65-year-old family business started by my

7  parents in 1950.  We manufacture a variety of cleaning

8  chemicals and cleaning equipment.

9  Q    And how long have you been employed by Betco?

10  A    Officially since 1974, but there were a few years

11  before that through school and things.  So since 1974.

12  Q    And you're a graduate of Notre Dame?

13  A    Correct.

14  Q    What year?

15  A    1974.

16  Q    And then you went with the family business?

17  A    Yes.

18  Q    All right.  I'd like to focus your attention on the

19  period starting with the acquisition by Betco of

20  Bio-Systems and ending with the time that Malcolm

21  Peacock left.  All right?

22  A    Okay.

23  Q    Before I do that, on the screen is Exhibit 1.

24  Would you look at the screen to your right -- to your

25  left.  Do you see Exhibit 1?
                PAUL BETZ - DIRECT

1    A    Yes.

2    Q    Would you identify that, please.

3    A    That is the confidential business memorandum.

4    Q    And that was delivered to you or to Betco?

5    A    Correct.

6    Q    By Cornerstone?

7    A    Correct.

8    Q    And was that considered by Betco in its acquisition

9    of Bio-Systems?

10   A    Yes.

11   Q    All right.  Showing you on the screen which is

12   Exhibit 771, would you identify what is that document?

13   A    That's the Asset Purchase Agreement between Betco

14   and Bio-Systems.

15   Q    And did you sign that document on behalf of Betco?

16   A    Yes, I did.

17   Q    And do you know who signed the document on behalf

18   of the sellers?

19   A    I'm sure it was Malcolm Peacock.

20   Q    All right.  Following acquisition of Bio-Systems,

21   did Mr. Peacock have a role in the Beloit operation?

22   A    Yes.

23   Q    What was his role?

24   A    He was president.

25   Q    And what were his duties and responsibilities?
                    PAUL BETZ - DIRECT

1    A    He was directed to continue to run the business as

2    he had run it up until the point that we bought it.   All

3    the functions reported to him.   And basically it was --

4    it appeared to be a profitable, well-run business, and

5    my direction was just keep doing what you've been doing.

6    Keep running it.   Everybody reports to you.   You run the

7    business.

8    Q    Were there any restrictions on Mr. Peacock's

9    operation of the business?

10   A    No.   My direction was you gave us a sales

11   projection, you gave us a profit projection.   Those are

12   your only really two measurements I'd like you to look

13   at.   Keep running the business.   And then I was involved

14   with him -- even before we bought the business, we

15   realized -- we had addressed, Malcolm and I, felt the

16   business could grow with a greater sales initiative.   So

17   my involvement with him would be to converse with him

18   occasionally on trying to develop a sales program.

19   Q    Thank you.   To whom did Mr. Peacock report?

20   A    To me.

21   Q    And to whom did the Bio-Systems' employees report?

22   A    To Mr. Peacock.

23   Q    And Beloit has now been -- I'm sorry.   Bio-Systems

24   has now been owned by Betco for almost five years and

25   it's located in Beloit?
                      PAUL BETZ - DIRECT

1   A      Correct.

2   Q      Who was the owner of the building?

3   A      Mr. Peacock and probably with his wife.

4   Q      And Betco pays rent to Mr. Peacock?

5   A      That is correct.

6   Q      And has Betco in the almost five years timely and

7   properly paid its rent?

8   A      I believe so.

9   Q      As part of the purchase and sale, Mr. Peacock was

10  to be employed by Bio-Systems for two years; correct?

11  A      That is correct.

12  Q      In the discussions or leading up to the Asset

13  Purchase Agreement, whose request was that he be

14  employed for two years?

15  A      That was Mr. Peacock's request from the very first

16  conversation, that he would like to stay there for two

17  years and continue to run the operation.

18  Q      Did there come a time when Mr. Peacock left?

19  A      Yes.

20  Q      When was that?

21  A      I believe it would be around November in 2011.

22  Q      And what were the circumstances of his leaving?

23  A      We realized that he was going to run the business

24  for two years, but we also realized that we had to

25  anticipate that after two years we would be running the
                        PAUL BETZ - DIRECT

1  business.  And so in anticipation of starting to learn

2  the business, we then hired a couple of people, Chris

3  Pavain and John Yazek to become involved with the

4  business.

5      And so as part of a transition, it was best that

6  Mr. Peacock stay home, be available as a consultant, but

7  allow our people to now learn the business.

8  Q    And that was in November of 2011?

9  A    Yes.

10 Q    And did you have a conversation with Mr. Peacock in

11 which you related to him what you've just related to me?

12 A    Yes.

13 Q    And was Mr. -- what was Mr. Peacock's reaction?

14 A    I think just fine.  I don't remember anything other

15 than that.

16 Q    And that's --

17 A    I think he understood he wasn't going to be there

18 forever and we needed to do what was necessary to turn

19 things over to our people eventually.

20         THE COURT:  I didn't quite follow the asking

21 him to stay home.  What was the purpose in that?

22         THE WITNESS:  To go into a consulting role.

23         THE COURT:  I understand.  But there's no

24 reason why he can't consult from an office in the

25 building.  I'm trying to understand why you said *stay*

PAUL BETZ - DIRECT

1    *home.*

2              THE WITNESS:  He was running the business.  All

3    the people reported to him.  As long as he was there, it

4    was difficult for us to put our people in.  And so we

5    were in the middle of changing the command, so to speak,

6    and with him still being there, it was difficult for the

7    employees.  They were getting mixed messages.

8              THE COURT:  So when you met with him, had you

9    already had some people on site?  When you met with him

10   to tell him you're moving to a consulting role, you

11   can't be here, had you already had people on site?

12             THE WITNESS:  Just for a very short period of

13   time.

14             THE COURT:  So where did this come from, this

15   problem with this tension?  Why did you believe there

16   was going to be tension?

17             THE WITNESS:  I'm not so sure I know the answer

18   to that question.

19             THE COURT:  That's fine.  You may continue.

20             THE WITNESS:  It's about four-plus years.

21             THE COURT:  Understood.

22             THE WITNESS:  Can I answer that question?

23             THE COURT:  Sure.

24             THE WITNESS:  I mean I don't know that there

25   was any tension, it was just -- it was just time.  I

                    PAUL BETZ - DIRECT

1    mean it was -- he couldn't continue being the leader and

2    be there.  I don't know that we -- there was any --

3    maybe we were -- we didn't have any tension, but we just

4    felt it was appropriate that now our people started to

5    learn the processes and the procedures in the business.

6              THE COURT:  Next question.

7              THE WITNESS:  Rather than go up to two years

8    and --

9              THE COURT:  I understand.  You've answered the

10   question.  You may ask your next question.

11             MR. JACKSON:  Thank you, Your Honor.

12   BY MR. JACKSON:

13   Q    Did there come a time when Betco terminated

14   Mr. Peacock?

15   A    Yes.

16   Q    And when was that?

17   A    I believe in April of 2012.

18   Q    And please tell the Court what the circumstances

19   were and why you terminated Mr. Peacock.

20   A    Well, during that period between November and

21   April, we started learning things that were inconsistent

22   with the way we thought the business was being managed

23   and it became counterproductive to have him involved in

24   any way.

25   Q    Specifically what did you learn?

                       PAUL BETZ - DIRECT

1  A    I think one of the very first things was he wanted

2  to raise everybody across the board 30 percent and --

3           THE COURT:  Raise their salaries?

4           THE WITNESS:  Raise across the board everyone's

5  salary 30 percent, and that was in my mind rather

6  inconsistent with trying to hit a sales-and-profit

7  number if you're going to increase the wages 30 percent.

8  So that was one indicator that something was awry.

9  BY MR. JACKSON:

10 Q    Were there more?

11 A    There were other concerns starting to come out from

12 various people.  You know, employees that were reluctant

13 to apparently talk to us before were starting to tell us

14 some things that they felt we needed to know.

15 Q    Specifically what?

16           MR. BIANCHI:  Objection.  Hearsay.

17           MR. JACKSON:  There will be other witnesses who

18 will be offered, Your Honor, who will link this up.

19           MR. BIANCHI:  My objection is --

20           THE COURT:  Just a minute.  I won't accept it

21 for the truth of the matter asserted, but you can answer

22 the question.

23           THE WITNESS:  Okay.  So what was the question

24 again?

25           THE COURT:  What did employees start telling
                    PAUL BETZ - DIRECT

1  you?

2          THE WITNESS:  This was -- this was direct to me

3  and where we were -- and I forget if it was Chris Pavain

4  or John Yazek were saying we can't produce the bacteria

5  that we need to produce to make the shipments.  And so

6  I'm like why not?  Well, we do not have the capacity.

7       And then I believe I went over there and talked to

8  them, I said "Well, why didn't you tell us?

9       We were directed to not tell you."

10  BY MR. JACKSON:

11  Q    During the time that Mr. Peacock ran the plant, did

12  you have an understanding of the testing procedures that

13  were being undertaken in Beloit?

14  A    Only from a very high level.

15  Q    Well, did you have an understanding?

16  A    Yes.  I mean --

17  Q    What was that understanding?

18  A    Well, on my very first tour of the facility, I

19  asked how do we know -- what --

20  Q    Who did you ask?

21  A    Malcolm.

22  Q    Thank you.

23  A    I went through the facility with Mr. Peacock and

24  specifically said "You're growing bacteria.  How do you

25  know what you're growing?  How do you know it's the
                    PAUL BETZ - DIRECT

1  right bugs?"  And I was -- you know, then had a tour of

2  the laboratory.  I was shown --

3  Q    Did he respond to your question --

4          THE COURT:  Before you go on, we don't have any

5  setting or time frame.  When was this?  Was this before

6  or after the APA was signed?

7          THE WITNESS:  This would have been before the

8  API was signed.

9          THE COURT:  APA, right.

10          THE WITNESS:  Before the API -- A was signed.

11          THE COURT:  Asset Purchase Agreement, APA.

12          THE WITNESS:  Yes.

13          THE COURT:  Thank you.  Next question.

14  BY MR. JACKSON:

15  Q    What did he tell you with regard to testing?

16  A    We test everything, and were I so certified to

17  guarantee or verify that the testing is being completed.

18  Q    Did anything change with regard to your

19  understanding after you acquired the Beloit plant and

20  the operation at Bio-Systems?

21  A    Not that I'm aware.

22          MR. JACKSON:  Your witness.  (10:55 a.m.)

23                    CROSS-EXAMINATION

24  BY MR. BIANCHI:

25  Q    Mr. Betz, before Betco purchased Bio-Systems, it
                    PAUL BETZ - CROSS

1  was buying microorganisms from Novozymes; is that

2  correct?

3  A    Correct.

4  Q    And in purchasing Bio-Systems, Betco began

5  purchasing those same microorganisms from Bio-Systems.

6  A    Correct.

7         MR. BIANCHI:  Your Honor, may I approach?

8         THE COURT:  You may, but hopefully we won't

9  have to continue to do this.  That's why we took the

10 break.

11        MR. BIANCHI:  I didn't realize it was locked.

12        THE COURT:  I understand that.  Let's continue,

13 please.

14 BY MR. BIANCHI:

15 Q    Mr. Betz, do you recall seeing Exhibit 526 before?

16 A    I don't know.

17 Q    You don't know?

18 A    I mean it's three pages.  I'd have to read it.

19        THE COURT:  Why don't you look it over and then

20 you can answer the question if you've seen it before.

21 We're off the record for a second.  The witness is

22 looking at this.  Let me know when you're ready to

23 discuss the document.

24      (Pause)

25        THE WITNESS:  I don't remember if I've seen
                    PAUL BETZ - CROSS

1   this before or not to be honest.

2          THE COURT:  Let's go back on the record.  Your

3   answer is you don't remember if you've seen this

4   document before.

5          THE WITNESS:  Correct.

6          THE COURT:  Next question.

7          MR. BIANCHI:  I'm going to give him his

8   deposition.

9          THE COURT:  That's fine.

10  BY MR. BIANCHI:

11  Q    Mr. Betz, I'm going to have you turn to page 109,

12  please.

13  A    Okay.

14  Q    And on page 109, if you look at line 8.  I'll read

15  it for you.  It says Defendants' Exhibit No. PP was

16  marked.  Question was asked:  "Have you ever seen this

17  document before?"

18      This is PP.

19      Yes, PP.  Right.  This is the exhibit I was

20  referring to as something in March."

21      And if you look at the document that I handed you,

22  Exhibit 526, that's document PP.

23         THE COURT:  Based on that, do you recall that

24  you saw something like this in March?

25  BY MR. BIANCHI:
                    PAUL BETZ - CROSS

1  Q    Of 2011.

2  A    I don't recall if I saw this or I did not see this.

3        THE COURT:  You're welcome to ask the question

4  if you wish.

5        MR. BIANCHI:  Yeah.  Sorry.

6  BY MR. BIANCHI:

7  Q    If you turn to what's marked Betco 65986.  It's the

8  last page of the document -- no, no.  Of Exhibit 526.

9  I'm sorry.  I apologize.  And if you look at No. 2, I'm

10 going to read it for you.  It says:  "Have lab evaluate

11 issue of out-of-spec finished product.  Colony counts

12 are consistently too low, but the product is shipped

13 anyway.  Implementation of Item No. 1 may improve this."

14      Do you see that there?

15 A    I do.

16 Q    And this document on the front shows that it's a

17 Bio-Systems visit note from 3-15-2011 from a trip that

18 involved Joe Provolich, John Henson, Kurt Bischoff, and

19 Brett Hanus.

20 A    Yes.

21 Q    So, in fact, Betco was aware in March of 2011 that

22 the lab needed to evaluate out-of-spec finished product

23 and that colony counts are consistently too low but

24 product is shipped anyway; correct?

25 A    That's what it says.
                      PAUL BETZ - CROSS

1  Q    Are you aware that your employees visited the

2  Beloit plant on March 15th of 2011?

3  A    Yes.

4  Q    And are you aware that they drafted this document

5  that's Exhibit 526?

6  A    Yes.

7  Q    Before purchasing Bio-Systems, Betco was looking

8  for a microbiologist consultant; isn't that right?

9  A    Before -- when was that, please?

10 Q    Sure.  So in the summer of 2010 while Betco was

11 looking at Bio-Systems and considering purchasing it, it

12 began looking for a microbiologist consultant; is that

13 correct?

14 A    Before we bought the business, did we -- yes, we

15 did.

16 Q    Yes.  And the reason that Betco was looking for a

17 microbiologist consultant is because it was buying a

18 technology it did not know; is that correct?

19 A    That is correct.

20      THE COURT:  Let's just go off the record for a

21 second.  We're off the record.

22      (Pause at 11:04 a.m.)

23      THE COURT:  We're back on the record.

24 BY MR. BIANCHI:

25 Q    Mr. Betz, we're going to jump back now to

                    PAUL BETZ - CROSS

1  document -- it's Exhibit 526, okay?

2  A    That's this?

3  Q    Yes.

4        THE COURT:  It's also on the screen to your

5  left if you want to look to make sure you're looking at

6  the same thing.

7        THE WITNESS:  Okay.

8        THE COURT:  Next question, Counsel.

9  BY MR. BIANCHI:

10  Q    I understand you may not recall the actual

11  document, but you were aware that your employees brought

12  these observations back to Betco that are listed in this

13  document; isn't that correct?

14  A    Correct.

15  Q    And that includes all the follow-ups listed on the

16  back page of the document; is that correct?  Do you

17  recall those follow-ups being brought to your attention?

18  A    I never got into the minutia on this.  I do recall

19  some of this conversation.  I believe this was addressed

20  and Malcolm even came over to Toledo maybe in a month or

21  so after that and dealt with -- tried to deal with a lot

22  of these issues.  But the line here that says "people

23  get nervous when we visit," I think that was the issue

24  that we were probably somewhat reluctant to get too

25  involved at that point.
                    PAUL BETZ - CROSS

1    Q    Mr. Betz, I'm going to have you look at the camera

2    now or the TV next to you so I can show this document.

3    This is Exhibit 506.

4         And do you recall this document, Mr. Betz?

5    A    Yes.

6    Q    And it is a due diligence document that was created

7    by Betco before the purchase of Bio-Systems; correct?

8    A    Correct.

9    Q    And we're going to look at 66837.  And we're going

10   to go nine dots down.  Right there.  And it says "Yields

11   are never consistent.  There is a cycle in which bugs

12   are fermented, measured, and then mixed.  This process

13   takes more than a week."

14        Did I read that correctly?

15   A    That is correct.

16   Q    And Betco purchased Bio-Systems primarily because

17   it was a profitable business; isn't that right?

18   A    That would be one of the reasons.

19        MR. BIANCHI:  Your Honor, I move for admission

20   of Exhibit 506.

21        THE COURT:  And 526?

22        MR. BIANCHI:  Yes.

23        THE COURT:  They are admitted.

24   BY MR. BIANCHI:

25   Q    And to be clear, primarily Betco purchased

                    PAUL BETZ - CROSS

1   Bio-Systems because it was profitable; right?

2   A    That was one of a couple of reasons.

3   Q    So no, that's not the primary reason?

4   A    Well, it was profitable.

5        THE COURT:  Was it a primary reason or not?

6        THE WITNESS:  It was one of a couple primary

7   reasons.

8        THE COURT:  Next question, Counsel.

9   BY MR. BIANCHI:

10  Q    And in fact, Betco was treating the purchase of

11  Bio-Systems as if it was simply purchasing a stock or an

12  asset; isn't that right?

13  A    That is correct.

14  Q    I'm going to show you again on the TV next to you

15  Exhibit 515.  And Mr. Betz you recognize this document?

16  A    Yes.

17  Q    This is an email that you sent to your executive

18  team before the purchase of Bio-Systems; correct?

19  A    Correct.

20       MR. BIANCHI:  Move for the admission of Exhibit

21  515.

22       THE COURT:  There being no objection, it is

23  admitted.

24  BY MR. BIANCHI:

25  Q    I'm going to look, Mr. Betz, there's these dots on

                 PAUL BETZ - CROSS

1    the side.  We're going to go to the third dot down.  You

2    said "The technology scares me the most as it is not

3    core to Betco."

4         Did I read that correctly?

5    A    That's correct.

6    Q    Then right below it there's a question that says:

7    "How do we know if the bugs are current, meaning state

8    of the art, or bordering on obsolete?"

9         Did I read that correctly?

10   A    Yes.

11   Q    And then we're going to skip down over the really

12   -- the next *How*, it says:  "How do you be sure you

13   aren't growing bad bugs?"

14        Did I read that correctly?

15   A    Correct.

16   Q    When Betco was deciding to purchase Bio-Systems, it

17   decided that if Mr. Peacock did not run the business

18   right, it would simply get rid of him; isn't that right?

19   A    Say that again.

20   Q    Sure.  In purchasing Bio-Systems, Betco had decided

21   that if Mr. Peacock did not run the business, it would

22   simply get rid of him?

23   A    I don't think that was ever stated.

24   Q    I'm going to have you look at your deposition in

25   front of you.  Turn to page 94, please.  Page 94, line

                    PAUL BETZ - CROSS

1   18.  It says:  "And you still went through with the

2   business deal?

3        "Answer:  Yes, I figured he could run it for two

4   years.  If he didn't run it, I would get rid of him.

5   And he didn't run it properly, so I got rid of him."

6        Did I read that correctly?

7   A    You did.

8   Q    Upon purchasing Bio-Systems, you agreed with

9   Mr. Peacock that in most cases Kurt should not bother

10  Derek Loverich with questions; isn't that right?

11  A    Probably initially only from the standpoint the --

12  Q    My question is whether you said that or not.

13  That's it.

14          MR. JACKSON:  Objection.

15          THE WITNESS:  Out of context.

16          THE COURT:  Let's stop both ways.  At some

17  point after you acquired the business, did you tell --

18  and it's Mr. Loverich?

19  BY MR. BIANCHI:

20  Q    Did you tell Mr. Bischoff that he should not, in

21  most cases, should not bother Derek Loverich with

22  questions?

23  A    There was probably a point I said that; correct.

24  Q    And upon purchasing Bio-Systems, Betco believed

25  that Mr. Loverich, Derek Loverich, probably had better

                     PAUL BETZ - CROSS

1  knowledge of Bio-Systems' formulas than Mr. Peacock;

2  isn't that right?

3  A    I don't know.

4  Q    I'm going to have you look at Exhibit 522 here.

5         THE COURT:  It will be on your screen to your

6  left.

7  Q    Exhibit 522, please take a look at it.  And do you

8  recognize this chain email between you and Kurt

9  Bischoff?

10 A    Yes.

11 Q    And in the email, I'm pointing to here in October

12 26, 2010, the sentence that begins *In fact*.  "In fact,

13 one thing we have identified is that Derek manages the

14 plant and does all the formulating."

15       And then I apologize, above that it says, "But

16 Derek has some good knowledge of these formulae,

17 probably better than Malcolm."

18       Did I read that correctly?

19 A    That is correct.

20       MR. BIANCHI:  I move to admit Exhibit 522.

21       THE COURT:  There's no objection.  Actually

22 it's no longer listed among your exhibits, so we could

23 treat it as impeaching.  Actually I apologize.  522 is

24 admitted.  No objection.

25 BY MR. BIANCHI:
                    PAUL BETZ - CROSS

1   Q    In the summer of 2012, you questioned whether Neil

2   Seeger was a good fermenter; isn't that right?

3   A    Yes.

4   Q    And that same summer you also questioned Neil

5   Seeger's competence; isn't that right?

6   A    Yes.  That doesn't mean he was incompetent.  I just

7   was questioning it.

8            THE COURT:  Your counsel can elaborate.

9            THE WITNESS:  Okay.

10           THE COURT:  Just focus on the question.

11           THE WITNESS:  Okay.

12           THE COURT:  If you need to -- if you can't

13  answer yes or no, then that's fine.  You can explain

14  that.  But if it's a straightforward question, I'd

15  appreciate answering yes or no.

16           THE WITNESS:  Okay.

17           THE COURT:  You don't need to elaborate.

18           THE WITNESS:  All right.

19           THE COURT:  Next question.

20  BY MR. BIANCHI

21  Q    Can you tell us who Neil Seeger is?

22  A    Neil Seeger was our microbiologist.

23  Q    Was?  He no longer is?

24  A    No.  He's left now.

25  Q    And he was in 2012 the microbiologist at
                   PAUL BETZ - CROSS

1   Bio-Systems, the Beloit plant; correct?

2   A    That is correct.

3        MR. BIANCHI:  I have no further questions.

4        THE COURT:  Redirect.   (11:16 a.m.)

5        MR. JACKSON:  Thank you, Your Honor.

6                    REDIRECT EXAMINATION

7   BY MR. JACKSON:

8   Q    Mr. Betz, I show you what Mr. Bianchi has marked as

9   Exhibit 515.  He asked you some questions, specifically,

10  "How do we know if the 'bugs' are 'current', meaning

11  state of the art, or bordering on obsolete?"

12       Do you see that?

13  A    Yes.

14  Q    In your direct examination you talked about having

15  a conversation with Mr. Peacock with regard to testing

16  and that same question, did you not?

17  A    Correct.

18  Q    Do you know whether your conversation with

19  Mr. Peacock preceded or followed Exhibit 515, which is

20  dated July 26, 2010?

21  A    This is dated July -- I can't see the top of it.

22  Q    I'm sorry.  The date on it says *July 26, 2010*.  My

23  question is did this conversation you referenced in your

24  direct precede, that is was it before or was it after

25  July 26, 2010?
                    PAUL BETZ - REDIRECT

1    A    It was very close to the first visit.  Whether it

2    was just before it or just after it because we were

3    developing possible questions.  We understood we didn't

4    know all the intricacies of this business, so we were

5    just hypothetically saying well, what are some things

6    maybe we should try to learn, probably in anticipation

7    of the visit.

8    Q    Are you done?

9    A    Yeah.

10   Q    Okay.  Thank you.

11        MR. JACKSON:  Your Honor, I forgot to move the

12   admission of Exhibit 1 and 771.

13        THE COURT:  Exhibit 1 and 2, which were the

14   confidential business review and the APA, was that --

15        MR. BIANCHI:  It's the same thing.  771 was the

16   number on our exhibit list.

17        MR. JACKSON:  Right.  I think we've got it

18   double marked.  If it's marked Exhibit 2 --

19        THE COURT:  The question is only if it's

20   admitted or not and I'm happy to admit it under either

21   number, but I need to know what that number is.

22        MR. JACKSON:  We'll use Exhibit 2.

23        MS. TURKE:  504 and 771.

24        MR. JACKSON:  504 and 771.

25        THE COURT:  504 and 771 are admitted.
                    PAUL BETZ - REDIRECT

1        MR. JACKSON:  No further questions.

2        THE COURT:  You may step down then, Mr. Betz.

3  And the plaintiff may call its next witness.

4        MR. JACKSON:  Call Kurt Bischoff.

5        **KURT BISCHOFF, PLAINTIFF'S WITNESS, SWORN,**

6                    DIRECT EXAMINATION

7  BY MR. JACKSON:

8  Q    Sir, would you state your name and address.

9  A    Kurt Bischoff.  8511 Lewis Avenue.  Temperance,

10 Michigan.

11 Q    And you're employed by whom?

12 A    The Betco Corporation.

13 Q    What is your title?

14 A    I'm the Vice President of Research and Development.

15 Q    And what are your duties in that role?

16 A    My duties in that role are to direct the research

17 and development activities and to direct the activities

18 of the Regulatory Affairs Department.

19 Q    And briefly describe your educational background.

20 A    Bachelor of science.  Georgia Tech.  1982.

21 Q    And how long have you worked for Betco?

22 A    I've worked there for 18 years.

23 Q    Referring to the purchase of Bio-Systems by Betco,

24 did you have a role in that acquisition?

25 A    Yes, I did.
                    KURT BISCHOFF - DIRECT

1   Q     What was your role?

2   A     My role was to do my best to assess the technology,

3   the operation, and the quality that existed in Beloit.

4   Q     Did you say the quality?

5   A     Quality, control, the laboratory, and make sure we

6   had instrumentation, people capable of performing tests.

7   Q     And were you -- did you visit the Beloit plant

8   before the purchase?

9   A     Yes, I did.

10  Q     Did you have conversations with Mr. Peacock?

11  A     Yes, I did.

12  Q     Did you reach an understanding of the practices and

13  procedures of quality control at the Beloit plant?

14  A     I did.

15  Q     And would you tell the Court how you reached that

16  understanding?

17  A     We spent time at the quality control lab during the

18  tour that was hosted by Mr. Peacock.  Mr. Peacock

19  introduced us to the laboratory manager, Mindy Walters,

20  and then showed us various pieces of equipment that are

21  used to test the products manufactured, explained a bit

22  about how each piece of equipment that he highlighted

23  was used, and demonstrated the use of the spiral plater

24  and the ProtoCOL counter.

25  Q     Did you and Mr. Peacock have a discussion with
                    KURT BISCHOFF - DIRECT

1  regard to the testing of product?

2  A    We did during that visit to the quality control

3  lab, yes.

4  Q    And what did Mr. Peacock tell you?

5  A    He told us that all products were tested; that they

6  had to conform to the specifications prior to being

7  released.

8  Q    During the time that Mr. Peacock ran the facility

9  after the purchase but before he left, did you have an

10  understanding of testing procedures at the Beloit plant?

11  A    Yes, I did.

12  Q    And what were those?

13  A    That I understood what tests were performed and the

14  reasons why they were performed.  They were performed to

15  identify the amount of bacteria present and also other

16  key attributes of the products that were being

17  developed.

18  Q    And your understanding was based on what you've

19  just testified to?

20  A    Yes.

21  Q    All right.  Did there come a time when you learned

22  that some of the product was not tested?

23  A    Yes.

24  Q    First, what did you learn with respect to the

25  testing of product?  That is -- let's talk for a moment.
                    KURT BISCHOFF – DIRECT

1    Let me digress for a moment.  What type of products did

2    Beloit produce?

3    A    They produced liquids, powders, solids, gels, and

4    extruded product.

5    Q    All right.  And your understanding was that all

6    five of those were tested?

7    A    It was my understanding that every product, all

8    five of those categories that had bacterial content were

9    tested for bacterial count.

10   Q    Let's talk about the liquid product.  Did your

11   understanding change at some time?

12   A    Yes.

13   Q    When and how did it change?

14   A    My understanding changed in early winter between

15   January and March of 2012 when we first began seeing --

16   being reported issues at the Beloit facility of not

17   being able to hit counts.

18   Q    Let's speak with reference to -- what about

19   focusing on liquid products.  Were they being tested?

20   A    The liquid products were not being tested.

21   Q    The extruded products.

22   A    As far as I know, the extruded products were not

23   being tested for bacterial count.

24   Q    The gel products.

25   A    I don't know whether the gel products were tested

                    KURT BISCHOFF - DIRECT

1  at that time.

2  Q    I had two more and I --

3  A    Block.

4  Q    Sorry?

5  A    The block products.  It was my understanding that

6  they were being tested.

7  Q    And how about powder products?

8  A    My understanding was the powder products were

9  always tested.

10  Q    Okay.  When you say *always tested* with regard to

11  the powder products, do you recall at what point in

12  their production process they were tested?

13  A    The powder products were tested twice during the

14  production period; once right after they came out of the

15  drying area to get a count, and then again after they

16  were blended into a final product.  So they were tested

17  in an intermediate stage and at a final product stage.

18  Q    Were you made aware of any product being shipped

19  that did not meet its label or product specifications?

20  A    No.  I don't specifically remember being told that

21  product was being shipped out of spec.  I was told that

22  when product was low in spec, it could be reworked

23  within the facility or shipped at a lower count based on

24  other products that were available to ship in the line.

25  Q    Are you familiar with the term *certificate of*

KURT BISCHOFF – DIRECT

1    *analysis*?

2    A    Yes, I am.

3    Q    Were certificates of analysis employed by the

4    Beloit plant?

5    A    Yes.

6    Q    And how so?

7    A    Certificates of analysis were generated for

8    customers who required them and sent along, or shortly

9    thereafter, shortly after a batch was produced to the

10   final customer.

11   Q    And how are certificates of analysis sent?

12   A    Certificates of analysis, you fill out the

13   information generated during the quality control

14   testing.  It is normally dated, signed, and then sent

15   either electronically or via conventional mail to the

16   end-user.

17   Q    And the certificate of analysis shows what?

18   A    It shows specific test results attributed to a

19   specific lot of product.  So each product has a set of

20   specifications arranged in which it must fall and a

21   certificate of analysis will list a specific value

22   associated with that lot of product.

23   Q    So it means there was a test.

24   A    Correct.

25   Q    And it was recorded.
                    KURT BISCHOFF - DIRECT

1  A    Yes.

2  Q    And it is of the product shipped.

3  A    Yes.

4  Q    And does it relate to the product in the customer's

5  hands?

6  A    Yes, it does.

7  Q    You're aware, are you not, that Mr. Peacock's

8  company, when he owned it, was ISO certified?

9  A    Yes.

10 Q    We've had some discussion of ISO certification.

11 You were here in court when I think Mr. Reich talked

12 about that?

13 A    Yes.

14 Q    And Mr. Bianchi had some questions?

15 A    Yes.

16 Q    Do you agree with the characterization of Mr. Reich

17 as far as what an ISO certification is?

18 A    I do.

19 Q    Was it significant in your review of the

20 Bio-Systems plant that it was ISO certified?

21 A    It was significant from a standpoint that we were

22 told that certain customers required ISO certification.

23 Q    Certain customers of Beloit.

24 A    Correct.

25 Q    And what customers were those?
                    KURT BISCHOFF - DIRECT

1   A     Specifically Nalco and General Motors.

2   Q     Were testing procedures set forth in the -- let me

3   rephrase.  Did you review the ISO manual that

4   Mr. Peacock had in place during his ownership and

5   operation of the Beloit plant?

6   A     Yes.

7   Q     And did it reference -- did the ISO Manual

8   reference testing?

9   A     Yes, it did.

10  Q     What did the ISO Manual state with regard to

11  testing?

12  A     What I remember specifically is it referenced that

13  each powder and each liquid product upon completion of

14  the batch needed to be brought to the quality control

15  lab for testing.

16  Q     And representing what to the reader?

17  A     Representing that all of those products would be

18  tested against a certain set of specifications.

19          MR. JACKSON:  No further questions.

20          THE COURT:  Cross-examination.  (11:29 a.m.)

21                    CROSS-EXAMINATION

22  BY MR. BIANCHI:

23  Q     Mr. Bischoff, you believe that as part of its due

24  diligence Betco had to ensure that the technology of

25  Bio-Systems was current; correct?
                    KURT BISCHOFF - CROSS

1   A     Correct.

2   Q     And before the purchase, Betco was aware that

3   bacteria yields were never consistent; correct?

4   A     Correct.

5   Q     And you knew before Bio-Systems was purchased that

6   it was a smaller company in the bioaugmentation industry

7   in comparison to companies like Genesis and Novozymes;

8   correct?

9   A     Yes.

10  Q     And post-purchase, you were tasked with developing

11  a list of items to accomplish in the first 100 days

12  after purchase; isn't that right?

13  A     Yes.

14  Q     I'm going to have you look at the TV of an exhibit

15  here.  It's Exhibit 521.  And you recognize this

16  document, Mr. Bischoff?

17  A     Yes.

18  Q     And this is an email that you sent in September of

19  2010 to the executive team at Betco; right?

20  A     Correct.

21  Q     And some of the things that you said should be done

22  in the first 100 days was acquire formulas; right?

23  A     Yes.

24  Q     Thoroughly review and learn the processes for

25  growing microorganisms; right?
                    KURT BISCHOFF - CROSS

1  A     Yes.

2  Q     Down here it says "learn how to operate the lab

3  equipment"?

4  A     Yes.

5  Q     You did not complete this 100-day list within 100

6  days of purchase; is that right?

7  A     That's correct.

8          MR. BIANCHI:  Ask to move Exhibit 521 into

9  evidence.

10          THE COURT:  It is admitted without objection.

11  BY MR. BIANCHI:

12  Q     During July 2011, so this is after the purchase,

13  Betco began the process of having Bio-Systems produce

14  urinal pucks for Betco; correct?

15  A     The work began in July.  I believe production

16  started in September/October of that year.

17  Q     And this project, the urinal puck project, took a

18  lot of your time between July and September 2011; isn't

19  that right?

20  A     That's correct.

21  Q     And in fact, it took time that could have been used

22  to complete other items on the 100-day list we just

23  looked at; right?

24  A     That's correct.

25  Q     And in 2011, Bio-Systems was not the only project

                    KURT BISCHOFF - CROSS

1  that you were working on for Betco; correct?

2  A    That's correct.

3  Q    In fact, your Bio-Systems' projects were one of

4  over 30 or more projects that you had on your plate in

5  2011; right?

6  A    Correct.

7  Q    And in fact, in late December of 2011, you were

8  still securing all the formulas from Bio-Systems; isn't

9  that right?

10 A    No, that's not correct.  We had all the formulas.

11        THE COURT:  Does securing have some different

12 meaning than having the formulas?  Do you know were they

13 secured in some way different than you had them?  Do you

14 view the receiving and securing as two different things?

15        THE WITNESS:  We received all the formulas.  I

16 had them received.  Secured, they were with Mr. Betz and

17 myself.

18        THE COURT:  And is that all you would normally

19 do to secure formulas?

20        THE WITNESS:  I think in terms of the

21 definition, secure meant to procure as opposed to lock

22 them up in the safe.  That was my understanding.

23        THE COURT:  All right.  Thank you.  You're

24 welcome to show it to him on the document screen if

25 that's your problem.  Otherwise let's proceed.

                    KURT BISCHOFF - CROSS

1  BY MR. BIANCHI:

2  Q    Did you seek additional help from Betco to complete

3  your 100-day task regarding Bio-Systems because you

4  decided it would be in your best interest to handle

5  Bio-Systems' technical 100-day list by yourself; isn't

6  that right?

7  A    No.  I'm sorry.  I think we've got this confused

8  with the end of 2011 as opposed to the end of 2010.

9  Q    Did I say end of 2010?  I meant --

10            THE COURT:  That's when he was referring, to

11  the first 100 days after acquisition.

12            THE WITNESS:  Correct.

13            THE COURT:  And did you decide not to ask for

14  any additional help in completing that list?

15            THE WITNESS:  I don't recall whether or not I

16  sought additional help.  There were a number of items

17  there.

18            MR. BIANCHI:  Your Honor, may I approach?

19            THE COURT:  You may.

20  BY MR. BIANCHI:

21  Q    Mr. Bischoff, I'm going to have you turn to page

22  76, please.  And actually we'll start on 75.  Line 24.

23  Are you there?

24  A    Yes.

25  Q    And it says:  "So you didn't want to let anybody
                    KURT BISCHOFF - CROSS

1   else help you, is that what you're saying?"

2       To the next page.

3       "Answer:  I decided that it would be in my best

4   interests to do it myself since I am for the most part

5   the only laboratory person that handles Bio-Systems'

6   affairs."

7       Did I read that correctly?

8   A    Yes, you did.

9   Q    So you didn't seek any additional help to complete

10  the 100-day list; correct?

11  A    This was in reference to one specific task,

12  entering all the formulas into our computer system by

13  the end of 2011.  This was independent from the 100-day

14  task list.

15  Q    So the 100-day list didn't say acquiring the

16  formulas on it?

17  A    It did say acquire the formulas.  This was another

18  task that was generated after the 100-days, enter all of

19  their formulas into our electronic system.

20  Q    So Betco was relying on you to provide it with due

21  diligence work on the technology aspect of Bio-Systems;

22  correct?

23  A    Yes.

24  Q    And your qualifications though to evaluate the

25  manufacturing processes at the Beloit plant were, in

                  KURT BISCHOFF - CROSS

1  your words, rudimentary?

2  A    That's correct.

3  Q    In fact, some of the technical components of

4  Bio-Systems was above what you could completely

5  understand; isn't that right?

6  A    Above what I could completely understand; correct.

7  Q    After the purchase of Bio-Systems, you communicated

8  quite a lot over email with Dana Juul; isn't that right?

9  A    Yes, it is.

10  Q    You always communicated at times with Derek

11  Loverich by email after the sale; isn't that right?

12  A    That is correct.

13  Q    And you also spoke with Derek face-to-face when you

14  made visits to the Beloit plant; isn't that right?

15  A    Yes.

16  Q    And that was all throughout the year in 2011;

17  correct?

18  A    Correct.

19  Q    And in fact, on your trip visits to the Beloit

20  plant you were able to gain access to Neil Seeger?

21  A    Yes.

22  Q    Mindy Walters?

23  A    Yes.

24  Q    And Mindy is -- was the lab manager at Bio-Systems;

25  correct?

                    KURT BISCHOFF - CROSS

1   A    Yes.

2   Q    To Chrissy Stratton?

3   A    Yes.

4   Q    And do you know what Chrissy's title is?

5   A    I believe she was purchasing manager.

6   Q    And again to -- you had access to Derek, all to be

7   able to discuss production items; correct?

8   A    Yes.

9   Q    I'm going to have you look at the screen.  This is

10  Exhibit No. 537.  Have you seen this document before?

11  A    I'm familiar with this document, yes.

12  Q    And correct, it is a formula to manufacture

13  intermediate product for Bio-Systems; correct?

14  A    Yes.

15  Q    And this document represents some of the

16  information about Bio-Systems' processes that you

17  received from Dana shortly after the purchase by Betco;

18  correct?

19  A    Yes.

20  Q    And in fact, you would study the information on

21  Exhibit 537 to be able to determine how the products

22  were manufactured at Bio-Systems; right?

23  A    Yes.

24        MR. BIANCHI:  Ask to move 537 into evidence.

25        THE COURT:  It is admitted without objection.
                  KURT BISCHOFF - CROSS

1   BY MR. BIANCHI:

2   Q     And you, in your own words, said you did not come

3   to a comfortable understanding of Bio-Systems' formula

4   system until December 2011; isn't that correct?

5   A     That's correct.

6   Q     I'm going to put Exhibit 538 on the camera here.

7   There's a couple pages, so I'm going to have to go

8   through it.  But on the first page do you recognize this

9   document?

10  A     Yes, I do.

11  Q     And it's a procedure for making a batch of bacteria

12  using the 500-gallon fermenter procedure; correct?

13  A     Yes, it is.

14  Q     And this information up here shows that it was in

15  the ISO Manual; isn't that right?

16  A     I don't believe any of these formulas were in the

17  ISO Manual.  Formulas were not part of the manual.

18  Q     I'm going to turn to 63450 in here.  The document

19  would be better in one long document putting together,

20  but here you see it notes various revisions to the

21  document; isn't that right?

22  A     Yes.

23          THE COURT:  And for the record, this is still

24  537?  Exhibit 537?

25          MR. BIANCHI:  Yes -- sorry.  No.  538.  I

                    KURT BISCHOFF - CROSS

1   apologize.  538.

2   BY MR. BIANCHI:

3   Q    And if you go to 63451, there's dates and changes

4   made; correct?

5   A    That is correct.

6   Q    And on 10-26, 2011, it says "Changed procedure

7   completely and changed approved by," go to the next

8   page, and if you follow it along it's the production

9   manager; isn't that right?

10  A    That's correct.

11  Q    So based on this document, the procedure for

12  producing a batch of bacteria using the 500-gallon

13  fermenter was changed completely in October 2011; isn't

14  that correct?

15  A    That's what the document says.  I don't know

16  personally what changed.

17  Q    And in October 2011, Derek Loverich was the

18  production manager; isn't that right?

19  A    Yes.

20  Q    Next we have Document 519.

21         MR. BIANCHI:  I ask to move 538 into evidence.

22         THE COURT:  It is admitted.

23  BY MR. BIANCHI:

24  Q    Do you recognize the email chain that is in Exhibit

25  519, Mr. Bischoff?

                    KURT BISCHOFF - CROSS

1  A    I do.

2  Q    And was emails made, sent around August 24, 2010,

3  between you and Mr. Betz and also Tony Lyons, and then

4  the one at the very bottom is with a Barry King;

5  correct?

6  A    Yes.

7  Q    And here Mr. Betz suggests that Mr. King visit

8  Bio-Systems after the closing; correct?

9  A    That is correct.

10 Q    Mr. King never did visit the Beloit plant, did he?

11 A    No, he did not.

12 Q    And not bringing Mr. King in to inspect the Beloit

13 plant was a mistake; right?

14 A    That's what I said in my deposition; Monday morning

15 quarterbacking.

16 Q    And, in fact, Betco actually signed a consulting

17 agreement with Mr. King; isn't that right?

18 A    That's correct.

19        MR. BIANCHI:  I ask to move.

20        THE COURT:  519 is admitted as well.

21 BY MR. BIANCHI:

22 Q    And we're going to look again at 519 here real

23 quick.  So in the email, the back page is between you

24 and Mr. King.  And he notes -- you sent him an email

25 with various questions; isn't that right?
                KURT BISCHOFF - CROSS

1    A    Yes.

2    Q    In one of them you note is "The intellectual

3    property that we are purchasing are the formulas and the

4    strategic purchasing agreements that they have

5    established."  Then it says "The unique combination of

6    various microorganisms to produce a desired effect is

7    essentially where the technical value lies.  Is that

8    accurate or have I missed something?"

9         Did I read that correctly?

10   A    You did.

11   Q    And then Mr. King responds to your point about the

12   unique combinations, he says "And the unique

13   combinations of all those other commodity chemical

14   enhancers, surfactants, et cetera that go into the

15   proprietary formulations, that is the property of value

16   to you as purchaser."

17        And then in your response -- your question "Is that

18   accurate?"  He says "Again, exactamundo.  You perceive

19   the true value is not so much the product in the

20   container but in the performance capabilities in the

21   field."

22        Did I read that correctly?

23   A    Yes, you did.

24   Q    I'm going to have you look at Exhibit 544 and it is

25   an email on the first page between you and Dana, and if
                    KURT BISCHOFF - CROSS

1  we go all the way back through, it's a chain of emails

2  that date all the way back to Friday, October 22, 2010.

3  Do you recall this email correspondence?

4  A    Yes.

5  Q    And I'm going to turn to this last email.  So here

6  there is a report of a plate count for Betco's push

7  product; is that right?

8  A    Yes.

9  Q    So here we are within a month of purchase and Betco

10 was already having one of its products shipped to

11 Bio-Systems to begin checking the plate count; correct?

12 A    Yes.

13 Q    And this analysis was part of a project to utilize

14 Bio-Systems' material in place of a competitor,

15 Novozymes' same material, that was in a Betco product;

16 right?

17 A    Yes.

18 Q    I show you now Exhibit 546.

19         MR. BIANCHI:  And I ask to move Exhibit 544

20 into evidence.

21         THE COURT:  It is admitted.

22 BY MR. BIANCHI:

23 Q    And this is an email chain between you and

24 Mr. Peacock and there's Mr. Betz.  Do you recognize this

25 document at well?
                    KURT BISCHOFF - CROSS

1    A     I recognize the email.

2              THE COURT:  I'm sorry, this is 546?

3              MR. BIANCHI:  Yes, sir.

4              THE COURT:  And your answer was yes?  You

5    recognize this?

6              THE WITNESS:  The answer was yes.

7              THE COURT:  Thank you.

8    BY MR. BIANCHI:

9    Q     And if we -- in this email from Mr. Peacock, he

10   says "I suggested to Paul that you spend a week here to

11   learn our processes and correct what you feel is

12   incorrect."

13        Did I read that correctly?

14   A     You did.

15   Q     You never did visit the plant for a week; correct?

16   A     Correct.

17   Q     Instead you attempted to get an understanding of

18   processes at the Beloit plant through a couple single

19   day visits; isn't that right?

20   A     I would say that's incorrect in the context of the

21   exhibit.  I was trying to understand how to make the

22   formulas work.

23             MR. BIANCHI:  I offer Exhibit 546 into

24   evidence.

25             THE COURT:  It is admitted.
                    KURT BISCHOFF - CROSS

1  BY MR. BIANCHI:

2  Q    I'm going to have you turn to page 49 in your

3  deposition, please.  And on line 3 it says "What did you

4  do about that, if anything?"

5      The answer:  "I continued to try to get

6  understanding of their formulas and their processes

7  through visits to Bio-Systems.

8      Just through like single day visits; is that right?

9      That's correct."

10     Did I read that correctly?

11  A    You did.

12  Q    I'm going to show you Exhibit 526, which has

13  already been admitted.  So you mentioned, I believe, in

14  your direct about becoming aware of products being

15  shipped out under spec and you said January of 2012?

16  A    Yeah.  That's my recollection, AJ.

17  Q    Okay.  Do you recall the visit that you made to

18  Bio-Systems on March 15 of 2011?

19  A    I do.

20  Q    And do you recall Exhibit 526, which is the visit

21  notes?

22  A    Yes, I do.

23  Q    And number 2 says, "Have lab evaluate issues of

24  out-of-spec finished products - colony counts are

25  consistently too low but product is shipped anyway.

KURT BISCHOFF - CROSS

1    Implementation of Item 1 may improve this.  Bischoff."

2         Did I read that correctly?

3    A    You did.

4    Q    You never did have a lab evaluate the issues of

5    out-of-spec finished product until this litigation in

6    2012; isn't that right?

7    A    That's incorrect.  The quality control lab

8    evaluated this.  I didn't have an external lab evaluate

9    it.

10   Q    When you say *quality control lab*, what are you

11   referring to?

12   A    The laboratory in-house at Bio-Systems.

13   Q    I'm going to have you look at page 51 of your

14   deposition.  Line 14 says, referring to Exhibit 526

15   here.  If you go to the last page, it says *Follow-ups*.

16   It says "Have lab evaluate issues of out-of-spec

17   finished product.  Colony counts are consistently too

18   low.  Did you have the lab inspect the issue of

19   out-of-spec finished products?

20         I did not."

21         Did I read that correctly?

22   A    You did.

23   Q    So according to Document 526, someone had raised

24   with you an issue that colony counts in products were

25   consistently too low but products were being shipped in

                    KURT BISCHOFF - CROSS

1  March of 2011; correct?

2  A    I see the document, yes, that is correct.  I don't

3  remember the "being shipped" part of it.

4  Q    I'm going to now show Exhibit 566.  Mr. Bischoff,

5  do you recognize this March 2011 email chain?

6  A    I do.

7  Q    And in the note in the email on the first part, if

8  we start here, it says by as, "As far as the follow-up,

9  I am afraid that once we indicate that out-of-spec

10 material is being shipped, that it could become a wild

11 fire."

12      Did I read that correctly?

13 A    Yes.

14 Q    And that is an email that you drafted; correct?

15 A    That's correct.

16 Q    And it references the word *shipped*?

17 A    It does.

18 Q    And the term *wild fire* I understand at Betco means

19 "a very high profile project that needs to be addressed

20 immediately"; isn't that right?

21 A    That's correct.

22 Q    As far as you were aware after the purchase of

23 Bio-Systems, Mindy Walters was in charge of the spiral

24 plater and the ProtoCOL counter; correct?

25 A    Yes.

                    KURT BISCHOFF - CROSS

1    Q    And in December 2010, you had Mindy walk you

2    through the process that Bio-Systems used to plate and

3    count bacteria using the spiral plater and the ProtoCOL

4    counter; right?

5    A    Yes.

6         MR. BIANCHI:  I'd ask to move Exhibit 566 into

7    evidence.

8         THE COURT:  It had admitted.

9    BY MR. BIANCHI:

10   Q    I show you now what is Exhibit 524.  Mr. Bischoff,

11   do you recognize this November 2010 email?

12   A    Yes.

13   Q    So as of November 10, 2010, so we're a little over

14   a month after the purchase, you say you had "a flash

15   drive from Bio-Systems that contained the ISO Manual,

16   the mix sheets, Bio-Systems' culture sheet, private

17   label correlations, Betco pricing for products under

18   consideration, and QC information."

19        Did I read that correctly?

20   A    Yes.

21   Q    And your understanding is the ISO Manual documented

22   an additional detail, various of Bio-Systems' processes;

23   isn't that right?

24   A    That's correct.

25   Q    And you were aware that LexaMed's testing of IP

                    KURT BISCHOFF - CROSS

1  products were based on samples of products produced in

2  April 2010; isn't that right?

3  A    In that time frame, yes.  Yes.

4  Q    In April 2012?

5  A    April, May, June, yes.

6         MR. BIANCHI:  I move to admit Exhibit 524.

7         THE COURT:  It is admitted.

8         MR. BIANCHI:  I have no further questions.

9         THE COURT:  All right.  Redirect.  (11:56 a.m.)

10                REDIRECT EXAMINATION

11 BY MR. JACKSON:

12 Q    Mr. Bischoff, Mr. Bianchi questioned you with

13 regard to Exhibit 526, which was a memo I think you

14 testified you produced on March 15, 2011.  Do you see

15 that?

16 A    Yes.

17 Q    And he questioned you with regard to specifically

18 colony counts are consistently too low but product is

19 shipped anyway.  When you say the product is shipped

20 anyway -- let me rephrase.  What did you mean by "it's

21 consistently too low"?

22 A    This report was drafted by Brett Hanus and the

23 counts coming out of the fermentation vessels were too

24 low to generate high-count powder products.

25 Q    All right.  When you say "high-count powder
                KURT BISCHOFF - REDIRECT

1  products," what do you mean by high-count powder

2  products?

3  A    Powder product, the bacteria count of 500-billion

4  colony-forming units per gram.

5  Q    500 billion or 5 billion?

6  A    5 billion.  Excuse me.  5-billion-count material.

7  Q    Was there powder product of Bio-Systems being sold

8  at this time that had a lower represented count?

9  A    Yes, there was.

10  Q    And was there a concern at this time with respect

11  to the ability to produce the lower graded or

12  lower-specked powder product?

13  A    No.

14  Q    When you say the product is shipped anyway -- well,

15  first of all, are those your words or are those someone

16  else's words?

17  A    Those are someone else's words.

18  Q    All right.  Do you know what Mr. Hanus meant when

19  he used those words?

20  A    Specifically I don't know what was shipped or how

21  much was shipped.  I don't.

22  Q    Do you know the testing procedures for Bio-Systems

23  that were in effect on March 15, 2011 -- I'm sorry, let

24  me rephrase.

25         Did you know on March 15, 2011, the testing
                KURT BISCHOFF - REDIRECT

1   procedures that were in place at Bio-Systems?

2   A    I am aware that there were testing procedures in

3   place and I was under the impression, I need to verify,

4   that they were exactly the same procedures and

5   specifications that were in place when we purchased

6   Bio-Systems.

7   Q    And you've testified on direct that all product was

8   tested?

9   A    Yes.

10   Q    Do you know the source of Mr. Hanus's information

11   when he wrote "colony counts are consistently too low

12   but product is shipped anyway"?

13   A    I do not know for sure.  I do know that we were

14   with Neil Seeger and Derek Loverich on that.

15   Q    My question is do you have personal knowledge of

16   his source of information?

17   A    I do not.

18   Q    And you talked with Mr. Bianchi about wild fire.

19   Specifically what were you concerned -- I'm sorry.

20              MR. JACKSON:  Your Honor, Exhibit 566.

21   Q    What were you specifically referencing when you

22   used the term wild fire in Exhibit 566?

23   A    If there was a problem with the fermentation that

24   wouldn't allow us to get the high counts necessary to

25   produce in-spec finished goods, then this would become a
              KURT BISCHOFF - REDIRECT

1  project involving a lot of resources and attention

2  devoted to solving that problem as quickly and

3  efficiently as possible.

4  Q    During this time Mr. Peacock was in charge, was he

5  not?

6  A    Yes, he was.

7  Q    Do you know of any discussion of anybody within the

8  Betco Company with Mr. Peacock with regard to that

9  matter?

10  A    No, sir.

11          MR. JACKSON:  Nothing further, Your Honor.

12          MR. BIANCHI:  Your Honor, may I -- very short

13  recross.   (12:01 p.m.)

14          THE COURT:  Very brief.

15                  RECROSS-EXAMINATION

16  BY MR. BIANCHI:

17  Q    Mr. Bischoff, first did you tell Mr. Peacock about

18  the product being shipped below spec?

19  A    No.

20  Q    Also you talked about what you were told about

21  testing and where the products were supposed to be up to

22  snuff.  Are you aware of any warranty claim by a

23  customer dating back to pre-November 2011 brought

24  against Bio-Systems?

25  A    I don't have any specifics, no.
                KURT BISCHOFF - RECROSS

1        MR. BIANCHI:  No further questions.

2        THE COURT:  All right.  You may step down,

3   Mr. Bischoff.

4      (Witness excused at 12:02 p.m.)

5        THE COURT:  Plaintiffs may call their next

6   witness.

7        MS. GEHRIG:  Thank you, Your Honor.  The

8   plaintiff calls Mr. Derek Loverich.

9      **DEREK LOVERICH, PLAINTIFF'S WITNESS, SWORN,**

10        THE COURT:  Ms. Gehrig, I presume.

11        MS. GEHRIG:  Yes, Your Honor.

12        THE COURT:  You may proceed.

13        MS. GEHRIG:  Thank you, Judge.

14                DIRECT EXAMINATION

15   BY MS. GEHRIG:

16   Q    Mr. Loverich, would you please state your name and

17   spell your last.

18   A    Derek Loverich.  L-o-v-e-r-i-c-h.

19   Q    Sir, where do you currently reside?

20   A    Popular Grove, Illinois.

21   Q    Where are you employed?

22   A    Bio-Systems International.

23   Q    And what is your current position?

24   A    Plant manager.

25        MS. GEHRIG:  Your Honor, we proposed a short
                      DEREK LOVERICH - DIRECT

1  video.  It's my understanding that the Court has already

2  reviewed it.  I don't know --

3          THE COURT:  I have reviewed the Loverich --

4  there's a second part that's not in evidence.

5          MS. GEHRIG:  Okay.

6          THE COURT:  So I haven't gone back to look at

7  that.

8          MS. GEHRIG:  I don't wish to waste the Court's

9  time.  If the Court has already reviewed it, would you

10 prefer we simply go straight with testimony?

11         THE COURT:  I'll tell you what, I will -- I

12 will be certain to review it again.  But I think I've

13 had the gist of the first portion.  So I'll look at it

14 over lunch as well, but unless you think it's crucial

15 that I have exact recall of the information, I think I

16 can follow.

17         MS. GEHRIG:  Thank you.

18 BY MS. GEHRIG:

19 Q    Mr. Loverich, did you participate in the filming of

20 a video in May of 2015 in your workplace?

21 A    Yes.

22 Q    And did that video give a broad overview of what

23 you do in your current role?

24 A    Yes.

25 Q    Sir, how long have you been employed at the Beloit

                    DEREK LOVERICH - DIRECT

1   plant?

2   A    Since 2006.

3   Q    When you were hired who owned the plant?

4   A    Malcolm Peacock.

5   Q    Mr. Peacock?

6   A    Mr. Peacock.

7   Q    And sir, what position were you hired to fill back

8   in 2006?

9   A    I started off in liquid production and supervision.

10   Q    Sir, who interviewed you?

11   A    Mr. Peacock.

12   Q    Were other members of his family present?

13   A    Yes.

14   Q    And sir, were other members of his family involved

15   in the business at that time?

16   A    Yes.

17   Q    Specifically was his son Richard involved?

18   A    Yes.

19   Q    In what role?

20   A    He was the production manager.

21   Q    Was his daughter Lisa involved?

22   A    Yes.

23   Q    And what was her role?

24   A    She was in the financials.

25   Q    And was his wife Marilyn involved?
                    DEREK LOVERICH - DIRECT

1    A    Yes.

2    Q    What was her role?

3    A    She managed the ISO Manual.

4    Q    Sir, who technically did you report to when you

5    first started?

6    A    Richard Peacock.

7    Q    As a practical matter, who directed your day-to-day

8    activities?

9    A    Mr. Peacock.

10   Q    And here's where we get a little confusing.  When

11   we say Mr. Peacock, are we referring to Mr. Malcolm

12   Peacock?

13   A    Mr. Malcolm Peacock.

14   Q    Sir, just for clarity, if we're ever referring to

15   Mr. Richard Peacock, would you specify?

16   A    Yes.

17   Q    Sir, what is your formal education?

18   A    I have an ecology degree from Purdue with

19   environmental option.

20   Q    Was this in the year 2000?

21   A    Yes.

22   Q    Did you have course work in microbiology?

23   A    Yes.

24   Q    Did you learn about fermentation?

25   A    Yes.
                    DEREK LOVERICH - DIRECT

1   Q    And did you have exposure to plate counting of

2   bacteria?

3   A    Yes.

4   Q    Sir, your work history, just a brief summary prior

5   to when you began working at Bio-Systems, was your first

6   job with Stratford Technology?

7   A    Yes.

8   Q    And sir, did that -- is Stratford Technology a

9   biological weapons proliferation prevention program?

10  Was that their task?

11  A    Yes.

12  Q    And sir, did this take you to areas across the

13  seas?

14          MR. BIANCHI:  Objection.  Leading.

15          THE COURT:  I'll sustain the objection.

16  BY MS. GEHRIG:

17  Q    Sir, what were your responsibilities with this

18  company?

19  A    I provided biological aspect to the former by

20  weaponers.

21  Q    And sir, were you exposed to different types of

22  fermentation procedures?

23  A    Yes.

24  Q    And equipment?

25  A    Yes.

                    DEREK LOVERICH - DIRECT

1    Q    Did you learn anything about microbiology

2    techniques in that job?

3    A    Yes.

4    Q    And sir, was your second job -- what did that

5    involve?

6    A    Environmental field work.

7    Q    And was that groundwater remediation?

8    A    Yes.

9    Q    How long did you remain in that position?

10   A    About a year.

11   Q    Sir, I'd like to talk about your initial duties

12   when you were placed in charge of liquid production.

13   What were your specific job duties?

14   A    Fermentation as well as liquid production.

15   Q    And sir, what basics did you already know when you

16   showed up at Bio-Systems?

17   A    Some of the basics of fermentation; the math needed

18   to produce different batches.

19   Q    Was the setup, the facility, new to you?

20   A    Yes.

21   Q    And sir, did you know how to formulate products?

22   A    No.

23   Q    Did you learn that when you started?

24   A    Yes.

25   Q    Who taught you?
                    DEREK LOVERICH - DIRECT

1    A    Mr. Peacock.

2    Q    And sir, did you over the course of time take over

3    those tasks for the liquid production?

4    A    Yes.

5    Q    Were you aware of other products being produced in

6    the plant other than liquids?

7    A    Yes.

8    Q    And what general categories?

9    A    Powder products, solid products all containing

10   bacteria.

11   Q    And sir, were you aware of other departments

12   outside of production?

13   A    Yes.

14   Q    Including quality control?

15   A    Yes.

16   Q    And were you aware of a sales staff?

17   A    Yes.

18   Q    Were they in your building or a different building?

19   A    A different building.

20   Q    During that time did you become aware of any

21   perceived or did you yourself observe what you would

22   characterize as equipment deficiencies in the Beloit

23   plant?

24   A    Yes.

25   Q    What was the main equipment deficiency that you

                   DEREK LOVERICH – DIRECT

1  observed?

2  A    We had shortages of steam.

3  Q    And sir, what equipment is steam related to?

4  A    Boilers and fermenters.

5  Q    How pervasive was this problem in terms of its

6  effect on your ability to do your job?

7  A    It was a very large issue.  It impacted being able

8  to ferment as well as produce urinal pucks, bio cubes.

9  Q    Did it have any implications with regard to

10 contamination?

11 A    Yes.

12 Q    Could you describe that?

13 A    If you don't get the fermenters up to sterilization

14 temperature in a timely manner, you can have

15 contaminants and that will impact your overall yields.

16 Q    And sir, did it have any impact regarding

17 scheduling or your ability to produce product on a

18 timely manner?

19 A    Yes.

20 Q    And could you describe that, please.

21 A    We had, due to the lack of steam, we had to

22 schedule appropriately what we would do at what time.

23 So there were times where we could not run equipment

24 because of the shortages of steam.

25 Q    Did you ever have equipment competing against --
                    DEREK LOVERICH - DIRECT

1  one piece of equipment competing against another for

2  power?

3  A    Yes.

4  Q    And again, what did that do to production, your

5  ability to produce product?

6  A    It slowed or stopped it.

7  Q    Did you discuss these concerns with Richard

8  Peacock?

9  A    Yes.

10 Q    Did he share them?

11 A    Yes.

12 Q    And sir, did you attempt to raise these concerns at

13 that time with Mr. Malcolm Peacock?

14 A    No.

15 Q    Were you witness to any conversations between

16 father and son, Mr. Richard and Mr. Malcolm Peacock,

17 regarding those concerns?

18 A    Yes.

19 Q    And how did Mr. Malcolm Peacock respond?

20 A    He didn't like what Richard was suggesting.

21 Q    Sir, did your job change in 2009?

22 A    Yes.

23 Q    And at that time were you promoted to manager for

24 production of all processes in the Beloit plant?

25 A    Yes.

                    DEREK LOVERICH - DIRECT

1    Q    So not just liquids, were you now also in charge of

2    solids and powders?

3    A    That's correct.

4    Q    And sir, was this the first time, your first

5    exposure to the wet-batch process in terms of being

6    responsible for its production?

7    A    Yes.

8    Q    What personnel change prompted your shift in

9    responsibilities?

10   A    Mr. Richard Peacock left the building or left the

11   company.

12   Q    Did you observe any conflict between father and son

13   in the workplace prior to or at the time of Richard's

14   departure?

15   A    Yes.

16   Q    Was it verbal?

17   A    Yes.

18          MR. BIANCHI:  Objection.  Leading.

19          THE COURT:  I'll sustain that objection.  He's

20   answered.  You can ask your next question.

21          MS. GEHRIG:  Thank you, Your Honor.

22   BY MS. GEHRIG:

23   Q    How did your job duties change?

24   A    I started managing powder production, solids

25   production, and liquids production.
                    DEREK LOVERICH – DIRECT

1   Q    And sir, were you now reporting directly to

2   Mr. Malcolm Peacock?

3   A    Yes.

4   Q    Would you describe Mr. Malcolm Peacock's management

5   style?

6   A    I worked with him every day.  He was involved in

7   everything.  He wanted it done his way.

8   Q    Hands on or hands off?

9   A    Hands on.

10  Q    Did you feel you could openly suggest change or

11  criticize a procedure that he had developed?

12          MR. BIANCHI:  Objection.  Leading.

13          THE COURT:  Sustained.

14  BY MS. GEHRIG:

15  Q    Were there times that you suggested change?

16  A    Yes.

17  Q    How did he respond?

18  A    Sometimes not favorably.

19  Q    Sir, who taught you about the wet-batch process?

20  A    Malcolm Peacock.  Mr. Malcolm Peacock as well as

21  supporting staff.

22  Q    As well as?

23  A    Supporting staff.

24  Q    And sir, what's your -- in general terms, what's

25  your understanding of the process, why it's a desirable

                    DEREK LOVERICH - DIRECT

1    process?

2    A    It's a version of solid state fermentation designed

3    to give you high yields at a low cost.

4    Q    In your conversations with Mr. Peacock, did he take

5    any credit for having developed that process in the

6    Beloit plant?

7    A    Yes.

8    Q    Did he appear to be proud of it?

9    A    Yes.

10    Q    Was he in any way secretive about it?

11    A    Yes.

12    Q    Could you describe?

13    A    We would try not to have our customers see the

14    process.

15    Q    In what products was the wet-batch process used?

16    A    Powder products.

17    Q    And sir, approximately what percentage of

18    Bio-Systems' production as of September 2010 was

19    powders?

20    A    At least 50 percent.

21    Q    Sir, products -- are products tested at a couple of

22    different stages?

23    A    Yes.

24    Q    And at what stage in production is a product

25    assigned a lot number?

                    DEREK LOVERICH - DIRECT

1    A    When the batch sheet is made.

2    Q    Okay.  And if there is -- if the product is tested

3    in an intermediate level, is it assigned a lot number?

4    A    Yes.

5    Q    And does it get a different lot number in its final

6    stage?

7              MR. BIANCHI:  Objection.  Leading.

8              THE COURT:  Sustained.

9              MS. GEHRIG:  May I reask the question in a

10   nonleading manner, Your Honor?

11             THE COURT:  You may.

12   BY MS. GEHRIG:

13   Q    At what stages is a lot number assigned to product?

14   A    Intermediate products get lot numbers as well as

15   final products.

16   Q    Are they the same or different number?

17   A    Different number.

18   Q    Sir, did you have any concerns about the quality of

19   product being produced in the wet-batch process in 2009

20   or 2010?

21   A    Yes.

22   Q    What were your concerns?

23   A    Largely concerns with moisture.  We had repeated

24   issues where we could not use the product because it was

25   too wet.
                    DEREK LOVERICH - DIRECT

1  Q    Sir, what, if anything, did the Beloit plant do

2  during that time period to dry wet-batch product?

3  A    We had various racks with cardboard trays where

4  they would be used to dry.  At times where they weren't

5  drying fast enough, extreme measures would be taken,

6  including dispensing the product along the floor.

7  Q    The floor of what?

8  A    The plant.

9  Q    And sir, were you present?  Did you observe that

10 happening?

11 A    Yes.

12 Q    And did you observe any measures taken to clean the

13 floor before the product was spread on the production

14 facility floor?

15 A    It would be swept.

16 Q    No other cleaning?

17 A    That's it.

18 Q    Sir, did you have concerns about keeping your job

19 if you criticized the wet-batch process?

20 A    Yes.

21 Q    Between 2006 and 2010, did you interact with staff

22 in other departments, including the lab?

23 A    Yes.

24 Q    How frequently would you interact with lab staff?

25 A    Every day.

                    DEREK LOVERICH - DIRECT

1   Q    And who was your primary contact?

2   A    Mindy Walters.

3   Q    Did you have contact with sales personnel?

4   A    Yes.

5   Q    And anyone in particular?

6   A    Dana Juul.

7   Q    How frequently did you contact Ms. Juul?

8   A    Couple times a week.

9   Q    Who was supervising the sales -- customer service

10  and sales staff during that time period?

11  A    Mr. Peacock.

12  Q    Sir, I'd like to talk to you about lab testing.

13  Were you familiar with what Mindy was doing in the lab?

14  A    Yes.

15  Q    And what types of test were you familiar that she

16  was conducting?

17  A    The different plating testing, moisture testing,

18  there would be B.O.D., dissolution testing, pH.

19  Q    Who had the last view of the products before they

20  were shipped?

21  A    There would be a quality check before shipping.

22  Q    And would that go through the lab?

23  A    Yes.

24  Q    And sir, were you aware that different tests, and

25  we're talking about bacteria tests, were occurring

                    DEREK LOVERICH - DIRECT

156

1  during different stages of the product's production?

2  A    Yes.

3  Q    Sir, during this time period who decided which

4  tests should be performed on which products?

5  A    Mr. Peacock.

6  Q    And did that -- his control of that issue, did that

7  stay the same after the plant was sold to Betco during

8  the last year he was present?

9  A    Yes.

10  Q    And sir, who decided at what stage each type of

11  product should be tested?  I'm talking about the

12  intermediate product or the final.

13  A    Mr. Peacock.

14  Q    And did he continue to control that decision so

15  long as he worked in the plant, including after the sale

16  of the business?

17  A    That's correct.

18  Q    Now sir, in 2006 to 2009 when you had

19  responsibilities for liquid production, were you aware

20  of at what stages liquid products were being tested for

21  bacterial counts?

22  A    Yes.

23  Q    Was there a period of time that liquids were tested

24  in final form?

25  A    Yes.

DEREK LOVERICH - DIRECT

1   Q    And did that change?

2   A    Yes.

3   Q    Did you participate in discussions with Mr. Peacock

4   and Ms. Walters leading up to that change?

5          MR. BIANCHI:  Objection.  Leading.

6          THE COURT:  I'll sustain that -- well, actually

7   it's preliminary and I'll allow an answer, but I need to

8   know a time frame.  So maybe we could start there and

9   then you could --

10          MS. GEHRIG:  Absolutely, Your Honor.

11          THE COURT:  -- finish the question.

12  BY MS. GEHRIG:

13  Q    In approximately 2008, did you have a conversation

14  at which Mr. Peacock was present and Ms. Walters was

15  present regarding final plate count of liquids?

16  A    Yes.

17  Q    What information was being brought to Mr. Peacock?

18          MR. BIANCHI:  Objection.  Hearsay.

19          THE COURT:  It would be before Mr. Peacock.  He

20  was present, so to the extent that it's preliminary to

21  asking his reaction, I'll allow it.  You may proceed.

22          MS. GEHRIG:  Thank you, Your Honor.

23          THE WITNESS:  Repeat the question, please.

24  BY MS. GEHRIG:

25  Q    What information was brought to Mr. Peacock?
              DEREK LOVERICH - DIRECT

1    A    I had concerns in talking with Mindy about liquid

2    product plate counts as well as shipping on time.  There

3    were multiple challenges at the time and we were looking

4    for guidance on what to do.

5    Q    And what did Mr. Peacock tell you?

6    A    We stopped doing final plate counts for liquid

7    products and instead used the intermediate concentrate

8    counts for final products.

9    Q    And sir, at that time was Mr. Peacock presented

10   with any information about whether or not plate --

11   whether or not final products were meeting spec?

12   A    I don't remember.

13   Q    What was his justification, if he had one, for not

14   plating final liquids?

15   A    I don't remember what the justification was.

16   Q    And sir, did that continue until after the sale of

17   the business and during the year that Mr. Peacock

18   remained on site?

19   A    Yes.

20   Q    And sir, in 2009 when your responsibilities

21   expanded, did you learn about testing practices for

22   those products as well as solids and the powders?

23   A    Yes.

24   Q    Sir, were some products not tested at all for

25   bacterial counts?
                    DEREK LOVERICH - DIRECT

1    A    Yes.

2    Q    Which products were those?

3    A    The solid products, specifically urinal pucks.

4    Q    And sir, were powders tested in their final form?

5    A    Yes.

6    Q    As well as IP?

7    A    Yes.

8    Q    When did testing take place in relation to

9    shipment?

10   A    A lot of times after the product had already

11   shipped.

12   Q    And sir, what was the rationale for that?

13   A    Speed was the most important.  We tried to produce

14   and ship as quickly as possible.

15   Q    And again, who was directing those shipments before

16   testing had been completed?

17   A    Mr. Peacock.

18   Q    And sir, were there times that product had been

19   tested and did not pass spec and was shipped?

20   A    Yes.

21   Q    Sir, how frequently would product be shipped before

22   it had been tested, the final product had been tested?

23   A    Probably every day.

24   Q    And sir, did that practice continue during the year

25   that Mr. Peacock ran the plant after the acquisition?

                    DEREK LOVERICH – DIRECT

1   A    Yes.

2   Q    Sir, to the best of your knowledge was there any

3   consequence for basically learning after the product had

4   shipped that it hadn't passed spec in terms of a recall

5   or anything like that?

6   A    My understanding was only if the customer

7   complained.

8   Q    Sir, did you have concerns about these procedures

9   and policies?

10  A    Yes.

11  Q    Did you discuss them with Mindy Walters?

12  A    Yes.

13  Q    Did you attempt to address them with Mr. Peacock?

14  A    Yes.

15  Q    Did he appear to share your concerns about low

16  plate counts or products not meeting specification?

17  A    We would be told that the products ultimately

18  worked and that at times certain customers knew what

19  they were getting and that they still worked.

20  Q    Sir, you're aware of the acquisition in September

21  of 2010?

22  A    Yes.

23  Q    How did you become aware?

24  A    Mr. Peacock told us a week or two prior.

25  Q    And did you travel to Toledo?

                    DEREK LOVERICH – DIRECT

1    A    Yes.

2    Q    To meet the new owners?

3    A    Yes.

4    Q    Who all went on that trip?

5    A    Myself, Dana Juul, Chrissy Stratton.

6    Q    Sir, between 2010 and November of 2011, did you

7    continue to report directly to Mr. Peacock?

8    A    Yes.

9    Q    Did you believe he had the authority to fire you if

10   he chose?

11   A    Yes.

12   Q    Were there any immediate changes in production and

13   testing procedures September 2010 to January 2011?

14   A    No.

15   Q    Did you get a new staff person?

16   A    Yes.

17   Q    Who was that?

18   A    Neil Seeger.

19   Q    Did you understand he was a microbiologist?

20   A    Yes.

21   Q    And sir, what was your understanding of his role in

22   the business?

23   A    He was to help improve process efficiency.

24   Q    Did you and Mr. Seeger work together closely?

25   A    Yes.

                    DEREK LOVERICH - DIRECT

1  Q    Describe how you felt in terms of your ability to

2  share your concerns with him?

3  A    I felt like I had an ally, someone that was

4  actually sharing my same concerns.

5  Q    And did you, meaning you and Mr. Seeger, discuss

6  the concerns that you had about the plant?

7  A    Yes.

8  Q    Did you share these concerns with Mr. Peacock?

9  A    Yes.

10  Q    Did Mr. Peacock appear to welcome Mr. Seeger's

11  input or suggestions?

12  A    No.

13  Q    Did you believe you could make changes without

14  Mr. Peacock's approval?

15  A    No.

16  Q    Sir, were representatives of the Betco -- excuse

17  me.  Were representatives from Betco present from time

18  to time in the Beloit plant?

19  A    Yes.

20  Q    Who did you see?

21  A    Brett Hanus, Kurt Bischoff, Paul Betz, Denise

22  Lennard.

23  Q    Did Malcolm in any way discourage you, or Mr.

24  Seeger in your presence, from communicating with Betco

25  personnel?

                    DEREK LOVERICH - DIRECT

1   A     Yes.

2   Q     How?

3   A     Denise Lennard was not to be allowed in the

4   building, in that plant I'm talking.  He wanted all

5   communication to be going through him before going to

6   Toledo.

7   Q     Sir, in March of 2011 did you make any effort to

8   communicate the concerns you had about the facility

9   directly with Betco personnel?

10  A     Yes.

11  Q     What did you do?

12  A     I went home and I typed up a letter of some of the

13  concerns that I wanted to improve on.

14  Q     Sir, why did you go home to do that?  Didn't you

15  have a computer at work?

16  A     I feared my job would be in jeopardy.

17  Q     How did you make this communication to Betco

18  personnel?

19  A     I physically handed them the document.

20  Q     Who did you hand it to?

21  A     Kurt Bischoff and Brett Hanus.

22  Q     Sir, what concerns did you put in the memo?

23  A     I had concerns with fermentation, with the boiler

24  capacity, certificates of analysis, the shipping of

25  product prior to final plate specification.

                    DEREK LOVERICH – DIRECT

1   Q    And sir, were these issues that you had previously

2   attempted to raise with Mr. Peacock?

3   A    Yes.

4   Q    Did you keep a copy of the memo?

5   A    No.

6   Q    Why not?

7   A    I was worried about my job.

8   Q    Did you inform Betco personnel that you were

9   concerned for your job by sharing that information with

10  them?

11  A    I did.

12  Q    Sir, did Betco respond in any -- to any of the

13  concerns raised in your memo?

14  A    Not at first.

15  Q    At some point did they have a site visit?

16  A    Yes.

17  Q    And did you talk to them about any -- any of the

18  issues that were raised in your memo?

19  A    Yes.

20  Q    Did you talk to them about --

21          THE COURT:  Do you recall when that was?

22          THE WITNESS:  When?  I believe it was March of

23  2011.

24  BY MS. GEHRIG:

25  Q    And sir, ultimately were some -- did Betco commit
                    DEREK LOVERICH - DIRECT

1  to assist with some improvements?

2  A    Yes.

3  Q    And what improvements were those?

4  A    The boiler capacity.

5  Q    Sir, I'm just going to ask you to look at a chart

6  that has been put up on the screen.  Have you seen that

7  chart before?

8  A    Yes, I have.

9  Q    Does it include various items that were purportedly

10 purchased by Betco for the Beloit plant?

11 A    Yes.

12 Q    And sir, I'm going to represent to you that if you

13 touch the screen, it will produce an arrow.  Could you

14 go through this document and point to various equipment

15 upgrades that or equipment that was upgraded following

16 the Betco visit.

17 A    Okay.  The water softener was part of it.  And if

18 you could go to -- can I go to the next page?

19         THE COURT:  You can clear that in the bottom

20 left, the arrow, if you want to get something else.

21         THE WITNESS:  Bottom left?

22 BY MS. GEHRIG:

23 Q    What have you pointed to, sir?

24 A    I'm sorry?

25         THE COURT:  She just wants you to read what you
                    DEREK LOVERICH - DIRECT

1   just pointed to.

2          THE WITNESS:   South boiler room 1, component of

3   project 722.

4   BY MS. GEHRIG:

5   Q    What was the line item purchased of that item?

6   A    I'm sorry?

7   Q    Does it show a cost of that item?

8   A    $70,888.04.

9   Q    Okay.  If we take you to the third page, are you

10  going to find some more stuff?

11  A    I believe so.

12  Q    Okay.  You pointed to?

13  A    I'm looking at south boiler room 2, component of

14  project 722.  Again, the same price $70,888.  The room

15  louvers, the next one for $2,466.  The south, I'm

16  assuming boiler room, add-on project 722 for $55,845.

17  The next one, north boiler room, I'm having trouble

18  reading it, for $37,230.  I believe that's it.

19  Q    Okay.  And sir, does this document also indicate a

20  date of purchase?

21  A    Yes.

22  Q    And either -- from your recollection, did you get

23  these items immediately after the Betco visit?

24  A    No.

25  Q    Was there -- what was the nature of the delay?  Are

                    DEREK LOVERICH - DIRECT

1  we talking weeks?  Months?

2  A    Months.

3  Q    Now sir, you initially talked about underpowered

4  boilers in the Beloit plant.  Is this equipment that was

5  designed to address that issue?

6  A    Yes.

7  Q    And sir, did you hope or did you expect that

8  replacing the boilers would address more than one issue?

9  A    Yes.

10  Q    What did you think replacing the boilers or a

11  boiler upgrade would do for the Beloit plant?

12  A    I thought we would -- I thought we would achieve

13  higher fermentation yields by achieving better

14  sterility, as well as not overcooking the nutrient going

15  into the fermenters.  I also thought that the other

16  supporting processes could have higher production rates.

17  Q    Are we talking better counts?

18  A    Better counts.

19  Q    And would it help with contamination?

20  A    Yes.

21  Q    And sir, ultimately when you did get the equipment,

22  did it help?

23  A    Yes.

24  Q    Did it completely solve your problems?

25  A    No.

                    DEREK LOVERICH - DIRECT

1  Q    Sir, did Mr. Peacock give you any particular

2  instruction regarding what to say to Betco personnel

3  regarding the boiler situation?

4  A    I was to say that the additional boiler capacity

5  was needed due to the increased urinal puck production

6  required for Betco.

7  Q    And was that accurate?

8  A    That was needed to -- yes, but it was also

9  fermentation capacity for -- steam was very much needed.

10 Q    Without regard to Betco's desire for additional

11 pucks, did you still need the boilers?

12 A    Yes.

13 Q    Did you believe that what Mr. Peacock was asking

14 you to say was true?

15 A    It was true, yes, that we did need additional

16 capacity for pucks.

17 Q    Did you think it was the whole truth?

18 A    No.

19 Q    Sir, do you recall a visit by Betco -- by a Betco

20 vice president, Chris Pavain, to the Beloit plant in

21 September or October of 2011?

22 A    Yes.

23 Q    And was Mr. Peacock still working in the Beloit

24 plant at the time?

25 A    Yes.

                    DEREK LOVERICH - DIRECT

```
 1   Q     Was Mr. Peacock present when Mr. Pavain arrived?

 2   A     No.

 3   Q     Were you and Neil Seeger both at the Beloit plant

 4   when Mr. Pavain arrived?

 5   A     Yes.

 6   Q     What did you do?

 7   A     Mr. Pavain asked for a meeting.  Neil Seeger and

 8   myself went up to my office and we started talking about

 9   production issues.

10   Q     Were you interrupted in any way?

11   A     Yes.

12   Q     What happened?

13   A     Mr. Peacock came into the room.

14   Q     And what did he do?

15   A     He essentially stopped the meeting.  He said that

16   -- he asked Chris, Mr. Pavain, why are you talking to

17   those two?  They don't know anything.

18   Q     What was your impression from Mr. Peacock's

19   actions?

20   A     It made me think that he didn't want me talking to

21   Mr. Pavain.

22   Q     Sir, did you understand Mr. Peacock's employment at

23   the Beloit plant to end some time in late 2011?

24   A     Yes.

25   Q     How did you learn of his impending departure?
```
                    DEREK LOVERICH - DIRECT

1    A    Mr. Peacock came into the plant and told everyone

2    he had been fired.

3    Q    Sir, did Mr. Peacock's departure change the way you

4    felt about your freedom to investigate quality control

5    issues?

6    A    Yes.

7              MR. BIANCHI:  Objection.  Leading.

8              THE COURT:  I'll sustain the objection.  Strike

9    the answer.

10   BY MS. GEHRIG:

11   Q    What did you do, if anything, after Mr. Peacock

12   left, differently?

13   A    I began working more with Mindy Walters, Neil

14   Seeger on various components of the Beloit facility and

15   I tried to fix some of the problems that I viewed.

16   Q    Did you communicate with Betco in January of 2012?

17   A    Yes.

18   Q    Was that in an email?

19   A    Yes.

20   Q    Sir, I'll direct your attention to what appears on

21   the screen and I believe has been marked as Exhibit 4.

22   Is that an email that you authored?

23   A    Yes.

24   Q    Did anyone assist you with regard to the content of

25   that email?
                    DEREK LOVERICH - DIRECT

1    A    Yes.

2    Q    What was the purpose of sending it?

3    A    To make light of several shortcomings that I viewed

4    at the Beloit facility.

5    Q    Sir, was all of this information known to you prior

6    to the time that Mr. Peacock left the plant?

7    A    No.

8    Q    What put it all together?

9    A    I was able to work with Neil Seeger, Mindy Walters,

10   and truly put the pieces together and I learned more

11   information about each section.

12   Q    What had been inhibiting that prior to Malcolm's

13   departure?  Excuse me, Mr. Peacock's departure.

14   A    For fear of losing my job, Mr. Peacock.

15   Q    Sir, could you take your concerns and describe them

16   to us as you described them to Betco in your email.

17   A    I had concerns that final products were shipped

18   before plate results were in.  I had concerns that

19   liquid products were not plated in final form.  I didn't

20   believe many of the products being shipped met

21   specification.  And the certificates of analysis were

22   not based off of the plate counts generated from the

23   lab.

24   Q    From the final product did you say?  I'm sorry, you

25   trailed off.

DEREK LOVERICH - DIRECT

1  A    Yes, for the final products.

2  Q    And sir, is the first full paragraph under your

3  bullet points directed towards final liquids?

4  A    Yes.

5  Q    And what did you have to tell Betco about the

6  plating of final liquids?

7  A    Well, that it wasn't done.  It stopped several

8  years ago; hadn't been done for years.  It was based off

9  of the intermediate count for the concentrate that was

10  used to make up the final product.

11  Q    And sir, did you have some plan that you proposed

12  to Betco to deal with that issue?

13  A    Yes.  We were going to test several weeks of

14  products, potentially build in overages to try to use

15  existing resources to fix the problem.

16  Q    And sir, your next problem, what did that concern?

17  A    This was powder products using the wet-batch

18  technology to achieve plate count and specification.

19  Q    And sir, did you feel like you needed to describe

20  the wet-batch process in that paragraph a little bit?

21  A    Yes.

22  Q    And sir, did you have concerns about contamination

23  during the production of the wet-batch products?

24  A    Yes.

25  Q    And sir, does your next paragraph talk about
                    DEREK LOVERICH - DIRECT

1   potential fixes for that problem?

2   A    Yes.

3   Q    What potential fixes were you proposing?

4   A    Incorporate overages, higher bacterial percentages

5   going into the products to the final plate

6   specification.

7   Q    And sir, the next paragraph, are you talking about

8   what's been going on, whether you've been getting

9   complaints from customers?

10  A    Yes.

11  Q    And you explain prior procedure?

12  A    Yes.

13  Q    And concerns about that as an ongoing problem?

14  A    Yes.

15  Q    Now sir, your last paragraph, does it reference

16  communications with salespeople?

17  A    Yes.

18  Q    Prior to Malcolm's departure, did you communicate

19  frequently with salespeople regarding their procedures?

20  A    No.

21  Q    And in this time frame, were you getting a better

22  understanding about what their procedures were?

23  A    Yes.

24  Q    And communicating that to Betco?

25  A    Yes.
                    DEREK LOVERICH - DIRECT

1  Q    Sir, at this time did you see yourself as basically

2  in charge of the Beloit plant?

3  A    Yes.

4  Q    Who did you send this email to?

5  A    Can you back up to the first page?  Chris Pavain,

6  Brett Hanus, Denise Lennard, and also Kurt Bischoff,

7  John Yazek, Neil Seeger, Mindy Walters, Dana Juul,

8  Gerson Artreche.

9  Q    Did that include people in all departments at the

10 Beloit plant?

11 A    Yes.

12 Q    And your main contacts at Betco?

13 A    Yes.

14 Q    Sir, did you also contribute to a second email

15 dated May 16 of 2012?

16        THE COURT:  How much more do you have for this

17 witness?

18        MS. GEHRIG:  Approximately 10 minutes, Your

19 Honor.

20        THE COURT:  Why don't we break for lunch.  We

21 will reconvene at 1:30 and continue with this witness.

22 Mr. Loverich, if you'll be good enough to be back in

23 your seat at that time, I would appreciate it.

24     Anything more for the plaintiffs before we break?

25        MS. GEHRIG:  We would ask that the first email
                    DEREK LOVERICH - DIRECT

1   be admitted into evidence.

2          THE COURT:  That was Exhibit 4?

3          MS. GEHRIG:  Yes, Your Honor.

4          THE COURT:  All right.  It is admitted.

5   Anything more for the plaintiffs?

6          MS. GEHRIG:  No, Your Honor.

7          THE COURT:  Anything more for the defendants?

8          MR. BIANCHI:  (Shakes head no)

9          THE COURT:  All right.  Then we are in recess.

10  We will reconvene at 1:30.  And you're free to move

11  about.

12      (Noon recess      12:38-1:37 p.m.)

13          THE COURT:  My apologies for the delay.  You

14  may continue.

15          MS. GEHRIG:  Thank you, Your Honor.

16  BY MS. GEHRIG:

17  Q   Mr. Loverich, when we left of I had just, I

18  believe, asked you if you would look at the screen which

19  has had -- which now shows Exhibit -- what's been

20  previously marked as 8.  Have you seen that document

21  before?

22  A   Yes.

23  Q   And is that a document that was prepared by one of

24  your colleagues?

25  A   Yes.
                    DEREK LOVERICH - DIRECT

1   Q    Mr. Seeger specifically?

2   A    Yes.

3   Q    And did you work with Mr. Seeger to prepare the

4   information that is stated in that May 16, 2012, email?

5   A    Yes.

6   Q    What is this email regarding?

7   A    Concerns over the ProtoCOL counter and spiral

8   plater.

9   Q    And why was that a concern to you?

10  A    With Neil coming in, he had more of a background in

11  manual plate counting.  And when we would do the two

12  methods side by side, we weren't getting similar

13  numbers.

14  Q    What was the concern?

15  A    That the spiral plater was -- had much higher

16  counts compared to manual counting.

17  Q    Did that create a problem in terms of

18  representations you had been making about product

19  bacteria counts?

20  A    That's correct.

21  Q    If what your concerns were were accurate, had you

22  been accurately representing counts to customers?

23  A    No.

24  Q    Sir, did you have any conversations with

25  Mr. Malcolm Peacock that caused you to believe that he

                  DEREK LOVERICH - DIRECT

1  was aware of a bias in the ProtoCOL counter?

2  A    Yes.

3  Q    And what was the context?  When I say context, a

4  time frame would be helpful and what you were doing at

5  the time.

6  A    I can remember one example.  This would have been

7  2008 or 2009.  We were doing a competitive match to a

8  Novozymes product.  We had plated the product using the

9  ProtoCOL counter.

10  Q    When you say "the product," is this a competitor's

11  product?

12  A    That's correct.

13  Q    Okay.

14  A    And the results that we got were very high.  I

15  asked Mr. Peacock if I should use those results for our

16  competitive match and we were advised not to use that

17  because they had spreader colonies on the plates and we

18  were to use a much lower number.

19  Q    Is that the only occasion you had conversations

20  with Mr. Peacock about the ProtoCOL counter?

21  A    No.

22          THE COURT:  Spreader colonies means

23  nontargeted?  I don't know what you mean by spreader

24  colonies or what you understood that term to be.

25          THE WITNESS:  They would have been much larger
                    DEREK LOVERICH - DIRECT

1  colonies on the agar plates themselves so that when the

2  counter was counting them, it thought it a much higher

3  count.  So it was looking for smaller cells but --

4  smaller colonies, but as it saw the bigger one, it was

5  lumping them together giving a much higher count; could

6  be ten times, could be a hundred times higher than the

7  original count.

8          THE COURT:  So did you find that a plausible

9  explanation by using a lower count?

10          THE WITNESS:  Yes, at the time.

11          THE COURT:  Thank you.

12 BY MS. GEHRIG:

13 Q    And sir, you stated that there was one or more

14 other occasions?

15 A    Yes.  We started experimenting -- this would have

16 been later 2010, I believe -- drying the centrifuge

17 slurry and plating the dried bacterial product after

18 that.  The counts that we were getting were many

19 trillions per gram and we had discussions and we started

20 using lower counts.

21 Q    And what was the nature of the discussions that

22 caused you to use the lower counts?

23 A    It seemed improbable that we were getting counts

24 that high from the ProtoCOL counter.

25 Q    The machine was telling you something that you did

                DEREK LOVERICH - DIRECT

1  not believe was in the actual product?

2  A    That's correct.

3  Q    Sir, over the next two years -- and to orient you

4  we were just talking about taking us back to the email

5  dated May 16 of 2012 -- for the next two to three years,

6  2012/2013, did you work with Mr. Seeger to do anything

7  to improve the Beloit plant?

8  A    Yes.

9  Q    And what did you work with him to do?

10  A    We tried to improve the existing wet-batch process.

11  We worked on the fermentation.  We worked to replumb the

12  steam lines to improve fermentation itself.  We did

13  multiple experiments on the wet-batch process to try to

14  get higher yields.

15  Q    And sir, were you ultimately able to get the

16  5-billion count you needed with the wet-batch process

17  consistently in the Beloit plant?

18  A    No.

19  Q    And sir, what has --

20        THE COURT:  I'm sorry, the 5-billion count was

21  needed for which product?

22        THE WITNESS:  Using the powdered products,

23  wet-batch process was used.  Many of the specifications

24  for the final product that would go out was a 5-billion

25  count product per gram.
        DEREK LOVERICH - DIRECT

180

1           THE COURT:  Was that being certified

2  previously?

3           THE WITNESS:  Yes.

4           THE COURT:  On a regular basis?

5           THE WITNESS:  Yes.

6           THE COURT:  And it's your belief now that that

7  was inaccurate.

8           THE WITNESS:  Yes.

9           THE COURT:  And did you believe it at the time

10  it was being certified?  In 2009/2010?

11          THE WITNESS:  At the time before I knew what I

12  know now about the ProtoCOL counter I believed it.

13          THE COURT:  You believed it was accurate.  And

14  was that tested in the local lab, the Bio-Systems lab?

15          THE WITNESS:  Yes.

16          THE COURT:  And using the spiral counter, that

17  is what you understood was being given back as the

18  result?

19          THE WITNESS:  Yes.

20          THE COURT:  Thank you.

21  BY MS. GEHRIG:

22  Q    Sir, are you right now in the plant using the

23  wet-batch process?

24  A    No.

25  Q    What has replaced all the bacteria that you used to

                    DEREK LOVERICH - DIRECT

1  believe you were creating in the wet-batch process?

2  A    We use spray-dried cultures now.

3  Q    I beg your pardon?

4  A    Spray-dried cultures.

5  Q    Do you grow them yourselves or do you purchase

6  them?

7  A    We purchase them.

8  Q    Now sir, historically, and I'm talking historically

9  again back in the 2006 to 2010 time period, did you

10  purchase some bacteria in the Beloit plant?

11  A    Yes.

12  Q    Approximately how much?

13  A    It varied depending on the year.

14  Q    Would you characterize -- how would you compare the

15  amount that you purchased back then to the amount that

16  you purchase now?

17  A    Much smaller back then.  We purchase much more

18  right now.

19  Q    And have you had to use purchased bacteria to

20  substitute for what you thought you were growing in the

21  wet-batch process?

22  A    Yes.

23  Q    Did you abruptly end the wet-batch process or did

24  you phase it out?

25  A    We phased it out.
                    DEREK LOVERICH - DIRECT

1    Q     So have bacteria purchases increased during that

2    process?

3    A     Yes.

4    Q     Sir, earlier in your testimony you described

5    concerns you had about spreading wet-batch product on

6    the plant floor to dry it.  Did that stop after

7    Mr. Peacock left the business?

8    A     It eventually stopped, yes.

9    Q     Okay.  Was it still occurring in the year that he

10   remained in the plant, in 2010 to 2011?

11   A     Yes.

12   Q     Sir, in addition to not doing that, has anything

13   else been done to make the plant a cleaner place?

14   A     Yes.

15   Q     What have you done?

16   A     We've added additional dust collection, different

17   cleaning procedures, floor scrubbing, mopping, different

18   cleaning procedures for the equipment.

19   Q     Was there any issues with ducts?

20   A     Yes.

21   Q     Could you tell me what that issue was?

22   A     We had mold growing in the duct work and we brought

23   people in to sanitize and clean all of the duct work at

24   the plant.

25   Q     When did that occur?
                    DEREK LOVERICH - DIRECT

1    A    It's occurred twice.  I don't remember the exact

2    dates.  But it was probably 2011 or '12.

3    Q    And sir, would you describe the total plant as

4    cleaner or less clean than it was when Mr. Peacock was

5    on site?

6    A    Much cleaner.

7    Q    And have you done anything to make the processes

8    more -- clean is the wrong word -- aseptic?  Am I using

9    that correctly?  Less contaminated.

10    A    Yes.

11    Q    What have you done?

12    A    Well, phasing out the wet-batch process has been a

13    large help.  Fermentation where we are achieving much

14    higher yields now by getting up to proper sterilization

15    temperatures.  We have different procedures in place for

16    safeguarding the different materials, more quality

17    control checks, things like that.

18    Q    Sir, currently are all products tested before

19    they're shipped?

20    A    Yes.

21    Q    And if they don't pass spec, do they ship?

22    A    No.

23    Q    Have manual counts replaced the ProtoCOL counting

24    device?

25    A    Yes.

                    DEREK LOVERICH - DIRECT

1  Q    And sir, the certificates of analysis, is it your

2  understanding that Ms. Walters in quality control is now

3  preparing those documents?

4           MR. BIANCHI:  Objection.  Leading.

5           THE COURT:  Sustained.

6  BY MS. GEHRIG:

7  Q    Do you know who was preparing those documents while

8  Malcolm was supervising people at the plant?

9  A    The office, I believe.

10  Q    And do you know who's preparing them now?

11  A    Mindy Walters and the lab.

12           MS. GEHRIG:  Thank you, sir.  Those are all the

13  questions I have for you at this time.  (1:45 p.m.)

14           THE COURT:  Cross-examination.

15                    CROSS-EXAMINATION

16  BY MR. BIANCHI:

17  Q    Mr. Loverich, earlier you testified about a

18  conversation that you were having with Neil Seeger and I

19  think a Chris Pavain; is that right?

20  A    Yes.

21  Q    And you said you were talking about production --

22  A    I believe so.

23  Q    -- is that right?  Do you remember that today?

24  A    I don't remember the exact conversation.  We were

25  in the plant, so I assume we were talking about
                    DEREK LOVERICH - CROSS

1    production.

2    Q    So do you know what you were talking about or --

3    with Chris Pavain?

4    A    The exact -- I don't remember.

5    Q    So you don't actually remember what you were

6    talking about with Neil and Chris Pavain; correct?

7    A    That is correct.

8    Q    The products that are made at Bio-Systems, the vast

9    majority, where do they end up?

10   A    Wastewater treatment.

11   Q    In an attempt to clean that; is that right?

12   A    That's correct.

13   Q    And correct me if I'm wrong, but you mentioned at

14   one point that you did not talk with sales when Malcolm

15   was running Bio-Systems; is that right?

16   A    There was some interaction with sales, not nearly

17   as much as later.

18   Q    But there was.  You spoke with Dana Juul; right?

19   A    Yes.

20   Q    And you said that you provided a memo to Betco at

21   one point letting them know of various concerns that you

22   had?

23   A    That's correct.

24   Q    When was that?

25   A    I believe 2011.

                    DEREK LOVERICH - CROSS

1    Q    Do you know when?  A month?

2    A    I think March.

3    Q    March?

4    A    March/April, somewhere in that time frame.

5    Q    And then again, you talked to them when they came

6    to the plant in March; is that right?

7    A    That's correct.

8    Q    And you exchanged emails with Kurt at various

9    times; is that right?

10   A    That's correct.

11   Q    And with Denise Lennard, you exchanged emails with

12   her as well?

13   A    That's correct.

14   Q    And do you know Chris Pavain?  What area did he

15   work in in Bio-Systems, do you know?

16   A    I believe mainly sales.

17   Q    Mainly sales.  And at that time, your interaction

18   with sales was very minimal when you were talking with

19   Mr. Pavain; right?

20   A    Reasonably, yeah.  Yes.

21   Q    And that was in September of 2011, that

22   conversation between you, Neil, and Chris Pavain?

23   A    I don't remember the exact -- it sounds about

24   right.

25   Q    Okay.  And just to make sure I'm remembering, you

                    DEREK LOVERICH - CROSS

1  and Neil are production people and Chris Pavain is

2  sales; right?

3  A    That's -- he was over the overall operation, I

4  believe, but mainly sales.

5  Q    So in September 2011, Chris Pavain was --

6  A    He eventually -- excuse me.  He eventually became

7  over more of it.  Early on he phased in, I believe.

8          THE COURT:  What you want to do is just let him

9  finish his question before you answer.  I haven't been

10  very good about that today, so if you'd just let him

11  finish his question and you can answer.  Go ahead.

12  BY MR. BIANCHI:

13  Q    So Chris Pavain, when you had the conversation with

14  him and Neil, he was in charge of all of Bio-Systems?

15  A    No.

16  Q    Are you aware of customer complaints about

17  Bio-Systems' products in the time frame when Mr. Peacock

18  owned the company?

19  A    Yes.

20  Q    And how many products did Bio-Systems produce since

21  you've been there, like different kinds?

22  A    Hundreds.

23  Q    And I believe you discussed a product going out

24  that was under spec, but you don't know what that

25  product was?
                    DEREK LOVERICH - CROSS

1    A    There were multiple products.  I'm sorry.  What

2    time frame are we talking?

3    Q    Sure.  You had mentioned that products were being

4    sent out even though they were below spec and I'm asking

5    you if you can give me a specific product on when that

6    happened, a date and a specific product, please.

7    A    If I could look at the records I could.  B.O.D.

8    frequently went out.  There was an SK3 for Brazil in

9    particular that did not meet specification; not only in

10   the final plate, but even the theoretical or the

11   intermediate used to make that up.  That would have been

12   about every shipment.  Liquid products were frequent.

13   And I don't even know about the solid products because

14   they weren't plated.

15           THE COURT:  I'm sorry, they weren't?

16           THE WITNESS:  Weren't plated.

17           THE COURT:  Meaning they weren't given a

18   specific spec?  What do you mean by that?

19           THE WITNESS:  There was a specification.

20           THE COURT:  They weren't tested.

21           THE WITNESS:  Correct.

22           THE COURT:  Okay.  There was testimony earlier

23   that not all of the product even included a spec on it.

24   To your understanding was that true?

25           THE WITNESS:  I believe most everything had a
                         DEREK LOVERICH - CROSS

1   specification, but not a final test --

2           THE COURT:  All right.

3           THE WITNESS:  -- to see if it hit that.

4           THE COURT:  Let me just ask this question

5   because in reviewing the videotape over the lunch hour,

6   I had forgotten that there were large boxes, almost like

7   you'd see with doughnuts, with sand on it that were in

8   trays.  Was that the solid product?

9           THE WITNESS:  Yes.  That was the solid state

10  fermentation.  It was the intermediate product that we

11  were growing up the bacterial on a solid state.

12          THE COURT:  But is that how it was dried, just

13  by leaving it on those large carton containers?

14          THE WITNESS:  That was part of the process.

15  They were put into a room that was temperature

16  controlled.  It was essentially incubated for a period

17  of time to help the bacteria grow.

18          THE COURT:  All right.  So when you were

19  showing it on your film, that was the end stage?

20          THE WITNESS:  Where they were at, yes.

21          THE COURT:  Okay.  And the powder product I

22  think it was called was in much smaller plastic sealed

23  bags?  It was coming off a machine in a plastic seal,

24  almost like you'd see from the detergent products you

25  just put in your dishwasher.
                DEREK LOVERICH - CROSS

1          THE WITNESS:  Yes.

2          THE COURT:  The plastic would dissolve.  That's

3   unrelated to that sand material we saw.

4          THE WITNESS:  That very material was giving the

5   bacterial count for the pouched product that you were

6   seeing.  So...

7          THE COURT:  So in other words, was that -- the

8   large box was the medium for which the culture was then

9   developed?

10          THE WITNESS:  Yes.

11          THE COURT:  And that occurred in a separate

12   room under specific temperature ProtoCOLs.

13          THE WITNESS:  Yes.

14          THE COURT:  You may continue.

15   BY MR. BIANCHI:

16   Q    After Betco's purchase of Bio-Systems, you

17   interacted with various Betco employees; correct?

18   A    Correct.

19   Q    And more specifically, you would talk with Brett

20   Hanus and Kurt Bischoff about the concerns that you had

21   about Bio-Systems' operations; right?

22   A    Correct.

23   Q    So during the first year after Betco purchased

24   Bio-Systems, at most there was maybe a couple of weeks

25   that you didn't speak with some Betco personnel; isn't
                    DEREK LOVERICH - CROSS

1   that right?

2   A    That could be right.

3   Q    And during at least the early part of 2011, you had

4   limited interactions with Denise Lennard as well; right?

5   A    That's correct.

6   Q    And after the purchase and throughout all of 2011,

7   it was you who was responsible for sending out

8   production reports to Bio-Systems' employees and to

9   Denise Lennard; right?

10  A    And to Mr. Peacock.  I was generating the

11  production reports, that's correct.

12  Q    And all the information in the production reports

13  is true?

14  A    As far as I know, yes.

15  Q    I'm going to show you Exhibit 842.  If you look at

16  that little screen.  So this is an example of one of

17  your kind of production reports sent out in July of

18  2011; is that right?

19  A    Yes.

20          MR. BIANCHI:  I would move Exhibit 842 into

21  evidence.

22          THE COURT:  It is admitted.

23  BY MR. BIANCHI:

24  Q    I plan on going through a couple of these.  This is

25  going to be 843.  This is another example.  There's a
                    DEREK LOVERICH - CROSS

1  little bit more information on this one.  Do you

2  recognize that, Mr. Loverich?

3  A    Yes.

4  Q    And so was it just about every week that you would

5  send out one of these; is that right?

6  A    That's correct.

7         MR. BIANCHI:  Move Exhibit 843 in.

8         THE COURT:  It is admitted.

9  BY MR. BIANCHI:

10 Q    Do you know why these were sent to Denise Lennard?

11 A    Because I thought she wanted to see them.

12 Q    Did someone tell you that she wanted to see them?

13 A    I don't recall if someone did or not.

14 Q    Did Malcolm ever tell you not to sent the

15 production reports to Denise?

16 A    Specifically on the production reports I don't

17 believe so.

18 Q    Have you look at Exhibit 844.  It's another one.

19 This one is sent in July; is that right?

20 A    Yes.

21         THE COURT:  Are 842 and 843, one of them is

22 mislabeled as to date.  They both say 7-20-11.

23         MR. BIANCHI:  I think they might be -- sent out

24 one with some of the information and then sent out one

25 shortly after with additional information is what it

                    DEREK LOVERICH - CROSS

1    looks like potentially.

2              THE COURT:  All right.  I'll allow it.

3    BY MR. BIANCHI:

4    Q    I'm going to show you Exhibit 846, Mr. Loverich.

5    Can you confirm that this one is an August 17th

6    production report that you sent out; is that right?

7    A    Yes.

8    Q    And this one I think also has with it Number 847,

9    which is a summary.  Do you see that there?

10   A    Yes.

11   Q    You create those weekly production summaries?

12   A    Yes.  All of those previous emails would have had

13   this as well.

14   Q    They would have had these attached to them

15   somewhere?

16   A    That's correct.

17   Q    How would you fill out one of these?

18   A    All of the stations had logbooks that they kept

19   track of their production numbers.  I would sum them all

20   up and enter them into this sheet.

21             MR. BIANCHI:  Ask to move 846 and 847 into

22   evidence.

23             THE COURT:  They are admitted, along with 844.

24             MR. BIANCHI:  Yes.  Thank you.

25             THE COURT:  Since we're pausing, Ms. Gehrig, I
                        DEREK LOVERICH - CROSS

1  assume you wanted Exhibit 8 to be admitted as well.

2          MS. GEHRIG:  Thank you, Your Honor.

3          THE COURT:  That is admitted.

4  BY MR. BIANCHI:

5  Q    Mr. Peacock never told you to lie to anybody, did

6  he?

7  A    No.

8  Q    And some time after Betco purchased Bio-Systems,

9  Betco wanted to purchase pucks, which in turn meant that

10  Bio-Systems had to make more pucks; right?

11  A    That's correct.

12  Q    I think you already said this, but just to make

13  sure, producing more pucks would require additional

14  steam from your boilers; right?

15  A    That's correct.

16  Q    And we've seen this exhibit before, but we're just

17  going to show it to you.  This is Exhibit 526 and this

18  is the notes from the visit in March of 2011 and it says

19  that "Joe and Brett reviewed the following operational

20  issues with Derek and Neil."

21          Do you see that there?

22  A    Yes.

23  Q    So you guys discussed, looks like the boilers, the

24  150-gallon fermenters, dust control; is that right?

25  A    Yes.

                    DEREK LOVERICH - CROSS

1    Q    And then there was this Jack Holtz from Donaldson

2    Filtration Solutions.  Were you involved with that?

3    A    Yes.

4    Q    And then if you look at number 5, you guys

5    discussed a long-term opportunity to eliminate the

6    wet-batch process.

7    A    Yes.

8    Q    Is that your idea?

9    A    Mine as well as Neil's.

10   Q    So back in 2011 after you had been using the

11   wet-batch process for a little over a year,

12   year-and-a-half, you were ready to eliminate it; is that

13   right?

14   A    That's correct.

15   Q    And were you in the court today when the gentleman

16   from LexaMed testified?

17   A    No.

18   Q    You were not?  Have you seen his reports?

19   A    Yes.

20   Q    Are you aware that he said that the wet-batch

21   process can be used to grow spores?

22   A    Yes.

23   Q    And yet you and Neil were unable to get the

24   wet-batch process to work; is that right?

25   A    It works to an extent.  To get the yields that we

DEREK LOVERICH - CROSS

1  need consistently for the products to go out to the

2  specifications, no.

3  Q    And then if we look here, sorry, at number 7, it

4  says that there's "ongoing production challenges.  We've

5  got the colony counts are consistently too low due to

6  inadequate fermentation equipment capability."

7      Is that something that you shared?

8  A    Yes.

9  Q    And then on the back, number 1 says "Have Derek and

10  Neil work with Joe to put together a proposal for new

11  boilers."

12      Did you and Neil work with Joe to put together a

13  proposal?

14  A    Joe and Mr. Peacock.

15  Q    And Number 3, "Start a project with the lab to

16  determine the viability of eliminating the wet-batch

17  process."

18      Were you involved with that at all?

19  A    To a lesser extent.  That would have been mainly

20  Mindy and Neil.

21  Q    And do you remember, did -- it says there's a

22  tentative visit.  Do you recall if Betco made that

23  tentative April 18th visit?

24  A    I don't remember one way or another.

25  Q    And so you presented Betco with a fair amount of
                       DEREK LOVERICH - CROSS

1   your concerns in March of 2011; isn't that right?

2   A     That's correct.

3   Q     And yet they didn't take action for almost another

4   year; is that correct?

5   A     That wasn't my understanding.

6   Q     I'll have you look at Exhibit No. 710.  Can you

7   confirm that it's an email that you sent to Kurt

8   Bischoff and also you cc'd Malcolm on; is that right?

9   A     Yes.

10  Q     And this is in August of 2011?

11  A     Yes.

12  Q     And so you were providing plate count information

13  to Mr. Bischoff about a Betco product; is that right?

14  A     That's correct.

15  Q     And the way that these products were plate counted,

16  would that have been using the spiral plater and the

17  ProtoCOL counter?

18  A     Yes.

19  Q     And you thought at this time, so August 2011, that

20  those plate counts were valid; is that right?

21  A     That was our main process that we used, yes.

22  Q     Is it true that you believe that the trigger for

23  sporulation through the wet-batch process in the manner

24  that was used by Bio-Systems was a nutrient running out

25  and dropping moisture levels; is that right?

                DEREK LOVERICH - CROSS

1   A    Most likely.

2   Q    And isn't it true that sometimes the wet-batch

3   process would work and provide sufficient counts high

4   enough in bacteria when counted with the spiral plater

5   and the ProtoCOL counter?

6   A    Yes.

7        MR. BIANCHI:  Ask to move Exhibit 710 into

8   evidence.

9        THE COURT:  It is admitted.

10  BY MR. BIANCHI:

11  Q    When you were in production and Mr. Peacock owned

12  Bio-Systems, you generally did not know what was talked

13  about with customers; isn't that right?

14  A    Yes.

15  Q    And with regards to the ProtoCOL counter, you don't

16  know if anyone at Bio-Systems had calibrated it before

17  Betco purchased them; is that right?

18  A    I can remember Mr. Richard Peacock at one point

19  trying to, but I was only at arm's length from that, so

20  I don't remember the exact.  But occasionally

21  Mr. Richard Peacock would work on it.

22  Q    And did you understand that when Betco purchased

23  Bio-Systems that Richard still worked for Bio-Systems?

24  A    Yes, for a certain number of hours per week.

25  Q    So he was still available to work with you if you

              DEREK LOVERICH - CROSS

1   need it; is that right?

2   A    I don't know if I felt that was the case.  He

3   occasionally came in a couple times a month.

4   Q    And you had noted earlier that you felt like he was

5   sort of an ally of yours; is that right?

6   A    At times, yes.

7   Q    But after Betco purchased the company, you didn't

8   consider him an ally any longer?

9   A    Mr. Richard Peacock didn't work very often at all

10  at the plant.

11            THE COURT:  After it was sold.

12            THE WITNESS:  Correct.

13  BY MR. BIANCHI:

14  Q    I know you said you thought Mr. Richard Peacock

15  might have calculated it.  So it is possible that the

16  ProtoCOL counter was being calibrated by Mr. Richard

17  Peacock; is that right?

18  A    That is possible.

19  Q    And you are aware that when Mr. Peacock owned

20  Bio-Systems, he had customers and distributors come in

21  to watch the plating and counting process at

22  Bio-Systems; correct?

23  A    Yes.

24  Q    And indeed the spiral plater and the ProtoCOL

25  counter were described as new technology that
                DEREK LOVERICH - CROSS

1   Bio-Systems was proud of; right?

2   A    Yes.

3   Q    And you don't recall ever having a specific

4   conversation with Mr. Peacock about concerns you had

5   regarding the ProtoCOL counter being used to count

6   bacteria; isn't that right?

7   A    That sounds correct.

8   Q    And you didn't realize that manual counting of

9   bacteria was correct, in your mind, as opposed to using

10  the ProtoCOL counter until some time after Neil Seeger

11  began working at Bio-Systems; isn't that right?

12  A    That's correct.

13  Q    And you believe that Neil had more experience with

14  plate counting; is that right?

15  A    That's correct.

16  Q    Did you ever have conversations with Neil about him

17  being reprimanded at his previous job?

18          MS. GEHRIG:  Objection.  Relevance.

19          MR. BIANCHI:  For failing to properly plate

20  count.

21          THE COURT:  I'll sustain the objection.  Next

22  question, Counsel.

23  BY MR. BIANCHI:

24  Q    We already looked at this exhibit.  Go back to

25  Exhibit 538.  Recognize that?  The 500-gallon fermenter

                DEREK LOVERICH - CROSS

1   procedure.

2   A    Yes.

3   Q    And it shows on 10-26-2011 you changed the

4   procedure completely.  Do you see that?

5   A    Yes.

6   Q    Changed approved by.  Here it's production manager?

7   A    That's correct.

8   Q    And you were the production manager at that time?

9   A    That's correct.

10  Q    And you do not remember if you ever spoke with

11  Mr. Peacock about salespeople filling out certificates

12  of analysis without checking with the lab first about

13  plate counts; isn't that right?

14  A    I believe Mindy and I had asked about it.  The

15  procedure had changed from time to time is what I

16  understand.  I do know that Mindy had concerns several

17  times.

18  Q    I'm asking you --

19  A    If I --

20  Q    -- if you -- isn't it right that you don't remember

21  if you ever spoke specifically with Mr. Peacock about

22  salespeople filling out certificates of analysis without

23  checking with the lab about what the plate counts were?

24  A    That's probably correct.

25  Q    During the year between March 2011 and March 2012,

                  DEREK LOVERICH - CROSS

1   you continued trying to tell Betco about the concerns

2   you had about Bio-Systems, but from your perspective

3   they just didn't seem to understand; isn't that right?

4   A    Yes.

5   Q    And after Betco purchased Bio-Systems, it began

6   introducing new sales processes that created additional

7   changes in production; isn't that right?

8   A    Yes.

9   Q    And in fact, in 2012 Betco really started to ramp

10  up the changes which created a domino effect of even

11  more changes happening in production; isn't that right?

12  A    Yes.

13  Q    When Betco was providing the standard operating

14  procedures or SOP governing the wet-batch process to

15  LexaMed, the procedures did not follow exactly what the

16  written SOP said; wasn't that right?

17  A    I don't know.  I believe Neil Seeger was giving

18  those to them at that time.

19  Q    So were you aware of, you know, in the April 2012

20  time period, whether the written procedures that

21  Bio-Systems had matched how it was actually engaging in

22  the wet-batch process?

23  A    They should have.

24  Q    They should have?

25  A    Um-hmm.

                    DEREK LOVERICH - CROSS

1    Q    I'll have you look at Exhibit 727.  It's an email,

2    May 2nd, 2012, from you to Kurt Bischoff.  Do you recall

3    that email with Mr. Bischoff?

4    A    I don't.  I'm trying to familiarize myself.

5    Q    Sure.  I can move the document if you want me to

6    move it up.  Turn to the next page.

7    A    Sure.  Down just a little bit, please.

8    Q    This way?

9    A    The other way.  Right there.  Okay.

10   Q    So apparently there was some discrepancy between

11   the written process and what was actually being

12   practiced; isn't that right?

13   A    That looks to be the case.

14   Q    And you were the production manager during that

15   time, weren't you?

16   A    Yes.

17   Q    And so any differences between the written and the

18   actual process, you would have been a part of putting

19   that in the standard operating procedures or in the ISO

20   Manual; isn't that right?

21   A    That should have been the case.

22        MR. BIANCHI:  Move to admit Exhibit 727.

23        THE COURT:  It is admitted.

24   BY MR. BIANCHI:

25   Q    You are unaware whether Mr. Peacock concealed
                    DEREK LOVERICH – CROSS

1   bacteria counts below specification from Betco; correct?

2   A    Correct.  I don't know what they were talking

3   about.

4   Q    The one meeting that you recall at which

5   Mr. Peacock allegedly told you and other Bio-Systems'

6   employees not to speak to Denise Lennard was after the

7   March 2011 visit when you had shared in detail your

8   concerns with Betco, wasn't it?

9   A    Yes.

10           MR. BIANCHI:  I have no further questions.

11           THE COURT:  Redirect.   (2:16 p.m.)

12           MS. GEHRIG:  Thank you, Your Honor.

13                   REDIRECT EXAMINATION

14   BY MS. GEHRIG:

15   Q    Mr. Loverich, I want to direct your attention to

16   something you were just looking at, that was Exhibit

17   727, an email exchange with you and Mr. Bischoff.  I

18   don't have it to pull up, but do you remember you just

19   reviewed that?

20   A    Yes, it was actually --

21           MR. BIANCHI:  I've got it.

22           MS. GEHRIG:  Oh.  Thank you.

23   BY MS. GEHRIG:

24   Q    We're all looking at the same thing now,

25   Mr. Loverich?
                DEREK LOVERICH - REDIRECT

1   A    Yes.

2   Q    Okay.  Sir, did you think that any deviation that

3   was described in this email was going to have a

4   significant effect on the overall process?

5   A    No.

6   Q    And what were your words to that effect?

7   A    This was something that had previously been decided

8   with Mr. Peacock and that was one of the reasons I was

9   unaware of it.  The fact that it didn't get into the ISO

10  Manual was partly because I was unaware of it.

11  Q    And sir, the question that I'm asking is whether

12  you thought this was going to have a major effect on the

13  overall process or not, and I'd refer you to the second

14  paragraph in the middle of the page.

15  A    I don't believe it would have had a large impact.

16  Q    Just something that was overlooked?

17  A    Correct.

18  Q    Sir, I did want to go back a little bit to make

19  sure in response to some of the questions that the Court

20  was asking you about the processes in the Beloit plant,

21  just to make sure that everybody is on the same page.

22       Sir, in the video we see trays of product.

23  A    Yes.

24  Q    Is that wet-batch product?

25  A    Yes.
                    DEREK LOVERICH - REDIRECT

1  Q    So that is a powder product that is prepared

2  through the wet-batch process.

3  A    Yes.

4  Q    And sir, the large trays that I believe His Honor

5  described as kind of like doughnut trays, when you were

6  previously testifying about product being spread on the

7  floor, is that the product that was spread on the floor

8  for drying under Mr. Peacock's supervision?

9  A    Yes.

10         THE COURT:  I'm sorry, I'm confused then

11  because you had earlier indicated it was the medium in

12  which powder product was cultured.

13         THE WITNESS:  Yes.  It's very wet, and I can

14  describe it in detail if you'd like.

15         THE COURT:  Well, so it wasn't product that was

16  spread out on the floor, it was a medium for the making

17  of product.

18         THE WITNESS:  It was the bacterial wet-batch,

19  the intermediate product that makes up most of the final

20  product.

21         THE COURT:  So was that -- what I've been

22  describing as the banker box with sand or the sandbox,

23  was that an intermediate product?

24         THE WITNESS:  Yes.

25         THE COURT:  Or was it medium?
                    DEREK LOVERICH - REDIRECT

1          THE WITNESS:  It's intermediate product.

2          THE COURT:  So it already was cultured.

3          THE WITNESS:  Yes.

4          THE COURT:  All right.  How could there not be

5    contamination when that's your basic process?

6          THE WITNESS:  That was one of the problems.

7    There would be contamination.

8          THE COURT:  But anyone, including myself,

9    walking through that plant could see that.

10         THE WITNESS:  That's correct.

11         THE COURT:  Any other questions for this

12   witness?

13         MS. GEHRIG:  I'll be as quick as I can, Your

14   Honor.

15   BY MS. GEHRIG:

16   Q    Attorney Bianchi was asking you about material

17   under spec and you listed a couple of different

18   products.  Sir, was this a daily occurrence that

19   products were being shipped under spec?

20   A    Yes.

21   Q    Sir, at the time period when Mr. Bischoff visited

22   the plant in March of 2011, had you abandoned all hope

23   of the wet-batch process?

24   A    No.

25   Q    At that point did you think that boilers would
                    DEREK LOVERICH – REDIRECT

1  help?

2  A     Yes.

3  Q     Sir, did you know the extent of the problem?

4  A     No.

5  Q     Did you know the extent of the ProtoCOL bias?

6  A     No.

7  Q     Did you know whether the finished product was

8  desired bacteria or not?

9  A     No.

10 Q     Did you know how to quantify how much the new

11 boilers would help or cure?

12 A     No.

13 Q     Sir, at the time you are looking at what's been

14 marked and admitted as Exhibit 538 from October of 2011,

15 and a comment that you had made that changed procedures

16 completely, was Mr. Peacock still in the plant at that

17 time?

18 A     I believe so, yes.

19 Q     Could you have changed procedures completely

20 without Mr. Peacock's approval at that time?

21 A     No.

22 Q     If anything did change procedures completely, would

23 his approval have been required?

24 A     Yes.

25            MS. GEHRIG:  Thank you, sir.  That's all.
                  DEREK LOVERICH - REDIRECT

1    THE COURT:  Thank you.  You may step down.

2        (Witness excused at 2:23 p.m.)

3    THE COURT:  Plaintiff may call its next

4  witness.

5    MS. GEHRIG:  Thank you, Your Honor.  Plaintiff

6  calls Ms. Mindy Walters.

7    **MINDY WALTERS, PLAINTIFF'S WITNESS, SWORN,**

8    THE COURT:  You may proceed.

9    MS. GEHRIG:  Thank you, Your Honor.

10                  DIRECT EXAMINATION

11  BY MS. GEHRIG:

12  Q    Ms. Walters, would you please state your full name

13  and spell your last name.

14  A    Mindy Jean Walters.  Walters is W-a-l-t-e-r-s.

15  Q    Ma'am, where do you currently reside?  Your

16  hometown.

17  A    Brodhead.

18  Q    Is that here in Wisconsin?

19  A    Yes.

20  Q    And Ma'am, are you employed at Bio-Systems in

21  Beloit?

22  A    Yes.

23  Q    When did you begin working at Bio-Systems?

24  A    1997.

25  Q    And what was your formal education prior to
                   MINDY WALTERS – DIRECT

1  beginning work at Bio-Systems?

2  A    I have an associate degree in food science.

3  Q    Ma'am, what, if anything, did you learn about

4  bacteria and counting bacteria getting your food science

5  degree?

6  A    We learned the manual count method.

7  Q    And did you learn about different strains of

8  bacteria?

9  A    We did, yes.

10 Q    Did you learn about different strains of bacteria

11 under the microscope?

12 A    Yes.

13 Q    Is that something that you can see during the

14 manual counting process?

15 A    Yes.  On the Petri dish, yes.

16 Q    Ma'am, what was your first job after graduation?

17 A    I worked at Swiss Colony.

18 Q    What was your title?

19 A    I was a QA tech.

20 Q    Beg your pardon?

21 A    QA tech.  Lab tech.

22 Q    Is that quality assurance?

23 A    That's correct, yes.

24 Q    What did your duties include?

25 A    We did plate counts and we tested product for

                    MINDY WALTERS - DIRECT

1    pathogenic bacteria.

2    Q    So basically you're looking for the bad bugs?

3    A    Correct.

4    Q    And Ma'am, what testing procedures did you use at

5    Swiss Colony?

6    A    We used the manual method.

7    Q    How long did you work in that position?

8    A    I worked there about a year-and-a-half.

9    Q    And Ma'am, did you start work at Bio-Systems

10   immediately after your work at Swiss Colony?

11   A    Yes.

12   Q    And what position were you hired to fill?

13   A    Lab manager.

14   Q    Ma'am, who interviewed you for that position?

15   A    Mr. Malcolm Peacock and Susie Ball.

16   Q    Susie?

17   A    Ball.

18   Q    What was Susie's position in the company?

19   A    I believe she was office manager at that point.

20   Q    Ma'am, who supervised your work?

21   A    Mr. Peacock did and also Teresa Linquester.

22   Q    Who was -- excuse me.  What position did

23   Ms. Linquester fill?

24   A    She was a lab technician.

25   Q    As a tech, did you ultimately supervise her?

                   MINDY WALTERS - DIRECT

1    A    Yes.

2    Q    Did you supervise everybody in the lab?

3    A    Yes.

4    Q    And Ma'am, did you have a staff of assistants over

5    the years?

6    A    Yes.

7    Q    What were your job duties when you began in that

8    position?

9    A    We would plate the bacteria and count it.

10   Q    Did you do any other type of QC testing?

11   A    Yeah, we did moistures and we did some chemical

12   pHs, that kind of thing, and we did QC final checks.

13   Q    Ma'am, when you refer to the final check, at what

14   stage is the product?

15   A    Final.  Ready to go out the door.

16   Q    Ma'am, did you perform tests on liquid products?

17   A    Yes.

18   Q    On solid products?

19   A    Yes.

20   Q    And on powders?

21   A    Yes.

22   Q    Your lab -- was your lab responsible for QC on all

23   of those?

24   A    Yes.

25   Q    And Ma'am, you're responsible with regard for data

                    MINDY WALTERS - DIRECT

1  that comes from the lab.  Do you have responsibility to

2  make sure that it's gathered consistently?

3  A    Yes.

4  Q    And do you have responsibility for making sure that

5  test data is recorded?

6  A    Yes.

7  Q    Is test data kept in the normal course of

8  Bio-Systems' business?

9  A    Yes.

10 Q    In terms of the timing of when the test data is

11 recorded, is it recorded soon after it's obtained?

12 A    Yes.

13 Q    Within hours?  Days?

14 A    Yes.  Within hours, yes.

15 Q    And Ma'am, I'm going to show you some pages from

16 what I'll represent is from Exhibit 27 and I'm going to

17 ask you if you can identify what these pages look like.

18 Do you see a series of pages going by you on the screen?

19 A    I do, yes.

20 Q    And Ma'am, what do these look like?

21 A    Those look like our mix sheets.

22 Q    And I'll represent what's being shown is Bate

23 stamped Toledo 1 through 25.  Ma'am, what, if anything,

24 else do you see with the mix sheets?

25 A    There's also test results as well.
                    MINDY WALTERS – DIRECT

1   Q    How are these records kept?  Are they kept together

2   or apart?

3   A    They're kept together.

4   Q    So if we're paging through this, through these

5   documents, what are we seeing?

6   A    You would be seeing the mix sheet, and if

7   available, the test results.

8   Q    Do these represent the business records that stored

9   data for Bio-Systems regarding your work?

10  A    Yes.

11  Q    Ma'am, is some of the stuff handwritten?

12  A    Yes.

13  Q    Whose handwriting would appear on these sheets?

14  A    That one looks like it could be Derek's.

15  Q    So you have some information from production that

16  comes into this?

17  A    That's correct.

18  Q    Could you describe what comes from production and

19  what's generated by your lab?

20  A    What sheet?

21  Q    Yeah.  Basically what type of information.

22  A    Basically what -- this would be generated by

23  production.  This is kind of like their recipe, their

24  mix sheet.  We would attach our test results to this

25  particular sheet.
                    MINDY WALTERS - DIRECT

1  Q    So Ma'am, now we're looking at a page that looks

2  like it was computer generated.  What is this?

3  A    Yes.  That would be a test result from the ProtoCOL

4  counter.

5  Q    Now Ma'am, back in 2007 until after the business

6  was sold, was the ProtoCOL counter the device that was

7  used to bacteria test count?

8  A    Yes.

9  Q    Ma'am, did you maintain records in this same format

10 after the acquisition?

11 A    Yes.

12 Q    So basically the same type of data is coming from

13 production?

14 A    Yes.

15 Q    And that data from production is stored along with

16 the test records?

17 A    Correct.

18 Q    Now Ma'am, were you, in connection with this, did

19 you produce basically 100,000 documents in various forms

20 showing test data results dating back to 2007?

21          MR. BIANCHI:  Objection.  Leading.

22          THE COURT:  It's preliminary.  You can answer

23 the question.

24          THE WITNESS:  Yes.

25 BY MS. GEHRIG:
                    MINDY WALTERS – DIRECT

1   Q    And Ma'am, is that for one type of product or all

2   the products that were tested over that time period?

3   A    All the different products.

4   Q    And Ma'am, on these -- in these $100,000 -- not

5   $100,000 -- in these 100,000 documents, does it tell you

6   what type of tests that you performed?

7   A    You mean spiral versus manual?

8   Q    Does it tell you that?

9   A    You could look at the sheet and know that that's a

10  spiral test result.

11  Q    And does it tell you at what stage the test was

12  performed?

13  A    Yes.  If you look at the side, it will tell you

14  like, for example, that's a filter cake, so that would

15  be an intermediate.

16  Q    Does it also tell you what the result of the test

17  was?

18  A    Yes.

19  Q    And I apologize if I already asked this, but does

20  it tell you what type of product in terms of liquid,

21  powder or solid was tested?

22  A    Yes.  In a way, yes.

23  Q    If you know about the products, you can tell that.

24  A    That's correct.

25  Q    And Ma'am, in preparation for this trial, did you

                    MINDY WALTERS - DIRECT

1  supervise a review of those records to pull certain

2  data?

3  A    Yes.

4  Q    And does that data include what product was tested

5  at what stage of production?

6  A    Yes.

7  Q    From 2007 to present?

8  A    Correct.

9  Q    And Ma'am, do you see a chart in front of you?

10  A    I do.

11  Q    Does this chart compile that data from the 100,000

12  or more documents?

13  A    Yes.

14  Q    In May of 2015, did you participate in creation of

15  a video for use in this lawsuit?

16  A    Yes.

17  Q    Was your portion of the video created in your work

18  environment?

19  A    Yes.

20  Q    And Ma'am, did you explain some of your bacterial

21  testing procedures?

22  A    Yes.

23  Q    Did you explain what a manual count is?

24  A    Yes.

25  Q    And did you explain a count using the spiral plate

MINDY WALTERS - DIRECT

1  and ProtoCOL counter?

2  A    Yes.

3         MS. GEHRIG:  Your Honor, at this time I would

4  move into evidence the other portion of the video which

5  you have not seen.

6         THE COURT:  The objection to that portion was

7  what, Counsel?

8         MR. BIANCHI:  The objection is the process.  As

9  long as there's a possibility of showing it and being

10  able to ask her questions about what she's doing, then I

11  don't have as much of a problem with it.

12         THE COURT:  Well, the original objection was

13  hearsay.  If I remember correctly, you had a problem

14  with its being shown.  Which exhibit is it?  It's

15  something A.

16         MS. GEHRIG:  45B, I believe.

17         MR. BIANCHI:  Right.  It was hearsay and then

18  it was delayed production to be able to watch the

19  process and ask questions about what was being done.  So

20  it was two-fold.

21         THE COURT:  What I told you at the Final

22  Pretrial Conference is that you can play it and you can

23  ask this witness to describe it as you play it.  So if

24  you want to proceed to do that, then fine.

25         MS. GEHRIG:  Thank you very much.
                    MINDY WALTERS - DIRECT

1          THE COURT:  With apologies, you'll have to take

2     the volume down.  With the size of some of these files,

3     I'm surprised the computer can open anything at this

4     point.

5          MS. GEHRIG:  Your Honor, I don't want to waste

6     this Court's time.  If you would prefer to watch it on

7     your own as you have the other --

8          THE COURT:  Why don't you see.  If you're able

9     to cue it up, we'll play it.  But in the meantime if you

10    want to continue to ask questions, I would appreciate

11    it.

12         MS. GEHRIG:  Thank you, Your Honor.

13    BY MS. GEHRIG:

14    Q    Ma'am, the video that we're going to see, does it

15    show two different types of testing procedures?

16    A    Yes.

17    Q    And had you had any experience with the spiral

18    plater and ProtoCOL counter before Bio-Systems?

19    A    No.

20    Q    I'd like to distinguish between the manual plating

21    and the ProtoCOL counting.  With manual plating, what --

22    tell us what you're doing -- what you're going to be

23    showing us in the video.

24    A    Basically what we would be doing is we would be

25    hand placing the bacteria onto the Petri dish and

                    MINDY WALTERS - DIRECT

1  spreading it manually and then counting it with the

2  naked eye.

3  Q    Okay.  And Ma'am, do you have a series of dilutions

4  before you --

5  A    That's correct, yes.

6  Q    Ma'am, when you're -- and I hope this doesn't sound

7  like a stupid question.  Are you actually seeing the

8  different colonies as you manually count them?

9  A    Yes.

10  Q    And can you at least in some circumstances

11  distinguish a contaminant from a desired bacteria?

12  A    Yes.

13  Q    If you manually count the same sample repeatedly,

14  do you expect to get the same result?

15        MR. BIANCHI:  Objection.  Leading.

16        THE COURT:  Sustained.

17  BY MS. GEHRIG:

18  Q    Ma'am, when you use the ProtoCOL counter, has it

19  been able to distinguish between strains of bacteria?

20  A    Strains of bacteria?  No.

21  Q    Can it, to the best of your knowledge, distinguish

22  a contaminant from a desired bacteria?

23  A    No.

24        MR. BIANCHI:  Objection.  Leading.

25        THE COURT:  I'll overrule it.
                MINDY WALTERS - DIRECT

BY MS. GEHRIG:

Q     Ma'am, do you know whether the machine that you were using in Bio-Systems was calibrated for any particular strain of bacteria?

A     No.

Q     And Ma'am, was there -- are there occasions that you can get a different plate count for the same sample on the ProtoCOL counter?

A     Yes.

Q     How does that happen?

A     It depends on the orientation where you place the plate.

Q     Could you describe that?

A     Yes.  There's an hourglass design on the pattern or on the machine, and if you turn the plate, you can get a different count.

Q     Would you have that same experience with the manual plate?

A     No.

Q     How much of a variation could you get with one sample by twisting the plate?

A     It could be quite a bit.

Q     When you say *quite a bit*, what are we talking about?

A     Ten-fold.  I'm not --

                    MINDY WALTERS - DIRECT

1  Q    Ten-fold did you say?

2  A    Yes.

3  Q    And were you -- when you worked at Bio-Systems, did

4  you do anything to try to get maximum counts by twisting

5  the plate?

6  A    We would turn it, yes, so it was in the hourglass

7  shape, yes.

8  Q    Why did you do that?

9  A    I thought that was what we were supposed to do to

10  get the highest counts.

11  Q    Ma'am, did you have concerns about the accuracy of

12  test data produced by the ProtoCOL counter?

13  A    Yes.

14  Q    What was your concern?

15  A    Just that they were a little bit higher than what a

16  manual count would be.

17  Q    Did you discuss your concerns with anyone?  Again,

18  now let's talk about time period.  Before the company

19  was sold, did you talk to anybody?

20  A    I did not, no.

21  Q    After the company was sold, did you talk to

22  anybody?

23  A    I did then.  I talked to Derek and Neil.

24  Q    And Ma'am, did you discuss your concerns with

25  Mr. Malcolm Peacock?

                    MINDY WALTERS - DIRECT

1    A    About the counter?

2    Q    Yeah.

3    A    No.

4    Q    Why not?

5    A    I just didn't think that was something -- he was

6    the boss.  I didn't talk to him about that.

7    Q    Did Malcolm, Mr. Peacock, ever come to you with

8    questions about how quality could be -- quality control

9    could be improved?

10   A    No.

11         THE COURT:  You just need to speak a little

12   louder.  Your answer was no?

13         THE WITNESS:  Correct.

14   BY MS. GEHRIG:

15   Q    Ma'am, when you were testing the products, if a

16   product comes to you to be tested, did you know the

17   specification, what it was supposed to test at?

18   A    Yes.

19   Q    And was that at all times before and after the sale

20   of the company?

21   A    Yes.

22   Q    And you understood that there were certain bacteria

23   counts that the specification would say should be in the

24   product?

25   A    Yes.
                    MINDY WALTERS - DIRECT

1    Q    And were you also aware that certain products

2    stated that they contained certain strains of bacteria?

3    A    Yes.

4    Q    And Ma'am, when the stuff came to you for final

5    shipment, did you see the bacterial counts and strains

6    of bacteria?  Did you see those labels come through on

7    the final inspection?

8            MR. BIANCHI:  Objection.  Leading.

9            THE COURT:  You can answer the question.

10           THE WITNESS:  I'm sorry, can you repeat?

11           MS. GEHRIG:  Sorry.  It was a poorly phrased

12   question.

13    BY MS. GEHRIG

14    Q    In the final inspection were the products labeled?

15    A    Yes.

16    Q    And did the labels frequently include a

17    specification?

18    A    Yes.

19    Q    Ma'am, were you aware back in 2007 to 2010 that

20    some products were sent out under C of A?

21    A    Yes.

22    Q    Certificate of analysis.  And at that time did you

23    know which products had C of A?

24    A    I did not know which products, no.  I knew that

25    some internationals were, but I wasn't actually sure

                    MINDY WALTERS - DIRECT

1  what product.

2  Q    Did you know some liquids had C of A?

3  A    Yes.

4  Q    Did you know that some powders had C of A?

5  A    Yes.

6  Q    And did you know that some solids had C of A?

7  A    Yes.

8  Q    Ma'am, back at that time, 2007 to 2010, did you

9  have any role in the preparation of the certificate of

10  analysis document?

11  A    No.

12  Q    Did you have any role in communicating test data to

13  people who were preparing them?

14  A    No.

15  Q    And was that the same situation after the

16  acquisition while Malcolm, Mr. Peacock, was in the plant

17  from September of 2010 to November of 2011?

18  A    Yes.

19         THE COURT:  Who did provide them if you did

20  not?

21         THE WITNESS:  It would be in the office.

22         THE COURT:  Someone in the office.

23         THE WITNESS:  Correct.  Um-hmm.

24         THE COURT:  And did they get reports from you?

25         THE WITNESS:  No.
                    MINDY WALTERS - DIRECT

1        THE COURT:  So you didn't do any testing to

2    certify either.

3        THE WITNESS:  We tested the product, yes.

4        THE COURT:  But you do your typical test that

5    you would for spec.

6        THE WITNESS:  Correct, yes.

7        THE COURT:  And then that would be passed on.

8        THE WITNESS:  No, I don't believe so.

9        THE COURT:  So in your experience during the

10   period that we've just been talking about, before 2010

11   and then during the period when Malcolm Peacock was

12   still running the plant, were you aware that product was

13   shipping regularly that did not meet the spec?

14       THE WITNESS:  Yes.

15       THE COURT:  All right.  And was that true for

16   all product lines?

17       THE WITNESS:  Yes.

18       THE COURT:  Thank you.

19   BY MS. GEHRIG:

20   Q    Ma'am, going back, if you would, to Exhibit 16.

21       THE COURT:  It should be on your screen now.

22       MS. GEHRIG:  Perfect.

23       THE WITNESS:  There's nothing on here.

24       THE COURT:  Sorry.  I can correct that too.

25       THE WITNESS:  Thank you.
                MINDY WALTERS – DIRECT

1  BY MS. GEHRIG:

2  Q    Ma'am, does this chart reference the -- we

3  previously described the information that this chart

4  contains.

5  A    Yes.

6  Q    With reference to that chart as necessary, from

7  1997 to 2010 -- and when I say 2010 I mean up to the

8  sale of the business -- who directed what products were

9  tested at what different stages and times?

10  A    Mr. Peacock did.

11  Q    Did that continue until Mr. Peacock left the

12  business?

13  A    Yes.

14  Q    I want to talk about what tests were performed at

15  what times.

16  A    Okay.

17  Q    As of September of 2010 and ongoing until

18  Mr. Peacock left the business in November of 2011, how

19  were liquids tested?

20  A    They were -- final product liquids?

21  Q    Were they tested at all at any stage?

22  A    Yes.  At some point in time they were tested, yes.

23  Q    At what stage were they tested?

24  A    In the final product and intermediate.

25  Q    When liquid products were tested?

                    MINDY WALTERS - DIRECT

1    A    There was a point in time where we did not test

2    final products for liquids.

3    Q    Let's start at the beginning.  Liquid products

4    between September 2010 --

5    A    Okay.

6    Q    -- and until Mr. Peacock left the business, were

7    they tested in an intermediate phase?

8    A    Yes.

9    Q    Were they tested in a final phase?

10   A    No.

11   Q    What did you use for the count of the product?

12   A    I believe it would have been the intermediate

13   product.

14   Q    Had you ever heard the term *theoretical count*?

15   A    I had not, no.

16   Q    You've never heard of that?

17   A    I've heard of it, yeah.  But prior --

18   Q    Where did you hear of it?

19   A    Mr. Peacock.

20   Q    And what did Mr. Peacock explain that a theoretical

21   count was?

22   A    It's basically your -- it's a theory of account.

23   If you put the sums together, it should equal that.

24   Q    And what data do you take?

25   A    I'm sorry?

                    MINDY WALTERS - DIRECT

1    Q    Is it from the intermediate product testing?

2    A    Yes.

3    Q    Okay.  So describe to me how you understand by his

4    explanation you would come up with a theoretical count.

5    A    What you would do is you would test the

6    intermediate product and then you would get the count of

7    that, and depending on how much of the percentage of the

8    intermediate product you use, that should technically be

9    your theoretical count.

10   Q    And were -- you said that liquid products were not

11   tested in their final phase.

12   A    Correct.

13   Q    What was used in place of final phase testing?

14   A    I believe it was the intermediate.

15   Q    Did that cause you a concern?

16   A    Yes.

17   Q    Why?

18   A    Just because bacteria is a live organism and stuff

19   can happen and they could die and the final product may

20   not contain the exact count.

21   Q    Ma'am, was there a time historically when final

22   liquids were tested?

23   A    Yes.

24   Q    Did you participate in any conversations with

25   Mr. Peacock about not testing final product after a

                    MINDY WALTERS - DIRECT

1  certain time frame?

2  A    If we didn't test them, I would have to -- he would

3  have told me not to test them, yes.

4  Q    And did he give you any explanation of why final

5  liquids would not be tested or liquids would not be

6  tested in their final form?

7  A    No.  Not that I recall, no.

8        THE COURT:  When did this happen?  When did you

9  switch from counting the final product to just doing the

10  intermediate?

11        THE WITNESS:  It was kind of back and forth.

12  We tested and then didn't test and then we tested again.

13  I believe it was 2012 again when we started testing

14  final products, liquids.

15        THE COURT:  Had you -- when did you start?

16  When is the first time you remember not testing the

17  final product?

18        THE WITNESS:  I believe it was 2010, I believe.

19  I'm not sure of the date.

20        THE COURT:  Before or after the sale of the

21  company?

22        THE WITNESS:  It would have been before the

23  sale of the company.

24  BY MS. GEHRIG:

25  Q    And Ma'am, at any time if referring to the chart
                    MINDY WALTERS - DIRECT

1  would be helpful to you to answer questions, please let

2  us know.

3  A    Okay.

4  Q    Ma'am, directing your attention to powders, when we

5  talk about powders is the vast majority of those what we

6  refer to as wet-batch products?

7  A    Yes.

8  Q    And Ma'am, were -- at what stages were wet-batch

9  products tested?

10  A    They were tested at the intermediate and the final

11  stage.

12  Q    Were there times that the final tests were not

13  completed before the product shipped?

14  A    Yes.

15  Q    How frequently would that occur?

16  A    On a daily.

17  Q    Daily?

18  A    Yes.

19  Q    And Ma'am, with there times that the final test

20  revealed that the product did not pass bacteria counts

21  back on the ProtoCOL counter?

22  A    Yes.

23  Q    And can you approximate a percentage of time it

24  just didn't pass spec?

25  A    I would say about 30 percent.
                    MINDY WALTERS - DIRECT

1   Q     Did you tell Mr. Peacock?

2   A     There was times that I would tell him that it would

3   -- yeah, it would fail.

4   Q     And how would he respond?

5   A     At that point is when he would say there wasn't

6   anybody testing the product at a particular time.

7   Q     Did he take any action to fix the product?

8   A     Not to my knowledge, no.

9   Q     And did the product --

10        THE COURT:  I'm sorry.  What did you understand

11  that to mean when you said there wasn't anyone testing

12  the product at the time?

13        THE WITNESS:  I just assumed that there would

14  be nobody double-checking the count, the final count.

15        THE COURT:  I still don't understand.  You

16  brought to his attention the fact that the counts were

17  not meeting the spec.

18        THE WITNESS:  Um-hmm.

19        THE COURT:  That's what I thought you had said.

20        THE WITNESS:  That's correct, yes.

21        THE COURT:  And he responded by saying the

22  testing wasn't done at that time.

23        THE WITNESS:  Yeah.  Our customers were not

24  testing their product, the product that they had gotten

25  from us.

                MINDY WALTERS - DIRECT

1       THE COURT:  So what did you understand him to

2   be saying?  That as long as they didn't catch it, it

3   didn't matter?

4       THE WITNESS:  Yes.

5       THE COURT:  Or what did you understand?

6       THE WITNESS:  That's what I understood it to

7   say.

8       THE COURT:  All right.  You may continue

9   questioning.

10      MS. GEHRIG:  Thank you, Your Honor.

11  BY MS. GEHRIG:

12  Q    And Ma'am, if the product came back and had failed

13  and had not yet shipped, did it ship anyway?

14  A    Yes.

15  Q    Ma'am, what are extruded solids?

16  A    Extruded solids are our UR line.

17  Q    I beg your pardon?

18  A    Our UR line, our urinal pucks.

19  Q    Urinal pucks.

20  A    Urinal pucks, yes.

21  Q    And Ma'am, did those contain specifications?

22  A    Yes.

23  Q    And were C of As issued for some of them?

24  A    Yes.

25  Q    Were extruded solid products tested at all?
                  MINDY WALTERS – DIRECT

1   A     Not up until 2011 it looks like, the end of 2011.

2   Q     After Mr. Peacock left the business?

3   A     Yes.

4   Q     And when I say after he left, that's after the year

5   that he stayed on site?

6   A     Yes.

7   Q     Prior to the acquisition, did you voice your

8   quality control concerns to anybody in the business?

9   A     Prior to did you say?

10         THE COURT:  Yes.  Before the sale.

11         THE WITNESS:  No.

12  BY MS. GEHRIG:

13  Q     And Ma'am, did you believe that it would be

14  constructive to discuss them with Mr. Peacock?

15  A     Yes.

16  Q     Did you believe it would be constructive to discuss

17  them --

18  A     No.

19  Q     Okay.  And Ma'am, we've all been talking about

20  Mr. Peacock leaving in November.  How did you become

21  aware he wasn't going to be on site anymore?

22  A     I had found out, and I'm not sure who told me.  I

23  just found out he was no longer with the company.

24  Q     Now Ma'am, did you discuss your concerns with --

25  who primarily did you discuss your quality control
                    MINDY WALTERS - DIRECT

1  concerns with after Mr. Peacock had left the business?

2  A    Derek Loverich and Neil Seeger.

3  Q    I think you'll see what has been admitted as

4  Exhibit 4 on the screen in front of you.  Does that look

5  like something you've seen before?

6  A    Yes.

7  Q    And Ma'am, have you read it?

8  A    Yes.

9  Q    Does it appear to be an email from Mr. Loverich to

10  different people in the Betco organization and with you

11  cc'd on January 17th of 2012?

12  A    Yes.

13  Q    Did you participate in discussions with

14  Mr. Loverich before that went out?

15  A    Yes.

16  Q    Okay.  And having --

17           THE COURT:  Counsel, could I ask if you're

18  suddenly determined to show this tape, could you just --

19           MR. JACKSON:  I'm sorry, Your Honor.

20           THE COURT:  You're going to need to switch it

21  to a different computer, is that the problem?  So can we

22  just complete this questioning on this exhibit rather

23  than all this rigmarole.

24           MR. JACKSON:  I'm sorry, Judge.

25           THE COURT:  Would you please continue, Counsel.
                    MINDY WALTERS - DIRECT

1    It wasn't your fault.  I mean when you're ready, we'll

2    do it.

3              MR. JACKSON:  Okay.  Thank you, Judge.

4              THE COURT:  Please.

5    BY MS. GEHRIG:

6    Q    Ma'am, is the information in that email accurate?

7    A    Yes.

8    Q    And I'd like to draw your attention to particular

9    areas that deal with your position in the company.  Did

10   you contribute to information regarding products being

11   shipped before the plate results were in?

12   A    Yes.

13   Q    And final liquid products not being plated?

14   A    Yes.

15   Q    And the 30 percent of the products shipped not

16   meeting specification?

17   A    Yes.

18   Q    And now Ma'am, I want to talk about the certificate

19   of analysis.  Did you know what the salespeople were

20   using for information at that time?

21   A    No.

22   Q    And Ma'am, again since we've gone through this

23   already with Mr. Loverich, I don't feel the need to go

24   through it in detail but confirm you have read this

25   information.  It was accurate to the best of your

                    MINDY WALTERS – DIRECT

1    understanding at that time?

2    A    Yes.

3    Q    If you could please pull up Exhibit 8.

4         THE COURT:  Ms. Gehrig, whenever you want to

5    switch over and play the tape, it's up to you, whatever

6    is a natural point to do that.

7         MS. GEHRIG:  Your Honor, thank you.  I think if

8    we do this one last --

9         THE COURT:   That's fine.  I agree.

10   BY MS. GEHRIG:

11   Q    Ma'am, have you viewed this document before?

12   A    Yes.

13   Q    And it's been admitted into evidence and I'll just

14   orient you, I'll represent that it's an email that was

15   sent out on May 16 of 2012, apparently from Mr. Seeger

16   to Mr. Bischoff?

17   A    Yes.

18   Q    And Ma'am, does this email go to the core of some

19   of what you had been doing in quality control?

20   A    Yes.

21   Q    Ma'am, you testified earlier about concerns.

22   A    Um-hmm.

23   Q    Is that a fair characteristic, of concerns about

24   the ProtoCOL counter?

25   A    Yes.

                     MINDY WALTERS - DIRECT

1   Q    Before Mr. Seeger had done his testing that's

2   described in this email, did you know what the extent of

3   the problem might be?

4   A    No.

5   Q    Did Mr. Seeger's analysis confirm or discount your

6   concerns?

7   A    It confirmed.

8   Q    And once again, Ma'am, not to belabor the contents,

9   but were you familiar with the content of this email

10  before it went out through discussions with Mr. Seeger?

11  A    Yes.

12  Q    And is this information accurate or was it accurate

13  to the best of your understanding on May 16 of 2012?

14  A    Yes, to the best of my understanding.

15       (Video played at 2:52 p.m.)

16          THE COURT:  While you're waiting, is it just 16

17  that needs to be admitted?

18          MS. GEHRIG:  Yes, Your Honor.

19          THE COURT:  It is admitted.  (Video started)

20  Ms. Walters, you should feel free to describe what it is

21  we're looking at.

22          THE WITNESS:  What we're doing here is it looks

23  like we're getting ready to do a serial dilution.  And I

24  am basically taking 1 mil out of a sample and placing it

25  into a 99 mils.
                    MINDY WALTERS - DIRECT

1          THE COURT:  In other words, a concentrated

2   sample that you're placing into a much larger liquid?

3          THE WITNESS:  That's correct.

4          THE COURT:  And is that liquid just water?

5          THE WITNESS:  It's a buffered solution.  And

6   then the serial dilution continues.  Okay.

7      Now I'm taking a sample out of the last dilution

8   bottle and I am putting it onto the Petri dish.  And it

9   would be in three -- it would be triplicate plates.

10          THE COURT:  And the product you're testing

11   here, is this a liquid?

12          THE WITNESS:  It is, yes.  And then I would

13   spread it.

14          THE COURT:  If it wasn't, it is now.

15          THE WITNESS:  Right.  Then I would take a

16   spreader and spread out the colonies.  Okay.

17      Then we would put this in the incubator, and after

18   24 hours, we would manually count the product.  And that

19   is a colony counter in my hand and Sharpie and you

20   literally just count each colony that you see.

21          THE COURT:  How would you distinguish between

22   contaminated culture and the actual culture when trying

23   to count?

24          THE WITNESS:  You can tell by a morphology of

25   the colony a little bit.  You get to learn what the
                    MINDY WALTERS - DIRECT

1    colonies look like of the purchased culture.

2         And then this is the ProtoCOL spiral plater and

3    that's a blue dye plate just to kind of get the visual

4    effect, otherwise you couldn't see anything.  And it

5    basically is concentrated in the middle, more dilute as

6    it goes to the edges.

7              THE COURT:  You're talking about the ink now.

8              THE WITNESS:  Correct, correct.  Yes.  And that

9    would mimic the sample.  And then that is placed in the

10   incubator for 24 and 48 hours.

11        And then after your 48 hour, that's what it would

12   look like.  Then you would place it on the ProtoCOL

13   colony counter, you would enter in all your data that

14   you need, and basically you -- basically hit the space

15   bar and it would give you a count.  And right there is

16   the count.

17             THE COURT:  And once having been altered in

18   that way, would you still be able to do a hand count of

19   it?  Or once it's gone through the spiral process, is it

20   not possible to hand count anymore?

21             THE WITNESS:  It's plated a different way, so

22   it's --

23             THE COURT:  You couldn't do apples to apples.

24             THE WITNESS:  Correct.

25             MS. GEHRIG:  Your Honor, would it be acceptable
                        MINDY WALTERS - DIRECT

1  to ask that it be rewinded so you can see the last

2  portion, the plate where you were questioning the

3  witness?  Or would you --

4          THE COURT:  If what you're trying to show is

5  just the concentric circles --

6          MS. GEHRIG:  I --

7          THE COURT:  That's fine.  Go ahead.  You can

8  play it back just a hair.  But we're not going to spend

9  a lot of time with it, if you're able to.

10          MS. GEHRIG:  Would you prefer I just ask the

11  witness questions about what she identified?

12          THE COURT:  I would be delighted.

13  BY MS. GEHRIG:

14  Q   Ms. Walters, what was the last ten seconds of the

15  video that we did not see?  Did you do anything to the

16  plate?

17  A   Yes.  There was a part in there where I showed if

18  you turn the plate, that you would get different

19  results.

20  Q   And how different was the result in this case?

21  A   I believe that is the results right there.

22          THE COURT:  Can you tell by that what the

23  variation was?

24          THE WITNESS:  I'm sorry?

25          THE COURT:  Could you tell by that how great

                   MINDY WALTERS - DIRECT

1  the variation was?

2          THE WITNESS:  Yes.  Um-hmm.

3          THE COURT:  What was it?

4          THE WITNESS:  It was quite a bit.  1.33 times 7

5  to the 8th and 8.3 times 10 to the 9th or something like

6  that.

7  BY MS. GEHRIG:

8  Q    Ma'am, did significant changes -- are we all done

9  with that?  Did significant changes begin to occur to

10  the company in 2012?

11  A    I'm sorry?

12  Q    Did significant changes begin to occur in late

13  2012?

14  A    Yes.

15  Q    And Ma'am, did you personally bring the certificate

16  of analysis issue to the attention of the person who was

17  supervising you at that time?

18  A    Yes, I did.

19  Q    Mr. Keith Kennedy?

20  A    Correct.

21  Q    And has that process changed?

22  A    No, we -- I'm sorry.  Has --

23  Q    Does -- you previously described to the Judge that

24  the sales staff would prepare certificates of analysis.

25  A    Yes.
                    MINDY WALTERS - DIRECT

1   Q     Has the process changed?

2   A     Yes.  It is now the lab and QA having control of

3   the documents for C of A.

4   Q     And Ma'am, do you prepare certificates of analysis

5   close in time to when the product is tested?

6   A     Yes.

7   Q     And are those stored in the normal course of

8   business at Bio-Systems?

9   A     Yes.

10  Q     Ma'am, does the document in front of you have

11  significance to you?

12  A     Yes.

13  Q     What is that?

14  A     That is a certificate of analysis.

15  Q     And if you could go top to bottom, starting with

16  the upper left-hand corner.

17  A     Sure.  Right there it will say approved by and it

18  will be the name of the person that has completed the

19  document.  There will be the bill to, ship to.  There's

20  also a lot number, which would be for the final product.

21  There is a manufacture date, which is the date that we

22  started -- we produced the test -- produced the product

23  and tested it on the shipment date, the date that it

24  went out the building.  And then there would be the

25  analysis of the total count.
                   MINDY WALTERS - DIRECT

1    Q    And Ma'am, what does this particular certificate of

2    analysis, what does it certify?

3    A    This is certifying this colony-forming units per

4    gram.

5    Q    And Ma'am, is there any qualifying language in this

6    particular document?

7    A    Yes.  This is a potential product that we do not do

8    a final plate count out and we state that we do not do

9    it.  It's to a predetermined bacterial count.

10   Q    Basically if you don't do a test for a particular

11   reason, do you put that on the certificate?

12   A    That's correct.

13   Q    And if you could, to the second page, please.

14   Ma'am, is this another certificate of analysis?

15   A    Yes.

16   Q    And is this another one that bears your approved by

17   designation?

18   A    Yes.

19   Q    And again, if you could just walk us through.

20   A    Sure.  My name is up at the upper left-hand corner,

21   the lot number, the company who it's shipping to, the

22   PO, the manufactured date, shipment date, the product

23   name, and then the total count and the predetermined

24   again.

25   Q    Okay.  Ma'am, are you -- now do you test all final

                     MINDY WALTERS - DIRECT

1  liquid product?

2  A    Yes.

3  Q    And do you test all solid products?

4  A    Yes.

5  Q    And do you continue to test any powder products?

6  A    Yes.

7  Q    Is everything tested before it's shipped?

8  A    Yes.

9  Q    If it doesn't meet spec, does it ship?

10 A    No.

11 Q    Ma'am, in 2013 did you participate in testing

12 analysis at the direction of Mr. Kennedy?

13 A    Yes.

14 Q    And did you perform analysis on wet-batch products?

15 A    Yes.

16 Q    Did you perform tests on -- at what stage of the

17 products were you testing them?

18 A    I believe we did the intermediate products.

19 Q    Did you also do final?

20 A    Yes.

21 Q    And Ma'am, what did the results of your test show?

22 A    It showed that the final products were lower than

23 the intermediates.

24 Q    And would the final products have been able to meet

25 a 5-billion spec?
                    MINDY WALTERS - DIRECT

1   A    No.

2   Q    Ma'am, did you also do some testing for Mr. Kennedy

3   comparing spiral plate counts with manual plate counts?

4   A    Yes.

5   Q    And what kind of testing?

6   A    It was a manual count versus spiral.  We basically

7   did the same products side by side.

8   Q    Did you do that for multiple strain products?

9   Liquids?

10  A    Yes.

11  Q    Solids and powders?

12  A    Yes.

13  Q    And did you also do some single strains for

14  comparison?

15  A    I believe so, yes.

16  Q    And Ma'am, what percentage of products produced in

17  the Beloit plant are multiple strain?

18  A    Gosh, 95 percent of them, 90 percent of them.

19  Quite a few.

20  Q    And has that been the case since you started

21  working for Bio-Systems?

22  A    Yes.

23  Q    Ma'am, with regard to additional changes, are you

24  aware of bacteria purchases increasing?

25  A    Yes.

                    MINDY WALTERS - DIRECT

1   Q    And was that all of a sudden or has it been

2   gradual?

3   A    Gradual.

4   Q    Initially for which products?

5   A    Powders.

6   Q    And right now which products contain purchased

7   bacteria?

8   A    Most every product.

9   Q    And Ma'am, have you switched your counting

10  procedures?

11  A    Yes.

12  Q    Right now do you do any ProtoCOL counting?

13  A    No.

14  Q    Was this again a gradual switch or all of a sudden?

15  A    Gradual.

16  Q    When was it complete?

17  A    I believe it was April of this year.

18  Q    Do you believe bacteria -- do you believe that has

19  improved the accuracy of your testing?

20  A    Yes.

21          MS. GEHRIG:  Thank you, Ma'am.  (3:05 p.m.)

22          THE COURT:  Cross-examination.

23                    CROSS-EXAMINATION

24  BY MR. BIANCHI:

25  Q    Earlier in your testimony, Ms. Walters, you noted
                    MINDY WALTERS - CROSS

1  that at your previous job, Swiss Colony, you were

2  looking for bad bugs.

3  A    Yes.

4  Q    What did you mean by that?

5  A    Pathogenic bugs.

6  Q    Why?  What was bad about them?

7  A    It was a food -- it was a food product, so we

8  didn't want anything pathogenic in the product.

9  Q    So in that process you did pour plate manual count?

10 Is that --

11 A    We used a PG film is what we did.  But it was a

12 manual, yes.

13 Q    So the concern was you don't want bacteria in

14 there; right?

15 A    That's correct.

16 Q    And at Bio-Systems, you actually want bacteria;

17 right?

18 A    That's correct.

19 Q    And a lot of the data that we've been talking

20 about, all going back to 2007, where is all that kept?

21 A    The actual final products?

22 Q    The data on it.

23 A    The data, it's electronic and it's a hard copy,

24 yes.

25 Q    So electronically it would be -- there's a server

                    MINDY WALTERS - CROSS

1  computer?

2  A    Yes.

3  Q    Who has access to that computer?

4  A    I believe quite a few people do, I'm not exactly

5  sure who all has access or not.  I know the lab does.

6  Q    Okay.  Do you know whether salespeople have access

7  to it?

8  A    That I'm not sure what they have access to.

9  Q    So they could, you just don't know?

10  A    Sure, correct.

11  Q    And the information that you use for certificates

12  of analysis, it's located in that computer server

13  somewhere, isn't it?

14  A    Yes.

15  Q    So if someone had access to that computer server,

16  whether directly or remotely, they would be able to

17  access that information; right?

18  A    Yes.

19  Q    And when Betco purchased the company, you showed

20  Mr. Bischoff how you did counts; right?

21  A    Yes.

22  Q    So he was aware where all the information about the

23  counts was stored; correct?

24  A    I believe so.

25  Q    You showed him what you were doing; right?
                    MINDY WALTERS - CROSS

1  A    Yes.

2  Q    And that you entered the information in; is that

3  right?

4  A    Yes.

5  Q    And so he could have accessed that information in

6  the computer; is that right?

7  A    Yes.

8  Q    Did Malcolm tell you to hide the information in the

9  computer from anyone at Betco?

10  A    No.

11  Q    We were looking at this exhibit, I think it's 16;

12  is that right?  Is that what this is?  And I understand

13  that you looked at underlying data and you took this

14  information; is that right?

15  A    Yes.

16  Q    And so currently that looks like M-14 at the very

17  bottom, that's May 2014; is that right?

18  A    Yes.

19  Q    And that's when the spiral plate/ProtoCOL count

20  stopped; is that right?

21  A    No.  That's when we started to do a few products.

22  Mainly C of A products were done manually at that point.

23  Q    That's the MS; right?  Manual spreader, is that

24  what MS is?

25  A    Correct.  Correct.
                    MINDY WALTERS - CROSS

1  Q    So, but you guys chose not to do MP; right?

2  A    Right.

3  Q    There's the test that LexaMed did on all the

4  products; right?

5  A    I believe so.

6  Q    Is there a reason why you guys have chosen not to

7  do manual pour plate counts?

8  A    Why we chose not to do?

9  Q    Correct.

10  A    No.  What that -- at that particular time the

11  company we were purchasing bacteria from suggested the

12  way to plate.

13  Q    Have you checked to see if the way that they

14  suggested doing this manual spread plate gives you

15  different results than if you follow what LexaMed had

16  told you what they think is kind of the best method,

17  which is that pour plate manual count?

18  A    No.

19  Q    I think you mentioned Richard Peacock being

20  involved also with the lab --

21  A    Yes.

22  Q    -- is that correct?

23  A    Yes.

24  Q    Did he ever talk to you about when a product should

25  be plated?

                    MINDY WALTERS - CROSS

1  A     No.

2  Q     Was he involved with the technical -- any technical

3  issues with the ProtoCOL counter; is that right?

4  A     Yes.

5  Q     And when you started at Bio-Systems, there was no

6  ProtoCOL counter; is that right?

7  A     That's correct.

8  Q     And in fact, it was Richard Peacock who trained you

9  in the use of the counter; is that correct?

10  A     Well, actually the day I was there to visit, the

11  sales tech was there for the ProtoCOL counter.

12  Q     So it was your first day was the first day they

13  obtained that?

14  A     Yes.

15  Q     I'm going to bring you, because it's very big, the

16  Exhibit 790.

17         MR. BIANCHI:  Your Honor, may I approach?

18         THE COURT:  You may.

19  BY MR. BIANCHI:

20  Q     Can you identify what that document is?

21  A     That looks like the ProtoCOL Manual.

22  Q     And is that -- do you recognize the writing on it

23  at all?  It's not yours?

24  A     No.  Hmm-um.

25  Q     And are you familiar with the ProtoCOL Counter

                    MINDY WALTERS - CROSS

1   Manual?

2   A    Yes.  What I've used of, yes.

3   Q    Do you use it regularly?

4   A    No longer.

5   Q    When Bio-Systems was using the ProtoCOL counter,

6   were you using the manual?

7   A    The manual?

8   Q    Yes.

9   A    No.  We didn't have it every day by us, no.

10  Q    If you ran into problems, did you use the manual?

11  A    If we ran into problems, we usually got Richard.

12  Q    In the video that we watched, there were some flags

13  that were listed in the ProtoCOL counter screens.  Do

14  you know what flags are?

15  A    Yes.

16  Q    And what do they signal generally; are you aware?

17  A    Some of them would be a re-read or if they are

18  lower.

19  Q    What about the letters -- there were letters --

20  A    Yes.

21  Q    -- that were noted as flags; right?

22  A    Yes.

23  Q    So if you turn to 079356 of the document in front

24  of you -- sorry.  There's -- they're called Bates

25  numbers in the lower right-hand corner.
                    MINDY WALTERS - CROSS

1    A    I'm sorry, what was the number?

2    Q    It is 079356.

3    A    356.  Okay.

4    Q    And so if there were the letters LSU, what would

5    that mean?

6    A    That says account lower than the account limit and

7    I believe the S was the spread of the separator that was

8    used.  That would be the mode.  And then it was a whole

9    frame was used.

10   Q    So what does that mean to you?  What does it mean

11   that the count was lower than the count limit and

12   therefore the whole frame had to be used?

13   A    That's correct.

14   Q    What does that mean though?

15   A    What that means to me is that it has -- it has -- I

16   guess I'm not sure what the interval is and if once it

17   gets past that, it would count it as a whole.

18   Q    And so does that affect the reading --

19   A    Yes.

20   Q    -- that's happening?

21   A    Yes.

22   Q    And so if the other one said S2, what would that

23   mean?

24   A    Separator was used and two sectors of the spiral

25   frame was used.  So it wouldn't be a whole plate.  It

                    MINDY WALTERS - CROSS

1  wouldn't be a total plate reading.

2  Q    So that would give you different readings then;

3  right?

4  A    I would assume, yes.

5  Q    And then what would you do with that information?

6  A    That information?

7  Q    Correct.  If you had, like it was on the screen,

8  one said LSU and one said S2, does that mean you rerun

9  the test?  What's the next step there?

10  A    No.  That we just took the reading that it gave.

11  Q    Is that what the manual says to do?

12  A    No.  I don't know.

13  Q    And if you turn to 079362.

14  A    Yes.

15  Q    Look at that, and flip to the next page, there's

16  talk here about validation procedures.

17  A    Okay.

18  Q    Do you see that?

19  A    Yes.

20  Q    Do you use those procedures?

21  A    No.

22  Q    Why not?

23  A    I'm not sure.

24       MR. BIANCHI:  Your Honor, I'd ask that we move

25  into evidence Exhibit 790.
                MINDY WALTERS - CROSS

1          THE COURT:  It's admitted.

2          MR. BIANCHI:  I'll bring you another thick one.

3   I'm sorry.  Your Honor, may I approach?

4          THE COURT:  You may.

5   BY MR. BIANCHI:

6   Q    This is what's marked as Exhibit 778.

7   A    Okay.

8   Q    Feel free to take a look.  And can you just confirm

9   it's Section 7 of the ISO Manual?  And it looks like the

10  last update in this one was June 3rd, 2010; is that

11  right?  If you look at this one, it's Bates PLT 040114.

12  A    Yes.  Okay.

13  Q    You're familiar with the ISO Manual?

14  A    I am.

15  Q    And you're familiar with Section 7?

16  A    Yes.

17  Q    Where was the ISO Manual kept?

18  A    It was in the lab.

19  Q    And is that when Mr. Peacock owned the company?

20  A    Yes.

21  Q    I'm going to have you turn to page PLT 040130.

22  A    Okay.

23  Q    And so this talks about the procedure for doing

24  standard plate count; correct?

25  A    Yes.
                    MINDY WALTERS - CROSS

1   Q     And if you get down, you're making the plate, and

2   you have counting colonies.

3   A     Yes.

4   Q     What does it say underneath that?

5   A     "See owner's manual."

6   Q     See owner's manual.  Did you often see the owner's

7   manual for your process of counting colonies?

8   A     No.

9   Q     How about the Spiral Plater Manual?  Did you use

10  that?

11  A     No.

12  Q     But you believed that in your processes in the lab

13  that you were following the ISO requirements for the lab

14  in 2010; isn't that right?

15  A     Yes.

16  Q     And you also believed that you were following the

17  ISO lab procedures in 2011; is that right?

18  A     Yes.

19  Q     But in looking at this, were you following the ISO

20  Manual in the lab?

21  A     I did not see the owner's manual, no.

22  Q     Did anyone ever tell you not to look at the owner's

23  manual?

24  A     No.

25  Q     The ISO Manual, if you turn back a couple pages,

                    MINDY WALTERS - CROSS

1    we're going to go to PLT 040121.  Seems like here we're

2    getting in an even more detailed process.  Going all the

3    way to PLT 040125; is that right?

4    A    Correct.

5    Q    And if you look at PLT 0402 -- sorry, 0124, sorry.

6    There's a lot of letters and numbers.  Are you there?

7    A    Yes.

8    Q    And you go down about three paragraphs up from the

9    bottom, it says *For more detailed* -- do you see where

10   I'm at?

11   A    Actually I don't, I'm sorry.  Oh, yes, I do.  Yes.

12   Q    Got it?  Says "For more detailed procedures, see

13   user manual on ProtoCOL from Synoptics."  Do you see

14   that there?

15   A    Yes.

16   Q    And that's referring to Exhibit 790; right?

17   A    Yes.

18          MR. BIANCHI:  Your Honor, I would ask to admit

19   Exhibit 778 into evidence.

20          THE COURT:  It is admitted.

21   BY MR. BIANCHI:

22   Q    Now, you yourself had never calibrated the spiral

23   plater; is that right?

24   A    The spiral plater?  No.

25   Q    But you used to calibrate the ProtoCOL counter for
                    MINDY WALTERS - CROSS

1   every plate that you did; right?

2   A    Yes.  There was a function that we did, yes.

3   Q    And when did that stop, do you remember?

4   A    I don't remember.

5   Q    Do you recall that at some point you spoke with

6   Richard and then you stopped?

7   A    I believe that would have been the case, yes.

8   Q    And when you were in charge of the lab, Derek was

9   the person that was in charge of production; is that

10   right?

11   A    Yes.

12   Q    But you said you didn't talk to him about the

13   issues that you saw about the ProtoCOL counter until

14   after Betco had purchased Bio-Systems; is that right?

15   A    Correct.

16   Q    You do not know which specific products shipped out

17   below spec; isn't that right?

18   A    I'm sorry?

19   Q    You --

20   A    Can you repeat?

21   Q    Sure.  You don't know which specific products

22   shipped out below spec when Malcolm was running the

23   company.

24   A    What particular products?

25   Q    Correct.
                        MINDY WALTERS - CROSS

1    A    Well, yes, we would know.

2    Q    You do know?

3    A    I mean I couldn't tell you what they are today, but

4    yes, at the time we would do a final check of the

5    product.

6    Q    Right.  But I'm saying you can't tell me right now

7    a specific product.

8    A    Correct.

9    Q    And you don't know how many actually went out under

10   spec; correct?

11   A    Correct.

12         THE COURT:  In the case of percentages you

13   indicated earlier, you indicated it was --

14         THE WITNESS:  It was about 30 percent.

15         THE COURT:  So do you have an understanding as

16   to whether that's what percentage went out?

17         THE WITNESS:  That's correct, yes.

18         THE COURT:  You know that because?

19         THE WITNESS:  That was an estimated guess.

20         THE COURT:  Based on?

21         THE WITNESS:  Based on when we tested the

22   product and then we would check the final product that

23   went out the door.

24   BY MR. BIANCHI:

25   Q    I'm going to have you look to your TV this time.
                    MINDY WALTERS - CROSS

1  We're going to look at Exhibit 760.

2  A     Okay.

3  Q     Do you recognize this document?

4  A     I do.

5  Q     What is it?

6  A     That would be how to prepare a sample for plating.

7  Q     And do you understand that this document, which

8  kind of looks like it follows the ISO Manual section we

9  just looked at; is that correct?

10  A     That's correct.

11  Q     And again, it references the Proto Spiral Counter

12  by Synoptics?

13  A     Yes.

14  Q     For more detailed procedures, see the user manual;

15  right?

16  A     Yes.

17  Q     And you understand that this information was freely

18  shared with customers of Bio-Systems; right?

19  A     I would assume it was, yes.  I don't know.  I'm not

20  sure what the customers got.

21  Q     Were you aware that customers would come in and

22  watch you plate count?

23  A     Yes.

24  Q     Plate and count?

25  A     Yes.

                    MINDY WALTERS - CROSS

1   Q    And Malcolm encouraged that; right?

2   A    Yes.

3   Q    And in fact, all that time that you were using the

4   Proto counter and the spiral plater, you believed that

5   was an acceptable method to be able to count the

6   bacteria; right?

7   A    Yes.

8        MR. BIANCHI:  Your Honor, I ask to move 760

9   into evidence.

10       THE COURT:  It is admitted.

11  BY MR. BIANCHI:

12  Q    In the year 2011, you did not hear anything from

13  Malcolm about not telling employees not to interact with

14  Betco employees; isn't that right?

15  A    That's correct.

16  Q    And you didn't hear anything from Malcolm about not

17  communicating with Betco employees; correct?

18  A    Correct.

19  Q    And in fact, you periodically had interactions with

20  Betco employees all throughout 2011; right?

21  A    That's correct.

22  Q    And you never felt that you were somehow prohibited

23  from speaking with Betco employees during 2011; right?

24  A    No.

25  Q    So you felt like you could talk to Betco employees;

                    MINDY WALTERS - CROSS

1  correct?

2  A     Yes.

3  Q     And I know you mentioned this theoretical count or

4  intermediate count, calculated count.  You believed that

5  using that count was perfectly acceptable; right?

6  A     Yes.

7  Q     Were you ever told to hide --

8  A     No.

9  Q     Sorry.  I apologize.  I paused too long.  Were you

10  ever told to hide that method of counting Bio-Systems'

11  products?

12  A     No.

13  Q     The theoretical count.

14  A     No.

15  Q     In fact, that was something that, as far as you

16  were aware, everyone at Bio-Systems was aware of, the

17  theoretical counts?

18  A     Yes.

19  Q     After the ISO was completed, you would -- the ISO

20  Manual we looked at, you would review it and make sure

21  it was correct; right?

22  A     Review the manual or the --

23  Q     The sections that apply to the lab.

24  A     Yes.

25  Q     Did you ever explain the intermediate count method

                    MINDY WALTERS - CROSS

1  or the calculated count method to Neil?

2  A    Did we explain?

3  Q    Did you ever explain it to Neil Seeger?  Did you

4  ever explain to Neil that process?

5  A    Yes.  When he first started I believe I did.

6  Q    How about to Kurt Bischoff?

7  A    I believe so, yes.

8  Q    Do you remember when that was?

9  A    I don't remember.

10  Q    Would it have been shortly after the purchase of

11  the company?

12  A    I would assume, yes.

13  Q    So with your involvement with the ISO Manual, you

14  believe that someone could look at it in 2010 and 2011

15  and they would know the processes that the lab was

16  using; right?

17  A    Yes.

18          THE COURT:  Did you tell either one of them,

19  Seeger or Bischoff, about the amount of product,

20  particularly powder, that were being sold out of spec?

21          THE WITNESS:  I believe I would have discussed

22  that with Neil.

23          THE COURT:  And when would that have been?

24          THE WITNESS:  Maybe around the time he started.

25  I'm not really sure.

                    MINDY WALTERS - CROSS

1  BY MR. BIANCHI:

2  Q    And were you aware that in the wastewater industry

3  that Bio-Systems sells products into that competitors

4  were trying to knock down each other's plate count?

5  Were you familiar with that?

6  A    No, I wasn't.  No.

7  Q    You never tested competitors' products?

8  A    Yes, we would.  Yes.  Um-hmm.

9  Q    And would you use the spiral plater and the

10 ProtoCOL counter to test them?

11 A    Yes.

12 Q    And were you aware that if a customer came and said

13 hey, this competitor tested my product and this count

14 was, you know, something that I wasn't expecting,

15 Bio-Systems came back and said well, this is the method

16 that we use and that's how we got the number.

17      Is that --

18 A    I would assume.  I never talked to customers, so...

19 Q    You never talked to customers.

20 A    No.

21      THE COURT:  Did you generally find the

22 competitors' numbers were consistent with their specs?

23      THE WITNESS:  Yes.

24 BY MR. BIANCHI:

25 Q    I'm going to have you look at Exhibit 696.
                    MINDY WALTERS - CROSS

266

1   A    Okay.

2   Q    Jumping back to '98.  Do you recognize that

3   document?

4   A    Yes, I do.

5   Q    Is that your handwriting?

6   A    Yes, it is.

7   Q    And what is that document?  What are we looking at?

8   A    That is basically a plate count of what would have

9   been plated on the spiral plater.

10  Q    And it references a calibration plate.  Do you know

11  what that's referring to?

12  A    No, I'm not really sure what the calibration plate

13  was.

14  Q    Could it have been to compare a hand count to the

15  ProtoCOL counter?

16  A    A manual count?

17  Q    Yes.

18  A    Probably not a manual count, no.

19  Q    So when the column that says method --

20  A    Yes?

21  Q    -- none of those reference a hand count or manual

22  count?  Sorry.

23  A    I believe that was done on the spiral plater.  You

24  can't do a manual count when it's done on the spiral

25  plater.

                MINDY WALTERS - CROSS

1            THE COURT:  Are you looking for that,

2    Mr. Bianchi?  How much more do you have for this

3    witness?

4            MR. BIANCHI:  This is it.  May I approach?

5            THE COURT:  You may.

6    BY MR. BIANCHI:

7    Q    Ms. Walters, I'm going to have you turn to page 63

8    in your deposition, please.

9    A    Okay.  Okay.

10   Q    And if you look, there's a reference to Exhibit

11   151, and that's in line number 9.  Do you see that

12   there?  It says "I'm going to hand you what's been

13   marked Defendants' Exhibit 151."

14   A    Okay.

15   Q    "Can you identify what this document is."

16        And you said "Yeah.  It says calibration plate.  I

17   would assume it's the same as that, but I don't

18   remember, so...

19        Does it look like your handwriting?

20        Yes, it does.

21        So this document appears to be similar to

22   Defendants' Exhibit 150, so another kind of calibration

23   plate?

24        Yes.

25        With a hand count comparing what the ProtoCOL
                     MINDY WALTERS - CROSS

1  counters count.

2       Right.

3       And again I realize these documents are from '98

4  and the other one 2000.  You don't know when that

5  calibration comparison stopped?

6       No.  No, I don't."

7       Did I read that correctly?

8  A    Yes.

9            MR. BIANCHI:  Ask to admit Exhibit 696.

10           THE COURT:  It is admitted.

11           MR. BIANCHI:  I have no further questions.

12           THE COURT:  Any redirect?   (3:32 p.m.)

13           MS. GEHRIG:  Very briefly, Your Honor.

14                 REDIRECT EXAMINATION

15  BY MS. GEHRIG:

16  Q    Ma'am, did you ever use manual counting procedures

17  working at Bio-Systems prior to Mr. Peacock's departure?

18  A    No.

19  Q    And briefly with regard to any sort of calibration

20  or validation, did you discuss anything about the

21  ProtoCOL counter with Mr. Richard Peacock after he, I

22  guess, left the business in 2009?

23  A    I'm sorry, can you repeat?

24  Q    Mr. Richard Peacock -- you started in 1997.

25  A    That's correct.
                 MINDY WALTERS - REDIRECT

1   Q    Okay.  And Mr. Richard Peacock, Mr. Malcolm

2   Peacock's son, was employed at the business at that

3   time.

4   A    Correct.

5   Q    And from that period until 2009, was that the time

6   period that you worked with Mr. Richard Peacock?

7   A    Correct.

8   Q    Did you work with him in any form or fashion after

9   the acquisition?  I'm saying in 2010.

10  A    No.  I don't believe so, no.

11  Q    So any work that Mr. Richard Peacock did with you

12  on the ProtoCOL counter to validate, calibrate, whatever

13  was 2009 or earlier?

14  A    Correct.

15  Q    Did Mr. Malcolm Peacock direct you to calibrate,

16  validate or do anything with the ProtoCOL counter

17  thereafter?

18  A    No.

19          MS. GEHRIG:  Thank you, Ma'am.  That's all.

20          THE COURT:  You may step down.

21       (Witness excused at 3:32 p.m.)

22          THE COURT:  Before we take our afternoon break,

23  let me just ask for the plaintiff how much more -- how

24  many more witnesses you have.

25          MS. GEHRIG:  Your Honor, I've got three
                   MINDY WALTERS - REDIRECT

1   witnesses in the waiting, and if -- I don't know how --

2   we could present more today, but I'm thinking that those

3   three might be for the rest of the day.

4           THE COURT:  Well, it would really depend on how

5   many more you have in the morning.

6           MS. GEHRIG:  We have, I believe, three in the

7   morning:  Mr. Seeger, Mr. Kennedy, and Mr. Lyons.

8           THE COURT:  And will that complete your

9   case-in-chief on liability?

10          MS. GEHRIG:  Yes, Your Honor.  In fact --

11          MR. JACKSON:  Well, except Mr. Lyons, Your

12  Honor, he's offered for damages, and as I understood --

13          THE COURT:  With the exception of Mr. Lyons,

14  that's what I meant.  When I said your case-in-chief, I

15  said on liability, not on damages.  So I just wanted to

16  make sure.  So basically you have six witnesses.  Why

17  don't we see where we are.

18      For the defendant, how many witnesses would you

19  expect and how long do you think it will take?

20          MR. BIANCHI:  We have a total of five.

21          THE COURT:  So realistically?

22          MR. BIANCHI:  Three of -- our two experts and

23  Mr. Peacock.  At least half a day, it could go a little

24  more.  Mr. Peacock will obviously be the biggest chunk

25  of that.  And then we have two other witnesses scheduled

1    to come already Wednesday morning that will be very

2    short.

3            THE COURT:  Well, I just want to make sure, if

4    we can, if they're reachable -- if it looks like it's

5    getting that we could finish it, we would.  Why don't we

6    plan on those three and see where we are.  I'm happy to

7    go until 6 anyway.  That will at least make some

8    progress, and if we're still concerned about timing, we

9    could start at 8 a.m.  But at this point let's just plan

10   on that.

11       Yes, sir.

12           MR. JACKSON:  If I might, Your Honor, our last

13   witness, Mr. Lyons, are you anticipating that we're

14   going to bifurcate and that we'll schedule the damage

15   witnesses at some other --

16           THE COURT:  No, no.  We'll do it all this week

17   if we're going to go forward.

18           MR. JACKSON:  Okay.  Thank you.

19           THE COURT:  The only other matter I had was

20   please feel free to unseal any deposition transcripts

21   that you're going to want to use.  It might impress a

22   jury, but just delays things for me.  So thank you.

23       Anything more for the plaintiffs?

24           MS. GEHRIG:  You mean are we going to take a

25   break?

1        THE COURT:  Before we take our break.

2        MS. GEHRIG:  No, Your Honor.

3        THE COURT:  Sorry.  I can be a bit brusk.  Why

4  don't we reconvene at 5 to 4.  We're in recess.  Feel

5  free to move about as you wish.

6        (Recess          3:35-3:53 p.m.)

7        THE COURT:  Are we missing a witness?

8        MS. GEHRIG:  Your Honor, she's in the back of

9  the courtroom.  Ms. Deborah Dare.

10        THE COURT:  Very good.  You may call your next

11  witness then.

12        MS. GEHRIG:  Thank you, Your Honor.

13        THE COURT:  And you can actually come right up

14  to the table and be sworn.

15        **DEBORAH DARE, PLAINTIFF'S WITNESS, SWORN,**

16        THE COURT:  Please proceed.

17        MS. GEHRIG:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19  BY MS. GEHRIG:

20  Q    Ms. Dare, would you please state your full name and

21  spell your last.

22  A    Deborah Dare.  D-a-r-e.

23  Q    Where do you currently reside?

24  A    Janesville, Wisconsin.

25  Q    Where are you employed?
                    DEBORAH DARE - DIRECT

1    A    Bio-Systems International.

2    Q    What is your current position?

3    A    Sales manager for the Institutional Division.

4    Q    And Ma'am, how long have you been employed at the

5    Beloit plant?

6    A    Since 2009.

7    Q    When you were hired, who owned the Beloit plant?

8    A    Malcolm Peacock.

9    Q    Did Mr. Peacock interview you?

10   A    Yes.

11   Q    Who was your immediate supervisor?

12   A    Dana Juul.

13   Q    And what was Ms. Juul's position?

14   A    She was Team 3 lead.

15   Q    Who supervised Ms. Juul?

16   A    Malcolm.

17   Q    Ma'am, as sales manager do you have access to

18   product literature that relates to the products that you

19   sell?

20   A    Yes.

21   Q    Does that include labels?

22   A    Yes.

23   Q    And does that include data sheets?

24   A    Yes.

25   Q    Did those -- were those in existence for your

                    DEBORAH DARE - DIRECT

1  products, the products that you were selling, at the

2  time you began at Bio-Systems?

3  A    Yes.

4  Q    And were they kept on what we refer to as an F

5  drive electronically prior to the sale of the company?

6  A    Yes.

7           MS. TURKE:  Objection.  Leading.

8           THE COURT:  I'll sustain the objection and I'll

9  strike the answer.

10 BY MS. GEHRIG:

11 Q    Ma'am, how were these documents maintained prior to

12 the acquisition?

13 A    Electronically on a central drive.

14 Q    And what was the name of the drive that -- on which

15 they were kept electronically prior to the acquisition?

16 A    The F drive.

17 Q    How are they now kept?

18 A    Electronically on a central drive named the T

19 drive.

20 Q    And how are they categorized or stored?

21 A    Some by customer and some by category.

22 Q    Ma'am, have there been any significant revisions

23 until prior to Mr. Kennedy reviewing them in 2013?

24 A    No.

25 Q    Ma'am, were you aware when you started at
                    DEBORAH DARE - DIRECT

1    Bio-Systems in 2009 that Bio-Systems had an ISO Manual?

2    A    I was aware of its existence, yes.

3    Q    Were you ever asked to refer to it regarding any

4    specific job duties that were assigned to you?

5    A    No.

6    Q    How did you learn that the company had been sold in

7    September of 2010?

8    A    Malcolm announced it.

9    Q    And did Mr. Peacock make a change -- or excuse

10   me -- make a point of saying whether anything would

11   change?

12   A    He said nothing would change.

13   Q    Did he continue to supervise the staff in your

14   office until November of 2011?

15   A    Yes.

16          MS. TURKE:  Objection.  Leading.

17          THE COURT:  I'll sustain the objection and I'll

18   strike the answer.

19   BY MS. GEHRIG:

20   Q    Who supervised the sales staff from the time of the

21   acquisition until November of 2011?

22   A    Malcolm Peacock.

23   Q    Did Mr. Peacock give you any particular

24   instructions regarding who should speak to Betco

25   personnel after the acquisition?
                    DEBORAH DARE - DIRECT

1   A    He said that only Dana Juul or myself should speak

2   to people at Betco.

3   Q    Did anything in your department change over the

4   next several months?

5   A    No.

6   Q    Did any -- were there any significant changes prior

7   to Mr. Peacock's departure?

8   A    No.

9   Q    Ma'am, I'd like to talk about your job duties

10  between September of 2010 and September of 2011.  Did

11  you have contacts with your customers?

12  A    Yes.

13  Q    For what purpose?

14  A    In a sales role quoting new products, providing

15  data sheets, MSDS, just general customer service and

16  sales.

17  Q    Did you ever get questions from your customers

18  regarding the products they were purchasing?

19  A    Yes.

20  Q    Did you ever get questions regarding bacterial

21  counts?

22  A    Yes.

23  Q    What types of questions?

24  A    Wanting to verify the count of a specific product

25  primarily.

                    DEBORAH DARE - DIRECT

1   Q    Did you handle some of those questions yourself?

2   A    Yes.

3   Q    How did you handle them?

4   A    I would refer to the data sheets to get the

5   information or I would ask Dana what the count was.

6   Q    So if there were questions you couldn't handle, who

7   would you go to?

8   A    Dana.

9   Q    Ma'am, were you responsible during that time

10  period, and again September of 2010 until November of

11  2011, for preparing certificates of analysis?

12  A    Yep.

13  Q    Approximately how many certificates of analysis

14  would you prepare in a given week?

15  A    Probably five to ten.

16  Q    And approximately what percentage of your customers

17  received a certificate of analysis when Mr. Peacock

18  owned the business?

19  A    Probably half.

20  Q    And was that the same number during the year after

21  the acquisition?

22  A    Yes.

23  Q    Ma'am, how are certificates of analysis stored?

24  A    Electronically on the F drive.

25  Q    Did you keep old ones when you created new ones?
                   DEBORAH DARE - DIRECT

1   A     No.  During that time we did not.

2   Q     What did you do?

3   A     We would pull up -- I would pull up the last

4   certificate of analysis sent to that particular customer

5   and update any necessary information on it and then

6   store it back out under the same name.  We only kept one

7   electronic copy.

8   Q     And Ma'am, I'm going to direct you to the TV screen

9   in front of you.  Does that appear to be a certificate

10  of analysis for one of your clients?

11  A     Yes.

12  Q     Or customers?

13  A     Yes.

14  Q     And could you read the date on that?

15  A     The certificate date is June 20th, 2011.

16  Q     And Ma'am, is that during the period of time where

17  Malcolm continued to be in the plant?

18  A     Yes.

19  Q     Up in the upper left-hand corner, does this

20  document tell you who the document was approved by?

21  A     Yes.

22  Q     And who is that?

23  A     Malcolm Peacock.

24  Q     Now Ma'am, when you went into one of these

25  documents, when you pulled it up to create it for the

                    DEBORAH DARE - DIRECT

1  customer, could you tell me what information you

2  changed?

3  A    Yes.  I would change the lot number at the top, the

4  order number, the certificate date, and the ship date,

5  and then I would adjust the actual results on the line

6  where it says *total count*.

7  Q    What would you use as a reference for the actual

8  result?

9  A    I would take the last number that was entered there

10 and adjust it slightly up or slightly down just to make

11 it different.

12 Q    Did you have any access to information produced by

13 the lab when you did that?

14 A    No.

15 Q    Did you know whether product had been tested?

16 A    No.

17 Q    Do you know if it had been tested, what the result

18 was?

19 A    No.

20 Q    Who taught you to do it that way?

21 A    Dana.

22 Q    Ms. Juul?

23 A    Yes.

24 Q    And Ma'am, did that process remain in place until

25 after Mr. Peacock left the business in November of 2011?

                    DEBORAH DARE - DIRECT

1    A    Yes.

2    Q    Is that how it's done now?

3    A    No.

4    Q    Do you have any role in preparation of certificates

5    of analysis at this time?

6    A    No.

7    Q    Do you still get copies of certificates of analysis

8    that go to your customers?

9    A    Yes.

10   Q    Ma'am, I pulled up a new document.  Does that

11   appear to be a certificate of analysis that went to one

12   of your customers?

13   A    Yes.

14   Q    And in the upper --

15        THE COURT:  Before we go off the previous

16   document, was that from a specific exhibit?  You said a

17   Bates number.

18        MS. GEHRIG:  I beg your pardon, Your Honor.  It

19   was from Exhibit 19.

20        THE COURT:  Thank you.

21   BY MS. GEHRIG:

22   Q    And Ma'am, also from Exhibit 19, 720095 Bate stamp

23   number, is that in front of you right now?

24   A    Yes.

25   Q    And Ma'am, is this an example of what certificates
                    DEBORAH DARE - DIRECT

1  of analysis now look like?

2  A    Yes, it is.

3  Q    Is there a different person's name in the upper

4  left-hand corner?

5  A    Yes.

6  Q    And who is that?

7  A    Mindy Walters.

8  Q    And again, Ma'am, you have no -- you get a copy,

9  but you don't participate in the preparation of these

10  documents?

11          MS. TURKE:  Objection.  Leading.

12          THE COURT:  I'll sustain it as cumulative.  And

13  you can ask your next question.

14          MS. GEHRIG:  Thank you.

15  BY MS. GEHRIG:

16  Q    Ma'am, have complaints from customers regarding

17  bacteria counts increased or decreased over time?

18  A    Decreased.

19  Q    Do you recall when the last complaint you received

20  regarding a bacteria count?

21  A    Summer of 2013.

22  Q    And how frequently did you get them, let's say,

23  back in 2011/2010?

24  A    Several times a year.

25          MS. GEHRIG:  Thank you, Ma'am.  That's all I
                    DEBORAH DARE - DIRECT

1   have for now.   (4:03 p.m.)

2                       CROSS-EXAMINATION

3   BY MS. TURKE:

4   Q    Good afternoon, Ms. Dare.   After Betco purchased

5   the Bio-Systems plant, you were supervised by Ms. Denise

6   Lennard; correct?

7   A    For a time period, yes.

8   Q    Okay.   And that was after the acquisition?

9   A    No, not immediately after.

10  Q    But some time after the acquisition you became

11  supervised by Ms. Lennard?

12  A    Yes.

13  Q    But immediately after the acquisition I think you

14  testified Ms. Juul remained your direct supervisor?

15  A    Yes.

16  Q    Mr. Malcolm Peacock did not directly supervise you;

17  correct?

18  A    No.

19  Q    And Mr. Peacock never checked your work, did he?

20  A    Not to my knowledge.

21  Q    And in fact, you don't know what Malcolm Peacock's

22  role was after Betco acquired Bio-Systems; isn't that

23  correct?

24  A    No.

25  Q    That's not correct?
                       DEBORAH DARE - CROSS

1  A   No.

2  Q   You have an understanding of what Mr. Peacock's

3  role was after the acquisition?

4  A   What I was told his role was and how he functioned.

5         THE COURT:  Were you directed -- who told you,

6  without telling me what they said, who told you what his

7  responsibilities were?

8         THE WITNESS:  Denise Lennard.

9         THE COURT:  All right.  Next question.

10 BY MS. TURKE:

11 Q   Mr. Peacock never told you not to communicate with

12 Ms. Lennard; correct?

13 A   No.

14 Q   He did not.

15 A   He did not.

16 Q   And in fact, you had open lines of communication

17 with Ms. Lennard; isn't that right?

18 A   Yes.

19 Q   And Mr. Peacock never told you not to communicate

20 with any other employee of Betco; isn't that correct?

21 A   Correct.

22 Q   Now, you talked about certificates of analysis and

23 I think you said about 50 percent of the products that

24 go out have a certificate of analysis; is that correct?

25 A   50 percent of my customers.
              DEBORAH DARE - CROSS

1   Q    And a customer requests a certificate of analysis;

2   correct?

3   A    Yes.

4   Q    And when you prepared certificates of analysis, you

5   knew that the lab information was stored on a server;

6   correct?

7   A    No, I did not.

8   Q    You did not know that.  Did you ever ask your

9   supervisor, Ms. Juul, if you could obtain the lab

10  information?

11  A    Yes.

12  Q    You did.  And what did Ms. Juul tell you?

13  A    That we did not have access to that.

14  Q    Now, when you have a customer complain to you about

15  a product, you go through a process to verify the

16  complaint; don't you?

17  A    Yes.

18  Q    And there are many factors that could affect why a

19  product is not testing up to specification; correct?

20  A    Yes.

21  Q    It could be that the product is stored at the

22  incorrect temperature; right?

23  A    Correct.

24  Q    Or the product is stored with a humidity level

25  that's too high or too low; right?

                    DEBORAH DARE - CROSS

1   A     For some products, yes.

2   Q     And it could be that the product is being dispensed

3   in an incorrect manner; correct?

4   A     Yes.

5   Q     There could be contamination after it's delivered

6   to the customer; correct?

7   A     Yes.

8   Q     And you'll agree with me that not every customer

9   complaint about a product proves to be accurate or true.

10  In other words, the product isn't always off spec;

11  correct?

12  A     Correct.

13  Q     And you're familiar with the spiral plater counting

14  that Betco -- excuse me -- that Bio-Systems used before

15  Betco bought it?

16  A     Yes.

17  Q     And you are aware that customers were informed and

18  the spiral counting method -- excuse me -- spiral

19  plating and ProtoCOL method were disclosed to customers;

20  correct?

21  A     Not to every customer.

22  Q     And were you aware that some customers would ask

23  about the method of plate counting that was done in

24  2009/2010?

25  A     Yes.

                    DEBORAH DARE - CROSS

1   Q    And in those cases did you freely share with them

2   what the method was that was used?

3   A    No, I did not.

4   Q    You did not?

5   A    No.

6        MS. TURKE:  May I approach, Your Honor?

7        THE COURT:  You certainly may.

8   BY MS. TURKE:

9   Q    Ms. Dare, could you please turn to page 51 of your

10  deposition.  Are you there?

11  A    Yes.

12  Q    Okay.  I'm going to read starting at line 7:

13       "Question:  Were you aware in 2009/2010 what the

14  procedure for standard plate count was at Bio-Systems?

15       "Answer:  It was -- it was my understanding that we

16  were using the spiral plater count.

17       "Question:  Did customers ever ask about how

18  Bio-Systems did a plate count in 2009/2010?

19       "Answer:  Yes.

20       "Question:  And did you freely share with the

21  customer how plate count was done?

22       "Answer:  Yes.  That we were using the spiral plate

23  counter; that it was an advanced method."

24       Did I read that correctly?

25  A    Yes, you did.

                    DEBORAH DARE - CROSS

1          MS. TURKE:  I have nothing further.  Thank you.

2          THE COURT:  Any redirect?

3          MS. GEHRIG:  No, Your Honor.

4          THE COURT:  You may step down, Ms. Dare.  Thank

5    you.  You may call your next witness.

6          (Witness excused at 4:09 p.m.)

7          MS. GEHRIG:  Mr. Gerson Artreche, Your Honor.

8          THE COURT:  Mr. Artreche, if you would just

9    stand before the court reporter here and be sworn.

10         **GERSON ARTRECHE, PLAINTIFF'S WITNESS, SWORN,**

11         THE COURT:  You may proceed.

12                    DIRECT EXAMINATION

13   BY MS. GEHRIG:

14   Q    Mr. Artreche, would you state your full name and

15   spell your last.

16   A    Gerson Artreche.  A-r-t-r-e-c-h-e.

17   Q    Sir, where do you currently reside?

18   A    Beloit, Wisconsin.

19   Q    And are you employed at Bio-Systems?

20   A    I am.

21   Q    What is your current position?

22   A    International sales manager.

23   Q    How long have you worked at the Beloit plant?

24   A    Approximately nine years.

25   Q    Did you work at Bio-Systems before it was acquired?
                    GERSON ARTRECHE - DIRECT

1   A    Yes.

2   Q    And what was your position immediately prior to the

3   acquisition?

4   A    Prior to the acquisition I was filing documents and

5   faxing.

6   Q    At some point did you become a team leader?

7   A    I did, yes, at some point.

8   Q    In approximately what time frame?

9   A    About 2008.

10  Q    Who taught you your job duties in that position?

11  A    Betty Salazar.

12  Q    Was she on her way out?  Did you replace her?

13  A    I did.

14  Q    And sir, who supervised you in your position of

15  team leader after Ms. Salazar left?

16  A    Malcolm Peacock.

17  Q    Sir, were you aware back when you started at

18  Bio-Systems that Bio-Systems had an ISO Manual?

19  A    I was not aware.

20  Q    Were you ever asked to review any portion of an ISO

21  Manual in reference to your own job duties?

22  A    No.

23  Q    At any time during your employment at Bio-Systems?

24  A    No.

25  Q    Sir, as team leader of international sales, do you

                    GERSON ARTRECHE - DIRECT

1  have access to product literature?

2  A     Yes.

3  Q     What does that include?

4  A     That includes product data sheets, MSDS and COAs.

5  Q     How was that stored?

6  A     It was stored on a shared drive.

7  Q     Has there been any significant changes to the

8  literature for your products since the departure of

9  Mr. Peacock --

10 A     Yes.

11 Q     -- prior -- okay.  And who did that?

12 A     Mr. Keith Kennedy.

13 Q     Was the literature in place when you took your

14 place as team leader of international sales?

15 A     Yes, Ma'am.

16 Q     And sir, did you make any significant changes to it

17 from the time that you took it over until Mr. Kennedy

18 revised it?

19 A     No, Ma'am.

20 Q     Sir, did Mr. Peacock either supervise you or

21 supervise your supervisor from the time you started at

22 Bio-Systems until he left the plant in 2011?

23 A     Yes.

24 Q     How did you become aware that Betco had purchased

25 Bio-Systems?

                    GERSON ARTRECHE - DIRECT

1 A    Mr. Malcolm Peacock came into the sales office and

2 announced it.

3 Q    What, if anything, did he tell you about changes --

4 any changes that would take place in your workplace as a

5 result of the acquisition?

6 A    He basically said business as usual.  No changes.

7 Q    Did you still consider him to be your boss?

8 A    Yes.

9 Q    I'd like to talk to you about your job duties from

10 October of 2010 until November of 2011.  If we could

11 pull up a sample from Exhibit 19, Bates number 718262.

12       Sir, during that time period were you responsible

13 for preparing certificates of analysis for your

14 products?

15 A    Yes.

16 Q    And when I say *your products*, products that went to

17 your customers.

18 A    Correct.

19 Q    Approximately how many would you prepare in a week?

20 A    One or two.

21 Q    What information would you fill out?  And again,

22 please feel free to refer to the document in front of

23 you.  What information would you fill out on the

24 certificate of analysis?

25 A    The lot number, order number, certificate date,

                    GERSON ARTRECHE – DIRECT

1   shipment date, and total count.

2   Q    And sir, where did you get information for the

3   total count?

4   A    From a previous certificate of analysis.

5   Q    Describe what you did.

6   A    I basically took the last product certificate of

7   analysis that went out to the customer and I would

8   change the date, the order number, shipment date, and

9   total count.

10  Q    And where did you get that number for total count?

11  A    From a previous certificate of analysis.

12  Q    Did you have any access to lab data for that

13  number?

14  A    I did not.

15  Q    Did you know whether that product had been tested?

16  A    I did not.

17  Q    Sir, is a UR block, is that an extruded solid

18  product?

19  A    It is.

20          MS. TURKE:  Objection.  Leading.

21          THE COURT:  I'll overrule it.  You can ask your

22  next question.

23          MS. GEHRIG:  Thank you.

24  BY MS. GEHRIG:

25  Q    Did you ever ask Mr. Peacock about this method of
                    GERSON ARTRECHE - DIRECT

1  certificate of analysis preparation?

2  A    I believe once I questioned it.

3  Q    And what did he say?

4  A    Oh, that's the way things are done.

5  Q    Sir, for what types of products -- when I say type

6  I'm talking about whether it's a solid, a liquid or a

7  powder -- for what type of product did you prepare a

8  certificate of analysis?

9  A    For all products that went out to the customer that

10 were either liquid, solid or powder product.

11 Q    And sir, were any of these products shipped to

12 foreign countries?

13 A    Yes.

14 Q    And were any of these products for the intended use

15 in wastewater treatment plants?

16 A    Yes.

17 Q    Sir, who taught you the method of certificate of

18 analysis preparation you've described?

19 A    Betty Salazar.

20 Q    Who supervised Ms. Salazar at the time she taught

21 you that process?

22 A    Mr. Malcolm Peacock.

23 Q    And sir, is that the way you do it today?

24 A    No.

25 Q    Sir, do you have responsibility for invoicing your

                    GERSON ARTRECHE - DIRECT

1  customers or making sure they get invoices?

2  A    At this particular moment?

3  Q    Back in 2010 to 2011, did you have responsibility

4  for generating invoices?

5  A    No.

6  Q    Did you get copies of invoices that went to your

7  customers?

8  A    Occasionally.

9  Q    Did you provide data that went into invoices?

10  A    No.

11  Q    Did you get copies of invoices?

12  A    Yes.

13  Q    And sir, how are invoices stored?

14  A    They are actually generated electronically and they

15  go out directly to the customer.  Are you speaking now?

16  Q    Sir -- I apologize.  I have not been clear.  Back

17  in 2010 and 2011, during the time period that

18  Mr. Malcolm Peacock was supervising you, how were

19  invoices stored?

20  A    On a shared drive.

21  Q    You had access to them?

22  A    To specifically commercial invoices, if that's what

23  you're referring to, Ma'am.

24  Q    And sir, did you, during that time period, have a

25  client named EMVI (sic)?

              GERSON ARTRECHE - DIRECT

1    A    Yes, from the Philippines.

2    Q    And sir, did you cause invoices to go to that

3    client in any particular way?

4    A    Yes.  Electronically.

5    Q    Sir, I'd like to draw your attention to a set of

6    invoices, and I guess this is reaching back to 2009.

7    Was this one of your customers in 2009?

8    A    Yes.

9    Q    And sir, looking at a document in front of you on

10   the screen, is this an invoice that went to your

11   customer in 2009?

12   A    Yes.

13   Q    And what is the total amount due on that invoice?

14   A    $22,080.

15   Q    And if you would switch to -- this is Exhibit 10,

16   Bio-Ohio 79983.  If you would switch to 379984.  Sir,

17   what is this?

18   A    This is a commercial invoice.

19   Q    And sir, were both of these invoices, the one you

20   just looked at and the one you're looking at now, for

21   the same product?

22   A    Yes.

23   Q    To the same customer?

24   A    Correct.

25   Q    Were they for the same amount?
                        GERSON ARTRECHE - DIRECT

1   A    No, Ma'am.

2   Q    What was -- why did you cause two different

3   invoices to go to this client?

4   A    One was the actual payable invoice and this one

5   here that we're looking at is for customs.

6   Q    Who taught you to do it that way?

7   A    Mr. Malcolm Peacock.

8   Q    And if we could turn to another example from

9   Exhibit 10, is this a 2010 invoice, sir, that you're

10  looking at now?

11  A    It is.

12  Q    And is that, looking at the document number in the

13  lower right-hand corner, 379985?

14  A    Yes.

15  Q    And sir, is that to the same customer?

16  A    Yes.  Environmental Ventures.

17  Q    And the invoice, is that the -- what amount is the

18  invoice for?

19  A    A payable $22,080.

20  Q    And if we could switch to 379986.  Sir, is that a

21  second invoice?

22  A    Commercial invoice.

23  Q    For the same product?

24  A    Correct.

25  Q    To the same customer?
                    GERSON ARTRECHE - DIRECT

1   A    Yes.

2   Q    And if we could go to another two documents from

3   Exhibit 10 starting with 379987.  Is that another

4   invoice to your customer?

5   A    Yes.

6   Q    And for what amount was that?

7   A    $22,080.

8   Q    And if we would switch to 379988, is this another

9   invoice for the same product?

10  A    Yes.

11  Q    And for what amount?

12  A    $6,000.

13  Q    Sir, did someone from Betco, did this last set of

14  invoices come to the attention from -- to someone from

15  Betco in 2011?

16  A    Yes, Ma'am.

17  Q    And did you have a discussion with Mr. Peacock

18  about the situation?

19  A    Absolutely.

20  Q    And would you describe your conversation with

21  Mr. Peacock.

22  A    Well, the conversation was about the different

23  amounts, one set at $22,080 and the one going into

24  customs at $6,000.

25  Q    And which one was the client paying?
                GERSON ARTRECHE - DIRECT

1    A    The client was paying $22,080 I believe it was.

2    Q    What did Mr. Peacock say to you about this process?

3    A    He said this is how we do business in the

4    Philippines.

5    Q    And sir, did you -- did Betco allow you to continue

6    to do business that way?

7    A    No, Ma'am.

8    Q    If we could turn to Exhibit 10, 2011, invoices, is

9    this for the same client number, 379989?

10   A    Yes, Ma'am.

11   Q    And for what amount is this invoice?

12   A    $22,972 -- I believe it says 90 cents.  My eyes are

13   failing me here.

14   Q    It's that time of day.  And the next document,

15   please?  Is this 379990, sir?

16   A    Yes.

17   Q    And is that a second invoice for the same amount as

18   the first?

19   A    Yes.

20   Q    Sir, prior to this invoice -- what is the date on

21   this invoice?

22   A    This invoice is December 21st, 2011.

23   Q    Prior to issuing this last set of invoices, were

24   all the invoices that you recall sending out for this

25   client prepared in the way of the 2009/2010 and earlier
                    GERSON ARTRECHE - DIRECT

1   2011 invoices?

2   A    That is correct.

3   Q    Sir, after sending out this invoice, did you get

4   any more orders from this client?

5   A    This was the last order.

6   Q    Sir, are you bilingual?

7   A    I am.

8   Q    In fact, are you trilingual?

9   A    I am.

10  Q    Does that facilitate your communication with some

11  clients in foreign countries?

12  A    Yes, Ma'am.

13  Q    Sir, after the sale of the business did you become

14  aware of an issue with a client Tan Chee Hong?

15  A    Yes, Ma'am.

16  Q    And where is Tan Chee Hong located?

17  A    He is located in Malaysia, Kuala Lumpur.

18  Q    How long has Mr. Hong been a client of Bio-Systems?

19  A    If my mind recollects, 14/15 years, maybe more.

20  Q    And sir, what was the problem?

21  A    We had sent a product, AQ 500 specifically.  It was

22  supposed to be at a 5-billion count and it was an actual

23  1.4, -5, -6, -7, I can't recall the exact.  It was just

24  a lower count.

25  Q    Okay.  And sir, when you say it was a lower count,
                GERSON ARTRECHE - DIRECT

1   do you mean it tested lower or that the product spec

2   sheet actually had it at a much lower count?

3   A    The actual product data sheet had it at a 5-billion

4   count.

5   Q    Okay.  But how did you find out that he was getting

6   a lower count product then?

7   A    It was a conversation I believe I had with

8   Ms. Denise Lennard.

9   Q    Okay.  And how did you deal with this situation?

10  A    I recall it vividly.  It was about 11 p.m.

11  Ms. Denise Lennard and myself, we called Tan Chee Hong

12  in Malaysia and we spoke to him about the actual problem

13  that we were having.

14  Q    And how did you resolve that problem with Mr. Hong?

15  A    We let him know that we would have to make his

16  product at spec and charge him more for the product than

17  what he was paying because we were losing money on

18  pricing.

19  Q    Was it your impression from your conversation with

20  him -- did he think that he had been getting the product

21  that he was paying for?

22           MS. TURKE:  Objection.  Hearsay.

23           THE COURT:  Sustained.

24  BY MS. GEHRIG:

25  Q    And sir, does he continue to be a client?
                GERSON ARTRECHE - DIRECT

1  A    Yes, he is.

2  Q    Okay.

3           MS. GEHRIG:  Thank you, sir.  That's all for

4  now.    (4:23 p.m.)

5           THE COURT:  Cross-examination.

6                   CROSS-EXAMINATION

7  BY MS. TURKE:

8  Q    Good afternoon.

9  A    Good afternoon.

10 Q    So you're a salesperson; right, Mr. Artreche?

11 A    I am.

12 Q    And you get paid on commission; right?

13 A    Part.

14 Q    In part?  So if customers buy products and pay for

15 them, then you earn a percentage of that?

16 A    That is correct.

17 Q    And so you don't make that portion of your salary

18 if you do not get the sale done; correct?

19 A    Correct.

20 Q    And you are doing very well as a salesperson with

21 Betco owning Bio-Systems; is that correct?

22 A    That is correct.

23 Q    In fact, your sales have increased 12 percent since

24 Betco took over?

25 A    Approximately, yes.
                   GERSON ARTRECHE - CROSS

1    Q     Now, with respect to your preparing certificates of

2    analysis, you never questioned Ms. Salazar about the

3    instructions she gave you?

4    A     I never did.

5    Q     And you can't recall any specifics about your

6    conversation.  I think you testified that you spoke to

7    Malcolm Peacock about certificates of analysis; is that

8    correct?

9    A     Specifics, what do you mean?

10   Q     Do you remember when you spoke with Mr. Peacock?

11   A     I don't have that information in front of me.  No,

12   Ma'am.

13   Q     You don't remember what he would have said or what

14   you would have said either; correct?

15   A     Oh, business as usual is what he would respond.

16   Q     And you know, Mr. Artreche, that sometimes testing

17   data can be wrong or a false positive can be shown;

18   correct?

19   A     Sure.  Yes.

20   Q     And you would agree with me that counting bugs is a

21   tricky business.

22   A     Yes.

23   Q     Just to confirm, the issue you spoke with with your

24   attorney dealing with the Philippines, you spoke with

25   Betco about that in July of 2011; is that correct?
                GERSON ARTRECHE - CROSS

1   A    I can't recall the exact date, but I did speak to

2   them after the acquisition.

3   Q    Okay.  But prior to the fall of 2011?

4   A    I can't recall.

5   Q    Now, this issue with Tan Chee, first of all Tan

6   Chee continues to be a customer; correct?

7   A    Yes.

8   Q    And they buy a lot of product?

9   A    They do.

10  Q    And in fact, they ended up buying the same or more

11  product even after this incident that you discussed;

12  correct?

13  A    Well, without looking at the books, that seems kind

14  of right.

15  Q    Seems right to you?

16  A    Yeah.

17  Q    And the product that was being sold at Tan Chee,

18  was that called Biota AQ 500?

19  A    Correct.

20  Q    Okay.  Now, to your knowledge nobody tested the

21  product that had been previously shipped to Tan Chee to

22  know whether or not it met spec; correct?

23  A    Correct.

24  Q    You have no idea whether it met spec.

25  A    I have no idea.
                    GERSON ARTRECHE - CROSS

1   Q    So you can't confirm or disprove the Tan Chee

2   customer complaint; correct?

3   A    I'm not understanding the question.

4   Q    You don't know -- well, I'm asking you, you don't

5   know, you don't have any personal knowledge as to

6   whether the product that was shipped to Tan Chee met

7   spec or not?

8   A    Correct.

9   Q    Okay.

10          MS. TURKE:  I have nothing further.  Thank you.

11          THE COURT:  Any redirect?  (4:26 p.m.)

12          MS. GEHRIG:  No.  Thank you, Judge.

13          THE COURT:  I just have to ask you because I

14   thought you said originally when you -- just before the

15   acquisition you were filing and faxing?

16          THE WITNESS:  Yes.  When I first was employed

17   at Bio-Systems.

18          THE COURT:  You came in originally --

19          THE WITNESS:  I came in originally, yes, in

20   2006, just to file.

21          THE COURT:  And worked your way up to the

22   process that you've just described.

23          THE WITNESS:  That is correct.

24          THE COURT:  All right.  I've got it now.  You

25   may step down.  Thank you.
                GERSON ARTRECHE - CROSS

1            THE WITNESS:  Thank you.

2        (Witness excused)

3            MS. GEHRIG:  Thank you.  Ms. Dana Juul, Your

4    Honor.

5            THE COURT:  Ms. Juul, if you would stand before

6    the court reporter to be sworn.

7        **DANA JUUL, PLAINTIFF'S WITNESS, SWORN,**

8            THE COURT:  You may proceed.

9                        DIRECT EXAMINATION

10   BY MS. GEHRIG:

11   Q    Ms. Juul, would you please state your full name and

12   spell your last.

13   A    Dana Juul.  J-u-u-l.

14   Q    Where do you currently reside?

15   A    Roscoe, Illinois.

16   Q    And where are you employed?

17   A    Bio-Systems.

18   Q    How long have you worked at Bio-Systems?

19   A    14 years.

20   Q    Was that your first full-time job?

21   A    Yes.

22   Q    What is your current position?

23   A    Sales manager for a private label and customer

24   service manager.

25   Q    Did you work at -- you worked at the business
                        DANA JUUL - DIRECT

1  before it was acquired?

2  A    Correct.  Yes.

3  Q    And sir -- or excuse me, Ma'am, what was your

4  position immediately prior to the acquisition?

5  A    I was team lead for our Team 3.

6  Q    Ma'am, who taught you your job duties?

7  A    There was a variety of office managers from when I

8  started through the years.

9  Q    Did you train any new -- excuse me.  Did

10  Mr. Peacock supervise the office managers?

11  A    Yes.

12  Q    Did you train any new employees or employees who

13  started after you did?

14  A    I did.  Deborah Dare and Sonja Capes.

15  Q    Ma'am, as team leader of the private label

16  products, did you have access to product literature?

17  A    I did.

18  Q    Does that include labels that appear on product

19  packaging?

20  A    Yes.

21  Q    Does it also include data sheets?

22  A    Yes.

23  Q    Was that literature in place for your products when

24  you started or did you develop it yourself?

25  A    The majority of it was all in place.
                    DANA JUUL - DIRECT

1   Q      And did you have access to those materials?

2   A      I did.

3   Q      How are they stored?

4   A      They were electronically on a shared drive.

5   Q      What did you call that drive before the

6   acquisition?

7   A      It was the F drive.

8   Q      Did that change after?

9   A      Yes.  It is now the T drive.

10   Q      Were they stored by customer or otherwise?

11   A      Primarily the data sheets that I would access are

12   by customer because of the private label, but they were

13   also stored by product.

14   Q      Did you regularly access these materials for your

15   customers?

16   A      Yes.

17   Q      Did you distribute them to your customers?

18   A      Yes.

19   Q      Were they modified as necessary to fit the needs of

20   new clients?

21   A      Yes.

22   Q      And was that modification -- were the modifications

23   under Mr. Peacock's review?

24   A      Yes.

25   Q      Ma'am, were there any significant changes to your

                    DANA JUUL - DIRECT

1  products literature between September of 2010 and a

2  review by Mr. Kennedy in 2013?

3  A    There was not.

4  Q    Ma'am, did Mr. Peacock either supervise you or

5  supervise your supervisors until he left the business?

6  A    Yes.

7  Q    Were you aware back in 2000 when you began that

8  Bio-Systems had an ISO Manual?

9  A    I was.

10  Q    Were you ever asked to review the ISO Manual in

11  reference to your own job duties?

12  A    No, I was not.

13  Q    Do you recall ever reviewing any portion of the ISO

14  Manual?

15  A    I reviewed one procedure for plate count so I could

16  communicate that to my customer, like the actual steps.

17  Q    Why did you do that?

18  A    I was requested from a customer how we perform that

19  task.

20  Q    Ma'am, how did you learn of the sale of Bio-Systems

21  to Betco?

22  A    Malcolm told Derek Loverich, Chrissy Stratton, and

23  myself.

24  Q    Did he tell you whether there would be any changes?

25  A    He specifically said there would be no changes.

                    DANA JUUL - DIRECT

1   Q    Did he continue to supervise you?

2   A    Yes.

3   Q    And Ma'am, did you believe he continued to have the

4   power to fire you if he chose?

5   A    Yes.

6   Q    Ma'am, did Mr. Peacock ever express anger or

7   frustration with Mr. Betz in your presence?

8   A    I don't recall specific incidents.

9   Q    Did Mr. Peacock say anything to you that caused you

10  to restrict communications with Betco or between Betco

11  personnel and others in the plant?

12  A    I was told that Denise Lennard in particular should

13  be directed to him; if calls were to come in, to

14  transfer those.

15  Q    So -- and just so that I understand, were these if

16  Ms. Lennard was requesting to speak to you or to other

17  people or what?

18  A    Both.

19  Q    Okay.  Did you ever overhear him complaining about

20  Mr. Loverich?

21  A    Yes.

22  Q    And what was he saying about Mr. Loverich?

23  A    That he was going direct to Betco and not going

24  through Malcolm.

25  Q    Ma'am, with regard to your job duties from October

                    DANA JUUL - DIRECT

1    of 2010 until Mr. Peacock quit working in the Beloit

2    plant in 2011, did you have responsibility for customer

3    contacts?

4    A    Yes.

5    Q    And directing your attention to what's been marked

6    as Exhibit 9, an email, did you communicate with your

7    clients by email?

8    A    Yes.

9    Q    And do you recognize the document that's in front

10   of you?

11   A    Yes.

12   Q    What is this an email of?

13   A    This is a concern that a Canadian distributor had

14   regarding the plate count of a liquid concentrate that

15   he purchased.

16   Q    And Ma'am, what's the date of this email?

17   A    June 15th, 2011.

18   Q    So was this in the time period after the

19   acquisition and before Mr. Peacock left?

20   A    Yes.

21   Q    Did you forward this client's concerns to

22   Mr. Peacock?

23   A    Yes.

24   Q    And for purposes of understanding Mr. Peacock's

25   response, what were the client's concerns?
                    DANA JUUL - DIRECT

1          MS. TURKE:  Objection.  Hearsay.

2          THE COURT:  I'll overrule it, but it won't be

3   accepted for the truth of the matter asserted.

4       And you may proceed.

5          THE WITNESS:  The product that he purchased was

6   stated at a 4,000 billion count and that would be

7   diluted to a ready-to-use product.  And when he had it

8   tested, it was in the millions as opposed to billions.

9   He also had competitive products tested and those all

10  tested out at spec, so he was concerned why this

11  particular formula didn't pass and the others did.

12  BY MS. GEHRIG:

13  Q    And did you forward that to Mr. Peacock?

14  A    I did.

15  Q    And what was his response?

16  A    That that's a typical problem that we have in

17  Canada.

18  Q    And for purposes of understanding your

19  interpretation of that, what, if anything, was

20  significant about Canada?

21  A    The testing method is what was explained to me by

22  Mr. Peacock; that they do a different plating method and

23  not all of the bacteria would show up on that, so it

24  gave a low count.

25  Q    Ma'am, were you responsible between October of 2010

                      DANA JUUL - DIRECT

1  and November of 2011 for preparing certificates of

2  analysis for your customers' products?

3  A     Yes.

4  Q     And drawing from Exhibit 19 Betco 75481, Ma'am,

5  does that document look like it would have gone to one

6  of your clients?

7  A     Yes.

8  Q     And the date on it is January 5th of 2011?

9  A     Correct.

10  Q     Okay.  Ma'am, can you tell me the process that you

11  used to generate this certificate of analysis?

12  A     We would go into the F drive, now T drive, pull up

13  the previous certificate which is basically functioning

14  as a template, change the lot number, order number,

15  certificate date, shipment date, the product code if

16  there was a different product, shipping information, and

17  then the actual results for the count.

18  Q     Ma'am, how did you get the actual test result to

19  plug into this document?

20  A     That was not an actual number, it was just varied

21  based off of the last certificate issued.

22  Q     Did you have any idea whether this product had been

23  tested?

24  A     I did not.

25  Q     Or if it had been tested what the result was?

                    DANA JUUL - DIRECT

1   A    No.

2   Q    Who instructed you to do it this way?

3   A    Malcolm Peacock.

4   Q    And can you approximate -- do you remember the

5   approximate time frame of when he instructed you to do

6   it that way?

7   A    2006/2007.

8   Q    And did -- when Mr. Peacock instructed you, did he

9   tell you why you were being -- you were doing it this

10  way instead of a different way?

11  A    It was to save time.

12  Q    Did you train anyone else to prepare certificates

13  of analysis that way?

14  A    I did.  Deborah Dare and Sonja Capes.

15  Q    Which of your customers got certificates of

16  analysis, Ma'am?

17  A    Anyone that requested it.

18  Q    And approximately how many certificates of analysis

19  did you prepare in this fashion, I guess per week,

20  during the time period of September 2010 to November of

21  2011?

22  A    Anywhere from three to six a week.

23  Q    Did you save each document that went out to a

24  client?

25  A    No.  The information was saved over each time.
                    DANA JUUL - DIRECT

1    Q    And Ma'am, did any -- this went to Canada looking

2    at the C of A.  Did any of your C of A clients, were

3    they overseas?

4    A    Yes.

5    Q    Do you have new procedures now?

6    A    Yes.

7    Q    Do you currently prepare your own certificates of

8    analysis?

9    A    I do not.

10   Q    Ma'am, were you assigned some responsibilities

11   associated or in relation to Betco immediately after the

12   acquisition?

13   A    Yes.  In addition to purchasing Bio-Systems, they

14   would also be buying product from us.  So it was under a

15   private label, so I was working with them as a customer.

16   Q    And who primarily did you communicate with at Betco

17   with regard to that?

18   A    At that time it was John Henson and Kurt Bischoff.

19         MS. GEHRIG:  And Your Honor, I have not been

20   asking to admit the specific portions of Exhibit 19 that

21   the clients -- that the --

22         THE COURT:  19 was admitted already through

23   Ms. Walters.  It was 10 and 9 you don't have admitted.

24         MS. GEHRIG:  I thought it was 16.  But 19 has

25   already been admitted through Ms. Walters?

                    DANA JUUL - DIRECT

1            THE COURT:  Yes.

2            MS. GEHRIG:  Then I move to admit the other

3  two.

4            THE COURT:  16 was also admitted through

5  Ms. Walters.  I'll admit 10 and 9.

6            MS. GEHRIG:  Thank you, Your Honor.

7            THE COURT:  Cross-examination.  (4:36 p.m.)

8                    CROSS-EXAMINATION

9  BY MS. TURKE:

10  Q    Hi, Ms. Juul.  While you worked at Bio-Systems

11  under Malcolm Peacock, you relied on Mr. Peacock to

12  answer all sorts of technical questions, didn't you?

13  A    Yes.

14  Q    He was very knowledgeable about the correct

15  application of products; right?

16  A    Yes.

17  Q    And you preferred to consult with Mr. Peacock over,

18  for example, Mr. Loverich with respect to those

19  application questions; correct?

20  A    That was just the channel that I had.

21  Q    But you thought that Mr. Peacock would give you a

22  better answer on those areas of application; correct?

23  A    Yes.

24  Q    He was more knowledgeable; correct?

25  A    That was -- he was my boss, so he was who I went
                    DANA JUUL - CROSS

1  to.

2       THE COURT:  The question is did you view him as

3  more knowledgeable?

4       THE WITNESS:  For applications, yes.

5  BY MS. TURKE:

6  Q    Now, in your experience you said you worked with --

7  you've been at Bio-Systems for what?  14 years?

8  A    Yes.

9  Q    Would you say it's a common occurrence that

10 customers have concerns about products?

11 A    Yes.

12 Q    And sometimes there's a fix by either giving the

13 client a different product; maybe it's an application

14 question.  Do you agree with that?

15 A    Yes.

16 Q    Sometimes you have to change the dosing that

17 they're using, the dosage of the product; right?

18 A    Correct.

19 Q    And it's not necessarily always a human error or a

20 low count; correct?

21 A    Not always; correct.

22 Q    So let's talk a minute about your certificate of

23 analysis preparation.  When you first started at

24 Bio-Systems, I believe you used a spreadsheet and looked

25 up a lot number to find the testing results; is that

                    DANA JUUL - CROSS

1   right?

2   A     Correct.

3   Q     I'm going to show you -- I'm going to show you what

4   has been marked as Exhibit 763.  Do you recognize this

5   document?  Just starting on the first page, it says

6   *Basics.*  It talks about Team 1 being international.

7   Team 2:  Bio-Systems and Enviro-zyme.  Team 3:  Private

8   label.

9   A     Vaguely, yes.

10  Q     Do you have an idea of what this is?  First of all,

11  do you think you prepared it?

12  A     No.

13  Q     Okay.  Let's talk about this open ACT database.  Do

14  you know what the ACT database is?

15  A     The ACT database was our contact database; stores

16  customer information and notes about calls and emails

17  that you received.

18  Q     Okay.  And was that a database that you used or

19  still use at Bio-Systems?

20  A     Do not, no.

21  Q     Was it a database you used when Mr. Peacock owned

22  the company?

23  A     Yes.

24  Q     And then it talks about a sign-on and password.

25  Did you have a sign-on and password to access that

                    DANA JUUL - CROSS

1    database?

2    A    Yes.

3    Q    Okay.  So the rest of the document -- and in fact

4    I'm going to --

5         MS. TURKE:  Your Honor, I'll approach to give

6    the witness a full copy.

7         THE COURT:  That's fine.

8    BY MS. TURKE:

9    Q    It might be easier if you look at the full

10   document.  If you would just briefly review and then

11   I'll ask you a couple questions.

12        THE COURT:  Again, this is Exhibit 736?

13        MS. TURKE:  763.

14        THE COURT:  763.  I apologize.

15   BY MS. TURKE:

16   Q    Have you had a chance to review it?

17   A    Um-hmm.

18   Q    Would you agree with me that the contents of

19   Exhibit 763 appear to be a series of instructions and/or

20   procedures that are used at Bio-Systems when Mr. Peacock

21   owned the company?

22   A    Yes.

23   Q    Okay.  I'd like to direct your attention to --

24   there's a tiny number that starts PLT on the bottom

25   right-hand side of the page.  Do you see that?

                    DANA JUUL - CROSS

1    A    Yes.

2    Q    I'd like to direct you to PLT 038573.  And I can

3    also put it up on the TV screen if you want to look at

4    it.  Do you want to compare that what I have on the

5    screen is what you're looking at now in your hand?

6    A    Yes.

7    Q    Okay.  So this appears to be notes about the CoA or

8    certificate of analysis?

9    A    Yes.

10   Q    Are you familiar with the instructions or list that

11   follows under certificate of analysis?

12   A    Yes.

13   Q    Okay.  And it says *usually done at invoicing*.  Does

14   that refer to when certificates of analysis are

15   typically done?

16   A    Yes, when they're generated.

17   Q    So they're prepared when the invoice is going to be

18   generated.

19   A    Correct.

20   Q    Okay.  And then it references a *G:LOTFP*.  Could you

21   tell me what that is or what that refers to?

22   A    That was a folder on -- looks like the G drive.

23   Q    Okay.  And was that a folder that you would have

24   access to when you worked at Bio-Systems under

25   Mr. Peacock's direction?

                    DANA JUUL - CROSS

1    A    I don't recall using the G drive, no.

2    Q    Do you know what the G drive is?

3    A    I'm not sure, no.

4    Q    Okay.  The next line says *Look up by lot number*.

5    Do you see that?

6    A    Um-hmm.

7    Q    Does that refer to the lot number of a product?

8    A    Right.  The lot number for the particular batch of

9    product.

10   Q    Okay.  And then the next line says *Need number to*

11   *the right on bottom either under 48-hour or 72-hour*.

12        Do you see that?

13   A    Yes.

14   Q    Would that refer to testing results that were done

15   by testing a product either for 48 hours or 72 hours?

16   A    It could.

17   Q    Okay.  And then the next line says *Take the first*

18   *two digits before the decimal and put a decimal between*

19   *them* and says that is or *i.e. 52.44 will be 5.2*.

20        Do you see that?

21   A    Yes.

22   Q    Is this consistent with instructions you received

23   at Bio-Systems about reporting or creating a certificate

24   of analysis?

25   A    This was the original instructions that I was

                    DANA JUUL - CROSS

1   given, yes.

2   Q    Okay.

3   A    When I first started.

4   Q    And then a little bit further down it says

5   *Companies that request CoA are Ecological Labs, MITCO,*

6   *Garrett Callahan and Nalco.*  Do you see that?

7   A    Yes.

8   Q    Would you agree with me that not every customer of

9   Bio-Systems requested a certificate of analysis?

10  A    Correct.

11  Q    Now, with respect to the certificates of analysis,

12  you'll agree with me that what Bio-Systems was doing was

13  guaranteeing that these products met a minimum bacterial

14  count; correct?

15  A    Yes.

16  Q    And so Bio-Systems' responsibility in selling the

17  product with the certificate of analysis was to deliver

18  a product that met that minimum bacteria count; correct?

19  A    Correct.

20  Q    And you would have had no problem explaining this

21  certification process to anyone who asked you; correct?

22  A    Correct.

23  Q    This was not a secret at Bio-Systems; correct?

24  A    That we sort of had the minimum count?

25  Q    Correct.

                    DANA JUUL - CROSS

1  A    No, it was not.

2  Q    And you don't have any recollection of any customer

3  product count complaints during the time frame January

4  29th to November 2011; right?

5           THE COURT:  I'm sorry, January 29th, 2000 --

6           MS. TURKE:  2009 through -- I'm sorry, did I

7  say this incorrectly?  I'll strike that.

8           THE COURT:  Try again.

9  BY MS. TURKE:

10  Q    You don't recall any customer product complaints in

11  this time frame, January 2009 through November 2011?

12  A    The count complaints, yes.

13  Q    You do recall customer complaints about count

14  during that time period?

15  A    The -- if I'm remembering the date that was just

16  up, that was 2011.

17  Q    January 2009 through November 2011.

18  A    Right.  I believe the email was in June of 2011 for

19  the concentrate, the Canada customer.

20  Q    Is that the only one you can remember?

21  A    A specific instance, yes.  But there were -- I'm

22  sure there were more.  It was a frequent occurrence.

23  Q    But sitting here today, you can't recall any other

24  specific incident you can tell us about; correct?

25  A    No, not with detail.
                    DANA JUUL - CROSS

1   Q    Now, if you received a customer complaint about a

2   product count, then the process of Bio-Systems under

3   Mr. Peacock was to retest the sample; correct?

4   A    Which sample?  I'm sorry.  The retained?

5   Q    Correct.  The retained sample.

6   A    I believe so, yes.

7   Q    And you recall an instance where Ecolo-Bio, one of

8   the customers, had a complaint about a product.  Do you

9   recall that?

10  A    Yes.

11  Q    And in fact, the retained sample was tested and it

12  showed that it was not a problem of Bio-Systems' count;

13  correct?

14  A    Right, with the spiral.

15  Q    And you can't recall any customer leaving

16  Bio-Systems due to a quality issue; correct?

17  A    No, I did not.

18  Q    Because that would have been something that you

19  would remember; right?

20  A    Yes.  I don't remember specific customers.

21  Q    Okay.  Do you recall any customers leaving as a

22  result of a quality issue?

23  A    None of -- none of mine.

24  Q    Do you recall any customers of Bio-Systems leaving?

25  A    Yes.  I'm sorry.  I take that back.  I was thinking

                    DANA JUUL - CROSS

1  of -- no, I do not.  I'm sorry.

2  Q    You'll agree with me that the products Bio-Systems

3  sold worked for the application that they were sold for;

4  correct?

5  A    Yes.

6  Q    And are you familiar with a sort of marketing sheet

7  that Bio-Systems would provide to its customers that

8  described the plating and testing methods they used?

9  A    Yes.

10 Q    I'm going to show you what is Defendants' Exhibit

11 854.  Do you recognize this document?

12 A    Yes.

13 Q    Is this that sort of marketing piece I just asked

14 you about?

15 A    Yes, it is.

16 Q    Was this a document that was provided to customers

17 upon request or when would a customer obtain this

18 document?

19 A    They would receive this if they had questions on

20 our procedure or if it was a new customer.  It was

21 information on what we did.

22 Q    And there's also a back side; correct?

23 A    Yes.

24        MS. TURKE:  I move for the admission of Exhibit

25 854, please.
                    DANA JUUL - CROSS

1          THE COURT:  Did you want to admit 763 as well?

2          MS. TURKE:  Yes, please.

3          THE COURT:  They are admitted.

4    BY MS. TURKE:

5    Q    Now, Ms. Juul, you're familiar with Bio-Systems'

6    ISO procedure for customer complaints; correct?

7    A    Yes.

8    Q    So when you talked earlier with your attorney, you

9    may not have seen some of the ISO procedures, but you

10   did see some others?

11   A    Yes.  I -- the corrective action that we did, I

12   guess I wasn't thinking of it as an ISO procedure.  But

13   yes, I was aware of that.

14   Q    And sometimes you did not follow the procedure for

15   customer complaints, is that accurate?

16   A    Yes.

17   Q    You got busy --

18   A    Yes.

19   Q    -- right?  And like some procedures, they just

20   didn't get followed; correct?

21   A    Not 100 percent of the time.

22   Q    Now, you had access and the ability to talk to

23   Betco employees after Betco acquired Bio-Systems; right?

24   A    Yes.

25   Q    And you did not fear being fired if you talked to

                    DANA JUUL - CROSS

1  Ms. Lennard rather than directing her to Mr. Peacock;

2  right?

3  A    I didn't think I would be immediately fired, no.

4  Q    Because you had worked with Mr. Peacock for quite

5  awhile; correct?

6  A    Yes.

7  Q    And you had a good working relationship with him;

8  right?

9  A    It was good, yes.

10 Q    And the only thing Mr. Peacock told you about

11 communications with Betco was that if Ms. Lennard

12 called, that it should go through Mr. Peacock; right?

13 A    Right.  Direct the calls to him.

14 Q    But you spoke freely with Mr. Kurt Bischoff;

15 correct?

16 A    Yes.

17 Q    And you spoke frequently with John Henson from

18 Betco?

19 A    Yes.

20        MS. TURKE:  I have nothing further.  Thank you.

21        THE COURT:  All right.  Redirect.

22        MS. GEHRIG:  Thank you, Your Honor. (4:52 p.m.)

23              REDIRECT EXAMINATION

24 BY MS. GEHRIG:

25 Q    Ma'am, have you known Mr. Peacock since childhood?
              DANA JUUL - REDIRECT

1   A    Yes.

2   Q    And you worked with him in a company that he

3   originally owned in the year 2000?

4   A    2001.

5   Q    2001.  And Ma'am, have you observed his management

6   style -- did you observe his management style over the

7   years?  Did you have significant contact with him from

8   the year 2000 to September 2010?

9   A    Yes.

10  Q    Did you see him fire other people?

11  A    Yes.

12  Q    Did you have any concerns about disagreeing with

13  Mr. Peacock in the workplace?

14  A    It was not encouraged.

15  Q    And did you observe other people lose their

16  positions because they disagreed with him?

17  A    I believe so, yes.

18  Q    Ma'am, you were shown a document that, I guess just

19  to summarize, purported to summarize procedures.  I

20  believe you described them as original procedures?

21  A    Yes.

22  Q    Could you tell me, number one, had you ever seen

23  the document that was actually shown to you today?  Do

24  you ever recall seeing that document?

25  A    I don't recall this specific document, no.

DANA JUUL - REDIRECT

1   Q    Do you have any idea where it came from, that

2   particular document?

3   A    I can only assume that Malcolm would have generated

4   it or Marilyn or someone.

5   Q    Now, Ma'am, I want to understand just to be clear

6   when these original instructions came out that you --

7   that were described in the sheet you looked at today?

8   A    The instructions for C of A in there I was

9   originally told when I first started back in 2001/2002

10  is when I started doing C of As.

11  Q    In 2001 and 2002 were you given one set of

12  instructions?

13  A    Yes.

14  Q    And what was that set of instructions?

15  A    That was to refer to that spreadsheet and the raw

16  materials were entered in for a mix and their count was

17  entered, and then the spreadsheet would generate the

18  count from 48 hours and you would refer to that, that

19  number, and use that for your C of A.

20  Q    Was that referred to -- what was that referred to?

21  A    That was a theoretical count.

22  Q    Okay.  So the original procedure that you recall,

23  the first one that you were taught was to go to a

24  spreadsheet?

25  A    Go to the spreadsheet and you would go down -- it
                    DANA JUUL - REDIRECT

1 was the second column down at the bottom was the 48-hour

2 theoretical, and you would pull that to insert it into

3 the certificate.

4 Q Okay.  And so your understanding of that procedure,

5 was that a final product test result or was it an

6 extrapolation?

7 A It was an extrapolation.

8 Q And when did -- and I believe you stated that

9 Mr. Peacock spoke to you after that initial procedure

10 was set?

11 A Yes.

12 Q And was that the conversation -- I don't want to be

13 repetitive.  Is that the conversation that you described

14 earlier in your testimony?

15 A Yes.

16 Q Okay.  And from that day forward, did you refer to

17 any form of test results?

18 A No.

19 Q And again, just to make sure that I'm understanding

20 clearly, approximately what time frame was that that the

21 change was made?

22 A 2006/2007.

23 Q And Ma'am, you stated that you did read portions of

24 the ISO Manual?

25 A Yes.

DANA JUUL - REDIRECT

1   Q      Did Malcolm Peacock direct you to do that?

2   A      No.

3   Q      Did anyone in a management position supervising you

4   ever direct you to any portion of the ISO Manual?

5   A      No.

6   Q      Were you referred to the ISO Manual in reference to

7   your C of A duties?

8   A      No.

9           MS. GEHRIG:  Thank you, Ma'am.

10          THE COURT:  Thank you.  You may step down then.

11  Plaintiffs may call their next witness.

12      (Witness excused)

13          MS. GEHRIG:  Thank you, Your Honor.  I will

14  tell the Court that this witness, I think, is going to

15  take longer than the previous three.  But we'll go as

16  long obviously as the Court wants to go.

17          THE COURT:  We've got plenty of time.

18          MS. GEHRIG:  Very good.  Thank you, Your Honor.

19  Mr. Kennedy.

20          THE COURT:  Again, if you would stand before

21  the court reporter to be sworn.

22      **KEITH KENNEDY, PLAINTIFF'S WITNESS, SWORN,**

23          THE COURT:  You may proceed.

24          MS. GEHRIG:  Thank you, Your Honor.

25
                    DANA JUUL - REDIRECT

<u>DIRECT EXAMINATION</u>

1

2  Q    Mr. Kennedy, would you please state your full name

3  and spell your last.

4  A    My name is Keith William Kennedy.   K-e-n-n-e-d-y.

5  Q    Where do you currently reside?

6  A    Spencer, Ohio.

7  Q    Is that near Akron?

8  A    Yes.

9  Q    And where are you employed?

10 A    Bio-Systems International.

11 Q    Sir, Bio-Systems is in Beloit, Wisconsin?

12 A    Correct.

13 Q    How do you allocate your time between home and

14 Beloit, Wisconsin?

15 A    I spend between two to three weeks per month here,

16 roughly one week in front of customers, and then the

17 balance of my time would be at home working from my home

18 office.

19 Q    And sir, what technically is your title or position

20 with Bio-Systems?

21 A    I'm the vice president and I have responsibility

22 for sales, marketing research, and operations.

23 Q    Would it be fair to call you a *de facto* general

24 manager?

25 A    Sure.

KEITH KENNEDY - DIRECT

1    Q    How long have you been with the company?

2    A    It will be three years in October.

3    Q    How were you initially introduced to the company?

4    A    Through a common acquaintance.  Someone that used

5    to work for Betco introduced me.

6    Q    What time period was that?

7    A    This would have been 2011, third quarter of 2011.

8    Q    Sir, what was your employment situation at the time

9    you were first introduced?

10   A    I was currently -- at that time I was employed by

11   Diversity, which was acquired by a company called Sealed

12   Air, and they were sorting through the acquisition

13   integration, sorting out who had a job and who didn't.

14   So at that time I declined to develop an idea of working

15   for Betco to wait to see what happened to the

16   integration.

17   Q    And sir, what brought you back to Betco?

18   A    They decided they didn't want to do wastewater and

19   so the team was let go and I called Betco back and said

20   let's talk.

21   Q    And sir, Betco has owned the company Bio-Systems

22   since you became introduced to them; is that right?

23   A    Correct.

24   Q    With whom did you interview in 2011, and I guess

25   again in 2012?
                        KEITH KENNEDY - DIRECT

1    A    Denise Lennard and Paul Betz.

2    Q    In connection with your interviews, did you

3    research the Beloit plant's history?

4    A    Yes.

5    Q    You were aware of the transfer of ownership?

6    A    Yes.

7    Q    And sir, were you aware kind of the circumstances,

8    that the previous owner remained an on-site manager --

9    A    Yes.

10   Q    -- for a period of time?  Had you ever met -- did

11   you ever meet Mr. Peacock in connection with these

12   contacts with Betco?

13   A    No.

14   Q    Did you also research exactly what type of products

15   were being manufactured in the Beloit plant?

16   A    I had a pretty good idea, yes, through their

17   website mostly.

18   Q    And what did you understand that they were doing

19   and producing in the Beloit plant?

20   A    Live culture bacteria for bioaugmentation or

21   biomediation and wastewater and some janitorial

22   applications.

23   Q    And sir, what did you understand the role that you

24   were interviewing for in Bio-Systems?

25   A    Well, in general to grow sales and profitability,

                    KEITH KENNEDY - DIRECT

1   you know, top line.  But it was also made clear that

2   there were some issues that they wanted me to sort

3   through.

4   Q    What is your understanding -- did you have a

5   general understanding of the issues before you accepted

6   the position?

7   A    I did.

8   Q    And what was your general understanding of the

9   issues?

10  A    Concerns about the viability of the wet-batch

11  process, and in general, the plant being able to produce

12  enough bacteria to meet the business requirements.  And

13  some concerns about the counting method, although that

14  didn't really gel up until after the fact.  It was very

15  clear upfront that there were concerns regarding plant

16  capacity and the wet-batch process that actually had

17  turned into a lawsuit.

18  Q    Sir, did you learn more soon after you started?

19  A    Sure.

20  Q    I'd like to -- what is your education?

21  A    I hold a bachelor's degree in metallurgical

22  engineering from the University of Pittsburgh 1982 and a

23  master's degree in material science engineering three

24  years later.

25  Q    And sir, just to facilitate your discussion of your

                    KEITH KENNEDY - DIRECT

1   professional experience, I'm going to refer you to a CV

2   that you prepared.  Sir, does this describe your

3   professional experience?

4   A    It does.

5   Q    And including your work most recently at

6   Bio-Systems?

7   A    Yes.

8   Q    And immediately prior to Bio-Systems what was your

9   area of expertise?

10  A    My career roughly split between -- 50/50 between

11  research and marketing or business management, and as

12  far as the industries, roughly split between cleaning

13  and sanitation and industrial and wastewater management

14  or municipal wastewater management.

15  Q    What in your -- the history of your employment,

16  your professional experience, suits you for the position

17  that you took at Bio-Systems?

18  A    The overarching umbrella is water management.

19  Water management as a discipline requires an in-depth

20  understanding of corrosion, deposit analysis, and

21  microbiological processes, whether they be beneficial or

22  detrimental.

23  Q    And sir, in your previous work experience had you

24  supervised microbiologists?

25  A    I have.
                    KEITH KENNEDY - DIRECT

1   Q     Have you supervised quality control lab personnel?

2   A     Not directly.   Indirectly.

3   Q     Do you understand the processes involved in testing

4   bacteria?

5   A     I do.

6   Q     And do you understand contamination?

7   A     Sure.

8   Q     How does that relate to wastewater treatment?

9   A     Well, the bacteria that are selected for

10  bioaugmentation or selected based on their ability to

11  produce certain enzymes, depending on the substrate that

12  you're going after, had relatively high rates, and those

13  target organisms are desired because they are better at

14  producing the enzymes we need for wastewater treatment.

15       Contaminant organisms may or may not produce those

16  enzymes at the same rate, so it's preferred to focus on

17  target organisms and to differentiate between

18  contamination and target.

19  Q     And sir, who had been functioning as the general

20  manager of Bio-Ohio or Bio-Systems before you accepted

21  the position?

22  A     John Yazek.

23  Q     And was your understanding that that was the person

24  who was hired in 2011 when you were unable to consider

25  the position?
                         KEITH KENNEDY - DIRECT

1   A     Correct.

2   Q     How did your qualifications set you apart from

3   Mr. Yazek?

4   A     Well, I don't know the gentleman personally, but my

5   understanding is that I've spent more time in an R&D

6   role studying functions, mechanisms, new product

7   development as opposed to sales.

8   Q     And sir, do you believe in a scientific method to

9   problem solve?

10   A     Yes, I do.

11   Q     Did you take that approach to your new position at

12   Bio-Ohio?

13   A     Yes, I have.

14   Q     Sir, immediately after you joined Bio-Systems, did

15   you become aware of an issue with certificates of

16   analysis?

17   A     I did.

18   Q     And what is your understanding of certificates of

19   analysis as they're -- as they were being used in the

20   Beloit plant?

21           MR. BIANCHI:  Objection.  Cumulative, Judge.

22   I'm not sure what --

23           THE COURT:  I'll overrule the objection.  You

24   may answer.

25           THE WITNESS:  Certificates of analysis are used
                    KEITH KENNEDY - DIRECT

1  to document the quality or the content of specific lots

2  for specific products to a specific customer.

3  BY MS. GEHRIG:

4  Q    And what was the problem?

5  A    They were not being generated based on data, they

6  were being generated based on whatever it was last time;

7  make it a little different this time.

8  Q    And what did you do to remedy the situation?

9  A    We transferred the function of CoA generation from

10  the sales office over to the quality control manager and

11  issued a policy where we required testing of every

12  finished product prior to shipment, including those that

13  were associated with certificates of analysis.

14  Q    And sir, do you -- are C of As, are they retained,

15  or are -- were you aware of a prior process where they

16  were saved over?

17  A    Yes.

18  Q    What's the process now?

19  A    Pull up the last one, adjust the information that's

20  been previously described, put in a new result, and

21  issue.

22  Q    And that was the old process?

23  A    Yes.

24  Q    Okay.  Now are they saved independent?

25  A    Oh, sure.  Yeah.  Now, yes, each lot is tested

                    KEITH KENNEDY - DIRECT

1   individually; a CoA is generated, and they're stored in

2   a file that Mindy Walters maintains, a database that she

3   maintains.

4   Q    Sir, did you become aware of a problem with

5   products not being tested?

6   A    Yes.

7   Q    And with untested products being shipped?

8   A    Yes.

9   Q    And what is your understanding of products that

10  were not being tested at the time that you came on

11  board?

12  A    That we were testing most of our powders, perhaps

13  all of our powders, sometimes before, sometimes after

14  the product was shipped.  That the liquid is not being

15  tested.  And that solids were not being tested.

16  Q    And sir, what is your understanding of how that

17  situation arose?

18  A    Well, you know, some of it is before my time.  I

19  think that there's been testimony here today that the

20  liquids were tested off --

21          THE COURT:  You don't need to repeat that.  You

22  should testify from your own knowledge.

23      And you can ask your next question.

24          MS. GEHRIG:  Thank you.

25  BY MS. GEHRIG:
                    KEITH KENNEDY - DIRECT

1   Q    Sir, did you become aware of an issue with product

2   literature?

3   A    Yes.

4   Q    And what was the issue?

5   A    That the product literature did not always

6   accurately reflect what was in the product or how the

7   product performed.

8   Q    What types of literature were being used at

9   Bio-Ohio when you began in October of 2012?

10   A    Product data sheets, product labels, and a few case

11   histories.

12          MS. GEHRIG:  I will ask that Exhibits 23, 24

13   and 25, which have been described by the sales

14   representatives who had access to those documents, be

15   admitted.

16          THE COURT:  I'll reserve on 23, 24 and 25 and

17   we can address it at a break.

18          MS. GEHRIG:  Thank you, Your Honor.

19   BY MS. GEHRIG:

20   Q    In October of 23, did you do anything to review the

21   documents that were stored at Bio-Systems?

22   A    October of?

23   Q    Did you review the documents?

24   A    Yes.

25   Q    And what time period?
                  KEITH KENNEDY - DIRECT

1    A    October of '13.

2    Q    2013?

3    A    2013.  Yes.

4    Q    Sorry.  It's that time of the day.

5    A    Summer of 2013, yes.  I'm sorry.

6    Q    Okay.  And sir, did you -- how many -- if we could

7    bring up Exhibit 13.  Sir, do you see a document in

8    front of you?

9    A    I do.

10   Q    Does this document assist you in summarizing the

11   work that you did?

12   A    It does.

13   Q    And does this front page of the document refresh

14   your memory as to how many data sheets you reviewed?

15   A    Yes.

16   Q    How many?

17   A    Approximately 1,654 data sheets, 4,800 labels.

18   Q    Okay.  And sir, what, if anything, did you find

19   regarding total plate count representations on data

20   sheets?

21   A    We found that 57 percent of the labels contain a

22   reference to total plate count.

23   Q    And sir, is that the data sheets or the labels?

24   A    I'm sorry, I misspoke.  It's the data sheets that

25   are 57 percent.  32 percent of the labels cited total

                    KEITH KENNEDY - DIRECT

1   plate count.

2   Q    And sir, did you personally or did you and your

3   staff go through and mark up all of these?

4   A    My staff and I printed them all off of the T drive

5   and reviewed them for various issues, including total

6   plate count.

7   Q    And sir, when you reviewed these records, did you

8   make a visible notation on the face of the document

9   showing what was wrong with the record?

10  A    We did.

11  Q    And sir, if we could go to Exhibit 23.  83248.  And

12  sir, do you see a document -- is that the first page?

13  Do you see a document in front of you?

14  A    Yes.

15  Q    And is this one of the documents that you and your

16  staff reviewed?

17  A    It is.

18  Q    Could you -- did you visibly indicate on here what

19  was wrong with this document?

20  A    It's highlighted plate count --

21          THE COURT:  If one of you could just remove

22  that arrow.  It's been sitting there forever.  Lower

23  left-hand corner.  Thank you.  I'm sorry, you can answer

24  the question of your counsel.

25          THE WITNESS:  Yes, the plate count of 5 billion
                    KEITH KENNEDY - DIRECT

1  per gram is highlighted in blue.

2  BY MS. GEHRIG:

3  Q    Okay.  And if we could go to 83394, also from

4  Exhibit 23.  I'm sorry.  You were paging through,

5  weren't you?  Okay.  On this document, could you -- this

6  is 83252.  Could you indicate what was wrong with this

7  document?

8  A    Plate count is listed as 3.5 billion per gram.

9           THE COURT:  And you know it's wrong because?

10          THE WITNESS:  Because the ProtoCOL counter

11  introduced a bias for essentially every product that we

12  ship.  So if the --

13          THE COURT:  No.  But you're saying based on

14  what you were told was the practice at the time, you're

15  assuming it wasn't accurate.

16          THE WITNESS:  Based on the work that I've done

17  subsequently, I believe that if it lists plate count,

18  that it's incorrect based on what I've learned about the

19  ProtoCOL counter.

20          THE COURT:  All right.  You can ask the next

21  question.

22          MS. GEHRIG:  Thank you, Your Honor.  And the

23  next sheet, did we skip one?  Have we looked at 83394?

24  After all that, I got the number wrong.

25  BY MS. GEHRIG:
                    KEITH KENNEDY - DIRECT

1   Q    Sir, in addition to plate count claims, what other

2   areas were you looking for on the data sheets?

3   A    Well, during the course of the review we also

4   picked up and eventually corrected a number of other

5   issues regarding, for example, claims that our product

6   control eliminated or reduced filamentous bacteria

7   and/or algae.  This was an issue because our EPA

8   regulations require a data set and a primary

9   registration to make such a claim.  So we noted those.

10  Q    And could you turn to 86051, please.

11       THE COURT:  It's unlikely I'm going to be

12  admitting 23, 24 and 25, so if you want to just go to

13  what his results were, that might be more effective.

14       MS. GEHRIG:  Excellent.  Thank you.

15       THE COURT:  I haven't heard an objection on

16  1006 grounds, so I'm assuming that they'll be admitted

17  on that basis.  If not, we can revisit the specific

18  examples.

19       MS. GEHRIG:  Thank you.

20  BY MS. GEHRIG:

21  Q    Go back to 13, please.  Okay.  So sir, the first

22  page of this, the literature review discusses the plate

23  count claims; is that correct?

24  A    Correct, yes.

25  Q    Could you turn to the second page, please.
                    KEITH KENNEDY - DIRECT

1        MR. BIANCHI:  Your Honor, I object to this

2   document.  It was coming.  I don't object to 3A, but

3   this one I believe runs in line with the argument that

4   we have that there's no cited documents showing how he

5   determined what he did.  This is --

6        THE COURT:  I'm with you now.  It appears that

7   my means of speeding things up may not succeed.  If you

8   want to lay a foundation as to what he did in 3B, well

9   then we'll have to address them individually.

10        MS. GEHRIG:  All right.  Thank you.

11   BY MS. GEHRIG:

12   Q    Sir, with regard to -- is this 3B?

13        THE COURT:  This is 3B.

14   Q    With regard to what you did to compile the data

15   contained in 3B, could you describe what you did?

16   A    Yes.  We reviewed the product data sheets to look

17   for misrepresentation in these buckets:  Plate count

18   claim, performance, strain identification, shelf life,

19   pathogen certification.  And when we found

20   discrepancies, we circled them and noted them.

21   Q    And sir, for each category does it state the number

22   that you identified with the issue?

23   A    It does.

24   Q    And a percentage of the total?

25   A    Yes.
                KEITH KENNEDY - DIRECT

1  Q     For the 1,157 data sheets that you reviewed?

2  A     Yes.

3  Q     And all of those documents were compiled with the

4  circled information identified on sheets which were

5  provided and which are included in Exhibit No. 23?

6  A     Correct.

7          THE COURT:  What does the 70 percent represent?

8  Is that the cumulative --

9          THE WITNESS:  70 percent is the percent of data

10  sheets that required revision of some sort.

11         THE COURT:  And there's no double counting

12  between those percentages?

13         THE WITNESS:  We tried our best.  It's a big

14  pile.  We actually alphabetize them to ensure that that

15  was avoided.

16         THE COURT:  All right.  And I understand

17  obviously what plate count claims are.  What's

18  inaccurate performance claims?  I think you've already

19  described those as well generally.  So how did you

20  determine that they were inaccurate?  Let's take

21  hydrogen sulfide.

22         THE WITNESS:  Hydrogen sulfide.  Okay.  That's

23  basically largely based on my personal experience in the

24  field.  Hydrogen sulfide can be reduced by the chemistry

25  that's in Bio-Systems' products.  It's a question of

                    KEITH KENNEDY - DIRECT

1   degree however.  The amounts of the particular raw

2   materials were so minute compared to the amount of water

3   being treated, I didn't consider it to be an accurate

4   representation of product performance.

5           THE COURT:  And that's the same with respect to

6   these other statements under inaccurate performance

7   claims?

8           THE WITNESS:  The filamentous algae control,

9   pathogen control are examples of EPA label violations.

10  Cold weather --

11          THE COURT:  EPA label violations in the sense

12  that the EPA won't let you make that claim or that it

13  overstates it?

14          THE WITNESS:  That you're not permitted to make

15  the claim.

16          THE COURT:  All right.  And the cold weather.

17          THE WITNESS:  The inference on the data sheet

18  was that they were quote/unquote cold weather bugs in

19  the product, and in fact, the formulas were identical to

20  summer or warm weather bugs.

21          THE COURT:  And pathogen control?

22          THE WITNESS:  Pathogen control is another

23  reference to EPA violation.  If you have a product

24  that --

25          THE COURT:  All right.  I missed something
                 KEITH KENNEDY - DIRECT

1  then.  I thought it was filamentous control?  That's

2  not --

3          THE WITNESS:  That's another example.

4          THE COURT:  That's EPA?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  And agent control, EPA or not?  I

7  thought you mentioned two.  It sounds like you're saying

8  three now.

9          THE WITNESS:  There are three.  I forgot about

10  path -- filamentous bacteria, algae control, and

11  pathogen control.

12          THE COURT:  In your opinion overstate or

13  conflict with EPA restrictions.

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  All right.  I'm with you.

16  Incorrect strain ID?

17          THE WITNESS:  If the label says there are 14

18  strains and there are 4, if the product data sheet says

19  that there are Pseudomonad strains that are not viable

20  or even in the product to begin with, that would be

21  another example.

22          THE COURT:  And you made that determination

23  yourself.

24          THE WITNESS:  Yes.  We valued -- I pull it up

25  and --

                    KEITH KENNEDY - DIRECT

1           THE COURT:  When you say *we*, that sounds like
2     others were involved in the process.
3           THE WITNESS:  Yes.
4           THE COURT:  So on what basis were they
5     instructed to count or not count?
6           THE WITNESS:  The team that was working for me
7     primarily was looking for the hydrogen sulfide and plate
8     count claims.  Whenever they had concerns about the
9     other issues, they kicked back to me and I reviewed the
10    formula.
11          THE COURT:  So in the case of incorrect strain
12    ID, you would have looked at each of these?
13          THE WITNESS:  Yes.
14          THE COURT:  And you were able to determine that
15    they were incorrect how?
16          THE WITNESS:  By comparing the product data
17    sheet to the formula; to the mix sheet, to the recipe.
18          THE COURT:  Shelf-life claims, is that
19    something you did personally as well?
20          THE WITNESS:  The issue there was that
21    shelf-life claims for a product that just contained
22    vegetative cells, the Pseudomonads would be seriously
23    overstated.  I believe that the shelf-life claims are
24    correct regarding the Bacillus spores, but not for
25    vegetative.
                    KEITH KENNEDY - DIRECT

1          THE COURT:  So you instructed someone to find

2    every place where there was a vegetative claim.

3          THE WITNESS:  Correct.

4          THE COURT:  Incorrect pathogen certification.

5    Is that the EPA issue or is that something --

6          THE WITNESS:  No, sir.  The pathogens that we

7    test for are salmonella and shigella.  We had a number

8    of data sheets that referenced e-coli certification,

9    which was not being done.  Those are all examples of

10   pathogens.

11         THE COURT:  Any more questions with regard to

12   this document?

13         MS. GEHRIG:  No, Your Honor.  I move for its

14   admission.

15         THE COURT:  I will reserve on its admission

16   until the defendant has an opportunity to cross-examine.

17   You should proceed.

18         MS. GEHRIG:  Thank you.  Next page, please.

19         THE COURT:  I will admit 3A, however.

20   BY MS. GEHRIG:

21   Q    Sir, with regard to page three of the literature

22   review, could you describe what you were looking at

23   that's summarized on this document?

24   A    It's a similar process to what I just described for

25   data sheets, only now we're looking at the product

                   KEITH KENNEDY - DIRECT

1  labels, the labels that's affixed to the package on

2  shipping.

3  Q    And sir, you looked at 47 -- you and your staff

4  looked at 4,793 product labels?

5  A    Correct.

6  Q    And based on your review of those labels, you

7  filled in the data in this sheet?

8  A    Correct.

9  Q    With regard to plate count claims, is that a

10 similar type of analysis that you've just described for

11 the Court?

12 A    It is.

13 Q    And your result in that was?

14 A    About 32 percent of our labels had plate count

15 claims.

16 Q    And again, sir, with regard to the next category,

17 performance claims that are inaccurate or violate

18 regulatory requirements, is that the same type of

19 analysis you just described for the Court?

20 A    It is.

21 Q    Same process is followed?

22 A    Same criteria, yes.

23 Q    And sir, you found 19.8 percent deviation?

24 A    Correct.

25 Q    Incorrect strain identification.  Is that the same

                    KEITH KENNEDY – DIRECT

1   process you just identified for the Court?

2   A    It is.

3   Q    And what percentage of total was a problem?

4   A    3.2.

5   Q    Sir, what's the green-aware logo?

6   A    Green-aware logo, as I understand it, is a

7   self-certification process that was created by

8   Bio-Systems in -- as an answer to or as a similar

9   certification for green seal or the environmental

10  businesses answer to Good Housekeeping seal of approval.

11  There's a set of criteria that can be used to determine

12  if something is green or not, and this green-aware logo

13  was the Bio-Systems' answer to those other programs.

14  Q    Are you aware of any independent review outside of

15  Bio-Systems that made them eligible to certify that they

16  were green aware?

17  A    I am not.

18  Q    And why is that inappropriate?

19  A    Without the certification, it doesn't really mean a

20  whole lot.

21  Q    Did you think that that was any form of a

22  misrepresentation?

23  A    I did.  Without understanding what was behind it or

24  whatever kind of testing would have supported the claim,

25  we felt it best to remove it.

                    KEITH KENNEDY - DIRECT

1  Q    And that was what percentage?

2  A    8.7.

3        MS. GEHRIG:  And Your Honor, again I'll move to

4  admit.

5        THE COURT:  And I will reserve on the same

6  basis.  You may proceed.

7        MS. GEHRIG:  Thank you.

8  BY MS. GEHRIG:

9  Q    Sir, did you become aware of production issues?

10  A    Yes.

11  Q    And what was the concern?

12  A    Concern was that the wet-batch process was not

13  fundamentally viable; that it wasn't able to increase

14  plate count while the material was drying on the racks.

15  Q    And sir, was there a particular specification,

16  bacteria count specification that you were focused on?

17  A    A wide variety of our products shipped at 5 billion

18  CFU per gram specification and so the concern is if the

19  wet-batch process isn't higher than that, you can't use

20  it as a raw material to dilute back down to 5 billion.

21  Q    And sir, what was the total amount of production

22  affected by this concern?

23  A    All of our powders, which I estimated about 70

24  percent of the business.

25  Q    And sir, have you seen what's been marked and
                    KEITH KENNEDY - DIRECT

1  admitted as Exhibit 4?

2  A    I have.

3  Q    And were you aware of the concerns that are voiced

4  in this email?

5  A    I was.

6  Q    Exhibit 6.  Sir, were you aware of attempts to make

7  the wet-batch product work in the Beloit plant --

8  A    Yes.

9  Q    -- subsequent to the acquisition and subsequent to

10 Mr. Peacock's departure?

11 A    Yes.

12 Q    And who participated in those efforts?

13 A    Well, looks like Neil Seeger and Derek Loverich

14 were on point for that.

15 Q    Okay.  And sir, when you came on board, what was

16 the status of their attempts to make the wet-batch

17 process work in the Beloit plant?

18 A    Unsuccessful.

19 Q    Sir, in September and October of 2013, did you

20 attempt to gather your own data to determine whether the

21 wet-batch process could possibly work in the Beloit

22 plant?

23 A    I did.

24 Q    What did you pull your data from?

25 A    We generated a series of experiments using the same

KEITH KENNEDY - DIRECT

1    exact process that the plant used for production.  So we

2    made a typical production and we reserved one of the

3    trays for R&D sampling.  We would sell the other trays

4    as it became available, but we set one aside to just

5    test total plate count as a function of time so that we

6    could accurately duplicate what the plant was doing.

7    Q    Did you have Ms. Walters test that product?

8    A    I did.

9    Q    Did she test it in one stage or multiple stages?

10   A    She tested periodically over the course of the four

11   weeks.

12   Q    And sir, are you familiar with the Exhibit -- it's

13   -- we've designated it 12, but it appears to be 2A on

14   this screen in front of you.

15   A    I am.

16   Q    And sir, what did you do to formulate or to create

17   the data that's graphed on this picture?

18   A    Okay.  All of these samples were taken from one of

19   the trays, the cardboard trays with the powder on it.

20   And we tested total plate count periodically over four

21   months to see how that sample, how that tray, how that

22   intermediate product behaved over time.

23   Q    Sir, I can't pronounce the names of these bacteria.

24   What is this bacteria?

25   A    This is Bacillus licheniformis.
                 KEITH KENNEDY - DIRECT

1  Q    Thank you, sir.  Why did you -- was this the

2  bacteria that you tested in this?

3  A    It's one of two, and we selected it because it's a

4  high volume Bacillus strain for us.

5  Q    Sir, what does this summary of data show?

6  A    Shows me that after the fermentate is mixed with

7  the substrate, the grains or the media, there is an

8  increase in total plate count.  It does not resolve

9  between contaminants and target, but it does show an

10 increase and that that increase then subsequently

11 returns back to baseline after seven to ten days.

12 Q    And sir, the process -- is the process still in a

13 wet form or is it in a dry form at the time that we see

14 the peak?

15 A    It's going to be some place in the middle.  I would

16 expect there would still be some moisture in there.  The

17 incubation process requires a slow drying, so the room

18 is warm, it's humidified and so it doesn't dry quickly.

19 My guess is that there's still some moisture in the

20 sample at that peak.

21 Q    And so, sir, how much time is required to get the

22 product from where it's tested at that intermediate

23 stage to when it's ready for production?

24 A    It can be used in production pretty much any time

25 after it gets close to being dry seven to ten days.

                    KEITH KENNEDY - DIRECT

1    Q    Does your graph illustrate where the product would

2    be and its testing result in seven to ten days after the

3    peak?

4    A    It's going to be pretty close to back down to

5    baseline.  It's going to be after the peak.

6    Q    And --

7          THE COURT:  How many different results does

8    this graph represent?  Is this just one sample?

9          THE WITNESS:  This is one experimental batch

10   sample.  Frequently each dot is a different sample on a

11   different date.

12         THE COURT:  How many of these did you run?

13         THE WITNESS:  We ran them on two different

14   strains.

15         THE COURT:  So twice.

16         THE WITNESS:  Correct.

17   BY MS. GEHRIG:

18   Q    And sir, what is depicted on page two?

19   A    This is the same data as presented on page one, but

20   I've summarized performance by week to simply

21   demonstrate mostly the value of this presentation is to

22   compare the 136 to the 214.  So the fermentate plus the

23   grain or media or substrate at the start gives kind of

24   136 million CFU per gram.  And after the process was

25   mature at week four, it only went up to 214.  What we

                    KEITH KENNEDY - DIRECT

1    were looking for would be over 5,000.

2    Q    So sir, at its highest peak did this product meet

3    spec at the 5-billion count?

4    A    If you can back up one slide, please.  The peak was

5    just a little bit under 5 billion on the single data

6    point in order to do the weekly averages that comes back

7    down.  But that shows the highest that we got was almost

8    5 billion.  You could call it 5 billion for all intents

9    and purposes.

10   Q    And sir, you said you performed this same

11   experiment for a second strain?

12   A    Correct.  Bacillus subtilis.  Same experiment, same

13   environment, same conditions, just a different strain.

14   Q    And sir, why did you pick this second strain?

15   A    Also a large volume strain for our product line.

16   Q    And sir, can you describe the results of the study

17   depicted visually on the graph?

18   A    It's very similar to the licheniformis.  There was

19   an initial plate count and then it increased.  After

20   about a week, it started to decrease and by the end of

21   say 10, 11 days, it was back to where we started.

22   Q    And sir, if we're talking again about the 5-billion

23   count, did this experiment get close to the 5-billion

24   count?

25   A    This one peaked at three.  Just a hair under 3.0

                    KEITH KENNEDY - DIRECT

1    times 10 to the 9th would be just slightly shy of 3

2    billion.

3    Q    And the last page, please.  And sir, what is

4    summarized on Exhibit 2B?

5    A    Again, just a distillation of the previous graph

6    showing -- the table is actually more interesting

7    because it shows that we started at 40 million, we ended

8    up at 250 million, 254 million, whereas we were aiming

9    at 5,000 or higher.

10   Q    Thank you, sir.

11            MS. GEHRIG:  I'll move to admit Exhibit 12.

12            MR. BIANCHI:  Same objection.

13            THE COURT:  I will reserve on the same basis.

14   BY MS. GEHRIG:

15   Q    Sir, what is the ProtoCOL counter?

16   A    ProtoCOL counter is an electronic device that's

17   used to measure colony-forming units on an agar plate.

18   Q    You were familiar with bacteria counting prior to

19   Bio-Systems?

20   A    Correct.

21   Q    Had you ever previously worked with a ProtoCOL

22   counter?

23   A    No.

24   Q    What was your understanding of the ProtoCOL

25   counter's intended use?

                    KEITH KENNEDY - DIRECT

1    A    ProtoCOL counter is an example of a wide range of

2    devices that are used to do plate count quickly and

3    automatically to save the operator time or to improve

4    consistency from operator to operator or lab to lab,

5    batch to batch.  Mostly they're time-saving devices and

6    they're also -- some of these devices give you an answer

7    more rapidly than 24 hours.

8    Q    And sir, what is your understanding of the industry

9    standard for counting bacteria?

10   A    All of these methods are compared to the manual

11   count plate method.  The marketing literature for these

12   different devices always use manual plate count as kind

13   of the gold standard.  So my new device works with these

14   different advantages, plus it correlates this way with

15   manual plate count.

16   Q    Sir, were you alerted to any concerns about the

17   ProtoCOL counter when you began at Bio-Systems?

18   A    I was.

19   Q    And again, referring back to the email from

20   Mr. Seeger?

21   A    Yes.

22   Q    And sir, relating back to your concerns about

23   testing results generated at the Beloit plant, did you

24   have concerns that even when the product was tested, if

25   the ProtoCOL counter isn't functioning, was there an

                    KEITH KENNEDY - DIRECT

1    integrity problem?

2    A    Yes.  I had concerns.

3    Q    Did you collect any data on your own to determine

4    whether the ProtoCOL counts being conducted on the

5    machine in the Beloit plant were similar or dissimilar

6    to manual counts?

7    A    I did.

8    Q    Sir, how did you collect the data?

9    A    I worked with Mindy Walters and her team to collect

10   and analyze a series of 275 finished product samples --

11   excuse me -- 275 total that included some fermentate and

12   intermediate product.  So where it says liquid powder

13   sold, those are our finished products.

14        So 275 duplicates.  And what we were doing in each

15   case was using the ProtoCOL counter with our standard,

16   the test that we've always been running, side by side

17   with the manual plate count method.

18   Q    And sir, did you test -- did you test one type of

19   material or did you test several types of material?

20   A    We tested -- the forms are on the left:

21   Fermentate, intermediate product, liquid powder, and

22   solid.

23   Q    Sir, is a fermentate a single strain or multiple

24   strains?

25   A    Single strain.
                    KEITH KENNEDY - DIRECT

1   Q    And how did the fermentate test out on the ProtoCOL

2   counter?

3   A    We got an agreement of 1.126.  And what that is is

4   the ratio of the plate count as determined by a manual

5   divided by the ratio as determined by the ProtoCOL

6   counter.

7   Q    Is that within an acceptable range?

8   A    It's basically a 12.6 variance.  I consider that

9   acceptable, yeah.

10  Q    Sir, the IP wet-batch powder, is that single strain

11  or multiple strain?

12  A    Single strain.

13  Q    And how did that do?

14  A    7.2 percent variance.  The two methods agreed

15  within 7.2 percent.

16  Q    And sir, your liquid, solid, and powder products

17  that you tested, were those single or multiple strain?

18  A    Multiple strain.

19  Q    And how did the liquids perform?

20  A    The liquid ratio between manual and ProtoCOL showed

21  a .159.  And what that means is that the manual --

22  excuse me.  If the ProtoCOL counter said it was 100, the

23  manual said it was 15.9.  So that's the ratio we're

24  looking at.

25  Q    Okay.  And with the powders?
                KEITH KENNEDY - DIRECT

1  A     Powders is a ratio of .334.  So if the ProtoCOL

2  counts out 100, then the manual would have reported

3  33.4.

4  Q     And finally with the solids.

5  A     Same ratio.  This time it's 8.3 out of 100.

6  Q     And sir, relating back to the literature that you

7  reviewed, did this -- is this the basis upon examination

8  by the Court of your concern with the plate count

9  claims?

10  A     It is.

11  Q     Was it your understanding that the ProtoCOL counter

12  had been used to -- for testing in the Beloit lab at the

13  time that that literature was being distributed?

14  A     Yes.

15  Q     So sir, even if all of the products had been tested

16  at the time that they were manufactured and met spec on

17  the ProtoCOL counter, based on this analysis do you

18  believe that Bio-Systems had been selling what they

19  purported to be selling?

20  A     I believe that this bias applied to every powder

21  that we -- every product that we sold.

22  Q     And sir, did you try to take a snapshot in terms of

23  what that meant for the whole amount of bacteria that

24  Bio-Systems had been purporting to sell in a single

25  year?

                    KEITH KENNEDY - DIRECT

1   A    I did.

2   Q    And what year did you select?

3   A    2012.

4   Q    And sir, could you describe the analysis?

5   A    What we did was we looked at the -- we generated a

6   list of all 4,011 shipments that we made in 2012.  We

7   had the product, we had the pounds shipped, and the

8   targets plate count based on the specification either

9   published or nonpublished.

10       We then applied the bias product-by-product,

11  form-by-form, and determined how many bacteria our

12  specification, internal or external, would require us to

13  have shipped.  Then applied the bias to determine how

14  many bugs on average we actually shipped.

15  Q    And sir, did you -- how does the term *the gap*, how

16  is that significant --

17  A    The gap --

18  Q    -- to this analysis?

19  A    -- is the difference between what we said we were

20  shipping and what we actually shipped.

21  Q    And what did you determine the gap in terms of

22  bacteria content or --

23  A    That's the green/blue line.  The required shipment

24  in 2012 was called 2300 quadrillion colony-forming units

25  for that year whereas we actually shipped 640 using that

KEITH KENNEDY - DIRECT

1    same metric.

2    Q    And so the gap would be?

3    A    1,647.  On a ratio basis it would be 641 over

4    2,288.

5    Q    Sir, what did you do with that data to determine a

6    financial impact?

7    A    Right.  So that difference could be made up either

8    with capital improvement or with expense by buying

9    bacteria from the outside lab.  If we -- this analysis

10   on 4C applies our purchase by price times the amount of

11   bacteria that we needed to purchase to cover that gap

12   between what we actually shipped and what we said we

13   were shipping and that number came out at about $1.1

14   million using 2012 as a baseline.

15   Q    And again, sir, this is assuming that all tested

16   products made spec?

17   A    Correct.

18   Q    All products were tested and all products which

19   were tested --

20   A    Exactly met spec, right.

21   Q    -- made spec.  Okay.  Sir, you have already

22   testified about some of your observations with regard to

23   the -- or some tests that you did with the ProtoCOL

24   counter.  Did you observe independently a second -- did

25   you collect a second set of information regarding the

                     KEITH KENNEDY - DIRECT

1   ProtoCOL counter?

2   A    I did.

3   Q    And when did you do that?

4   A    In May of 2015.

5   Q    And sir, could you describe what you did?

6   A    Yeah.  I took a sample from our incubator, placed

7   it on the counter, rotated it a series of times, and got

8   different numbers.

9   Q    And sir, did you take pictures of that analysis?

10   A    I did.

11   Q    And sir, could you describe what you did that is --

12   is this depicted on Exhibit -- proposed Exhibit 18?

13   A    Yeah.  This is just showing the screen printout.

14   So you place the agar plate in front of a video camera,

15   which takes an image.  That image is analyzed by the

16   ProtoCOL counter and it produces a number, in this case

17   1.52 times 10 to the 9th.

18   Q    And what was the next step in your process?

19   A    I twisted the agar plate.  It sits horizontally.  I

20   twisted it about 20 degrees, just, you know, from twelve

21   o'clock to one o'clock, and hit the space bar again to

22   get another number from the same sample.

23   Q    And will that show up on our next screen?

24   A    Yes.  And that time it was 3.73 times 10 to the

25   9th, so roughly twice as high.
                    KEITH KENNEDY - DIRECT

1    Q    And twisting it again?

2    A    I continued that all the way around the compass,

3    all the way around the clock for a total of 18 times

4    just to see what I could get, how wide was the range.  I

5    had heard it was a big range, I just wanted to see, and

6    in fact, it was a range of 13.7 from the smallest number

7    reported by the ProtoCOL counter to the highest number

8    reported, had a range of 13.7.  Specifically, the lowest

9    was 1.2 billion and the highest was 17 billion.

10   Q    Sir, did you perceive this to be a problem?

11   A    Absolutely.  You know, as the guy managing the

12   business, it almost -- it tells me that this is

13   essentially a meaningless tool.  Statistically we showed

14   the averages across a wide number of samples, but

15   day-to-day, I can't tell if I'm going, you know, 12

16   miles an hour or 170 miles an hour.  It's that wide of a

17   range.  It's not a viable tool.

18   Q    Sir, did you also take a look at the literature

19   relating to the ProtoCOL counter which had been

20   distributed at Bio-Systems while the company was owned

21   or managed by Mr. Peacock?

22   A    I did.

23   Q    And sir, is this a copy of some of the literature?

24   A    Yep.

25   Q    And did you see any problems with the literature?
              KEITH KENNEDY - DIRECT

1  A    I did.  You know, this is a marketing piece

2  designed to tout the benefits of the ProtoCOL counter

3  and the spiral plater, and there are some issues.  It

4  says in the opening paragraph that the procedure for

5  this method should take 20 grams and mix it with 200

6  milliliters of water.  Well, that doesn't happen.

7  That's not an accurate statement.  I understand it.

8  It's a reference to the serial dilution demonstrated in

9  the video, but that's not what this says.  This says you

10  put 20 grams of product into 53,000 gallons of water and

11  then plate that.  Well, that's not what happens.

12      We have just previously shown that the ProtoCOL

13  counter is actually able to produce a wide variety of

14  results through a simple sample rotation without any

15  other complexities.  Twisting the plate gives you a very

16  wide range of answers.

17  Q    And any other issues?

18  A    As I've stated before, I believe that manual plate

19  count is the industry standard based on my experience as

20  a micro lab manager.

21  Q    And sir, is this the second page of the literature?

22  A    Yes.  This gets into the finer points of how long

23  it takes and how long it doesn't take and I believe that

24  the claims or the benefits for the ProtoCOL counter are

25  hyperbolic.  There is some times savings to be sure.

KEITH KENNEDY - DIRECT

1   That's the basis on which the ProtoCOL is selling it,

2   but I think that the benefits are overstated.

3   Q    Sir, did you have concerns about statements or

4   representations that had been made to Bio-Systems'

5   customers?

6   A    Yes.

7   Q    And did you believe that there were any affirmative

8   misrepresentations?

9   A    Yes.

10   Q    In what areas?

11   A    Well, we had a number of customers who were testing

12   our products and finding out that we were light, that we

13   were under plate count.

14   Q    And sir, did you try to reach out to customers to

15   address some of these issues?

16   A    Certainly.  In some cases we brought it to their

17   attention; in some cases they brought it to our

18   attention.  In each case, we sorted out, you know, could

19   we afford to just make up the difference and eat the

20   cost or did we have to have a price discussion.

21   Q    And had anyone started that process before you took

22   the position?

23   A    Yes.  Denise Lennard and some of the sales

24   managers.

25   Q    And to approximately how many accounts had people

                  KEITH KENNEDY - DIRECT

1  reached out before you came on board?

2  A     Probably five or six.

3          MR. BIANCHI:  Objection.  Hearsay.

4          THE COURT:  Sustained.

5  BY MS. GEHRIG:

6  Q    Was there a significant number of customers that

7  had not been contacted?

8  A    Yes.

9  Q    Approximately how many did you reach out to that

10  had not been contacted?

11  A    I probably, over the course of the first year,

12  talked to 20 to 25 customers about this issue.

13          THE COURT:  Counsel, while you're doing that,

14  it's hard to tell what exhibit you're dealing with.

15  You're not always identifying it for the record.

16          MS. GEHRIG:  I apologize.

17          THE COURT:  That's fine.  I just want to make

18  sure.  The wet-batch process I believe was Exhibit 12;

19  is that correct?  We went from Exhibit 3A, 3B, and 3C to

20  12.

21          MS. GEHRIG:  Your Honor, it's my fault because

22  I've been referring to them to the witness by the label

23  that appears on the screen.

24          THE COURT:  You haven't always because you

25  referred to the wet-batch process as Exhibit 12.  You
                KEITH KENNEDY – DIRECT

1    didn't refer to it by the numbers in the top left-hand

2    corner.  Then I think you referred to or meant to

3    Exhibit -- you did refer to Exhibit 4A, but I think you

4    meant to say 14.

5              MS. GEHRIG:  That's correct, Judge.

6              THE COURT:  All right.  And then finally this

7    ProtoCOL orientation is 18; is that correct?

8              MS. GEHRIG:  It is 18, Your Honor.

9              THE COURT:  Right.  Okay.  So I have those.

10   Now what are we calling up?

11             MS. GEHRIG:  Your Honor, can I just go back one

12   more time to make sure I think we've got everything

13   right?  I erroneously referred to 3A, B, and C when

14   that's Exhibit 13.

15             THE COURT:  All right.  I will note it as

16   Exhibit 13.  Although that creates a problem for you

17   because 3A is admitted, but 3B and 3C are not.  So right

18   now it's not really clear.  Well, Exhibit 13 is out, so

19   you'll have to decide that.

20        But let's not waste time with this witness anymore.

21   Why don't you proceed.

22             MS. GEHRIG:  Thank you, Your Honor.

23             THE COURT:  And you are on Exhibit?

24             MS. GEHRIG:  15.

25             THE COURT:  Thank you.
                    KEITH KENNEDY - DIRECT

1          MS. GEHRIG:  Thank you, Judge.

2   BY MS. GEHRIG:

3   Q    Sir, which customers did you reach -- is this a

4   summary of customers that you --

5   A    This page is a summary, yes.

6   Q    And sir, on this page which customers did you reach

7   out to?

8   A    Well, in subsequent pages there's a list there.

9   Q    If we could.

10  A    I spoke with Chempace -- go ahead.

11  Q    And sir, what was the issue with Chempace?

12  A    Oh --

13          MR. BIANCHI:  Objection.  Hearsay.

14          THE COURT:  Sustained.

15  BY MS. GEHRIG:

16  Q    Sir, what --

17  A    Altech Supply.  Biological Solutions.  Chemtreat.

18  Next page, Ecological Labs.  Elhorn.  Garrett Callahan.

19  In-pipe.  MTEK.  Rex-Bac-T.  Orville Quante indirectly.

20  Tan Chee has been mentioned.  Team Labs.  And Zone

21  Solutions.

22  Q    Sir, what was your goal in reaching out to these

23  clients?

24  A    Conversations regarding plate count and potential

25  solutions.  Some of these people were deposed, and after

                KEITH KENNEDY - DIRECT

1   the deposition they had questions and so I would answer

2   those questions.

3   Q    And what did the process of resolving any issues

4   that you encountered, what did that involve?

5   A    Generally it was a discussion first of all to let

6   them --

7          MR. BIANCHI:  Objection.  Hearsay.

8          THE COURT:  You can describe the general

9   discussion.  You can't describe specific discussions

10  other than what would you generally do, not what

11  individual customers told you.

12         THE WITNESS:  Okay.  I would discuss with them

13  total plate count versus what they were receiving and

14  the content of their product versus the label, strain

15  identification, and so on.

16  BY MS. GEHRIG:

17  Q    Did you have to make some adjustments to margins

18  and prices as a result of these conversations?

19  A    For some of our customers, yes.

20  Q    Did you lose any customers as a results of these

21  conversations?

22  A    We lost a couple of customers and we conceded

23  margin on a couple of customers.

24  Q    And sir, are the product of these discussions

25  summarized on the first page of Exhibit 18?
               KEITH KENNEDY - DIRECT

1   A     Um-hmm.

2   Q     And sir, does the summary include both the issue

3   that you identified, the result, and the financial

4   impact?

5   A     It does.

6   Q     Sir, the certificate of analysis issue, has that

7   been resolved?

8   A     Yes.

9   Q     And did any changes need to occur to lead times for

10  product distribution to make that adjustment?

11  A     Yes.

12  Q     Could you describe?

13  A     Generally we moved from three days to five days,

14  five business days lead time so that we had enough time

15  to make, test, and complete testing the product before

16  we shipped instead of doing it parallel.

17  Q     And sir, relatedly have you adjusted lead time so

18  that all products can be tested?

19  A     Yes.

20  Q     And that the results -- could you describe what

21  lead time is required --

22  A     Sure.

23  Q     -- when you test in the manner that you're testing

24  now?

25  A     When we receive an order, it's entered into our
                     KEITH KENNEDY - DIRECT

1  system.  That shows up on the production schedule the

2  following day.  Then it's either made that day or the

3  next day, and after it's completed, a sample is pulled

4  for QC testing.  That process takes 24 to 36 hours.  At

5  the end of that time, we're able to ship.

6      When you add that all up, depending on weekends and

7  whatnot, we end up with it being very difficult to ship

8  three days after receipt of order.  We moved it to in

9  five days.

10 Q    And sir, you described various issues with

11 labeling.  Have those been adjusted --

12 A    They have.

13 Q    -- and fixed?  You've described your contact with

14 the customers.

15 A    Yes.

16 Q    Sir, when you started work at Bio-Systems, how many

17 purchase bugs -- what percentage of bugs were purchased

18 for your products?

19 A    Well, I would say maybe 25 percent of total

20 requirement.  That's an estimate.

21 Q    And has that increased or decreased since --

22 A    It's increased significantly.

23 Q    And sir, can you produce enough bugs in the Beloit

24 plant as it's equipped to meet your customers' demands?

25 A    We cannot.

                    KEITH KENNEDY - DIRECT

1   Q    What are you doing to deal with that?

2   A    Well, I make that statement based on an analysis of

3   the current fermentors, what they're able to produce,

4   and assuming very generous operating conditions like

5   24/7, 365, no mistakes, relatively high fermentate

6   output.  That still doesn't give us enough bacteria to

7   meet our current requirement at the current volumes and

8   current state of specification.  I would say that

9   currently we're able to produce 10 to 15 percent of our

10  total requirement.

11  Q    And so what do you do to bridge the gap between --

12  A    We're purchasing --

13          THE REPORTER:  I'm sorry.

14          THE COURT:  I'm sorry, what you're doing is

15  you're jumping on top of her question and I should have

16  said something earlier and I apologize to our court

17  reporter.  Wait until she finishes her question before

18  you answer.  And believe me, if the court reporter had

19  to say something, it must be really bad because that

20  almost never happens.  It's my fault for not warning you

21  before.

22      Would you please wait until the question is

23  completely asked.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  You may ask your next question,
                    KEITH KENNEDY – DIRECT

1    Counsel.

2           MS. GEHRIG:   Thank you, Your Honor.

3    BY MS. GEHRIG:

4    Q    Sir, how are you bridging the gap?

5    A    We're purchasing bacteria from a third party.

6    Q    And sir, is that data that's provided to people

7    that do the finances for --

8    A    It is.

9    Q    -- Bio-Systems and Betco?

10          Sir, have you completely eliminated use of the

11   wet-batch process in the Beloit plant?

12   A    We have.

13   Q    And have you completely switched over from ProtoCOL

14   counting to manual bacteria counts?

15   A    Yes.

16   Q    And when did that occur?

17   A    April/May of this year.

18   Q    Thank you, sir.

19          MS. GEHRIG:   Subject to issues with exhibits,

20   that's all I have at this time.

21          THE COURT:   All right.   With apologies,

22   Mr. Kennedy, we're going to stop at this point.   But you

23   are planning on being back tomorrow anyway.

24          THE WITNESS:   Yes, sir.

25          THE COURT:   I'm afraid if you would just be
                       KEITH KENNEDY - DIRECT

1   back here at 8:30 to begin your testimony, we will

2   proceed at that time.

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  And you may step down then.

5          THE WITNESS:  Thank you.

6          THE COURT:  I just want to talk with the

7   parties for a couple minutes about these exhibits.

8       (Witness excused at 5:49 p.m.)

9          THE COURT:  13, what was called 3A, so I guess

10  13A is admitted.  13B and 13C I will reserve on.  And

11  for the record we'll now call 3A 13A, and 3B and 3C 13B

12  and C respectively.

13      Exhibit 12, the wet-batch product process I'm going

14  to reserve on.

15      14, 18 and 15 I would ask the parties to see if

16  they can reach some agreement on each of these summaries

17  with respect to portions that might be acceptable and

18  those I need to rule on tomorrow.

19      At the close of Mr. Kennedy's testimony, I will

20  give you rulings on each.

21      Anything more for the plaintiffs at this time?

22          MS. GEHRIG:  Not at this time, Your Honor.

23          THE COURT:  And you have additional witnesses

24  tomorrow; is that right?

25          MS. GEHRIG:  We have --
                KEITH KENNEDY - DIRECT

1          THE COURT:  I'm sorry, I'm just talking about

2   liability at this point.

3          MS. GEHRIG:  Your Honor, we just need to finish

4   with Mr. Kennedy and then we have one more.

5          THE COURT:  Very good.  Thank you.  And

6   defendants anticipate completing their witnesses if we

7   begin at 10:30?

8          MR. BIANCHI:  I think we could, yeah.  We'll

9   have the witnesses here.

10          THE COURT:  Then I would ask you to make that

11   effort.  In following up on a question that was posed to

12   me, which is how we will go forward on damages, my

13   thought would be if we could get in the liability case,

14   it will give me a little time to consider it.  But I

15   will try to give you an indication whether we're going

16   forward with damages right away so you'll know what

17   you'll need to prepare for on Wednesday.  If it's close,

18   I'm going to take the damage testimony.  If I know for

19   certain that once I lay out all my findings we're not

20   going to go forward, I'll tell you that.  And obviously

21   if I think there's liability, I'll give you more

22   direction in that regard too.

23       But my hope would be to complete the evidence and

24   give you some guidance by the end of the day tomorrow

25   and then to proceed with damages on Wednesday if

                    KEITH KENNEDY - DIRECT

1    necessary.

2         Anything more for the defendant tonight?

3              MR. BIANCHI:  No, Your Honor.

4              THE COURT:  All right.  Then unless there's

5    something more from either side, we will adjourn for the

6    day and I will see you at 8:30 tomorrow morning to

7    continue with trial.  You're free to move about.

8              MS. GEHRIG:  Thank you, Your Honor.

9         (Proceedings concluded at 5:51 p.m.)

10

11                        *  *  *  *  *

12            I, LYNETTE SWENSON, Certified Realtime and
     Merit Reporter in and for the State of Wisconsin,
13   certify that the foregoing is a true and accurate record
     of the proceedings held on the 15th day of June 2015
14   before the Honorable William M. Conley, Chief Judge for
     the Western District of Wisconsin, in my presence and
15   reduced to writing in accordance with my stenographic
     notes made at said time and place.
16   Dated this 16th day of July 2015.

17

18                             /s/_____

19                             Lynette Swenson, RMR, CRR
                               Federal Court Reporter
20

21

22   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means
23   unless under the direct control and/or direction of the
     certifying court reporter.

24

25                     KEITH KENNEDY - DIRECT