UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

BETCO CORPORATION, LIMITED,

      Plaintiff,

-vs-                   Case No. 14-CV-193-WMC

MALCOLM D. PEACOCK, MARILYN    Madison, Wisconsin
PEACOCK, B HOLDINGS, INC., and  June 17, 2015
E HOLDINGS, INC.,          8:33 a.m.

      Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF COURT TRIAL
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY,

APPEARANCES:

For the Plaintiff:
                Connelly Jackson & Collier
                BY:  REGINALD JACKSON
                    TIMOTHY NACKOWICZ
                405 Madison Avenue, Ste. 4300
                Toledo, Ohio  43604

                Nowlan & Mouat
                BY:  DAVID MOORE
                    SARA GEHRIG-WOODMAN
                100 South Main Street
                Janesville, Wisconsin  53547

Also present:     Kaylynn Vernon - legal assistant

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

1  APPEARANCES CONTINUED:

2  For the Defendants:
                    Michael Best & Friedrich
3                    BY:  ALBERT BIANCHI
                        MARY TURKE
4                    1 South Pinckney Street, Ste. 700
                    Madison, Wisconsin  53703
5

6

7                    * * * * *

8                    **I-N-D-E-X**

9  Closing statement by Mr. Moore                3-34
   Closing statement by Mr. Bianchi             34-51
10  Rebuttal argument by Mr. Moore               51-58
   Court's ruling                               60-68
11

12

13                    * * * * *

14       (Proceedings called to order.)

15          THE CLERK:  Case Number 14-CV-193-WMC.  *Betco*

16  *Corporation, Limited v. Peacock, et al.* called for the

17  third day of court trial.  May we have the appearances,

18  please.

19          MR. MOORE:  Attorney David Moore appears for

20  the plaintiff, along with Reggie Jackson, Attorneys Tim

21  Nackowicz and Sarah Gehrig here in the courtroom.

22          MR. BIANCHI:  And for defendants, Attorneys

23  Albert Bianchi and Mary Turke.  And then we have our

24  client, defendant Malcolm Peacock.

25          THE COURT:  Very good.  We're here for closing

1    arguments on liability, and because plaintiff has the

2    burden of proof on at least everything but perhaps the

3    affirmative defense, we'll hear from plaintiffs first.

4          MR. MOORE:  Thank you, Your Honor.  I want to

5    attempt here to address the questions the Court raised

6    at the end of the day yesterday in the context of our

7    closing argument on liability.  And I want to, as best I

8    can, specifically address the question of relative duty

9    between the parties that I understood the Court was

10   discussing.  And I also want to address the question of

11   causation, without addressing damages in full, but the

12   relationship of damages to --

13         THE COURT:  I think of it as injury in the

14   sense that to get to damages, we have to have injury.

15         MR. MOORE:  Right.  I'd like to begin with --

16   and I think the Court also commented on the fact that

17   what Judge Posner appears to be suggesting, what he

18   implies in the *Market Street* case is that there is a

19   duty of candor that applies in a post-contract good

20   faith situation that does not apply in the pre, in the

21   contract formation stage.  That's what I understand that

22   he is saying.  He doesn't say it directly because he

23   uses the phrase candor in the negative sense and then

24   comes back to it, but that's what I understand it to

25   mean and that's what I understood the Court was

1  articulating.  I agree with that.

2        The Court has verbalized -- this Court has

3  verbalized a struggle with what it characterizes as the

4  duty to come forward and was there a duty to come

5  forward on the part of Mr. Peacock and therefore how

6  does his duty of candor relate to the duty to come

7  forward.  I understand the Court has suggested three

8  areas of inquiry that are categorized around things that

9  Betco didn't know about and didn't address, perhaps as

10 quickly as it might have depending on one's view of the

11 facts.  The Court talked about the boilers, and it

12 talked about products not meeting spec and why not, and

13 certificates of analysis, CoAs being falsified.  What

14 was the duty of coming forward in relation to Betco's

15 duty to act.

16      I am going to beg the Court's indulgence for a

17 moment though to take one step back from those inquiries

18 and get to the question of duty in general and I want to

19 address that duty to come forward as the Court has

20 characterized it in relationship to the duty of good

21 faith.

22      The Court also pointed to Judge Posner's

23 characterization of good faith in *Market Street*, and the

24 quote precisely is that "This duty is," this duty that

25 the Court was trying to articulate is "as it were

1  halfway between a fiduciary duty, the duty of utmost

2  good faith," in parens, in italics, "and the duty merely

3  to refrain from active fraud."  So it's as if we have

4  this long chain across the courtroom and over on the

5  right we have fiduciary duty and over here we have

6  fraud.  It's clear I think from *Market Street* and from

7  the cases that come after it and even some that come

8  forward that that duty, wherever it hangs on that chain

9  across the courtroom, it depends on the facts and

10  circumstances of the case.

11      I want to start with a premise, important -- not a

12  premise, a fact.  This is no longer a tort case based on

13  the Court's decision.  I understand it.  It is a

14  contract case.

15          THE COURT:  It is.

16          MR. MOORE:  And even though the Court dismissed

17  the breach of contract cause of action, the duty of good

18  faith and fair dealing is a contract cause of action.

19          THE COURT:  At least in Wisconsin.

20          MR. MOORE:  Yes.  And we could argue the point

21  elsewhere.  As I've discussed with my colleagues, the

22  law in Ohio is definitely different.  But this is a

23  breach of contract case.  And the APA here puts in play

24  two contractual duties at least.  One is express.  At

25  least one that's express and one that's implied.  And

1  the one that's express that I'm going to point to for

2  the moment is in Section 4.19 of the contract.  It deals

3  with the express warranties and representations made by

4  the seller.  And the quotation is the first clause of

5  that paragraph up until the comments followed by the

6  conjunctive *and*.  What it says is "Each item processed

7  or delivered by seller has been in conformity with all

8  applicable contractual commitments and all express and

9  implied warranties."

10         THE COURT:  I'm glad you started there because

11  the more I look at that clause and think about it in the

12  context of an acquisition.  You put your finger exactly

13  on it by disjoining the remainder of that sentence.  It

14  seems to me it's been conflated into something more than

15  it is.  It's a product warranty, and in particular, it's

16  a warranty against claims that are going to be made

17  against the company.  And while you could try to just

18  truncate that first phrase, as your client has

19  repeatedly done in this litigation, the impact of 4.19

20  is to ensure -- in fact the entire paragraph after that

21  first clause is to ensure that the seller is standing

22  behind what it sold against liabilities that are brought

23  against it.  And from what I've been able to tell, there

24  haven't been any.

25         Now, I understand that there may be some issues

1  with respect to specific clients who were affirmatively

2  informed of issues, and to that extent there may still

3  be a product issue.  But I just think it's been made

4  more than it is and, as is well-known, acquisition

5  purchase agreements or asset purchase agreements are --

6  is negotiated back and forth.  Certainly that first

7  clause is broader than you would typically see because

8  you might have *to the seller's knowledge* or *qualified*

9  *by.*

10      But if I read the paragraph as a whole, it's really

11  not anything more than a product warranty.  It's

12  warranting the product that was sold was not outside of

13  compliance and it's assuring that in the balance sheet

14  itself, there is money set aside for that liability

15  that's more than adequate.  Had that not proven to be

16  true, then I -- and maybe that's your argument.  Maybe

17  you're going to argue that it wasn't true.  But I

18  haven't heard that evidence in the case.

19          MR. MOORE:  Your Honor, I think that I would

20  characterize it differently.  I disagree with what the

21  Court has suggested that this is simply wrapped into a

22  product warranty.  The way I read it -- and I say this

23  for a couple of reasons.  Number one, this is in the

24  warranties and rep section.  It's in Article IV of the

25  contract.  That's an indemnity section that contains

1  other stuff that we've talked about here in Section X.

2  But the contract says what it says and what I —— and I

3  don't know necessarily what the typical contract might

4  say, I do know what this one says and it does

5  specifically ——

6          THE COURT:  Well, it's fairly easy to find

7  language that varies in all kinds of ways in the

8  cases ——

9          MR. MOORE:  Sure.  But what does it mean?

10          THE COURT:  —— as it arises in drafting these

11  things.  Well, I'll let you finish your thought.  So the

12  way you read this paragraph is?

13          MR. MOORE:  The way I read this paragraph is

14  that it contains more than one warranty and the first

15  one that it contains is what I will refer to as a

16  warranty of warranties.  Let me back up for a second

17  and ——

18          THE COURT:  I don't think that's helping your

19  case, but let's go with that.  Warranty of warranties.

20          MR. MOORE:  Well, it says that what this

21  company is producing meets spec is the simplest way that

22  I would characterize the language there.  It says that

23  what's being produced by this company is good.  It meets

24  spec.  What's on the labels is what's in it.  What's in

25  the certificates of analysis is what's in it.  And the

1  product that is produced, the product that is produced

2  by this company is good, which is hardly an unreasonable

3  request to be made on the part of the buyer,

4  particularly in light of the economic loss doctrine.

5  That is to say what is produced by this company is going

6  to be consistent with the way it's labeled.  That is

7  what I am suggesting.  That is what I believe is the

8  express warranty that has been made there.  And that it

9  is breached if, in fact, this is a company that's being

10  sold under the terms of the APA that does not produce

11  product to spec on a consistent basis.  I think that's

12  what the words of the warranty say.  I think that's what

13  it means.

14      I understand that there is additional language in

15  the paragraph from which one might characterize as a

16  typical proposition that we're not going to have

17  customers coming back at us and making claims.  But this

18  says more than that.  There is an indemnity clause.

19  There is a lengthy indemnity provision in Article X of

20  the contract that addresses the question of what happens

21  when we get sued by customers or other third parties.

22      So I do believe that Section 4.19 does at least and

23  in part say that this company is producing what it says

24  it's producing.  And that's the express warranty.

25          THE COURT:  I'm just looking at the other -- I

1   mean reps and warranties, and they're all about limiting

2   one's liability.

3         MR. MOORE:  Right.

4         THE COURT:  They're not about an assurance of

5   -- well, I don't want to overstate it.  But for the most

6   part, they're not about an assurance of getting what you

7   paid for, which is what I'm hearing you're now trying to

8   read into 4.19.

9         MR. MOORE:  I don't think I'm trying to read

10  it.  I think I'm looking at the actual language.  I

11  didn't draft this contract.  I think all the lawyers in

12  this room would like to take a shot at redrafting this

13  contract.

14        THE COURT:  Which is always the truth.

15        MR. MOORE:  It's always the case in --

16        THE COURT:  Transactional lawyers are doing the

17  best they can under the pressures of an acquisition.

18        MR. MOORE:  And I had an argument with one of

19  my transactional partners about that very issue.  But

20  hindsight is 20/20.

21        THE COURT:  I get your general point.

22        MR. MOORE:  So the contract says what it says.

23  Now, let's go to the implied provision which is just as

24  much a part of the contract as the express provision.

25  An implied contract of good faith.  Part of the

1  contract, just like Section 4.19 or any other provision

2  of that contract, and the problem that's been raised

3  here is that we blew the express deadline, assuming I'm

4  reading the contract right.  We're all agreed that

5  there's a one-year deadline that would apply to this if

6  --

7          THE COURT:  To breaches of contract.

8          MR. MOORE:  Right; right.  So the argument here

9  is we blew the deadline, we missed the contractual

10  opportunity, and that is why we're talking about good

11  faith here.  So the question then becomes why did we

12  blow it.  And we say we blew it because Malcolm Peacock

13  breached his duty of good faith and fair dealing.

14      So how is that duty defined under these facts, the

15  eternal struggle that's set up for us by Judge Posner?

16  And the Court phrased it, I believe phrased it with

17  another preliminary question what's Betco's duty?

18  What's Betco's duty if Mr. Peacock has a duty of good

19  faith?  In the earlier good faith cases, *Schaller* out of

20  Wisconsin, and I'll just characterize the similar

21  language in other cases, it talks about the duty of

22  decency, of fairness, of reasonableness in performance

23  and enforcement.  That was the case law that came to

24  *Market Street*.  And in *Market Street*, the Court

25  struggled with that same question and talked about the

1   duty of the nonbreaching party.  When it's written by

2   Judge Posner, we talk about Judge Posner.  That's the

3   Seventh Circuit Court of Appeals.  I mean this is some

4   interesting writing by any stretch and I quoted much of

5   it in my trial brief and I don't want to be repetitive.

6   But I do want to point to what I believe is key in

7   seeing how that struggle is dealt with by Judge Posner.

8       Judge Posner says "It's one thing to say that you

9   can exploit your superior knowledge of the market.  It's

10  another thing to say that you can take deliberate

11  advantage of an oversight by your contract partner

12  concerning his rights under the contract."  And then he

13  uses one of the many key phrases that come out of there.

14  He talks about sharp dealing.  He says "Such taking

15  advantage is not the exploitation of superior knowledge

16  or the evidence of unbargained-for expense, it's sharp

17  dealing."

18      Talks about -- further about sharp dealing.  Says

19  "The form of sharp dealing that we're discussing might

20  or might not be actionable as fraud or deceit."  Again,

21  there's a point.  Not a fraud case.  Contract.  This is

22  a question of tort law and there's a rule there that

23  applies.

24      In a contract case, Judge Posner says "Before the

25  contract is signed, the parties confront each other with

1  a natural wariness and neither expects the other to be

2  particularly forthcoming, therefore there's no

3  deception.  But afterwards, the situation is different.

4  The parties are now in" -- another key phrase -- "a

5  cooperative relationship, the costs of which will be

6  considerably reduced by measure of trust.  So each

7  lowers his guard a bit and now silence is more apt to be

8  deceptive."

9      And again pointing out that this is a contract

10  case, not a tort case, he says that it doesn't rise to

11  the level of fraud what we're talking about, and leading

12  up to his statement about that -- I'll refer to it as

13  the long chain between fraud and fiduciary duty.

14      He also talks about the fact that "contracts don't

15  just allocate risk, they also for some of them set in

16  motion a cooperative enterprise."  Another phrase

17  slightly different from the cooperative relationship.

18  "To some extent places one party at the other's mercy.

19  The parties to a contract are embarked on a cooperative

20  adventure."

21      And he talks then about the office of good faith,

22  of the doctrine of good faith, which is to "forbid the

23  kinds of opportunistic behavior that a mutually

24  dependent cooperative relationship might enable in the

25  absence of rule."  Says "Good faith is a compact

1    reference to an implied undertaking, not to take

2    opportunistic advantage in a way that could not have

3    been contemplated at the time of drafting and was

4    therefore not resolved explicitly by the parties."

5        He says "At the formation of the contract, the

6    parties are dealing in present realities but performance

7    still lies in the future and as it unfolds the

8    circumstances change.  And often those circumstances are

9    unforeseeable and the explicit terms of the contract

10    become progressively less apt to the governance of the

11    parties' relationship and the role of implied conditions

12    grows."  And this is --

13        THE COURT:  I know that you're getting to apply

14    this to the facts of the case, but --

15        MR. MOORE:  I am.

16        THE COURT:  -- you had started down this road

17    to talk about a duty of your client.

18        MR. MOORE:  Right.

19        THE COURT:  But now we're still talking

20    about --

21        MR. MOORE:  I'm sorry.

22        THE COURT:  If you could draw the relationship

23    to the duty of your client, that's what I'd be

24    interested in hearing.

25        MR. MOORE:  The duty --

1          THE COURT:  In this, if you will.

2          MR. MOORE:  Yeah.  The duty of our client is

3    weighed, and actually it's discussed in *Market Street*.

4    Under the facts of *Market Street*, which are at least

5    analogous in some ways in this sense:  In *Market Street*,

6    the suggestion was that the party other than Market

7    Street, which is referred to in that case as the -- I'm

8    sorry, the trust I believe that Judge Posner says -- or

9    the pension trust.  That was the phrase I was searching

10   for.  And Posner, after looking at this good faith

11   question says, you know, the fault -- he says "the fault

12   was the pension trust's incredible attention --

13   incredible inattention," that's the phrase he uses in

14   the case.  He thought they were incredibly inattentive.

15   But then he went on to say "Nonetheless we" -- he said

16   "We don't usually excuse contracting parties from

17   failing to read and understand the contents of the

18   contract."  That's slightly different from where we are.

19   But he says "Such enterprises make mistakes, just like

20   the rest of us, and deliberately to take advantage of

21   your contracting partner's mistake during the

22   performance stage, but we're not talking about the

23   advantage of superior knowledge at the formation stage

24   is a breach of good faith."

25          So what he says in that case before sending that

1    case back to Judge Reynolds in the Eastern District is,

2    you know, I know that the pension trust didn't do

3    everything right, and in fact, it was incredibly

4    inattentive, but that doesn't resolve the question of

5    good faith.  I'm not suggesting my client was incredibly

6    inattentive --

7              THE COURT:  Well, it's interesting you say that

8    because I think in some ways I might disagree with you.

9              MR. MOORE:  Okay.

10             THE COURT:  But that's not -- you still haven't

11   answered the question as to what obligation your client

12   did have.  Or perhaps you're saying that no matter how

13   incredibly inattentive they may have been, there's still

14   an obligation by the other party not to take deliberate

15   advantage, an oversight in their rights.  And I guess

16   you're saying the oversight of their rights is they

17   needed to do something within the first year.

18             MR. MOORE:  Yes, I am.

19             THE COURT:  So what is it that you contend

20   Mr. Peacock did that took deliberate advantage of the

21   oversight?  He didn't impede your client from following

22   up on really bright red flags.  If you look at the March

23   11 notes that were provided to your client, and this is

24   just the first of many that continued, there's an awful

25   lot that was called to their attention.

1          MR. MOORE:  I understand.

2          THE COURT:  And --

3          MR. MOORE:  This is what --

4          THE COURT:  It's more than incredible

5    inattentiveness.  It's not just that they didn't see it,

6    it was -- there were flags waved in the air and we got

7    problems here and they still didn't follow it.

8          MR. MOORE:  I would disagree with that

9    characterization.  But let me assume for the moment that

10   that's what it was or that at least it arose to the

11   point of incredible inattentiveness.  I'll assume that.

12         THE COURT:  Okay.

13         MR. MOORE:  The problem is that the case law

14   that talks about this issue, and there is case law that

15   comes after that, and I'll point to one that I'm

16   familiar with because it came out of our office, it was

17   called the *Uebelacker* case.  It was Judge Crabb's

18   decision in 2006.  And good faith was an issue in that

19   case.  The citation is 464 F. Supp 2d 791.  And in that

20   case, Judge Crabb pointed back because the other party

21   in the case was pointing to Schaller and suggesting that

22   the Court had essentially said that the duty of good

23   faith doesn't apply where the nonbreaching party has the

24   ability to protect itself from harm.  And Judge Crabb

25   said that --

1          THE COURT:  I'm not suggesting that at all.

2    I'm not saying it doesn't apply.  Clearly it applies and

3    clearly Mr. Peacock had duties.  I'm trying to ask you

4    -- I'm trying to have you focus on specifically what it

5    is that he did that took deliberate advantage of your

6    client's incredibly inattentiveness to the one-year

7    period of time that it had to act.

8          MR. MOORE:  I'll proceed with that phrase in

9    mind.  What did Mr. Peacock do.  The way I characterized

10   that in the brief was he cloaked it.  How did he cloak

11   it?  Cloaking has to be taken in the context of what

12   Mr. Peacock was doing.  Mr. Peacock was -- we

13   characterize he was the president of the company.  He

14   characterized himself, if I recall correctly, as the

15   general manager of the company.  I'm not sure that makes

16   a difference.

17         THE COURT:  Well, it may make a difference

18   legally, but practically I don't disagree with you.  I

19   mean I would assume once the company was purchased --

20   well, it's clear hearing from both Mr. Betz and

21   Mr. Peacock, he was running -- he was continuing to run

22   the business at Bio-Systems.  Now, we may quibble over

23   what that meant and where his focus is, but he was still

24   in charge.

25         MR. MOORE:  Right.

1       THE COURT:  Which it has a two-edge sword to it

2  because basically he was told to just continue.  I think

3  his statements -- it keeps being emphasized he said

4  business as usual.  I didn't hear any other instruction

5  from Mr. Betz than business as usual except let's grow

6  sales.

7       MR. MOORE:  Here's where I'm going with that

8  question.

9       THE COURT:  Yeah.

10       MR. MOORE:  When we look at that chain across

11  the courtroom of fraud versus fiduciary duty, what I'm

12  saying is -- or whatever, chain, cord or whatever.

13       THE COURT:  No, no, no.  Chain is as good as

14  any.

15       MR. MOORE:  Okay.

16       THE COURT:  Spectrum.  Whatever we want to say.

17  You want to say that the spectrum moved closer to fraud.

18       MR. MOORE:  No.

19       THE COURT:  I'm still asking you what are the

20  acts that you believe indicate this cloaking.

21       MR. MOORE:  I'm saying that the acts include a

22  requirement of Mr. Peacock to come forward, which is the

23  way the Court characterized that.  Does Mr. Peacock --

24  unless I misunderstood what the Court said late

25  yesterday.

1    THE COURT:  No, I asked the question whether he

2  had a duty to come forward.  So --

3    MR. MOORE:  And I'm saying he does.

4    THE COURT:  -- tell me what it is you think he

5  should have come forward with.

6    MR. MOORE:  He should have come forward and he

7  should have pointed out as the manager, as the person

8  operating this business, that we have an issue here with

9  the boilers and here is what that issue is.  He should

10  have come forward and suggested to Betco that there's an

11  issue here with us meeting specs.  We're not meeting

12  specs.  We're consistently not meeting specs.  What's on

13  our labels and what is on our certificates of analysis

14  is not what's being produced in this plant.  And we are

15  actually issuing certificates of analysis to customers

16  that say that this -- and they're being made up, and I'm

17  suggesting that he had a duty to come forward and tell

18  it, not because he was a seller, but because he was the

19  manager.

20    And once he -- now granted, if Mr. Peacock had just

21  been the seller, we'd have a different issue.  But he,

22  under the contract, under the terms of the contract, he

23  took over and was, depending on one's definition, to run

24  the company during the next year.

25    THE COURT:  No, he said in terms of the -- are

1    you talking about the APA or are you talking about the

2    personnel contract?

3           MR. MOORE:  Well, the personnel contract, which

4    is incorporated and part of attached to the APA.  And I

5    understand we're not -- this is not an action under

6    that, but it defines the duty that he had in the context

7    of the APA under the APA.

8           THE COURT:  This would be a really easy case if

9    he were asked to do fiduciary duty because then I don't

10   think there's any question that he needed to come

11   forward.

12          MR. MOORE:  That's my point.

13          THE COURT:  That's where I'm -- that's where

14   I'm struggling with your point.

15          MR. MOORE:  I'm not saying that on this chain,

16   that it slides down to the fraud end.  I'm saying it

17   slides up to the fiduciary duty.

18          THE COURT:  You said he had fiduciary duties

19   and he didn't.  The one thing with Judge Posner -- the

20   one thing that all of these cases say is he's not a

21   fiduciary to the buyer.

22          MR. MOORE:  No, but he's somewhere in between

23   these duties.

24          THE COURT:  Somewhere in between.

25          MR. MOORE:  Yes.

1            THE COURT:  A fiduciary would have an

2   obligation to come forward and point out all the warts.

3            MR. MOORE:  Um-hmm.  That's right.

4            THE COURT:  I'm not sure he has that

5   obligation.

6            MR. MOORE:  Well, what is the duty of a Keith

7   Kennedy?  Let's suppose instead of Mr. Peacock, Keith

8   Kennedy, an outsider, comes into --

9            THE COURT:  We know what Keith Kennedy did as

10  an outsider.  But, you know, I think that that pushes

11  the law too far because that essentially says before

12  sale, you're totally arm's length; and after sale,

13  you're totally obligated to the employer to ferret out

14  all problems which existed presale.

15            MR. MOORE:  Not in all cases.

16            THE COURT:  But in this case.

17            MR. MOORE:  But in this case.

18            THE COURT:  Why is this case different?

19            MR. MOORE:  Because --

20            THE COURT:  This case implies a duty, a

21  fiduciary duty.  And is your answer because he became an

22  employee?

23            MR. MOORE:  No, because he became a managerial

24  employee.  And there is case law that talks about the

25  duties of employees, and I believe it is -- it depends

1    on the context --

2          THE COURT:  You haven't given me that.  I

3    haven't seen that.  If that was your perspective, I

4    would have appreciated it somewhere having been provided

5    to the Court.  I'm looking in the case law for implied

6    duty of good faith that the duty arises to a fiduciary

7    because the person was given a position of authority

8    after the fact.

9          MR. MOORE:  I understand.  I apologize if --

10          THE COURT:  No, no.  I didn't mean it so much

11   as criticism as -- this is new.  Until now, everyone has

12   been citing duty of good faith case law and I think

13   that's what you need to argue.

14          MR. MOORE:  I think this is part of good faith

15   duty of case law.  That's where I'm coming from when I

16   look at the cases subsequent.  Because what -- I'm not

17   suggesting, and in fact that's where I was going with

18   the *Uebelacker* case is that it's irrelevant, the fact

19   that the party might have had -- sat on their rights,

20   for lack of a better phrase in this context.

21          What I am suggesting is that, and what *Uebelacker*

22   made clear, that's just one factor.  It depends on the

23   other facts and circumstances.  And what I'm saying here

24   is that in this context, whether it's Malcolm Peacock or

25   Keith Kennedy or any other person who comes in as a

1 managerial employee to any business, they must have

2 certain duties to their employer.  And whether we

3 characterize those as fiduciary or not, those duties

4 include I think the right to carry out your job

5 description, which may include duties to investigate,

6 duties to find things, duties to point things out to

7 upper management.  What makes the additional unique

8 facts in this case is that we know what Mr. Peacock knew

9 or at least I think we did, that's something the Court

10 needs to find.  But my view of the facts is that

11 Mr. Peacock knew this business.  He grew it.  It was his

12 business every which way.  He was operating it.  He was

13 in control.  And whether we have any argument about

14 whether that was the case after the contract, we know it

15 was the case before.  So he was uniquely qualified to

16 operate this business.  He knew everything there was to

17 know about it that anybody else -- at least I think we

18 can say knew more about it collectively than anybody

19 else.  And I'm suggesting that at the point in time in

20 which he became a manager, he had a duty as a manager

21 and we have to be able to separate out the fact yes, he

22 was the seller and he had another interest.  But what

23 *Market Street* suggests, in my view to me, is okay, now

24 we're past pre-contract.  Now let's look at the

25 relationship that exists.  At a minimum, there's a duty

1    of good faith.

2            THE COURT:  And I'm trying to understand --

3    it's an interesting argument and it sort of takes me

4    down two different paths as the decision maker.  Let's

5    assume that he suddenly needed to take off the hat of

6    the former manager and put on the hat for Betco, which

7    is kind of an odd concept because if you think about it,

8    he really just had to continue to be manager.  He just

9    had to continue.  And as manager of his company for many

10   years, he managed with an antiquated plant that was

11   expanded over time; that was satisfying his customers to

12   the best of his ability despite the fact that he wasn't

13   in compliance with the specs often; and the fact that

14   they were fudging at least by the end, we really don't

15   know what was happening earlier, but certainly by the

16   end he was fudging on the certificates of analysis.  So

17   that first path takes me well, he continued to do what

18   he did, which is what he did when he owned the company,

19   what he thought was appropriate when he owned the

20   company.  So how can that be a breach of duty of good

21   faith?

22           MR. MOORE:  He can't breach a fiduciary duty to

23   himself is what you're suggesting.

24           THE COURT:  No, I'm saying more than that.  I'm

25   saying that he -- is it right -- this gets to the other

1  esoteric question which is whether it's an objective

2  standard.  But is it right to expect an objectively

3  reasonable person who has run his business and sold it

4  as that business to suddenly say nope, we're going to

5  scrap every way we went about business and now I'm going

6  to tell Betco we need to totally retool.

7        MR. MOORE:  No, I'm not suggesting he had to

8  tell Betco that they had to retool.  What he did have to

9  tell them is, you know what?  I don't know why, but

10  these numbers aren't right.  We've got something funking

11  going on here.  Because the fact of the matter is that

12  these -- this is what we're doing with CoAs and anybody

13  objectively, as the Court has said, has to know that if

14  you put it in a CoA, it's got to mean something more

15  than what Mr. Peacock said it means.  That hat --

16        THE COURT:  Let's assume that that's the other

17  road then.  Let's assume that he had an obligation to

18  come forward and disclose the problems.  And I agree

19  with you that seems to me the certificates of analysis

20  are the most egregious that were ongoing.

21        MR. MOORE:  Right.

22        THE COURT:  Now he disputes whether he knew

23  about that or not, and that's a tough sell.  But we'll

24  leave that to the side for now.  Then he takes on, as

25  you suggested, the role of Mr. Kennedy.  He goes in and

1  says what do we do to correct these problems.

2        MR. MOORE:  I'm not suggesting necessarily that

3  he had a duty to investigate himself like Mr. Kennedy

4  was doing to investigate.

5        THE COURT:  That is what you're saying.  You're

6  saying as a manager, he should have come in and cleaned

7  up the shop.

8        MR. MOORE:  No, no, I'm not suggesting he had

9  to go that far.  But there's a duty of candor.  The duty

10 of candor suggests that if you do nothing else, you go

11 to management and say these CoAs are not accurate.  They

12 haven't been accurate for a long time, and I don't know

13 why and it's not -- you know, maybe I just backed into

14 this and I didn't intend anything bad, but we've got a

15 problem here.  I can't fix it.  But you need to know

16 about it.  And you need to bring in somebody -- well,

17 you don't even have to go that far.

18     Then management can make its own decision as to

19 whether to bring in a Keith Kennedy or anybody else

20 that's in a capacity to fix it.  I'm not suggesting that

21 Mr. Peacock had a duty to fix the problem that he

22 created or didn't create.  That he had --

23        THE COURT:  What's the implication of that

24 ultimately?  It's not that you get part of your purchase

25 price back.  It's just that you would get the costs of

1    correcting the past problems, which is what you went

2    about doing.  And frankly, there wasn't really much cost

3    associated that I've seen, associated with correcting

4    past sales.  The cost was going forward to develop a new

5    system that met all of your requirements.  And unless I

6    read 4.19 that it was a breach of the proportions you're

7    suggesting --

8            MR. MOORE:  Assuming I'm wrong on 4.19.  I

9    understand.

10           THE COURT:  Yeah, then the damages are really

11   those related to correcting the past problems.

12           MR. MOORE:  And I would frankly agree that

13   that's the case.  If the Court says no, 4.19 doesn't

14   mean what I'm saying it means, then we're talking about

15   what the cost was to control what problems we could and

16   we'll put in evidence to that effect.  I recognize that

17   point and we look at the measure differently.

18           THE COURT:  All right.

19           MR. MOORE:  I do -- I'm sorry.  I guess --

20   well, I want to point out, because I don't think I

21   completed this loop as to what happened with the *Market*

22   *Street* case.  As I indicated, and it's all published

23   case law, but it went back to Judge Reynolds and the

24   court there quoted one portion of Judge Posner's

25   decision that I have not quoted yet.  I believe I did in

1    the brief, and it was the phrase that -- and now I'm

2    quoting from what the district court said -- it says "In

3    looking back at Judge Posner's words, the court said a

4    dispositive question in the present case is simply

5    whether Market Street Associates tried to trick the

6    pension trust and succeeded in doing so."

7         And then the case went back to the Seventh Circuit.

8    Ultimately -- and you know, we can disagree as to how to

9    look -- how things stand on the chain across the

10   courtroom image, but ultimately the position of Betco is

11   that Mr. Peacock tricked them and the Court is focusing

12   or has focused in terms of asking what Betco's duty,

13   well, how diligent did Betco have to be in finding out

14   that they were being tricked.  And the problem --

15        THE COURT:  I'm going to ask you one more time

16   and give you a chance.  What is it that he did that

17   tricked your client after sale other than, and I'm not

18   discounting that this might be a source of liability,

19   other than failing to come forward and disclose the

20   problems with specs and certificates of analysis?

21        MR. MOORE:  The assumption being that there is

22   no duty to come forward, just to --

23        THE COURT:  No, no.  I'm saying -- forget the

24   assumption.  Is there anything else that you want me to

25   focus on that you believe he did other than coming

1  forward?

2        MR. MOORE:  Well, my struggle quite frankly

3  here is that I know this is not an economic loss

4  doctrine fraud.  We've got all those issues.  But we

5  have pointed here to things that happened before and I

6  would suggest they are appropriate at least to give

7  context.

8      What is that context?  The context is the

9  certificates of analysis.  The context is a seller who

10 told a buyer that we test all our products.

11       THE COURT:  Let me be a little bit more

12 specific.  I've heard evidence that on the production

13 side Mr. Peacock was overbearing, was specific in

14 direction as to who should talk to Betco through the

15 chain of command.  But on the spec and certificate of

16 analysis side, nobody said they weren't allowed to talk

17 to the Betco people.  In fact, they were talking to them

18 regularly.

19     So I didn't hear any testimony on the side that

20 you're focusing on, which is the problem with the specs

21 and the problem with the certificate of analysis,

22 whether it's sales or the lab, that they were being told

23 by Mr. Peacock you can't talk to Betco.

24       MR. MOORE:  So the Court asked me what -- I

25 might mischaracterize, but what Mr. Peacock did to hide

1  the ball, what he did that was deceptive.

2          THE COURT:  What he did that was a trick, yeah.

3  How did he try to trick them.

4          MR. MOORE:  And the point that the Court raised

5  had to do with whether or not the employees were free or

6  not to go to Betco and tell what they knew, implying

7  that the trick of Mr. Peacock was to try to prevent that

8  from happening.

9          THE COURT:  I'm asking you.

10          MR. MOORE:  I understand.

11          THE COURT:  I'm not trying to tell you.  That

12  seemed to be a theme that was coming through the

13  witnesses.

14          MR. MOORE:  And this is where I'm struggling in

15  attempting to isolate this, as I believe I need to at

16  least try to do from pre-contract formation because I

17  believe that provides the context.  The context in which

18  we came into this is that Betco thought product was

19  being made to spec and that it was being tested and they

20  had good reason to believe that.  And the trick -- and I

21  guess the suggestion is the trick needs to be some sort

22  of affirmative post-contract action and if that's what

23  the Court is suggesting.  And I do have difficulty

24  suggesting that there's some affirmative action.  Well,

25  I would say yes, I believe he was managing the company.

He was attempting to prevent Betco people from coming in
and learning things.  He breaks up the meeting that was
occurring.  He tells people to communicate through him.

So if the affirmative act that we're looking for
there is hiding the ball, yes, that is where I'm coming
from.  But I am --

THE COURT:  All of that is on the production
side, not on the side that you're focusing on in terms
of what he should have come forward and talked about,
which is the failure to perform regular testing of the
batches and putting specs on when they're really not
sure, or the more egregious failure to do actual testing
and putting the correct numbers on the certificates of
authority.  That's on the side of the company where he
really didn't affirmatively suppress.

MR. MOORE:  Where he didn't affirmative?

THE COURT:  Suppress disclosure except, I
guess, by the theory by dint of personality no one felt
free to say anything.

MR. MOORE:  Yeah.  I mean on -- there is a
context that we've attempted to put forth in which the
Court needs to see these facts, which is where I'm
coming from on the argument of the duty to come forward.
So if the suggestion is that there needs to be an
affirmative act that is a trick, I don't know that I can

1  say that outside that context, both the pre-contract and

2  the post-contract context.  I'm suggesting that

3  Mr. Peacock knew what was going on and that he had to

4  know that Betco would at least be interested in that

5  fact in that he carried out no -- what I believe was an

6  affirmative duty to bring that forth.  That is a form of

7  a trick and I believe it is a trick and I believe that

8  in the context of pre-contract and post-contract, that

9  there was a trick going on.  That was the way that I

10 heard the evidence.  The Court might have heard it

11 differently.

12      But I don't believe I ultimately am suggesting to

13 the Court that Mr. Peacock was not acting in good faith.

14 He was not acting in good faith.  And that is a trick.

15 That is a form of trick.  And we can get caught up in

16 the semantics of what Judge Posner was using, but I

17 believe the trick is important in its own context as

18 well as in the context of the *Market Street* discussion

19 and the post-*Market Street* discussion that says yeah,

20 you can say that you've got to pay attention, buyer.

21 You can say that you can be incredibly inattentive or

22 that you are incredibly inattentive, but that does not

23 dispose of or wrap up or complete the duties that the

24 seller has under the covenant of good faith and fair

25 dealing.  And that is particularly so under these

1  circumstances when you move the duties that he

2  undertakes that far to that end of the courtroom, as

3  I've suggested.  So that is my argument.

4       THE COURT:  I'm going to stop you there.

5       MR. MOORE:  Sure.

6       THE COURT:  You have the burden of proof, so

7  I'm going to allow a short rebuttal.  Mr. Jackson or you

8  are welcome to at the close of the argument by the

9  defendant.  We'll hear next from the defendant.

10       MR. MOORE:  Thank you, Your Honor.  (9:23 a.m.)

11       MR. BIANCHI:  Morning, Your Honor.

12       THE COURT:  Morning.

13       MR. BIANCHI:  In listening to Betco's opening,

14  one of the questions that you posed is what was their

15  duty.  What was Betco's duty in this.  And I think that

16  Wisconsin Jury Instruction 3044 lays out the duty and

17  that's it is not a breach of the duty of good faith if a

18  course of action available to plaintiff could have

19  avoided the harm and this course was not followed.  And

20  I think you've -- in the discussion it was pointed out

21  very clearly that there was a course of action that

22  Betco could have taken.  It bargained for a full-year

23  warranty on the company, and during that year it decided

24  that it wasn't going to do any actual look at the

25  company.  There were many red flags that were raised by

1   personnel at Bio-Systems.  We heard testimony on that.

2       And then I think the red flag for Mr. Peacock was

3   that Betco for some reason, which we don't know, chose

4   not to share those things with him.  And I'm not saying

5   they had a duty to share them with him and try and work

6   through it, but I do believe that they had a duty under

7   the contract to assert a claim for all of those.  They

8   could have come right out to him and said we're claiming

9   that these problems right here, these are all breaches

10  of your warranty.  These are all breaches of

11  representations that you made to us.  And the contract

12  permitted those to go past the one year then once they

13  were raised.

14      As soon as they are raised, the statutes of

15  limitations, it says in Section X that they can continue

16  to go on.  And, in fact, Mr. Peacock bargained for

17  something in that same situation and that was the 2.7

18  million cap.

19      So again, I know that Betco mentioned context and I

20  absolutely think that's true.  We have to look at this

21  duty in the context of the contract that was agreed to

22  between the parties.  And the context that they're

23  presenting I believe is wrong.  It's the context of more

24  of a tort of fraud.  Betco certainly said that this is a

25  contract situation, but there was very little discussion

1  of how the contract fits into this contextually and I

2  think that it's important that in Section 10 there were

3  those provisions and that's what Betco's duty was.  They

4  didn't have to come and bring it forward and talk to him

5  about it, but they at least had to state that claim and

6  say here's the problem.  And in fact, they were put on

7  notice.  Mr. Lyons testified that when Mr. Peacock

8  approached him about the discount, he talked to Mr. Betz

9  and said have you seen any problems, any reason why we

10  shouldn't pay this money out?  And Mr. Betz's response

11  was no.

12        Now, why Mr. Lyons didn't ask Mr. Bischoff, why he

13  didn't ask the people that visited the plant multiple

14  times we don't know.  They didn't explain why that

15  didn't work out.  But they were certainly on notice.

16            THE COURT:  Let me get to the part that I don't

17  think they were on notice for.  The certificates -- I

18  never get this right.

19            MR. BIANCHI:  Analysis.

20            THE COURT:  Analysis.  Certificate of analysis.

21  Have a certificate of value and it never fits with the

22  "a."  The certificate of analysis.  I didn't see

23  anywhere that that's a red flag; that that was something

24  that Betco was aware.

25            MR. BIANCHI:  I agree that that wasn't

1  specifically raised to them.  But I do think that the

2  evidence certainly shows that they had complete access

3  to all the information that was going on, and not only

4  complete access to it, but they were encouraged to come

5  and be a part of the plan.  They could come and talk to

6  Dana Juul all the time; ask her how's the process?  How

7  does this work?  How do we start the whole process?

8       Your Honor, I believe that when they bought the

9  company, they could have come in, they could have set

10  someone in the beginning part here is where the

11  fermentation happens, and follow the process all the way

12  through.  And they had one year to do that to see how

13  everything worked out.  And so I still think that that's

14  part of their duty to be able to take a course of

15  action.  The course of action --

16       THE COURT:  The problem I have with that is I

17  don't know why it would have occurred to them that a lab

18  wasn't actually doing the testing required for a

19  certificate of analysis.  So I don't know how you even

20  formulate the question.

21       Now, I suppose if you did a real true diligence

22  after you bought the company, maybe that's what you're

23  suggesting they were obligated to do, you might get to

24  the point that that was a failing on Betco's part.  But

25  the most difficult part about Mr. Peacock's testimony

1  was his testimony that a certificate of analysis didn't

2  mean what everyone else, including his own expert, says

3  it means.

4      I'm just struggling with how to address that in the

5  context of a duty of good faith and fair dealing.

6          MR. BIANCHI:  Well, I think one of the points

7  to look at is that in the Marketplace (sic) case, it

8  was, as I know you know, it was on summary judgment and,

9  one of the things that Mr. Posner pointed out was was

10 there -- this needs to go to a jury because it needs to

11 be decided whether --

12         THE COURT:  It's not Mr. Posner, he's a judge.

13         MR. BIANCHI:  Judge Posner.

14         THE COURT:  In case he's ever reading this

15 transcript.

16         MR. BIANCHI:  That's scary to think.

17         THE COURT:  Could be Professor Posner.  I guess

18 he wouldn't mind that.

19         MR. BIANCHI:  But I think one of the things

20 that he looks at is, right, was there a trick and

21 deceit.  Your Honor questioned Mr. Peacock and he was

22 very honest with what he thought about it.  There was no

23 deceit.  There was no trick.  And in fact, the people

24 who testified, Mrs. Juul, Mr. Gerson, they were doing

25 it.  They didn't believe there was any trick or deceit

1    with it as well.  There was no trick or deceit here, and

2    that's what I think is --

3            THE COURT:  Are you saying no trick or deceit

4    on the part of the sale to the customer?

5            MR. BIANCHI:  No trick or deceit on the part of

6    the certificates of analysis.  That's -- I think that to

7    breach the duty of good faith, as has been pointed out,

8    there has -- the state of mind of the person who was

9    trying to trick is important.  In the *Market* --

10           THE COURT:  That's not true.  The state of mind

11   of the individual -- Mr. Peacock's state of mind is not

12   important.  He's subject, unless I'm misreading the

13   cases, to an objective test which is what would a

14   reasonable person do.  What would they have to do to

15   meet the duty of good faith.

16           MR. BIANCHI:  I mean I think that Judge Posner

17   thinks or Judge Posner at least talks about that.  In

18   the case of Marketplace (sic), what he says "The

19   district judge jumped the gun in choosing between

20   alternative characterizations."  He's referring to --

21           THE COURT:  Understood.

22           MR. BIANCHI:  -- summary judgment.  "The

23   essential issue bearing on Market Street Associates'

24   good faith was Orenstein's state of mind, a type of

25   inquiry that ordinarily cannot be concluded on summary

1  judgment and could not be here.  If Orenstein believed

2  that Erb knew or would surely find out about paragraph

3  34, it was not dishonest or opportunistic to fail to

4  flag that paragraph, or even to fail to mention the

5  lease, in the correspondence and rare conversation with

6  Erb, especially given the uninterest in dealing with

7  Market Street Associates that Erb fairly radiated.  To

8  decide what Orenstein believed, a trial was necessary."

9       Whether it's objective or not, I think that's an

10  important consideration because I think the objective

11  person would have to look at it.  Did the person

12  objectively -- were they believing that what they were

13  doing was wrong and they were trying to create some kind

14  of trick here?

15       I think what Betco is certainly arguing is for a

16  fiduciary duty; that he had some, you know, much bigger

17  duty than what the duty of good faith and fairly dealing

18  is here.  I mean if they wanted to bring a claim that he

19  breached his employment contract and violated some

20  fiduciary duty, that certainly could have been brought.

21  That's not what we're dealing with here.  We're dealing

22  with the duty of good faith within this -- within the

23  APA and I think it needs to be tied to that.

24          THE COURT:  What about the fact that the APA

25  incorporates or refers to the personnel or the

1  employment agreement?

2        MR. BIANCHI:  I agree that it incorporates it,

3  but you would have to bring a breach of that contract.

4  I think otherwise they are not separate contracts.

5        THE COURT:  But they might inform what the duty

6  of good faith and fair dealing is in the context of

7  those.

8        MR. BIANCHI:  I would argue that it's separate.

9  No, that it doesn't do that.  That that's a separate

10 claim and it's a separate issue.

11   One of the other points about the certificates of

12 analysis is I do think it was interesting we did not

13 hear from a single customer about what they expected

14 when they got a certificate of analysis.  It may very

15 well may be, Your Honor, that customers, there's just

16 looking for a minimum.  They continue to come back to

17 Mr. Peacock.  Because one of the questions that I think

18 is still left on the table, and you pointed it out last

19 night, when a customer would get a product, if that

20 wasn't what was actually there, wouldn't there be a

21 complaint or a problem or something being raised?  And

22 there's just zero evidence of that happening.  Zero.

23       THE COURT:  Maybe the customer foolishly

24 believed that he was getting what the certificate of

25 analysis said he was getting or she.

1          MR. BIANCHI:  Certainly I think it could be

2     possible.  We're talking hundreds of customers over 20

3     years and there's not a single piece of evidence that

4     would suggest that with the certificates of analysis

5     having to, you know, set forth exactly the amount that

6     was being there.

7          Your Honor, that also brings to the next point

8     which is, as you said, the injury; that even if we could

9     find some level of breach here, which I absolutely don't

10    think that there is, because again, Betco could have

11    taken action to find out all this information, including

12    the certificate of analysis.  All they needed to do was

13    sit one day in the office and say how do you fill these

14    out.  And not because there was any concern.  Again, I'm

15    not saying that they would have known that something

16    potentially wrong was going on because nobody thought

17    that there was anything wrong there or in any of the

18    other things that were going on in the plant.  They just

19    needed to be a part of it and I believe that that was

20    their duty in entering the contract, the APA with

21    Mr. Peacock.  They had to keep up their end of the

22    bargain as well, and they chose not to.  They didn't

23    raise those -- any issues with him that they're now

24    bringing forward to the Court.

25          And so as far as the causation or the injury

1   argument, Betco claims that Mr. Peacock breached his

2   duty of good faith and that it caused them some harm,

3   but we did not again see any evidence of the harm that

4   that would cause.  Especially with the certificates of

5   analysis, we didn't see a single customer complaint,

6   lost customer.  And there's nothing again that's tied

7   into the contract of we read Section 4.19 the same.  I

8   believe, Your Honor, that it's a liability, and everyone

9   testified there was no liability that's been raised.

10         THE COURT:  That's not entirely true.

11   Mr. Kennedy did talk about going back to individual

12   customers.  It's not clear, and I didn't accept it as an

13   exhibit because it's not clear what part is hearsay from

14   customers and what part is summary of what he did.  But

15   I couldn't -- there certainly seemed to be a suggestion

16   that there were some negotiations with clients.  Now

17   they could have been all prospective, which is what it

18   appeared to be; that is to say either we improve the

19   process and we charge you more or we improve the process

20   or we don't charge you more or you walk away as a

21   customer.  I suppose walking away as a customer could

22   have its own intended cost.  So it's not entirely true

23   there isn't evidence of customer issues.

24         MR. BIANCHI:  Well, and my response to that

25   would be that it's all hearsay.  There is no -- there's

1   no invoice that shows any change in price; no -- we have

2   you noted there have been way more exhibits than you

3   expected, plenty of emails.  Not a single email of a

4   customer.  And in fact, in the deposition designations,

5   if you look at the customers that are there and compare

6   some of them to the list, you'll see that there's

7   overlap and that those customers that are noted in the

8   list as having some kind of problem said no, no, no

9   problems on our end.  We don't know what's going on.

10  And I think that it's very telling why there isn't any

11  customer information from Betco, because there wasn't a

12  problem.  There just wasn't.

13       People did not have a problem with the product that

14  they were receiving.  And so because of that, I believe

15  that there's certainly not the preponderance of the

16  evidence being satisfied that Betco has suffered any

17  injury from any potential breach.

18       And I think certainly on the boiler issue, that

19  that can't be a breach.  I think that that was raised,

20  and not only was it raised, it was something they

21  decided to do and started doing before the year was up

22  and they certainly could have said no, we want you to

23  indemnify us for this.

24       And the same thing with the things being shipped

25  under spec.  There was lots of information where they

1  were completely aware that it was being shipped, Your

2  Honor.

3       So the only thing that would be left would be the

4  certificate --

5            THE COURT:  Go ahead.  The only thing that

6  would be left would be the certificate of analysis.

7            MR. BIANCHI:  Yes.

8            THE COURT:  What about this notion that specs

9  were being put on bags without any testing actually

10  being done?

11           MR. BIANCHI:  I do not remember hearing any

12  testimony that said that specific -- what specific

13  products were not going out without any testing.  My

14  recollection was that there was this -- the theoretical

15  count, which was this IP that was tested and then they

16  were mixed and so there was no final test.  And that was

17  the problem.

18           THE COURT:  In other words, the intermediate

19  tests that were relied on by extrapolation.  I agree.

20           MR. BIANCHI:  Right.

21           THE COURT:  I guess there were a number of

22  categories -- I had understood there were a number of

23  products that went out with specs in which no test was

24  done at all.  You're saying that that's not your

25  recollection.

1          MR. BIANCHI:  That's not my recollection.  And

2     I think the other thing is there was hundreds of

3     products, so what I think is also difficult here is

4     knowing what product goes with what.  Like we have all

5     these -- well, there are certificates of analysis and we

6     had a guesstimation that maybe 30 percent of the

7     products could have gone out with certificates of

8     analysis, and not every time.  So there was nothing

9     tieing the evidence together to be able to say here's

10    actually what happened.  So that even if somehow there

11    was some level of a breach there, again, where the

12    injury would come I think is nonexistent.

13         But even that, Your Honor, I think that's again

14    subsumed in knowing that product was under spec and it

15    was going out to customers at the same time.  That's

16    something that's in that same area that obviously

17    something is wrong with the product area.  And so we

18    need to go take a look at it.

19         THE COURT:  The other problem I have is that

20    it's clear that your client has a motivation.  Whether

21    he acted on it or not is part of what I have to decide.

22    But he clearly had a motivation to tamp down any

23    discovery of need for substantial change.  Because he's

24    a bright man; he knows if nothing comes out during the

25    first year, he's free and clear on breach of contract.

1    And if nothing comes out in two years, although he

2    wasn't allowed to stay long enough to do that, that all

3    claims are going to be lost.  It's hard not to think

4    about that motivation when you consider the way he

5    behaved at least toward the production side of the

6    company.  Saying something as cruel as these people

7    don't know anything suggests a real effort to suppress

8    interaction and discussion.

9         Now, the response to that in part is by March of

10   2011, those same people had already conveyed most of

11   their concerns and so I'm not sure it gets him

12   completely off the hook.  To the extent he was

13   affirmatively acting in a dictatorial way or controlling

14   way, and it undermines certainly his notion that he was

15   just out there dealing with sales if he's affirmatively

16   barging into production meetings and telling Betco

17   representatives not to talk to these people, there's

18   something going on here that I'm troubled by and that

19   may result in a breach of fiduciary duty.  I'm not sure

20   where the injury fits, but it's troubling conduct.

21            MR. BIANCHI:  I think there's a couple things

22   with the example even that you give.  If you'll recall,

23   Mr. Loverich did not remember what the conversation was

24   about.

25            THE COURT:  No, no, I'm not assuming that -- it

1  doesn't matter.  I mean he barged in and stopped the

2  conversation.  So he didn't know what the conversation

3  was about.

4         MR. BIANCHI:  Except I think there's an

5  important point and that's that Chris Pavain was a

6  salesperson and that those two gentlemen were

7  production.  So from our perspective, I understand that

8  this is -- the evidence is, you know, they're disputing

9  it, was that from Mr. Peacock's perspective when he saw

10  that, he saw production people talking to someone in the

11  sales department that wouldn't have the answers for the

12  questions was his position.  So when he walks in and

13  says why are you talking to them, they're not going to

14  know anything that you want to know, Mr. Pavain.  That's

15  our view of that situation.

16         THE COURT:  Was Mr. Pavain the only one present

17  at that meeting and that was something I missed?  Was he

18  the only one present for Betco?

19         MR. BIANCHI:  Yes, Your Honor.  And if you

20  notice, the visits from the production people, the

21  technical people in March, Mr. Pavain is not listed

22  there because he wasn't part of that group.  That was

23  Mr. Bischoff, Mr. Henson, I think Mr. -- I forget

24  Brett's last name.

25         MS. TURKE:  Hanus.

1            MR. BIANCHI:  Hanus.  Thank you.

2            THE COURT:  That's fine.

3            MR. BIANCHI:  So I think in that circumstance

4    that's what was -- what he was seeing what was going on

5    there.  And I think we showed plenty of the back and

6    forth emails.  And even they tried to put it off that he

7    didn't think Mr. Stratton -- Neil knew what he was doing

8    and he didn't want to give him any information.  Then we

9    saw emails where he would say well, what does Neil think

10   about this?  And this was late in the summer of 2011

11   where he's asking Neil's opinions on things.

12        So I just think that it was not true that he just

13   totally discounted what Mr. Stratton said.  I think it

14   had a lot more to do with there was a production and the

15   thing that he had been doing for 25 years, not saying

16   that it was all right, but when you do something for 25

17   years and you're well practiced and you're older, in my

18   experience being younger I often get told you don't know

19   what you're talking about and then it's on me to try and

20   prove to someone else that maybe I do know what I'm

21   talking about and these are important points.  And I

22   think that that's a lot of what was going on between

23   Mr. Loverich and Mr. Stratton and Mr. Peacock.  You had

24   someone who had a way of doing things and believed that

25   the way that they were doing it was right and wanted to

1  because that's the company that they had run and had

2  created.  And then you had new younger guys who

3  presumably don't have experience with what you're doing

4  coming in and telling you this is what you need to

5  change.  And I think in your mind, if it were me, I'd be

6  like why am I going to listen to you?  Why do you know

7  what you're talking about?

8      So that would be our take on those kind of

9  interactions.  But again, nothing was being hidden from

10 Betco there.  And that meeting that took place, it took

11 place in, they said some time they thought in late

12 September 2011.  The year was over anyways at that

13 point, if we want to get technical.  They had a year

14 from the purchase, which was September 29, 2010.

15          THE COURT:  September of 2010.

16          MR. BIANCHI:  So even though Mr. Peacock was

17 there until November, and we certainly talked about that

18 time frame, the time for them to bring their claim was

19 up.

20          THE COURT:  Well to bring their breach of

21 contract claim.

22          MR. BIANCHI:  Correct.  Correct.

23          THE COURT:  Anything more then for the

24 defendant?

25          MR. BIANCHI:  The last point that I would make

1  about the duty of good faith and fair dealing that Judge

2  Posner notes in his opinion and several others in the

3  Seventh Circuit is that it is often used to insert

4  provisions into the contract that addressed situations

5  that the parties couldn't and didn't think to address at

6  the time.  And what we see Betco was trying to do is put

7  in an extra provision in the contract that says well, we

8  should have extended the warranty period longer.

9  Whereas in this circumstance no additional provision is

10  needed.  The contract provides that they had that time

11  to be able to bring their breach of warranty claims or

12  misrepresentation claims and within that year period,

13  the duty was on them to take that course of action.  The

14  parties had bargained.  The risk was there.  They were,

15  you know, obviously a sophisticated party and had that

16  opportunity to do that, and so we would ask that the

17  Court would find that Mr. Peacock did not breach his

18  duty of good faith and fair dealing.      (9:44 a.m.)

19          THE COURT:  And I'll hear then rebuttal from --

20          MR. MOORE:  Can't help it, Your Honor.

21          THE COURT:  No, no.  That's fine.  I

22  anticipated it.

23          MR. MOORE:  I hope it's clear that one of the

24  frustrations of attempting to respond here and to

25  respond in general is that we start out talking about

1   the duty of good faith and all of a sudden we're talking

2   about Betco's duty.  And I understand that what Betco

3   was supposed to do has been characterized as a duty, but

4   the primary focus here and the primary -- well, the

5   primary focus of *Market Street* is that you really do

6   need to look at the duty of, in this case the seller,

7   and then you might consider issues, including the

8   incredible inattentiveness of the other party.  But

9   we're really focusing on the good faith of Mr. Peacock,

10  not focusing primarily on Betco simply because Betco has

11  the burden of proof.

12      It's interesting that when we begin to talk about

13  it in that term, now all of a sudden we're going to talk

14  about the fraud case that at the defendants' request has

15  been thrown out as the Court has correctly pointed out.

16  No, this is a contract duty.  We do not -- if there's a

17  duty of due diligence, that applied to pre-contract

18  behavior, and we can use whatever characterization we

19  like with regard to the supposed duty on the part of

20  Betco post-contract, but it's not due diligence.

21      Now, I also want to point out that there's one

22  point I neglected to mention with regard to the trick

23  when the Court quite appropriately asked me what's the

24  trick and that is the testimony that I heard and

25  understood was that Mr. Peacock was essentially telling

53

1  the employees to lie about the boilers to Betco.  The

2  reason for the boilers were needed, suggesting we need

3  the boilers in order to produce the product that Betco

4  wants, when, in fact, there was a problem with the

5  boilers that was inherent to the operation.  That was

6  not only deceitful conduct, that was intentionally

7  misstating, directing employees to misstate the facts to

8  Betco as I heard and understood the testimony.

9          THE COURT:  That's not entirely true.  He was

10  telling them to emphasize one part --

11          MR. MOORE:  Right.

12          THE COURT:  -- which was one of the reasons why

13  they needed new boilers.  In any event, the boilers is

14  the part of this case that probably has the least

15  likelihood of going forward since it was clearly

16  something known by your client --

17          MR. MOORE:  I understand.

18          THE COURT:  -- early on.

19          MR. MOORE:  In any case, Your Honor, I wanted

20  to point out in response to the question because it was

21  something that was brought up.

22          THE COURT:  Understood.

23          MR. MOORE:  The question of Mr. Peacock's

24  knowledge and intent, I think the Court raised,

25  correctly stated that intent is not an element in this

1  case and I want to point the Court to that same jury

2  instruction that counsel was referring to, Wisconsin

3  Jury Instruction Civil 3044, and the comments on that.

4  The comments include the fact, and I'll quote it, says

5  "generally scienter is not an element of a contract

6  action.  Failure to perform a contract need not be

7  willful or negligent to constitute a breach."  And

8  that's the comment on the good faith instruction.

9       Counsel also referred to *Market Street* and the name

10 of the individual is Orenstein.  I want to point out

11 that Orenstein, in the *Market Street* case, was the

12 individual who was representing the trust, the other

13 party.  And it was Orenstein's conduct that was being

14 referred to by Posner in that case when he talked about

15 incredible inattentiveness.  He was saying that

16 Mr. Orenstein was incredibly inattentive, but

17 nonetheless that's not the question we're dealing with.

18 The question is whether there's a breach in the duty of

19 good faith and I'm going to send this back to the

20 Eastern District, which again ultimately found that

21 despite Mr. Orenstein's inattentiveness, that Market

22 Street had tricked the other side.

23      I understand the discussion about Mr. Kennedy's

24 testimony with regard to what was done with customers

25 and I would simply point out to the Court the difficulty

1    of bringing in -- putting on the stand our own customers

2    to testify as to why they might have had problems, both

3    with regard to the volume and whether it's a good idea

4    to bring in your customers and talk about the problems

5    they've had with us.  So that was at least problematic.

6            THE COURT:  On the other hand, Kennedy had gone

7    back and talked to customers about these issues.  So

8    it's not like he was put in a position of not

9    understanding.

10           MR. MOORE:  No.

11           THE COURT:  Is there a case where there has

12   been an issue with the customer on past purchases?  In

13   other words, were they -- I guess there was some

14   testimony, isolated testimony about testing not

15   comporting.  I didn't hear that specifically with

16   respect to a certificate of analysis.

17           MR. MOORE:  Is there a problem with past

18   customers?

19           THE COURT:  Yeah.

20           MR. MOORE:  Yes.  I can't point you to the

21   evidence, specific evidence at this point, but I know

22   from what I know about this case --

23           THE COURT:  There were isolated instances of

24   customers not raising getting -- raising a concern that

25   they weren't getting what they had bought.  That

1    testimony came in.

2           MR. MOORE:  Yes.

3           THE COURT:  What I'm talking about is had there

4    been payouts by Betco for customers not getting what

5    they bought for products sold before acquisition,

6    post-acquisition where there had to be payouts.

7           MR. MOORE:  I'm not aware of any payouts to

8    customers post-acquisition.  No, I'm not.

9           THE COURT:  Understood.

10          MR. MOORE:  As the Court has suggested, the

11   problem here -- the defense is well, people didn't know

12   that they weren't getting product.  They didn't know.

13   Well, the fact of the matter is and one of the natures

14   that we've learned about in this industry is no one is

15   suggesting here that this bacteria doesn't work and the

16   question is to what extent and how sophisticated a

17   customer do you have to be to know that you're getting 2

18   billion instead of 5 billion.  When you put bacteria, as

19   the Court took judicial notice, when you put bacteria in

20   a bucket it will grow, and that's true of septic systems

21   and municipal waste systems.  So ultimately there may be

22   5 billion there.  It's a question of how much time it

23   takes and that's the subtlety of this interesting little

24   exercise.

25          The fact of the matter is though that when a

1  customer asks for, it receives, and as happens in

2  foreign countries at least and in many sophisticated

3  municipalities say I want to see -- or municipalities in

4  general, that we want a certificate of analysis that

5  certifies what we're getting is what you're

6  representing, they're entitled to rely on that.  They

7  may never know they're being cheated, but that doesn't

8  mean they're not being cheated.

9      If we were going to argue here as to whether or not

10 Mr. Peacock hid something from Betco, the fact that he

11 hid it from customers is virtually indisputable I think.

12 If we didn't know, they didn't know.  It is a fact,

13 contrary to what I believe was being represented here,

14 that products were going out the door without testing.

15 Ms. Walters testified to that.  I know specifically as

16 to liquid products after 2007.  Product was going out

17 the door.  It was not being tested.

18     I guess I'll conclude by suggesting that if we're

19 going to talk about what gets inserted into this

20 contract, whether it's next to Section 4.19 or in some

21 other place, what we're going to insert here and what we

22 wish we would have inserted, to use the language from

23 *Market Street* that counsel was correctly referring to, I

24 guess the suggestion is that what we would have inserted

25 if we had thought about it and if we could do it over

1   again with 20/20 hindsight, we would have inserted

2   something at least that said "and you, seller, won't

3   hide the ball from us.  That you will give us a clean

4   look at what we thought we were getting so that that

5   one-year provision, we could reasonably take advantage

6   of it.  That we could get a good look at this."

7        I understand the Court's statements or the Court's

8   suggestion that well, you didn't do a very good job

9   about that.  You were perhaps incredibly inattentive.

10  But the fact of the matter is if Malcolm Peacock hadn't

11  been there, we believe this would have turned out

12  differently.  I recognize that's not the test here, but

13  if we're going to talk about what we would have

14  inserted, what hindsight would have allowed us to do,

15  that's what our hindsight, as we sit here, as we've sat

16  here and heard the evidence, that's what we would

17  insert.  Give us a chance to take a real look at this

18  operation and this product, not pre-petition or not

19  pre-contract, I understand that, but post-contract.

20  Thank you.

21        THE COURT:  Thank you very much, Counsel.  I am

22  going to take about a half hour.  I'd ask the parties to

23  be back at 10:30 and I will give you guidance on

24  liability and what, if anything, I'll hear as to

25  damages.  If we have to line up witnesses consistent

1   with their availability, we can talk about that as well,

2   though my expectation would be that we would proceed

3   with witnesses for the plaintiff on the issues that I

4   identify, assuming I do, and I'm frankly still puzzling

5   about one aspect.  And that we could proceed almost

6   immediately with that.

7        Anything more for the plaintiff before I take this

8   under advisement?

9             MR. MOORE:  No, Your Honor.

10            THE COURT:  Anything for the defendant?

11            MS. TURKE:  Your Honor, just wanted to talk

12   about briefly our damage expert.  He is available by

13   telephone.  He has to testify in another matter.

14            MR. BIANCHI:  We have until I think one --

15            MS. TURKE:  One o'clock central time for him to

16   testify.

17            THE COURT:  I'm sorry, you have until then or

18   he would be available?

19            MS. TURKE:  He would be available until one

20   o'clock central time.

21            THE COURT:  All right.  I guess we can go

22   forward.  How long do you think your witness will take?

23            MR. JACKSON:  Not long, Your Honor.

24            THE COURT:  All right.  Then perhaps we'll be

25   able to complete it all within that time frame.  I have

1    a 12:30 hearing, I believe.  It might be -- actually it

2    might be -- that's yesterday's -- I will work around it.

3    If we have to, we'll postpone that one for a half hour.

4         Very good.  Thank you all.  We're in recess and

5    will reconvene at 10:30.

6         (Recess              9:58-10:39 a.m.)

7         THE COURT:  I should begin by saying that I

8    appreciated the presentations by both sides.  This has

9    been a very interesting case well before we got to

10   trial.  It raises some very interesting disputed

11   positions.  I often told my clients when I was in

12   private practice that an interesting case is a wonderful

13   thing for lawyers.  It's not good news for clients

14   because it tends to make it expensive, involved, and

15   result, as this case did, in trial.  So I don't mean to

16   suggest that's any comfort to the parties.  I understand

17   that as interesting as the issues are, this has been a

18   difficult process, but I have appreciated how it's been

19   presented by both sides and I wanted to say that at the

20   outset.

21        In terms of deciding the remaining issue before me,

22   the implied duty of good faith in performance of the

23   contract, I start with the law.  As the trier of fact

24   I'm bound by the law, just as the jury is.  And whatever

25   the nuances may be, that law is set forth at Wisconsin

1   Jury Instruction Civil 3044, which I will now set forth

2   for the record.  Under Wisconsin law, the contract

3   between defendant and plaintiff requires that each party

4   act in good faith towards the other party and deal

5   fairly with that party when performing the express terms

6   of the contract.  This requirement to act in good faith

7   is a part of the contract just as though the contract

8   stated it.

9        In this case, the plaintiff claims defendant had an

10  obligation to use good faith when performing his duties

11  as the ongoing manager of his former company

12  Bio-Systems, including disclosing information that

13  plaintiff needed to know to exercise rights under

14  Section 414 and Chapter 10 or Section 10 -- should be

15  Section 4.14 and Section 10 of the contract.

16       As to this obligation -- excuse me.  As to this

17  obligation, plaintiff claims that defendant breached the

18  contract's good faith obligation by failing to disclose

19  problems with boilers, production processes, test -- and

20  testing of product before shipping, as well as

21  suppressing plaintiff's disclosures -- I'm sorry,

22  plaintiff's discovery of these problems.  Whether the

23  duty to act in good faith has been met in this case

24  should be determined by deciding what the contractual

25  expectations of the parties were.  Therefore, in

1  deciding whether the defendant breached the duty of good

2  faith, I am obligated to determine the purpose of the

3  agreement; that is, the benefits the parties expected at

4  the time the agreement was made.  This duty of good

5  faith means that each party to a contract will not do

6  something which will have the effect of injuring or

7  destroying the rights of the other party to receive the

8  benefits of the contract.

9      A contracting party can breach the duty of good

10 faith even if he did not violate an express term of the

11 contract.  It is not a duty of good faith -- a breach of

12 duty of good faith, if a course of action available to

13 the plaintiff could have been avoided or that plaintiff

14 could have avoided the harm and this course of conduct

15 was not followed.

16     I'll come back to this last sentence with regard to

17 the conduct of Betco.  I'll start with what is properly

18 the focus of the claim here and that is the conduct of

19 Mr. Peacock.  I do find that in the course of his duties

20 as the ongoing manager of the company, that he generally

21 discharged those duties as required, although there's no

22 question, as I've indicated on this record, that

23 Mr. Peacock's conduct was not above reproach, and I can

24 certainly understand Betco's frustration with respect to

25 his lack of engagement in the problems which existed in

1  the company.

2       I don't think that it is a breach, and I do not

3  find a breach of duty of good faith, because Mr. Peacock

4  failed to immediately disclose all of the warts that

5  existed with the current operation of the company.  I do

6  think, and I do find, that not only Mr. Peacock, but an

7  objectively reasonable person would have believed that

8  the operations of the company which had been successful

9  and had resulted in a profitable enterprise and ongoing

10 business value as a profitable enterprise could continue

11 in operation as it was generally.  And more to the

12 point, that with respect to the claims of failing to

13 disclose, that it was manifestly obvious, and

14 Mr. Peacock had no reason to think that it was not

15 obvious, that there were problems with this plant with

16 respect to its boilers, with respect to its production

17 processes, and to a lesser extent, and I'll come back to

18 this, with respect to the testing of products before

19 shipping.  And the reason for this is numerous.  This

20 plant was not a model of efficiency.  It had obvious

21 problems just by an examination of the plant itself.

22 Anyone coming in, as Mr. Kennedy did later, was able to

23 identify reasons why there would not be consistent

24 results in terms of the production of the bacteria that

25 -- the targeted bacteria and opportunities, obvious

1   opportunities for contamination.  And yet overall,

2   Mr. Peacock, over a long period of time was able to grow

3   his company into a profitable enterprise.  I do not

4   think that Betco was entitled to disclosure, and in

5   fact, I think the law is quite clear they were not

6   entitled to disclosure by Mr. Peacock of matters that

7   were obvious to them as were the problems with the

8   boilers, the production process, and as I say, to a

9   lesser extent the testing process.

10       Indeed by March of 2011, they had the benefit of a

11   detailed memo setting forth most of those problems, even

12   if they didn't have reason to know of them

13   independently, and I really do think they did and I

14   think the evidence makes that clear and so I find.

15       As I've indicated, I think there are two exceptions

16   to that.  One is for product that went out the door

17   without testing or adequate testing, including the

18   liquid product, but to a lesser extent some of the other

19   product.  And the problem with specifying what that was

20   is that the evidence was not entirely clear, and to the

21   extent it was not clear, I think that falls on the

22   plaintiff's burden of proof.

23       The second exception is product that went out the

24   door with certificates of analysis that were essentially

25   made up out of whole cloth.  Mr. Peacock should have

1    known -- he either knew or he should certainly have

2    known as the operator of the plant that these practices

3    were occurring, and under a duty of good faith he also

4    should have known that this would not be something

5    easily discovered by plaintiff Betco.

6         He also certainly knew that the discovery of those

7    problems outside of the first year of the contract and

8    outside of the second year of the contract would have

9    implications under the contract for the plaintiff.  And

10   I do think that the failure to come forward constitutes

11   a violation of the duty of good faith and fair dealing.

12   But as I've indicated at the outset, for a breach of a

13   duty of good faith to occur, it's a fact requires injury

14   or destroying the rights of the other party to the

15   contract.  And that's where I'm left wanting.

16        Although I will not preclude the plaintiff from

17   attempting to prove injury, I think there's no evidence

18   on this record of it.  And the reason is fairly

19   straightforward.  Sec. 4.19, the product warranty

20   provision, contemplates that the seller be responsible

21   for failures to conform with the applicable contractual

22   commitments and all express and implied warranties.  The

23   theory of the plaintiff is that had they become aware of

24   the inconsistencies with respect to certificates of

25   analysis or the lack of testing, adequate testing of

1    product or complete testing of product, that they would

2    have brought a general breach of contract claim and that

3    their remedy, as I understand it, would have been to

4    renegotiate the entire pricing of the agreement.  I do

5    not find that to be the remedy available.  I do not find

6    the general representation under 4.19 to be clearly in

7    breach.

8         Even if I were to limit that to the seller, the

9    representation that the seller had been in conformity

10   with all applicable contractual commitments and all

11   express and implied warranties that is in the context of

12   a larger guarantee, a series of guarantees that

13   Mr. Peacock was giving to the buyer with respect to

14   controlling liability for past sales.  Once he

15   relinquished control of the company and Betco became the

16   owner, to the extent he was obligated to disclose on a

17   going forward basis, and again this is -- it's not clear

18   to me he would be obligated to disclose past failures,

19   although I have found that he certainly knew of the

20   potential claim, I don't think he would have known that

21   the buyer Betco could have undone the entire contract by

22   virtue of these departures from commitments to clients.

23   At the end of the day, the remedy for ongoing failures

24   to deliver product as contemplated by the certificate of

25   analysis or by the specifications to a customer is to

1  fulfill that obligation.  I think it would be

2  unreasonable under the circumstances here to conclude

3  that Betco gets to completely rewrite the contract.

4      They got what they say they intended to get in the

5  purchase.  They got a company, warts and all, that was

6  producing at a profitability level under current

7  practices to the satisfaction of its customer base under

8  that practice.

9      Now, to the extent that they had other ideas, it

10 isn't spelled out in this contract even in this, what I

11 really do believe would be a conflated right under 4.19

12 of the contract, and I don't think it would have been a

13 basis, and I do not find it a basis, to undo the

14 contract itself or to rewrite the purchase term of the

15 contract.  At best, it is a basis, this breach, to hold

16 Mr. Peacock accountable for the consequences of the

17 ongoing failures to comport with the certificate of

18 analysis and the specs, and that is the only injury I

19 can find.  But that injury is not apparent to the Court

20 on this record; that is to say, it doesn't appear that

21 any customers post-sale complained about the quality of

22 the product they received any more than they did before,

23 and in particular, raised any challenges to a breach of

24 contract by Bio-Systems for false certificates of

25 analysis or for inaccurate specifications.

1    Unless there is some arising injury, then there is

2 not a breach of the duty of good faith.  That's the

3 Court's ruling, but I will hear briefly from plaintiff

4 if they believe they have damages they can show that

5 arise directly out of sales of product with inaccurate

6 certificates of analysis or of product before

7 acquisition or post-acquisition.  And I'll hear from

8 plaintiff on that point.

9    MR. JACKSON:  Your Honor, on the issue of can

10 we introduce evidence of bad customers, claims that they

11 have made about defective product, we're not prepared to

12 provide that evidence at this time.

13    THE COURT:  I understand.  And for that reason

14 I'm going to find no breach of the duty of good faith.

15 I will follow up with a written opinion which will

16 reflect, I think for the most part, what I've just told

17 you orally because I needed to provide you an oral

18 ruling.  Once that is in place, I will enter judgment

19 and I suspect that plaintiff disagrees with my reading

20 of the law and you'll have an opportunity to read -- to

21 appeal that ruling.

22    I would say to both sides that I don't think that's

23 necessarily a healthy way to proceed.  There is some

24 question, I suppose, as to the proper remedy and a

25 three-judge panel in the Seventh Circuit has found me to

1  be mistaken in the past and they may find it here,

2  although obviously as a trier of fact that's a more

3  difficult road to hoe for the plaintiff.  That may

4  happen.  I think it would make more sense for the

5  parties to try to reach resolution, but I do not involve

6  myself in that and at this point neither does our

7  standard mediator, Mr. Oppeneer.

8       You will be contacted, I'm certain, by the Seventh

9  Circuit mediators who are quite aggressive and will try

10  to encourage the parties to reach resolution.  I would

11  encourage both sides to consider that.

12       Was there something more for the plaintiff before

13  we adjourn?  I should say recess.

14            MR. JACKSON:  No, Your Honor.  And thank you

15  for allowing us to present our case.

16            THE COURT:  As I say, I have appreciated both

17  sides' presentations.  I think they were done very

18  professionally.  The clients were well served.  You have

19  a record that I think will at least highlight the

20  issues, legal issues for the Court of Appeals, as well

21  as basic findings by this Court.  And I thank both sides

22  for that.

23       Anything more for the defendants at this time?

24            MR. BIANCHI:  Your Honor, we would just ask if

25  you have a specific timing for briefing on attorneys'

1  fees?

2           THE COURT:  And those are available under the

3  contract?  I hadn't focused on that.

4           MR. BIANCHI:  Yes, Your Honor.  Under Section

5  10.5(e) it says in the event of the parties -- it was in

6  our proposed findings that were agreed upon -- "that the

7  prevailing parties' attorney's fees and costs shall be

8  made by the nonprevailing party."

9           THE COURT:  How much time to submit your claim

10  for fees?

11           MR. BIANCHI:  By next Friday.  Is that fair

12  enough?

13           THE COURT:  So a week from this Friday your

14  submissions will be due.  I would require that you

15  provide the backup, including your own internal data

16  keeping for your time in this matter and proof of all

17  invoices to your clients and the amount paid to date by

18  your client.  To the extent that there is a dispute over

19  the claim for fees, I will require that the defendants'

20  counsel provide the same information to the Court along

21  with their opposition.  And I'll give you two weeks, 14

22  days to file any opposition to the claim.  Yes.

23           MR. JACKSON:  Just so I'm clear when you said

24  to provide the same information, are you -- are you

25  asking from us our fees?

1          THE COURT:  I'm asking for your invoices to

2     your client, amount paid by your client to date, and

3     your time records if you -- you don't have to provide it

4     if you don't oppose it.  But if you're going to oppose

5     it, then I will require production of those things.  If

6     you believe portions of it, and it would only be

7     portions of it disclose attorney/client, you can do that

8     under seal to the Court, but the invoice, unless it goes

9     into substantial more detail than most, is not going to

10    prevent disclosure to the other side nor certainly will

11    the fact of payment.

12          MR. JACKSON:  That's in the event we oppose.

13          THE COURT:  In the event you oppose.  Exactly

14    right.

15          MR. JACKSON:  Okay.  Thank you.

16          THE COURT:  Anything more for the defendant?

17          MR. BIANCHI:  No.  Thank you.

18          THE COURT:  Again, I thank you both sides.  And

19    we're in recess.

20        (Proceedings concluded at 11:00 a.m.)

21                      *  *  *  *  *

22

23

24

25

1        I, LYNETTE SWENSON, Certified Realtime

2   and Merit Reporter in and for the State of Wisconsin,

3   certify that the foregoing is a true and accurate record

4   of the proceedings held on the 17th day of June 2015

5   before the Honorable William M. Conley, Chief Judge for

6   the Western District of Wisconsin, in my presence and

7   reduced to writing in accordance with my stenographic

8   notes made at said time and place.

9   Dated this 20th day of July 2015.

10

11                      /s/_____

12                      Lynette Swenson, RMR, CRR
                        Federal Court Reporter
13

14

15

16  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
17  unless under the direct control and/or direction of the
    certifying court reporter.
18

19

20

21

22

23

24

25