## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WISCONSIN

BETCO CORPORATION, LTD.,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION & ORDER |
| v. | | |
| | | 14-cv-193-wmc |
| MALCOLM D. PEACOCK, | | |
| | Defendant. | |

Some four years after acquiring the assets of two companies, collectively known as "Bio-Systems," plaintiff Betco Corporation, Ltd. brought this suit against former owner Malcolm D. Peacock to undo the sale or to be compensated for damages.[1]   Following summary judgment, a single claim remained for trial:   whether Peacock breached the contractual duty of good faith and fair dealing in his post-sale capacity as manager of Bio-Systems.   According to Betco, Peacock violated this duty by concealing ongoing problems with Bio-Systems' manufacturing process of which Betco was unaware before the sale, effectively preventing Betco from discovering the problems and enforcing certain remedies before they expired under the parties' purchase agreement.

A bench trial was held on June 15 through 17, 2015, to resolve the following factual issues:   (1) whether Peacock complied with his contractual duties of good faith and fair dealing; and if not, (2) whether that breach caused Betco to incur any damages.   At the conclusion of the liability phase of trial, the court found that Betco failed to establish that Peacock had breached his duty of good faith and fair dealing, but indicated that a written opinion would be issued explaining the court's ruling more thoroughly.   This opinion not

---

[1] Initially, Betco sued both Malcolm and his wife, Marilyn Peacock, as co-owners of Bio-Systems, but following summary judgment Malcolm Peacock is now the sole, remaining defendant.

only elaborates on that oral ruling, but also addresses several other, outstanding motions filed by the parties both before and after trial, ultimately directing entry of final judgment in defendant Peacock's favor.

FACTS[2]

## I.      Parties

Plaintiff Betco is an Ohio company that primarily manufactures cleaning chemicals and equipment.   In September 2010, Betco purchased the production equipment and related assets of Envirozyme, LLC, and Bio-Systems Corporation, companies based in Beloit, Wisconsin, which produced a variety of "bio-degradation" products in liquid and powder forms that contain bacteria designed to degrade various forms of waste.   Before the September 2010 acquisition, Bio-Systems had been owned, operated and managed by defendants Malcolm and Marilyn Peacock, with Malcolm Peacock ("Peacock") primarily responsible for the company's affairs.[3]

## II.     Sale of Bio-Systems' Assets to Betco

The Peacocks decided to sell Bio-Systems sometime before May 2010, engaging a mergers-and-acquisitions advisory firm to assist in the process.   Around May 2010, that firm contacted Betco regarding its potential interest.   As part of their initial discussions, the firm provided Betco a "Confidential Business Review" of Bio-Systems.   This document contained

---

[2]  The following facts are drawn from the parties' Stipulated Findings of Fact (dkt. #171-1), and the facts adduced at trial.  This court previously found it had subject matter jurisdiction over this dispute.  (Dkt. #99, p.2 n.1.)

[3] The court also granted summary judgment to two other named defendants – the Peacocks' post-sale holding companies, E. Holdings, LLC, f/k/a Envirozyne, LLC, and B. Holdings, Inc., f/k/a Bio-Systems Corporation.

information supplied by Malcolm Peacock, including representations as to the operations, profitability and other aspects of Bio-Systems.

From July through September of 2010, Betco performed due diligence regarding a potential purchase of Bio-Systems, which included site visits, conversations with Bio-Systems personnel, examination of financial information and requests for other information. Betco personnel principally involved in the due diligence process included:  Paul Betz (president and CEO), Denise Lennard (senior vice president of operations and human resources), Anthony Lyons (CFO), and Kurt Bischoff (the vice president of research and development).

As VP of research and development, Bischoff was responsible for the due diligence review of the technical aspects of Bio-Systems.  He testified at trial that before the purchase, he spent time in Bio-Systems' quality control lab and discussed testing processes with Peacock.  Based on his discussions with Peacock, Bischoff believed that all products were tested and that they had to conform to certain specifications before being shipped.  (Trial Tr., dkt. #202, at 114.)  Because Bischoff did not fully understand some of Bio-Systems' technology and processes, he contacted Dr. Barry King to act as Betco's expert consultant regarding Bio-Systems' bio-remediation processes.  Betco's CEO Paul Betz testified at trial that he had concerns about Bio-System's technology before the purchase, particularly in terms of whether the technology for growing bacteria was current, and he, too, thought Dr. King would be a useful consultant in that regard.  (Trial Tr., dkt. #202 at 106.)  While Bischoff asked Dr. King specific questions about the Bio-Systems technology during the due diligence process, however, King never asked to visit the Beloit plant, nor did he personally examine Bio-Systems' technology himself before the purchase.

3

During the due diligence period, Peacock told Betco personnel that the Beloit plant was not only adequate for production of the type and quantity of products then under production, but had significant excess capacity.   Peacock also told Betco personnel, however, that for the past 15 to 20 years, problems developed in culturing bacteria at the Beloit plant for a couple weeks every July, and this had caused inventory problems for Bio-Systems.   Betz specifically testified at trial that he knew before the purchase that Betco's bacteria yields were inconsistent.  (*Id.* at 104.)

## III.   The Asset Purchase Agreement

On September 29, 2010, the parties signed an Asset Purchase Agreement ("APA"). Under its terms, Betco agreed to pay $5.5 million, with $5 million to be paid at closing and $500,000 held in escrow in the form of a promissory note.  In return, Betco would receive the production equipment and assets located in Bio-Systems' commercial buildings in Beloit.  The money in escrow was set aside for use as necessary to cover any right that Betco might have to indemnification in accordance with the terms of the APA.  Except as diverted for that purpose, the note was to be paid out in full by September 29, 2012.

## IV.   Operation of Bio-Systems

Before the sale of the company, Peacock was involved in all aspects of Bio-Systems' business, including production, testing and sales.  Peacock had actually developed the so-called "wet-batch" process used at the Beloit plant to produce bacteria, and he was proud of the process.  He was also proud of the spiral plater and ProtoCOL counter that Bio-Systems used to count the level of bacteria in a product, and he willingly showed the equipment to Bio-Systems' customers.

According to some of his former employees, however, Peacock did not respond well to employees questioning Bio-Systems' methods nor suggesting changes. For example, the production manager of the Beloit plant, Derek Loverich, who had worked at the plant since 2006, testified that he attempted to raise concerns with Peacock over the years regarding deficiencies in the plant's boilers and fermenters with the wet-batch process, with products not meeting specification, and with untested products being shipped. Not only was Peacock not receptive to Loverich's concerns, (Trial Tr., dkt. #202 at 148, 154, 159, 160), he dismissed them by stating that Bio-Systems' products worked. (*Id.* at 160.) As a result, Loverich never shared any concerns he had about the ProtoCOL counter with Peacock; nor did he share any concerns about salespeople completing the certificates of analysis. (*Id.* at 200-01). Similarly, Bio-Systems' lab manager, Mindy Walters, had concerns about the accuracy of test data produced by the ProtoCOL counter, because they were higher than what a manual count would show, but did not discuss her concerns with anyone before the company was sold. (Trial Tr., dkt. #202, at 222.) She was also aware that product was being shipped that did not meet specification, but she never voiced any concerns about quality control with Peacock or anyone else before the sale. (*Id.* at 238.)

One of the problems existing in plant operations before the date of sale was the way in which Bio-Systems generated its "certificates of analyses" ("COAs") which are intended to assure that the product's specifications are accurate. These certificates were requested, and in instances required, by some of Bio-Systems' customers. Rather than the lab employees generating these COAs as a result of testing, however, Bio-Systems' sales team generally generated them. Specifically, the sales manager for the institutional division at

Bio-systems, Deborah Dare, would prepare the certificates of analysis for domestic products, and another employee, Gerson Artreche, would prepare them for international orders.

Dare testified that in order to prepare the certificates, she randomly changed the bacterial count listed on the certificate to make it slightly different than the previous certificate for the product. (*Id.* at 276-79.) Artreche testified further that when he prepared certificates of analysis, he simply use the total counts from a previous certificate of a product. (*Id.* at 290.) In other words, the certificates of analysis issued by Bio-Systems were not based on any up-to-date test results or information obtained from its lab.[4] Nevertheless, before the purchase of Bio-Systems by Betco, neither Peacock nor any other Bio-Systems employee disclosed to Betco how the certificates of analysis were prepared.

## V.    Post-Sale Operations

After signing the APA, Betco hired Peacock to continue operating the Beloit plant. Peacock had requested continued employment as part of the purchase negotiations, with the plan being that he would be employed as part of the company for two years. At trial, Betco CEO Paul Betz testified that the intention was for Peacock to "keep doing what [he'd] been doing." (Trial Tr., dkt. #202, at 91.) In other words, Peacock was to continue running the business as he had been running it. Peacock was to report directly to Betz, with Bio-Systems employees reporting to Peacock. (*Id.*) Moreover, Betz instructed Peacock to focus on sales and profits and to try and develop a sales program. Likewise, Peacock testified that he assumed that after the sale it would be "business as usual," with a focus on building sales. (Trial Tr., dkt. #203, at 144.) Therefore, Peacock instructed Bio-Systems employees that

---

[4] Yet another employee, Dana Juul, testified that Bio-Systems had previously used actual test data to prepare the certificates, but that in 2006 or 2007, Bio-Systems had changed its methods of preparing the certificates at the direction of Peacock in order to save time. (*Id.* at 312.)

nothing would change after the sale, and they should continue running Bio-Systems as usual.

After the purchase, Betco obviously had access to information about Bio-Systems processes that would have enabled it to determine how Bio-Systems manufactured and tested its products, as well as how it prepared certificates of analysis. (Trial Tr., dkt. #202, at 126.) As Betco's VP of research and development, Bischoff in particular had access via email to all key Bio-Systems employees, including Dana Juul, Derek Loverich, Neil Seeger, Mindy Walters and Chrissy Stratton. (*Id.* at 125-26.) Several employees further testified that Peacock never discouraged them from communicating with Betco after the sale. In particular, Bio-Systems' lab manager Walters testified that Peacock never told her to hide information from Betco, and she never felt like she could not or should not speak with Betco employees. (*Id.* at 249-262.) In fact, after the sale, Walters personally showed Bischoff how bacteria counts were done and where count information was stored. Moreover, institutional sales manager Dare testified that Peacock told her and her colleague Juul affirmatively to talk to Betco personnel (*id.* at 283), and Juul testified that she spoke freely with Bischoff and Henson. (*Id.* at 325.)

The one exception seemed to be Loverich, who testified that while Peacock never told him to lie to Betco personnel, Peacock discouraged him in particular from talking to Betco personnel that visited the plant. Loverich also believed he might lose his job if he told Betco personnel about problems he perceived in the manufacturing process. (Trial Tr., dkt. #203, at 163, 194.)

Regardless, after the purchase, Peacock suggested that Bischoff, as VP of research and development, visit the Beloit plant for a week to learn more about Bio-Systems' processes

and "correct what [Bischoff] felt [wa]s incorrect." (*Id.* at 132.) In response, Bischoff reported being extremely busy after the purchase, so he chose not to make a comprehensive visit, and instead made a number of shorter visits. Additionally, although Bischoff had set goals to review and learn Bio-Systems' processes and lab equipment within the first 100 days of the purchase, he ended up being too busy to do so. (*Id.* at 121-22.)

In January 2011, Bio-Systems hired Neil Seeger to optimize and improve the plant's fermentation capabilities and reduce contamination. Seeger testified at trial that when he arrived, he saw many obvious problems at the plant, including cleanliness and contamination issues. (Trial Tr., dkt. #203, at 44-48.) Seeger raised his concerns with Peacock, but found Peacock dismissive. (*Id.* at 48.) In particular, Peacock did not appear to be concerned with low bacteria counts, contamination, or the wet batch process generally, and did not think the wet batch process should be changed. (*Id.* at 53.) Loverich, on the other hand, shared many of Seeger's concerns, so much so that in March 2011, Loverich documented in a letter his concerns regarding production issues at the plant to Betco personnel. (Trial Tr., dkt. #202, at 163.) Specifically, Loverich wrote about his concerns with fermentation, boiler capacity, the wet-batch process generally, dust control and the shipping of product prior to final plate specification.

## VI.    March 2011 Visit by Betco Personnel.

In mid-March 2011, several Betco employees, including Bischoff, visited the Beloit plant and spoke with several employees at the plant, including Loverich and Seeger. They both told the Betco personnel that the Beloit plant's current boiler capacity was insufficient. As Betco's CEO and President, Betz testified at trial that after this visit, Betco knew that

8

some finished product was being shipped even though the bacteria colony counts were too low to meet specifications. (Trial Tr., dkt. #202 at 101). Betco later relayed some of the problems identified by Loverich to Peacock. However, no one raised with Peacock the fact that product was being shipped below specification. (Trial Tr., dkt. #202, at 140.) Moreover, the evidence was clear that Peacock did not see this as a problem after purchase, any more than he did before, so long as the process continued to satisfy the company's customers, which by all accounts, it did.

**VII.    Betco Pays Out Remaining Escrow Money and Peacock Resigns.**

Consistent with the terms of the parties APA, Betco released the remaining escrow money due Peacock in September 2011. Although Betco could have waited another year to do so, Peacock had requested an early payout at a 12% discount to Betco. Betco's CFO, Anthony Lyons, testified that it paid the escrow because he thought the discount was a good deal, even though Betco was aware of significant problems with the Beloit plant by that time. (Trial Tr., dkt. #203, at 124.)

Sometime in fall of 2011, Chris Pavain from Betco visited the Beloit plant. Peacock was not present when Pavain arrived, and Loverich and Seeger invited Pavain to meet with them in a conference room. Loverich and Seeger testified that Peacock interrupted the meeting. (Trial Tr., dkt. #203, at 56, 169.) According to Seeger, Peacock told Pavain that Loverich and Seeger "didn't know anything." (*Id.* at 56.) According to Peacock, he did not believe that either Loverich or Seeger would have anything useful to say to Pavain, who was focused primarily on sales, compared to Loverich and Seeger, who were involved in the manufacturing process.

9

In November 2011, Paul Betz and Denise Lennard told Peacock that that he was no longer needed at the Beloit plant.  Betz explained at trial that he did this so that Betco would learn how to run the Bio-Systems business itself, without relying on Peacock.  (Trial Tr., dkt. #202, at 93.)  Thus, Peacock was asked to step aside and act as a consultant only, so as to let others learn the business.  (*Id.*)  Peacock essentially stopped working at Bio-Systems at that time, although he was not officially terminated until April 2012.  (*Id.* at 95.)

## VIII.  After Peacock's Resignation.

In January and in March 2012, Loverich sent emails to Betco again outlining problems at the plant.  Over the next two years, Loverich and Seeger worked to improve the plant.  Among other things, they added procedures to make the plant cleaner, improve the air quality and decrease potential contamination.  They also tried to improve the wet batch process to achieve higher yields of bacteria.  Although partially successful, Loverich and Seeger were unable to achieve consistently high yields using the wet batch process.  (*Id.* at 179.)  Seeger testified that he was frustrated at times that Betco was not implementing necessary changes to improve things more.  (*Id.* at 95.)

In the spring of 2012, Betco hired Keith Kennedy as vice president of Bio-Systems.  At the time he was hired, Kennedy was told of Betco's concerns with the viability of Bio-Systems' wet batch process and the plant being able to produce enough bacteria to meet business requirements.  He also learned almost immediately about the problems with the ProtoCOL counting method and preparation of COAs.  (Trial Tr., dkt. #203, at 333-36.)  After Kennedy was hired, Bio-Systems started purchasing bacteria cultures from third

parties and began to phase out the wet batch process gradually.   Bio-Systems has also switched to using manual counts for bacteria testing, rather than the ProtoCOL counter. Finally, the COAs are now prepared by the lab, rather than sales personnel.

## IX.   Betco's Expert.

In April 2012, Bischoff also contacted Dr. King about evaluating the Beloit plant, acknowledging to King that Betco had made a mistake by not having him evaluate the plant before Betco purchased Bio-Systems.   Betco also hired Robert Reich, a microbiologist and the president of LexaMed, to assess the Beloit facilities and further determine whether the processes there were effective in growing certain bacteria.   (Trial Tr., dkt. #202 at 25.) Reich visited the plant and saw the various processes Bio-Systems used for growing bacteria. During the walkthrough, Reich saw several, obvious deficiencies with the processes and systems at the plant, including lack of temperature and moisture controls, as well as cleanliness issues.

Reich later conducted lab experiments at LexaMed facilities to test some hypotheses he had formed during that visit.   After his experiments, Reich concluded that: (1) although a wet-batch system can successfully grow bacteria spores, Bio-Systems' wet-batch process was too uncontrolled to produce a commercially viable bacteria population; (2) some of Bio-Systems' fermenters did not have necessary control features; (3) lots of opportunities existed for contamination in the Beloit plant; and (4) bacteria yields could not be increased at the existing facility. (*Id.* at 42-47.)

Reich did not, however, test any Bio-Systems products to determine if they actually worked for the intended purpose of sewage treatment.   (*Id.* at 62.)   Similarly, Betco offered

no evidence at trial suggesting that Bio-Systems' products did not work for their intended purpose, regardless of whether the product met the specification or the certificate of analysis was accurate.  Bischoff testified that he is not aware of any warranty claim brought by any customer.  (Trial tr., dkt. #202, at 140.)  Similarly, Dana Juul, the sales and customer service manager, testified that she could not recall any customer leaving because of a quality issue. (*Id.* at 323.)


OPINION

**I.     Duty of Good Faith and Fair Dealing under Wisconsin Law.**

Under Wisconsin law, each party to a contract owes a duty of good faith and fair dealing to the other. *Beidel v. Sideline Software, Inc.*, 2013 WI 56, ¶ 27, 348 Wis. 2d 360, 842 N.W.2d 240 (internal quotations omitted).  *See In re Chayka's Estate*, 47 Wis. 2d 102, 107 n. 7, 176 N.W.2d 561 (1970) ("Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties." (internal quotes omitted)).  This duty is essentially one of "cooperation on the part of both parties," and arises whenever the cooperation of one party is required for the performance of the other. *Ekstrom v. State*, 45 Wis. 2d 218, 222, 172 N.W.2d 660 (1969).  There is likewise an implied promise on the part of each party not to take action intentionally and purposefully that will prevent the other party from carrying out his side of the agreement or from obtaining the benefits of the contract.  *Id.*

A party breaches the duty of good faith and fair dealing when its actions have the effect of "injuring or destroying" the ability of the other party to receive the benefits of the contract.  Wis. JI-Civil 3044; *Ikaria, Inc. v. Montgomery*, 2016 WI App 34, ¶ 24, 369 Wis. 2d

12

72, 879 N.W.2d 809.  Actions that amount to a breach of the duty of good faith and fair dealing may include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Beidel v. Sideline Software, Inc.*, 2012 WI App 36, ¶ 15, 340 Wis. 2d 433, 811 N.W.2d 856 (emphasis in original) (quoting in block from Restatement (Second) of Contracts § 205 cmt. d (1981)).

The first step in evaluating whether there has been a breach of the duty of good faith and fair dealing is to determine the reasonable contractual expectations of the parties, including the primary purpose of the agreement.  Wis. JI-Civil 3044.  It is important to hold parties to their implied duty of good faith and fair dealing, but courts must avoid adding obligations and conditions to contracts that go beyond the agreement reached by the parties.  In other words, the implied duty of good faith is "not a license to rewrite a contract." *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 6255689, at *17 (E.D. Wis. Dec. 4, 2013).  After determining the parties' reasonable contractual expectations, the second step is determining whether one party has acted, or failed to act, in a way that has resulted in the other party being "actually denied the benefit of the bargain originally intended by the parties." *Zenith Ins. Co. v. Employers Ins. of Wausau*, 141 F.3d 300, 308 (7th Cir. 1998) (applying Wisconsin law).  The plaintiff has the burden of proving a breach of good faith and fair dealing.  *Id.*  Under this evaluation process, the court again finds, as it did at trial, that Betco has failed to meet its burden of proof.

13

A.     **Contractual Source of Peacock's Duty of Good Faith.**

Before the court can evaluate whether Peacock breached the parties' reasonable contractual expectations, there is a threshold question of which contract and contract terms are implicated by Betco's claim.  Throughout this case, Betco presented its contract claims -- including its claims arising under the covenant of good faith and fair dealing -- as arising from the Asset Purchase Agreement.  For example, Betco argued at summary judgment that the APA required Peacock to disclose any problems with the Bio-Systems' processing plant. (*See* Betco's SJ brief, dkt. #102 at 15-16.)

At trial, Betco continued to maintain that the source of the duty of good faith and fair dealing arose out of the APA itself.   (Trial Tr., dkt. #204, at 5.)   Betco's counsel hedged, however, suggesting that Peacock's duty may also have arisen out of his employment contract with Betco, which was attached as an exhibit to the APA.   Counsel seemed to suggest that because of his employment, Peacock's duty to Betco may be a *higher* duty than would normally attach to an implied duty of good faith -- perhaps approaching a duty of loyalty or a fiduciary duty.  (*Id.* at 20-25.)

Certainly, it is well-established under Wisconsin law that a corporate officer, director or someone with general policy and management authority is under a fiduciary duty of loyalty in the conduct of corporate business.  *See Liturgical Publications, Inc. v. Karides*, 2006 WI App 101, ¶¶ 7-9, 293 Wis. 2d 361, 715 N.W.2d 240 (corporate officers, directors and employees with policy-making authority have fiduciary duty of loyalty, good faith and fair dealing in conducting corporate business).   But this case has never included a claim that Peacock breached a fiduciary duty or duty of loyalty that arose out of his position as "president" of Bio-Systems.  Prior to trial, Betco never pursued such a claim and, even at

14

trial, Betco never expressly argued that Peacock had breached a *fiduciary* duty.   Instead, Betco consistently relied on Peacock's duties under the APA.   Moreover, Betco has never cited any legal authority for the proposition that, because of his amorphous, actual position as "president" or "manager" of the plant, with a focus on sales, Peacock should be held to a standard higher than the general duty of good faith and fair dealing that exists in every contract under Wisconsin law.

Accordingly, the court will evaluate Betco's claim under the general standard applicable to breach of good faith claims that apply to Peacock's obligations under the APA. For reasons explained below, however, the court also finds no breach of good faith or loyalty arising under his employment agreement.[5]

### B.   Whether Peacock Breached Betco's Reasonable Contractual Expectations.

Although Peacock's employment contract is not the basis for Betco's claim against him, Peacock's unique placement at the plant and the actions he took while employed as the titular "President" of Bio-Systems after the asset sale certainly inform the analysis of whether he breached his duty of good faith and fair dealing.   *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 766 (7th Cir. 2010) ("The obligations of the parties to perform the terms of a contract must be evaluated in the context of the totality of the business arrangement contemplated by the contract.").   Under the terms of the APA, Betco had one year to determine and raise problems with the plant and two years to withhold some or all of the $500,000 in escrow to address those problems.   Under these terms, it was certainly

---

[5]   Betco offered no credible evidence as to what the employments agreement meant for Peacock to serve as "President" of the newly-formed company "Bio-Systems of Ohio, LLC," since that is to be "determined by the Company's Management Team" (*i.e.*, Betco).

reasonable for the Betco to expect that Peacock would not *affirmatively* prevent Betco from discovering problems with Bio-Systems' manufacturing process or any other deficiencies with the plant's operations. The more difficult question, however, is whether Betco had a reasonable expectation, based on the APA and Peacock's contemplated continuing two-year employment with whatever responsibilities Betco assigned him, that Peacock had a duty to come forward and disclose all of the problems with Bio-Systems not previously disclosed before the sale, including: deficient boilers; products not manufactured to specification; flawed production and testing procedures; and generally unsupported certificates of analyses.

The court concludes that Betco did *not* have reasonable contractual expectations that Peacock would affirmatively disclose these problems for two reasons. *First*, the evidence presented at trial established that Betco's president, Paul Betz, instructed Peacock to continue to run Bio-System as he had previously, with a focus on growing sales and profits. The evidence further established that Peacock did just that. Indeed, Peacock expressly told all of his employees that there would be little change in operations after the sale and that business would continue as usual. Moreover, in light of the fact that his methods had yielded the profitable enterprise Betco had just purchased, Peacock reasonably believed he was performing his role just as Betz and Betco requested.

*Second*, the evidence at trial established that most of the problems identified some four years after the sale in its complaint in this lawsuit were *obvious* upon a physical examination of the plant itself. Loverich, Seeger and Reich all testified that numerous problems with the plant were immediately obvious upon inspection. Furthermore, by March of 2011, Betco had the benefit of a detailed memorandum setting forth most of

16

these same problems, even assuming it had not yet had reason or opportunity to discover them independently.

For purposes of the duty of good faith and fair dealing, Betco's reasonable contractual expectations did *not* include Peacock further calling attention to problems that were already obvious and could have been addressed by Betco before the sale or at least before all of their remedies expired under the terms of the APA.  *See* Wis. JI-Civil 3044 ("It is not a breach of the duty of good faith if a course of action available to plaintiff could have avoided the harm and this course was not followed."); *see also Schaller v. Marine Nat'l Bank*, 131 Wis. 2d 389, 403, 388 N.W.2d 645 (Ct. App. 1986) ("SPA was not at the bank's mercy. All SPA needed to do to avoid possible loss resulting from returned checks was to monitor the status of its own account.").  This is particularly true given that no one on Betco's management team even asked Peacock to make a candid assessment of the plant's operations after the sale; nor does anyone claim that Peacock ever lied to them after the sale.

There were two, non-obvious problems with the Beloit plant that gave the court pause:  (1) product being shipped to customers without adequate testing; and (2) product being shipped to customers accompanied by unsupported certificates of analysis.  Betco certainly could have taken action to discover these problems, by asking for a detailed explanation before or after the sale about how quality testing was conducted and who was responsible for creating the certificates of analysis.  Moreover, contrary to the picture painted by Betco, the evidence presented at trial showed that Betco had ready access to the Bio-Systems' personnel responsible for testing and for creating the certificates of analysis,

and yet no one at Betco ever asked anyone about either of these practices, including Peacock.

That being said, the evidence showed that these problems were not necessarily obvious to Betco.  On the other hand, Peacock knew, or as the nominal president and ongoing manager of the Beloit plant should have known, that these practices were taking place both before and after Betco purchased Bio-Systems.  Nevertheless, the court finds that Betco did not have any reasonable contractual expectation that Peacock would affirmatively disclose or attempt to correct these ongoing problems.  As I previously found, Peacock was expressly directed to continue running the Beloit plant as he had always done, which is exactly what he did.  Moreover, everyone involved in the specification and certification process continued "business as usual" per Peacock's general instruction, which was no more or less than what he was told to do by Betco's president.  *Cf., Didion Milling, Inc. v. Agro Distribution, LLC*, No. 05-C-227, 2007 WL 702808, at *14 (E.D. Wis. Mar. 2, 2007) (dismissing bad faith claim where intent of contract was increased profitability and facts showed that the defendant had taken efforts to increase profitability).  Thus, Peacock performed in line with Betco's reasonable contractual expectations, whether under the APA or the terms of his employment contract.

Further, despite Betco's suggestion to the contrary, the duty of good faith "is not a duty of candor."  *Market Street Assocs. Ltd. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) (applying Wisconsin law).  Good faith is simply a mutual duty of cooperativeness that prohibits a party from taking "opportunistic advantage in a way that could not have been contemplated at the time of drafting."  *Id.* at 595.  Although Peacock may have had a duty not to conceal problems, Peacock was not obligated to report every potential or actual

18

problem at the plant.  Here, Betco offered no credible evidence that Peacock did *anything* to mislead Betco with respect to either testing or certificates of analysis.  As discussed, Betco can point to no instance post-sale when Peacock was even asked about, much less misrepresented, the accuracy of product specifications or certificates of analysis.  Moreover, despite no longer working for him, and in most cases now working for plaintiff, all of the employees involved with certificates of analysis and testing testified that Peacock at no time told them to hide or refuse to discuss their practices with anyone at Betco.[6]  It is true that Peacock made no effort to point out or address these problems, but it is fairly clear he did not even view them as such, particularly given the long-term satisfaction of his customers with the products as sold.[7]

---

[6] The lone exception was the Beloit plant's production manager, Derek Loverich, who testified that Peacock generally discouraged him from speaking with Betco personnel during their visits, and actually interrupted an impromptu meeting Loverich and Seeger were having with a senior Betco official.  However, it was clear that Peacock did not think much of Loverich's opinions even before the sale, so much so that Loverich stopped pointing out problems to him, because he knew Peacock would just shut him down.  Moreover, Peacock testified credibly that he interrupted the specific meeting Loverich mentioned because the Betco official was interested in sales matters, about which neither Loverich nor Seeger knew anything.  Finally, whether discouraged or not, Loverich actually provided Betco with both verbal *and* written reports of what he perceived to be the problems with the plant.

[7] Whether motive or intent are relevant to a claim for breach of the duty of good faith depends on the circumstances.  Wisconsin's jury instruction for the duty of good faith state that "[g]enerally, scienter is not an element in a contract action," and that "[f]ailure to perform a contract need not be willful or negligent to constitute a breach."  Wis. JI-Civil 3044.  On the other hand, there are numerous cases suggesting that motive and intent may indeed be relevant to a claim for breach of the good faith.  See, e.g., *Mkt. St. Associates*, 941 F.2d at 596 (finding intent to be the *dispositive* question on breach of good faith claim); *Greer Properties, Inc. v. LaSalle National Bank*, 874 F.2d 457, 461 (7th Cir.1989) (summary judgment inappropriate on good faith claim where material issues of fact exist regarding motive); *N. Crossarm Co. v. Chem. Specialties, Inc.*, 318 F. Supp. 2d 752, 765 (W.D. Wis. 2004) (same).  The court need not resolve this issue, however, because Betco failed to present evidence that Peacock breached his duties of good faith under the contract, regardless his motivations.

In short, there was no credible evidence that Peacock's failure to disclose or correct the problems of which Betco now complains contravened the "intention and spirit" of the contract or the parties' expectations.  Nor that he acted to exploit a loophole in the APA to take advantage of Betco.  *See, e.g.*, *Chayka v. Santini*, 176 N.W.2d 561, 564, 47 Wis. 2d 102 (1970).  And certainly there was no evidence that Peacock engaged in conduct so arbitrary or unreasonable as to "strip nearly all the flesh from the bones" of the APA or his employment agreement.  *Id.*  In particular, he did not "destroy . . . the right of the other party to receive the fruits of the contract."  *Osowski v. Howard*, 2011 WI App 155, ¶ 17, 337 Wis. 2d 736, 807 N.W.2d 33.  Far from it, Betco got the assets of a successful business, including its goodwill and profits.  Accordingly, Betco failed to prove that Peacock violated the duty of good faith and fair dealing.

### C.    Betco's Failure to Prove Injury.

Even if the court had agreed with Betco that it was reasonable to expect Peacock to volunteer information after the asset purchse about deficiencies at the Beloit plant -- and about the certificates of analysis and product testing in particular -- Betco failed to prove at trial that any action by Peacock "ha[d] the effect of injuring or destroying" its rights under the APA.  Wis. JI-Civil 3044.  As stated above, to succeed on a claim for breach of the duty of good faith, Betco must prove that Peacock "actually denied the benefit of the bargain originally intended by the parties."  *Zenith Insurance*, 141 F.3d at 308 (citing *Foseid*, 541 N.W.2d at 212–13); *Schaller*, 131 Wis. 2d at 388)).  This means that Betco must show that Peacock's actions actually prejudiced it in some way.  *See Zenith*, 141 F.3d at 300.

Essentially, Betco's claim of injury is premised on the assumption that, had it known of the problems with the plant earlier, it would have timely sued for breach of Section 4.19 of the APA.  That section contains a general product warranty that contemplates the sellers -- including Peacock personally -- will be responsible for damages incurred as a result of the products' failure to conform to contractual commitments, as well as express and implied warranties.  Betco also argued that it would have been able to withhold the money that it retained in escrow to compensate it for injury caused by Peacock's failure to disclose problems at the plant.

Betco's theory fails for multiple reasons.  *First,* Section 4.19 of the APA protects Betco from liability connected to *past* sales.  The damages Betco *actually* claims, which essentially amounts to a theoretical renegotiation of the purchase price for Bio-Systems, would not have been available for a breach of Section 4.19 alone.  At most, Betco would have been able to recover for injuries resulting from an ongoing failure to fill out certificates of analysis properly and adhere to product specifications.  After the close of liability evidence, however, the record revealed no such injuries.

On the contrary, it was not apparent that *any* customers had complained post-sale about the quality of the product they received, and certainly not any more than had complained before the purchase.  Nor was there evidence that any customers:  challenged Bio-Systems' practices; complained of falsified or inaccurate certificates of analysis; complained about product testing; or raised any issue regarding inaccurate product specifications.[8]  Because Betco failed to produce any evidence of injury or prejudice as a

---

[8] Before ruling, the court offered Betco the opportunity to place into the record any evidence it had with respect to injury suffered as a direct result of the sale of product with inaccurate certificates of

result of Peacock's actions, any order of damages to Betco would essentially be a windfall. *See Handicapped Children's Bd. v. Lukaszewski*, 112 Wis.2d 197, 207 n. 2, 332 N.W.2d 774 (1983) (Under Wisconsin law, "an injured party is not entitled to be placed in a better position because of a breach of contract.").

Even if the court could award damages beyond those directly flowing from defects in the products as sold, it would not have done so.  Betco got what it paid for:  a business producing, manufacturing and selling a successful line of products to the satisfaction of its customer base.  *See Dennehy v. Cousins Subs Sys., Inc.*, No. CIV. 02-1772 (RHK/JSM, 2003 WL 1955168, at *4 (D. Minn. Apr. 21, 2003) (applying Wisconsin law) (dismissing claim for the breach of the duty of good faith where the plaintiff "received exactly what they bargained for").   To the extent that Betco eventually chose to make significant improvements in manufacturing processes to insure more consistency in product quality, the need for those improvements either:  (1) were obvious before purchase and certainly *after* any reasonable due diligence; or (2) were incurred to improve the plant generally, not to address any concrete injury that Betco had suffered as a result of Peacock's actions.

In sum, Betco was not denied any justified expectation.  *Horicon Foods, Inc. v. Gehl Foods, LLC*, No. 15-C-0689, 2016 WL 4926189, at *8 (E.D. Wis. Sept. 15, 2016) (dismissing claim for breach of implied covenant of good faith in part because plaintiff had not shown that any alleged breach caused harm); *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 6255689, at *18 (E.D. Wis. Dec. 4, 2013) (dismissing claim for breach of implied duty of good faith and fair dealing for plaintiff's failure to show that it suffered any injury as a result of the defendant's challenged behavior).  Therefore, Peacock

---

analysis.  Betco indicated it was not prepared to present such evidence.

is entitled to judgment in his favor on Betco's claim that Peacock breached his duty of good faith and fair dealing.

## II.   Betco's Motion for Reconsideration/To Alter or Amend Judgment and for Attorney Fees.

Shortly after trial, Betco filed a motion seeking reconsideration (dkt. #195) of the court's preliminary, oral ruling at the end of trial.  Betco argues that the court's preliminary ruling against Betco was based on the mistaken belief that Betco had to prove *damages* to prevail on its breach of good faith claim.  At minimum, Betco argues that it is entitled to nominal damages as a result of Peacock's breach of contract.  Betco has also moved for attorney fees (dkt. #196) as the so-called prevailing party in this action.

There is no merit to any of these arguments.  As an initial matter, Betco is mistaken that this court's oral ruling in favor of Peacock -- as is explained more fully in this opinion -- is based on the conclusion that Betco failed to prove *damages*.  Rather, this court ruled that Betco had failed to prove that Peacock's alleged wrongful actions or inactions *caused Betco to suffer any injury at all*, which was an essential element of Betco's breach of good faith claim. (Trial Tr., June 17, 2015, at 3); *see also* Wis. JI-Civil 3044 ("This duty of good faith means that each party of a contract will not do something which will have the effect of injuring or destroying the rights/ability of the other party to receive the benefits of the contract.") Specifically, Betco did not prove that Peacock's failure to disclose deficiencies in its testing of products or preparation of certificates of analyses had the effect of "injuring or destroying" Betco's rights or ability to receive the benefits of the APA.

The single case cited by Betco is inapposite.  In *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363 (7th Cir. 1990), the court of appeals found that the trial

court erroneously dismissed a breach of contract claim for lack of evidence from which the jury could have calculated damages. The plaintiff in *Olympia Hotels* had, however, already proven that (1) the defendant violated a contractual term *and* (2) the plaintiff had been injured as a result. *Id.* at 1372. In this case, by contrast, the court never reached the issue of damages because Betco failed to prove *liability* -- Betco simply had no evidence that Peacock failed to meet reasonable contractual expectations in a way that caused Betco to suffer any injury. Accordingly, Betco's motion for reconsideration will be denied.

For much the same reason, Betco's motion for attorneys' fees will also be denied. In its motion, Betco argues that fees should either be awarded to Betco, or to no one, under Section 10.05(e) of the APA, which provides as follows:

> (e)     After the Closing, the rights set forth in this Article X shall be each party's sole and exclusive remedies against the other parties hereto for misrepresentation or breaches of covenants contained in this Agreement and Related Documents. Notwithstanding the foregoing, nothing herein shall prevent any Indemnified Party from bringing an action based upon allegations of fraud or other intentional breach of an obligation of or with respect to any party in connection with this Agreement and the Related Documents. In the event such action is brought, the prevailing party's attorney's fees and costs shall be paid by the nonprevailing party.

Nothing in the language of Section 10.05(e) above would even arguably entitle Betco to attorneys' fees because it did not prevail on any of its claims. In contrast, defendants prevailed on every claim that Betco asserted in this case. Indeed, the majority of Betco's claims were rejected at summary judgment, and Betco's final contract claim was rejected at trial for reasons set forth at the time and as further explained in this opinion. Betco's alternative argument that the court should consider the stipulated dismissal of related claims between the parties in *another* action -- Case No. 12-cv-367 -- in determining who is

the prevailing party in this action is also without legal support.  Since Betco has in no sense of the word "prevailed" here, it is not entitled to any attorney fees.

## III.  Defendants' Motion for Attorney Fees and Outstanding Motion for Sanctions.

Defendants have themselves moved for $757,752.65 in attorneys' fees on the ground that they prevailed on all claims in this action.  For the reasons just discussed, that motion will be granted.  Defendants supported their motion with underlying invoices and payments, as well as declarations from Peacock and counsel.  Plaintiff did not object to any of defendants' evidence in support of attorneys' fees, likely because its own fees were comparable to or exceeded those of the defendants.  Instead, plaintiff objected only to the legal basis for the award of fees, which its own briefing of the meaning of Section 10.05(e) of the APA wholly undermines, at least in light of the court's ruling as to which party prevailed in this lawsuit.  Because plaintiff's objections lack merit, defendants' fee requests will be granted.

There is one final motion that remains outstanding in this case.  Shortly before trial, defendants moved for discovery sanctions against plaintiff for its failure to disclose certain evidence until shortly before trial.  (Dkt. #161.)  In light of the outcome of the trial, including a lack of any meaningful prejudice, especially after defendants' award of its actual fees, that motion will be denied as moot.

ORDER

IT IS ORDERED that:

1.    Plaintiff's motion for reconsideration/to alter or amend judgment (dkt. #195) and for attorneys' fees (dkt. #196) are DENIED.

25

2.     Defendants' motion for attorneys' fees (dkt. #192) is GRANTED.   Plaintiff must pay defendants $757,752.65 in attorneys' fees.

3.     Defendants' motion for sanctions (dkt. #161) is DENIED as moot.

4.     The clerk of court shall enter final judgment in favor of defendants and against plaintiff.

Entered this 23rd day of December, 2016.

                                        BY THE COURT:

                                        /s/
                                        _____

                                        WILLIAM M. CONLEY
                                        District Judge